UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**08 CV 02232**

----------------------------------------------------------X

VOTORANTIM CIMENTOS LTDA,

                    Petitioner,

            08 CV

**PETITION TO CONFIRM
FINAL ARBITRATION
AWARD**



OXBOW CARBON AND MINERALS LLC,
SUCCESSOR IN INTEREST BY MERGER TO
APPLIED INDUSTRIAL MATERIALS
CORPORATION,

                    Respondent.

----------------------------------------------------------X

       Petitioner, VOTORANTIM CIMENTOS LTDA, (hereinafter "VOTORANTIM"),

by its Attorneys, Chalos, O'Connor & Duffy, LLP, alleges upon information and belief as

follows:

THE PARTIES

      1.     Petitioner, VOTORANTIM, is a foreign business entity organized and

existing under the laws of a foreign country, with an office and principle place of

business at Rua Amauri 255 10 Andar, 01498-900 Sau Paulo, SP Brazil.

      2.     Respondent, OXBOW CARBON AND MINERALS LLC, successor in

interest by merger to APPLIED INDUSTRIAL MATERIALS CORPORATION,

(hereinafter "AIMCOR"), is a limited liability company organized and existing under and

by virtue of the laws of the state of Delaware with an office and principal place of

business at 850 Canal Street, Stamford, Connecticut 06902 and 1601 Forum Place, Suite

1400, West Palm Beach, Florida 33401.

JURISDICTION

3.    This Court has subject matter jurisdiction by virtue of the Federal Arbitration Act, 9 U.S.C. §§1, *et seq.*, particularly, 9 U.S.C. § 9 and 9 U.S.C. § 207.

4.    Venue of this petition is proper in the United States District Court for the Southern District of New York by virtue of 9 U.S.C. §9 and §207, as well as 28 U.S.C. §1391, as the underlying arbitration proceedings were conducted in New York.

FACTS

5.    Over the course of June 30, 2004 to November 10, 2005, six (6) arbitration hearings were conducted to determine issues of liability.

6.    On June 28, 2006, the Panel issued a partial final award, concerning all contested liability issues.  (*See* Partial Final Award, attached hereto as Exhibit "A").

7.    On September 27, 2006, AIMCOR filed a Petition to Vacate Arbitration Award in the United States District Court for the Southern District of New York, which was indexed by the Clerk of the Court as 06 CV 7763 (LBS) and assigned to the Honorable Leonard B. Sand.

8.    On October 26, 2006, VOTORANTIM filed a Motion to Dismiss the Petition to Vacate the Arbitration Award (06 CV 7763 – Docket Entry #4).

9.    On January 17, 2007, Judge Sand issued a Memorandum and Order (06 CV 7763 - Docket Entry #18), denying AIMCOR's Petition to Vacate the Arbitration Award and granting VOTORANTIM's Motion to Dismiss.

10.    A Judgment in favor of VOTORANTIM was entered by the Clerk of the Court on January 19, 2007 (06 CV 7763 - Docket Entry #19).

11.    Thereafter, five (5) hearings concerning "damages" were conducted before the arbitration panel between April 10, 2007 and July 17, 2007, during which one (1) witness and one (1) expert testified on behalf of AIMCOR, and one (1) witness testified on behalf of VOTORANTIM.

12.    On November 20, 2007, the Panel Chairman, acting on behalf of the Panel, sent counsel for both parties an email formally declaring the proceedings closed.

13.    On February 29, 2008, the Panel, by unanimous decision, rendered a Final Award. (See Final Award, attached hereto as Exhibit "B").

14.    In summary, the Panel directed AIMCOR to pay the net amount of US$4,530,735.01 ($4,919,518.88 – $388,783.87) to VOTORANTIM.

15.    The Final Award was served upon counsel for both VOTORANTIM and AIMCOR by the Panel. Specifically, a copy of the Panel's Final Award was sent to counsel for AIMCOR by the Panel both by Federal Express (Fedex) and email on February 29, 2008.

16.    The total sum due and owing Petitioner, VOTORANTIM, by Respondent, AIMCOR, as per the Final Award, is US$4,530,735.01, exclusive of costs and expenses incurred in connection with the instant proceeding.

17.    Although duly demanded, Respondent has failed to abide by the Final Award, and the Final Award remains unsatisfied.

WHEREFORE, Petitioner, VOTORANTIM, respectfully requests this Honorable Court, pursuant to 9 U.S.C. § 9 and 9 U.S.C. § 207, to enter an Order confirming the Arbitration Award dated February 29, 2008, and to direct the Clerk to enter judgment on

3

that Order and to order Respondent, AIMCOR, to pay the costs and reasonable attorney's

fees associated with this Petition, all together with both pre- and post-judgment interest.

Dated: Port Washington, New York
       March 6, 2008

                                        Respectfully submitted,

                                        CHALOS, O'CONNOR & DUFFY, LLP
                                        Attorneys for Petitioner
                                        VOTORANTIM CIMENTOS LTDA


              By:         _____
                                        George M. Chalos, Esq. (GC-8693)
                                        366 Main Street
                                        Port Washington, New York 11050
                                        Phone: (516) 767-3600
                                        Fax: (516) 767-3605
                                        Email: gmc@codus-law.com

# EXHIBIT "A"

-------------------------------------------------------X

*In the Matter of the Arbitration between*

**APPLIED INDUSTRIAL MATERIALS
CORPORATION,**

**CLAIMANT**                    **PARTIAL FINAL AWARD**

-  **AND** –

**VOTORANTIM CIMENTOS LTDA.,**

**RESPONDENT**
-------------------------------------------------------X

Before:        Walter R. Muff
               John F. Ring, Jr.
               Peter J. Zambito, Esq., Chairman

Representations:
For Applied Industrial Materials Corporation
Law Offices of Anthony J. Mavronicolas
By Anthony J. Mavronicolas, Esq.

For Votorantim Cimentos Ltda.
Fowler, Rodriguez & Chalos, LLP
By George M. Chalos, Esq.
    LeRoy S. Corsa, Esq.

## Introduction

The disputes which are the subject of this arbitration arose out of a Petroleum Coke Sale

Agreement (hereinafter the "Contract") entered into on October 24, 2000 between

Applied Industrial Materials Corporation (hereinafter "AIMCOR" or ""SELLER) and

Votorantim Cimentos Ltda. (hereinafter "VOTORANTIM" or "BUYER").

## Background

The terms of the Agreement provided for AIMCOR to supply and VOTORANTIM to lift

a quantity of 300,000 MT +/- 10% in each calendar year from January 1, 2001 until

December 31, 2003, FOB vessel Port Arthur, Texas, in accordance with delivery schedules presented by Buyer to Seller.

The clauses of the Contract pertinent to this dispute appear in Appendix A to this Partial Final Award.

Some differences arose between the parties during the 2001 delivery period, but these were resolved prior to this arbitration. It is the second and third year, i.e., 2002 and 2003, which that are the subject of this arbitration.

**Proceedings**

The Agreement between the parties provided for arbitration in New York before the American Arbitration Association, but the parties mutually agreed to proceed before two (2) members of the Society of Maritime Arbitrators, Inc. (hereinafter "SMA") and an admiralty attorney as chairman pursuant to the SMA Rules, with minor exceptions. AIMCOR initiated this arbitration against VOTORANTIM by giving Notice of Demand for Arbitration to VOTORANTIM on October 4, 2002, seeking damages in the amount of $1,306,641, plus interest, costs and attorneys' fees as a result of VOTORANTIM's alleged wrongful refusal to accept shipments under the Contract during calendar year 2002. AIMCOR also seeks additional damages as a direct result of VOTORANTIM's alleged wrongful refusal to accept the aforesaid shipments, which have caused Premcor Refining Group, Inc. (hereinafter "PREMCOR"), as supplier of the petcoke to AIMCOR, to initiate legal proceedings in Texas against AIMCOR. AIMCOR seeks indemnity and contribution from Votorantim.

VOTORANTIM served a Statement of Defense and Counter-Claim on November 22, 2002.

Thus, Walter R. Muff was appointed by AIMCOR and John F. Ring, Jr. by VOTORANTIM. Peter J. Zambito, Esq. was appointed as third arbitrator and chairman by counsel. The Panel made written disclosures and was accepted by the parties and their counsel.

Thereafter, in his Preliminary Memorandum, counsel for AIMCOR demanded damages of $1.3 million, plus interest from 2002, lost commissions of approximately $800,000, together with full indemnity, attorney fees and costs for any and all damages claimed by PREMCOR against AIMCOR in the Texas Proceedings.

Counsel for VOTORANTIM, in their Preliminary Memorandum, denied any liability whatsoever and included a counterclaim for damages suffered for alleged failure by AIMCOR to perform during the second half of 2002 and all of 2003.

During the proceedings, counsel and the Panel agreed to proceed solely on the issue of liability, with subsequent hearings on the issue of damages to be held, if necessary, after an Award as to liability was issued.

Five (5) hearings were held before the Panel, specifically on June 30, 2004 and on January 19, July 19 and on August 30 and 31, 2005, at which two (2) witnesses on behalf of AIMCOR and one (1) witness on behalf of VOTORANTIM testified. A further witness on behalf of VOTORANTIM was deposed on November 10, 2005, and the transcript of this testimony was furnished to the Panel.

Extensive exhibits were offered on behalf of both parties and were accepted by the Panel. The proceedings were closed early this year, and the parties submitted Main and Reply Post Hearing Briefs dated March 3 and 13, 2006 respectively.

3

**Facts**

Subsequent to the October 24, 2000 Contract entered into between AIMCOR and VOTORANTIM, AIMCOR entered into a Supply Agreement with PREMCOR on December 1, 2000 which, where pertinent, provided as follows:

> Clause 1....(AIMCOR) to purchase green petcoke, fuel grade, ...destined for fuel use to "Votorantim", a Brazilian Cement Manufacturer

> Clause 2....The term of the Contract shall commence on January 1, 2001 and terminate on December 31, 2003.

> Clause 3....Buyer will purchase from Seller approximately 300,000 Metric Tons a year of Petroleum Coke delivered reasonably ratably during a year. .....

This Supply Agreement incorporated PREMCOR's Terms and Conditions, inclusive of a Force Majeure provision. It also provided that "Under no circumstances shall Buyer and Seller be deemed to have an agency, joint venture or partnership relationship."

Previously, on September 13, 1999, AIMCOR had entered into a separate and distinct petcoke sales contract with VOTORANTIM to annually sell 200,000 MT, +/- 10% in VOTORANTIM'S option, green delayed petcoke. The term was January 1, 2000 to and including December 31, 2002. The petcoke was destined for Brazil and was to be produced by Shell Deer Park Refinery in Texas. VOTORANTIM had the option for an additional 100,000 MT, +/- 10%, final quantity to be mutually agreed. As it developed, the price of petcoke under this Agreement was cheaper than under the Contract which is the focus of this arbitration.

None of the aforesaid contracts were back-to-back where pertinent to the disputes in this Arbitration.

4

Early on, the grade of AIMCOR petcoke supplied by PREMCOR and provided to VOTORANTIM under its Contract of October 24, 2000 with AIMCOR did not conform to the Contract specifications, but this issue was resolved amicably and does not appear to be a concern in the issues that are the subject of this arbitration.

According to the testimony of Mr. Julio Caesar Rocha, a witness on behalf of VOTORANTIM, Clause 2 (Quantity) of the October 24, 2000 Contract was drafted jointly between him and Mr. Frank Swertz of AIMCOR (now retired). The negotiations regarding Clause 2 included quantity and provisions for a reduction of tonnage. Swertz memorialized these discussions in writing and sent them to Rocha, who approved the text.

Mr. João Brenha also testified on behalf of VOTORANTIM. Although not involved in the initial contract negotiations with AIMCOR, he became VOTORANTIM's supply manager in September 2002, responsible for managing the Contract.

On October 3, 2001, Brenha wrote to Mr. Matthew Scott-Hansen of AIMCOR, the successor of Swertz, to inform him that due to "technical constraints" in some of the VOTORANTIM plants, it was VOTORANTIM's intention to reduce the number of shipments of AIMCOR petcoke supplied by PREMCOR for 2002 from six (6) to five (5) in accordance with the provisions of Clause 2.2 of the Contract.

On November 30, 2001, in a further email to Scott-Hansen, Brenha referred to VOTORANTIM's consumption needs and lack of energy in Brazil, which he stated created a problem with respect to 2002 shipments. Specifically, he stated:

> " ...There is no room in our next year's [2002] plants fuel
> Consumption matrix to hard and unstable petcoke <u>as</u>
> <u>Premcor's used to be</u>." (emphasis added)
> ...........

5

He referred to Clause 2.2 of the Contract as consistent with this problem and stated that, as a result, VOTORANTIM would not schedule AIMCOR petcoke supplied by PREMCOR for 2002.

In the same message, he stated that he would send VOTORANTIM'S proposition for 2002 Shell petcoke shipments.

The Brazilian Government issued a Decree, No. 4.261, dated June 6, 2002, which restricted the use of electrical power in Brazil.

During his testimony, Brenha referred to an energy crisis in Brazil in the second half of 2001 and first half of 2002. Scott-Hansen testified that he read in the petcoke reports that "there were electricity cutbacks in Brazil [in 2001] due to droughts and the fact that the hydroelectric dams, which produce 85 percent of Brazil's electricity, could not generate enough electricity for the entire country and there would be cutbacks to electricity production. However, no formal edicts by the Brazilian Government in the latter half of 2001 or first five (5) months of 2002 were ever produced, if in fact ever issued.

Scott-Hansen and Brenha cooperated in written efforts to have PREMCOR modify AIMCOR's contract with PREMCOR by reducing the quantity AIMCOR was required to buy from PREMCOR. PREMCOR refused the request and insisted that AIMCOR comply with the terms of the contract of December 1, 2000.

Despite the fact that PREMCOR was not a party to the October 24, 2000 contract between AIMCOR and VOTORANTIM, it participated extensively in meetings regarding petcoke, which involved AIMCOR, VOTORANTIM and PREMCOR. The reason for this participation was never fully explained. However, it should be noted that AIMCOR, with respect to the PREMCOR/AIMCOR supply contract, did not have the same right to reduce shipment quantities as Votorantim did with respect to the AIMCOR/Votorantim contract pursuant to Clause 2.2. thereof.

In a letter dated March 18, 2002, Votorantim formally invoked clauses 2.2 and 13 of the contract and requested a reduction in the contractual tonnage in all the deliveries scheduled for 2002.

AIMCOR responded on April 2, 2002, requesting performance by VOTORANTIM under the Contract for the year 2002, failing which AIMCOR would hold VOTORANTIM responsible for all losses and expenses incurred as a result of VOTORANTIM'S breach of Contract.

According to Rocha and Brenha, VOTORANTIM had thirteen (13) plants in Brazil and, sometime in 2000, got permits to import petcoke and use it in most of the plants (9 to 10).

Fines were levied on VOTORANTIM by the Brazilian Government, but none appear to have involved imports or technical or Government constraints. Some of the fines concerned the method of storage of petcoke.

According to Rocha and Brenha, VOTORANTIM took all Shell Deer Park petcoke in 2002 for which it had contracted with AIMCOR on September 19, 1999.

In 2001, VOTORANTIM consumed its highest quantity of petcoke (about 1.4 million MT). In 2002, VOTORANTIM planned to use 1.6 million MT of petcoke, but instead used only 1.25 million MT, its second highest annual consumption during the years 1997 to 2004.

While on November 30, 2001, VOTORANTIM stated that it would not schedule any PREMCOR petcoke for 2002, on January 24, 2002 VOTORANTIM stated that it "would consider the partial reduction if the other party were willing to help us bearing some part of the costs which should be achieved restructuring the price...."

According to David Nestler, a witness for AIMCOR, VOTORANTIM's January 24, 2002 message does not state that VOTORANTIM wanted to cancel the contract.

In a letter dated August 16, 2002, VOTORANTIM notified AIMCOR that the energy crisis in Brazil "no longer exists," and that it was in a position to resume regular shipments in September, October and December 2002 (presumably, a total of 150,000 MT, as each prior shipment was 50,000 MT). Nothing was produced on the record that AIMCOR responded to that letter.

AIMCOR did not provide any petcoke to VOTORANTIM during the months of September, October and December 2002.

No evidence as to 2003 shipments was presented, although 2003 shipments were alluded to in the Post Arbitration Briefs.

As mentioned in the PROCEEDINGS section of this Partial Final Award, on October 4, 2002, counsel for AIMCOR wrote VOTORANTIM demanding arbitration.

Suit by PREMCOR against AIMCOR was commenced in the District Court of Jefferson County, Texas, alleging a breach of the PREMCOR/AIMCOR contract dated December 1, 2000. The suit has been stayed pending the outcome of this arbitration.

**Arguments**

The following is a summary of the parties' contentions as presented during the hearings and in their Main and Reply Post Arbitration Briefs:

AIMCOR'S contentions:

It claims that the Agreement between the parties was breached by Votorantim because neither Clauses 2.2 nor 13 of the Agreement permitted Votorantim to reduce the contractual tonnage or to suspend deliveries respectively while an energy crisis existed in Brazil in the latter part of 2001 and first half of 2002.

VOTORANTIM's contentions:

It claims that the energy crisis in Brazil permitted it to reduce contractual tonnage pursuant to Clause 2.2 of the Agreement and to suspend deliveries pursuant to the Force Majeure Clause, No. 13, of the Agreement. Further, Votorantim contends that AIMCOR failed to resume shipments of petcoke, as per contract, once the energy crisis ended.

## DISCUSSION AND MAJORITY DECISION

The Panel has carefully reviewed and evaluated all the evidence presented. In so doing, the Panel agreed unanimously that a Force Majeure event did not occur. In such regard, the Panel noted that the quantity provided for in the Shell Deer Park petcoke contract was accepted in full by Votorantim in 2002, so that there was no suspension in toto of petcoke shipments in 2002. Further, it was agreed unanimously that AIMCOR was at all times acting as a principal, not as an agent or broker, in this transaction.

Thus, the focus turned to Clause 2.2 of the October 24, 2000 Contract between the parties to this arbitration, and the Panel unanimously agreed that if technical or governmental constraints existed in Brazil, Votorantim had the right to reduce the quantity of petcoke it contracted to receive.

The Panel also was of the unanimous opinion that an energy crisis existed in Brazil in the second half of 2001 and first half of 2002.

In the opinion of the Panel, the law of Missouri had no impact on the decision.

At this juncture, the members of the Panel differed on the effect of the energy crisis on Votorantim.

9

The majority finds that Votorantim failed to prove how the energy crisis affected Votorantim per se. Rather, it argued "generally" that the energy crisis prompted a reduction in the use of electricity necessary to grind the petcoke and produce cement, but failed to provide evidence of how, where (among its many plants throughout Brazil) and to what degree it affected them, i.e., what limitations were imposed on them.

Although a Decree was issued by the Brazil Government on June 6, 2002, considerably after the energy crisis began, insofar as Votorantim was concerned, proof of its impact on it was lacking.

Also, fines levied on Votorantim by the Brazilian Government related to the storage of petcoke and not to the use of electricity.

Other, provisional, measures were issued on May 15 and August 24, 2001 by the Government of Brazil, creating a Chamber for the Management of Electrical Power Crisis but it was not shown whether or how and to what extent these provisions had an impact upon Votorantim's use of electricity.

Joao Brenha was asked what stages of penalties would have been imposed if Votorantim had failed to comply with Government regulations. In part, he replied:

> "Well, actually, I am not very, let's say, comfortable in responding like that because I am not absolutely qualified to discuss what happened in terms of energy in Brazil and so forth." (emphasis added) (p. 1186, lines 14/22, hearing of August 30, 2005)

Brenha was also asked "did the amount of electricity available to your plants start to increase at some point in time," to which he replied: 

> "Sure, but I would not be able to say where and when."

Further, Brenha sent an email to Scott-Hansen of AIMCOR on January 24, 2002, stating in pertinent part:

> "2 ....There is no way for us to move to a partial reduction, as suggested in your draft letter, without supporting another costs increase. The point is we would consider the partial reduction if the other party were willing to help us bearing some part of the costs which should be achieved restructuring the price ..." (emphasis added) (Ex. 11)

The majority infers from this comment that the energy crisis may not have had an impact on Votorantim, sufficient to warrant a reduction of 150,000 MT during the first half of 2002, but rather that the refusal to accept shipments during that interval was based upon the cost of the PREMCOR petcoke.

Thus, for the foregoing reasons, primarily Votorantim's failure to provide what specific effect the energy crisis had on its ability to receive, store and grind PREMCOR petcoke, the majority finds that Votorantim breached the Contract during the first seven (7) months of 2002 by not scheduling and accepting 150,000 MT of PREMCOR petcoke.

The majority also finds that AIMCOR breached the Contract by not responding to Votorantim's letter of August 16, 2002, in which Votorantim notified AIMCOR that the energy crisis was over and that it was in a position to resume regular shipments in September, October and December 2002 (presumably, each shipment of 50,000 MT or a total of 150,000 MT), or in providing petcoke during those months.

It is to be noted that Nestler of AIMCOR testified that the actions of Votorantim did not amount to an abandonment of the Contract.

11

## PARTIAL FINAL AWARD

In summary, the Majority of arbitrators (Mr. John F. Ring, Jr. dissenting in part) finds that Votorantim breached the Contract dated October 24, 2000 by not scheduling and accepting (150,000 MT petcoke) during the first half of 2002 and is liable for the damages sustained by AIMCOR as a result.

The Majority also finds that once Votorantim informed AIMCOR on August 16, 2002 that it was prepared to schedule and accept shipments in September, October and December 2002, AIMCOR breached the Contract of October 24, 2000 by not providing petcoke for delivery to Votorantim and is liable for the damages sustained by Votorantim as a result.

Appendix B hereto details arbitrators' fees and costs and is an integral part of this Partial Final Award. Pursuant thereto, arbitrators' fees are to be shared equally by the parties, but each party is jointly and severally responsible for said fees in toto.

Each party is responsible for its own counsel's legal fees, and Court reporting costs are to be shared equally.

Annexed to this Partial Final Award and also made an integral part hereof is Appendix C, a Partial Dissent by Mr. John F. Ring, Jr.

The Panel remains constituted to hear and determine the damages which flowed from the foregoing breaches.

This Partial Final Award may be reduced to a judgment in any court of competent jurisdiction.

Dated: New York, New York
      June 28, 2006

_____
Walter R. Muff

_____
John F. Ring, Jr.   (Dissenting in part)

_____
Peter J. Zambito, Chairman

13

--------------------------------------------------------X

*In the Matter of the Arbitration between*

**APPLIED INDUSTRIAL MATERIALS
CORPORATION,**

**CLAIMANT**

                                                                          **APPENDIX A**


– **AND** –


**VOTORANTIM CIMENTOS LTDA.,**

**RESPONDENT**

--------------------------------------------------------X


PERTINENT CLAUSES OF OCTOBER 24, 2000
CONTRACT BETWEEN AIMCOR AND VOTORANTIM

## Clause 1 – Term of the Agreement

1.1. This agreement shall take effect as of January 1, 2001 and shall continue until

December 31, 2003, unless terminated prior to such date under other

provisions hereof. No suspension of an obligation under this contract by

reason of Force Majeure shall extend the term except upon mutual agreement

of Buyer and Seller.

## Clause 2 – Quantity

2.1 Seller shall supply and Buyer shall lift the quantity of 300,000 MT +/- 10%.

Buyer's Option, in each calendar year. The optional tonnage of +/- 10% is

understood as a balance quantity to satisfy shipment conditions.

2.2 If Buyer is not able for technical or government approval to use petroleum

coke in one or more cement plants. Buyer has right to reduce contractual

tonnage according to reduced demand of plants affected. Buyer will inform

the Seller in due time in such cases and provide sufficient evidence accordingly. In such cases Buyer and Seller will formulate a new delivery schedule in mutual cooperation.

Clause 3 – Quality and Petroleum Coke Source

• • • • • • •

3.2 The petroleum coke to be supplied shall be primarily produced at the PREMCOR refinery, Port Arthur, Texas, USA. However, it is at the Seller's option, with Buyer's approval, to use an alternate source of petroleum coke of the same quality listed on the ANNEX to this agreement for lifting at a different load port, provided notice is given within 30 (thirty) days prior to the first day of the vessel's laycan.

Clause 7 –Delivery

7.1 In ratable shipments during the term period per vessel as chartered by Buyer. A delivery schedule shall be presented by Buyer to Seller thirty (30) days prior to the beginning of each quarter. A delivery schedule shall be mutually agreed between Buyer and Seller and be revised and updated for each Quarter. The delivery schedule for the year 2001 is attached in Annex 2.

7.2 Buyer shall provide seller with regular, good faith estimates in writing of its inventory level for coke, and Seller shall accept and incorporate Buyer's reasonable requests regarding modification thereto with a view toward compliance with Term Supply. At least 30 (thirty) days prior to the beginning of each quarter, Buyer shall provide Seller with a schedule of coke lifting for the next three months. If Buyer fails to comply with such schedule for a

reason other than Force Majeure, Buyer shall be responsible for and shall pay any storage fees charged by the Vessel Loading Terminal as a result of noncompliance with such schedule.

## Clause 12 – Title and Risk of Loss

Title and risk of loss of coke that is sold via the Vessel Loading Terminal shall pass from Seller to Buyer as the coke is loaded onto Buyer's vessel at the Vessel Loading Terminal for Transportation to end user.

## Clause 13 – Force Majeure

13.1 Neither Buyer nor Seller shall be liable for loss or damage due to any delay or failure in the performance of its obligations hereunder because of: (1) the compliance with any order or control of any governmental authority or persons purporting to act thereof, or (2) when and so long as the operations contemplated hereunder are interrupted, prevented, or delayed because of acts of God; perils of navigation; war hostilities; public disorders; acts of enemies; strikes; lockouts; labor or employment difficulties; fires; explosions; partial or total failure of the usual means of transportation, unloading, loading, or storage; the failure or delay in delivery to the Refinery of components or feedstocks necessary for the manufacture or production of coke; or any cause beyond is reasonable control, whether or not similar or any of the foreign interfering with the production, supply, transportation, or storage of the coke. If there is any delay or failure in making or accepting deliveries of products hereunder for such cause or causes, Buyer or Seller, as the case may be, shall promptly notify the other of the estimated duration of the delay or failure. In

the event either party finds it necessary to avail itself of the foregoing Force Majeure provisions, this Agreement shall not be extended thereby, but the quantity set forth herein shall be ratably reduced for the period during which said Force Majeure may exist. The affected party shall use all the reasonable good faith diligence and efforts to remove or cure the Force Majeure as quickly as possible.

13.2 Any tonnage lost due to Force Majeure conditions only to be replaced subject to mutual agreement between Buyer and Seller.

## Clause 15 – Arbitration

15.1 This contract shall be governed by the laws of the State of Missouri, United States of America.

15.2 Both Buyer and Seller recognize that circumstances may arise which would not have been foreseen at the time this Agreement entered into force. Both parties agree that they will use their best efforts to solve any problems due to any such unforeseeable circumstances in the spirit of mutual understanding.

15.3 In the event of any dispute arising in connection with this contract, the parties hereby agree to submit such dispute to arbitration under the rules of the American Arbitration Association in New York, United States of America.

15.4 Should the dispute not be resolved at the primary arbitration venue as noted on clause 15.3, the parties hereby agree to submit such dispute to arbitration under the rules of the Paris International Chamber of Commerce.

Clause 17 – General Terms

* * * * * * *

17.5  In the event that either party shall fail to perform any of its obligations hereunder and shall fail to remedy such default within 30 (thirty) days after written notice thereof has been given by the nondefaulting party, the nondefaulting party may terminate this Agreement with no further obligation or liability, at its option, by giving written notice to the defaulting party.  Upon such termination, the nondefaulting party shall be entitled, in addition to, and not in lieu of such termination, any and all other legal or equitable remedies which may be available to it in connection with such default.  Each party shall be required to mitigate its damages in the event of the other party's breach.  It is understood and agreed that a failure by Buyer to take and pay for coke that has been agreed upon pursuant to and in accordance to this Agreement shall be a default of Buyer, unless excused hereunder.  Seller's liability to Buyer for damages should not relate to other third parties (beyond Buyer), such as from Buyer's customers.  Seller's liability of nonconforming coke shall not exceed fifty percent (50%) of the F.O.B. vessel price per ton.

---------------------------------------------------X

*In the Matter of the Arbitration between*

**APPLIED INDUSTRIAL MATERIALS
CORPORATION,**

**CLAIMANT**

**APPENDIX B**

**AND –**

**VOTORANTIM CIMENTOS LTDA.,**

**RESPONDENT**

---------------------------------------------------X

The Arbitrators' fees in this matter are to be shared equally between the claimant and the Respondent in the total amount of $151,798.00.

The fees are payable as follows:

|  | Total to Date | Less previously disbursed | Due Now |
|---|---|---|---|
| Peter J. Zambito, Esq. | $52,458.00 | $13,333.00 | $39,125.00 |
| Walter R. Muff | $47,195.00 | $13,333.00 | $33,862.00 |
| John F. Ring, Jr. | $52,145.00 | $13,333.00 | $38,812.00 |

These fees are payable from the escrow account established, with equal deposits made by Claimant and Respondent, for this purpose with the Society of Maritime Arbitrators, Inc. (SMA).

The Panel's fees are to be paid from this SMA escrow account within ten (10) days of the date of issuance of this Award, with any excess balance returned simultaneously to Claimant and Respondent, as respectively due to them.

Arbitrator Walter R. Muff's travel expenses are the sole responsibility of AIMCOR.

Dated: New York, New York
June 28, 2006

APPENDIX C

```
*****************************************************
          In the Matter of the Arbitration            *
                                                       *
                      between                           *
                                                       *
APPLIED INDUSTRIAL MATERIALS, CORPORATION              *
        AS  CLAIMANT  AND  SELLER                      *      PARTIAL
                                                       *
                       and                             *      DISSENT
                                                       *
       VOTORANTIM CIMENTOS LTDA.                        *
       AS RESPONDENT  AND BUYER                         *
                                                       *
                                                       *
      UNDER A PET COKE SALES CONTACT                    *
         DATED OCTOBER 24, 2000                         *
                                                       *
                                                       *
*****************************************************
```

While the Panel agreed unanimously that :

    A) Aimcor was  a principal, not a broker/agent in respect to the Aimcor / Votorantim pet coke sales contract dated October 24, 2000

    B) An energy crisis did in fact exist in Brazil from mid 2001 to mid 2002

    C) That if technical or governmental constraints existed in Brazil, Votorantim had the right to reduce the quantity of pet coke it contracted to receive

    D) No event of Force Majeure occurred

Nevertheless the majority has ruled that Votorantim and Aimcor both breeched the above referenced pet coke sales agreement.

However,  this Arbitrator does not feel that Votorantim breeched the contract in any manner whatsoever. Votorantim acted strictly in accordance with their contractual rights and privileges as stipulated in Clause 2.2 of the Votorantim / Aimcor pet coke sales agreement

Clause 2.2 ( See Appendix A for full wording of this clause ) stipulates that should a technical event occur that caused a reduction Votorantim's  production of cement, they would be entitled to reduce the imported pet coke from Aimcor which was intended to be used for fuel at the cement plants.

1.

Such an event did in fact occur, which the Majority recognize.  A drought throughout Brazil prevented the Brazilian utilities from supplying their normal out put of electricity as some 85 % of Brazilian electricity is produced from hydro-electric sources. Aimcor by their own admission were well aware of this electricity reduction and the adverse effect it would have on cement production.

It is therefore clearly axiomatic that if there is a reduction in production of cement, caused by a reduction of available electricity,  there will be a reduced need for fuel to produce the reduced quantity of cement produced.  This Arbitrator feels this is clearly a " technical event " allowing Clause 2.2 to be applicable.

Votorantim followed the terms and conditions of the Aimcor / Votorantim pet coke sales contract by requesting a reduction of pet coke shipments during the energy crisis period, and subsequently, when the energy situation abated, in requesting a resumption of shipments as per the contract.

It should be noted that Aimcor , at least in this instance, was a merchant/ trader and not an supplier/originator of the pet coke.  In fact Aimcor entered into a supply contract between themselves and Premcor for the physical supply of pet coke from Premcor to Aimcor, which in turn would be provided  to Votorantim.

And while such  an arrangement is quite common in commercial commodity trading, in this case the terms and conditions of the two separate contracts were not identical or " back to back ". At least not in respect to the buyers rights to reduce the quantity of pet coke shipments.   The Premcor / Aimcor supply contract did not have the provisions for the buyer ( i.e. Aimcor ) to reduce quantities, while clearly in Clause 2.2 of the Aimcor / Votorantim contract, the buyer, Votorantim did in fact have this contractual right. Nevertheless, Aimcor did try to get Premcor to reduce the quantities in respect to the Premcor / Aimcor supply contract in order to accommodate Votorantim.  However Premcor was unwilling to amend their agreement with Aimcor and demanded that Aimcor perform as per contract.

While the Majority was dissatisfied with the proof submitted by both parties as to exactly how the energy crisis specifically affected  Votorantim, and to what degree, it should be noted that these proceedings were bifurcated, and the Panel asked to rule on liability only, in the first instance.  This Arbitrator feels that " proof of it's impact " ( i.e. the electricity cut backs effects on the production of cement ) would be  more properly addressed in the  damages  phase of this arbitration, and should have not influenced the Majority's opinion as to liability.

Respectfully,

*John F. Ring, Jr.*

John F.  Ring, Jr.

2.

# EXHIBIT "B"

---------------------------------------------------X

*In the Matter of the Arbitration between*

APPLIED INDUSTRIAL MATERIALS
CORPORATION,

                  Claimant,                    **FINAL AWARD**

      - and -

VOTORANTIM CIMENTOS LTDA,

                Respondent.

---------------------------------------------------X

             **Before:**      Walter R. Muff
                           John F. Ring, Jr.
                           Peter J. Zambito, Chairman

**Representations:**
For Applied Industrial Materials Corporation
Law office of Anthony J. Mavronicolas
By Anthony J. Mavronicolas, Esq.

For VOTORANTIM Cimentos Ltda.
Chalos O'Connor & Duffy, LLP
By George M. Chalos, Esq.
    LeRoy S. Corsa, Esq.

## INTRODUCTION

    The disputes which are the subject of this arbitration arose out of a Petroleum Coke Sales Agreement (hereinafter the "A/V Term Supply Contract") entered into on October 24, 2000 between Applied Industrial Material Corporation (hereinafter "AIMCOR" or "SELLER") and VOTORANTIM Cimentos Ltda. (hereinafter "VOTORANTIM" or "BUYER").

It should be noted that the A/V Term Supply Contract which is the subject of this arbitration was related, in turn, to a supply Contract between PREMCOR, as suppliers and sellers of petcoke, to AIMCOR, as buyers, AIMCOR having acted as a principal in both of these separate and distinct Contracts.

A PARTIAL FINAL AWARD dealing with liability was issued dated June 28, 2006. A majority of the arbitrators found therein that VOTORANTIM breached the Contract dated October 24, 2000 by not scheduling and accepting 150,000 MT petcoke during the first half of 2002 and was liable for the damages sustained by AIMCOR as a result; and further unanimously found that AIMCOR breached the same Contract by not providing petcoke for delivery to VOTORANTIM for the balance of the A/V Term Supply Contract, after it was informed in writing on August 16, 2002 that VOTORANTIM was in a position to resume regular shipments and was prepared to schedule and accept the remaining shipments as stipulated in the A/V Term Supply Contract.

The Panel incorporates herein the facts and findings of the Partial Final Award dated June 28, 2006. This FINAL AWARD deals with the issue of damages only.

Counsel for AIMCOR filed a Petition to Vacate the PARTIAL FINAL AWARD in the United States District Court for the Southern District of New York, and VOTORANTIM's attorneys cross-moved to dismiss the Petition. The Honorable Leonard B. Sand of the Southern District of New York, on January 17, 2007, issued a Memorandum and Order denying the Petition to Vacate and granting the cross-motion.

A Judgment to the above effect was issued and was entered on or about January 19, 2007.

2

## PROCEEDINGS

Five (5) hearings on damages were held before the Panel, specifically on April 10, 11 and 12 and July 16 and 17, 2007, during which one (1) witness and one (1) expert testified on behalf of AIMCOR, and one (1) witness testified on behalf of VOTORANTIM. Prior thereto, counsel for AIMCOR submitted a Preliminary Memorandum on Damages. Extensive exhibits relative to the issue of damages were offered on behalf of both parties and were accepted by the Panel and given the weight the Panel deemed each was entitled to be given.

The fifth and last hearing ended at 4:30 p.m. on July 17, 2007. Counsel for AIMCOR submitted and the Panel accepted additional Exhibits.

Thereafter, counsel for the parties submitted Main and Reply Post Hearing Briefs on Damages. Counsel for AIMCOR also submitted a bound volume of CITED LEGAL AUTHORITIES referred to his Main and Reply Briefs.

By email dated November 20, 2007 to both Counsel, the Chairman on behalf of the Panel formally declared the proceedings closed.

## FACTS AND DECISION

AIMCOR, in its MAIN and REPLY BRIEFS, at the end, raised seven (7) points, only two (2) of which we deem necessary to address below.

Point 2 asks for money damages in the amount of $2,164,471, resulting from a breach by VOTORANTIM of the A/V Term Supply Contract, whereas on page 12 of the MAIN BRIEF the contract loss is alleged to be $2,279,450. In its consideration of the discrepancy, the Panel utilized the summary of AIMCOR's claims as set forth in said Point 2.

3

Point 3 of the summary seeks lost commissions of $1,089,380, despite the Panel's earlier ruling in the PARTIAL FINAL AWARD that AIMCOR was a principal in the A/V Term Supply Contract, not a Broker and, therefore, not entitled to commissions. Here, too, AIMCOR's Briefs offered conflicting figures.

Overall, AIMCOR sought damages in Points 2 and 3 of $3,253,851.

Counsel for VOTORANTIM sought $4,247,405.60 in damages for the second half of 2002 and all of 2003 as a result of AIMCOR's breach.

Counsel for both parties also sought interest, costs and attorneys' fees.

In addition, counsel for VOTORANTIM sought $25,838.61 in attorneys' fees incurred in having to oppose AIMCOR's Petition to Vacate the Partial Final Award.

### (a) AIMCOR'S DAMAGES

The Panel determined that for the first half of 2002, AIMCOR was entitled to its "lost profits," the theory of damages being to place the aggrieved party in the same position it would have been had there been no breach, i.e., to make it whole.

AIMCOR's Damages Exhibit 4 (also VOTORANTIM's Exhibit H) reflects that for the 1st Quarter of 2002, 75,000 MT of petcoke was purchased from PREMCOR for $12.39 MT FOB, whereas the contract price to VOTORANTIM was $14.07 MT FOB, the difference being $1.68 MT. Said Damages Exhibit 4 includes a footnote reading, "Note: The commission per MT includes the US$0.41 deduction for the S. African btu discrepancy – Amendment #1."

The Panel notes an arithmetical error of $0.01 in AIMCOR Damages Exhibit 4, in that the difference in price, when $0.41 is added, computes to $2.09 per MT. As the computation for the second quarter of 2002 also gives credit for a differential of $0.41,

4

we accept $2.09 as the proper measure of damages. On such basis, the "lost profits" for the first quarter of 2002 are $156,750.

For the second quarter of 2002, AIMCOR Damages Exhibit 4 and VOTORANTIM Damages Exhibit H reflect that AIMCOR contracted to purchase 75,000 MT from PREMCOR for $11.51 MT FOB, whereas the contract price to VOTORANTIM was $13.03 MT FOB, the difference being $1.52 MT. Adding the $0.41 differential per AIMCOR Damages Exhibit 4, the measure of damages is $1.93 per MT.

Thus, the "lost profits" for the second quarter of 2002 amount to $144,750 (figure in Damages Exhibit 4 was incorrectly calculated).

Overall, for the first two (2) quarters of 2002, the total "lost profits" to AIMCOR amount to $301,500.

It is to be noted that the testimony of Dave Nestler as to the damages sustained, given during the Liability phase of this proceeding, did not account for the $0.41 differential, so that the Panel accepts the testimony of Matthew Scott-Hansen and Damages Exhibit 4, as the correct formula for damages for the first two (2) quarters of 2002, the Panel having corrected an arithmetical error.

Scott-Hansen was an employee of AIMCOR, who reported to Nestler, the senior executive in charge of marketing and sale of petcoke at AIMCOR (Damages T. 28, lines 3/9; T. 160, lines 13/16).

Also of importance is the testimony of Nestler in the liability phase of this proceeding, to wit (T. 839, lines 16/23).

5

"Q: Okay. Now, just so I am clear, if VOTORANTIM doesn't take the 2002 tonnage, AIMCOR doesn't go out of pocket to PREMCOR, correct? You don't have to pay for this stuff?

A: Mr. Nestler: No.

Q: That's your interpretation of the contract?

A: Mr. Nestler: Yes."

Scott-Hansen confirmed Nestler's testimony that AIMCOR had not "paid a penny yet" to PREMCOR "for the petcoke under this [VOTORANTIM] contract" (Damages T. 215, lines 22/25).

In furtherance of the above and pursuant to a question by arbitrator Ring, Scott-Hansen testified that AIMCOR never took any of the PREMCOR petcoke destined for VOTORANTIM and sold it elsewhere (Damages T. 229, lines 14/17, 23/25).

Scott-Hansen confirmed his response to arbitrator Ring, on questioning by Chairman Zambito, and added, "PREMCOR took it themselves and found better deals" (Damages T. 234, lines 8/18).

There was also testimony from Scott-Hansen that he recalled hearing that PREMCOR may have oversold petcoke by 200,000 MT (Damages T. 202, lines 23 through T. 204, line 7).

On questioning of Scott-Hansen by VOTORANTIM's counsel, the witness acknowledged that AIMCOR Damage Exhibit 4 (also VOTORANTIM Damage Exhibit H) reflected the net benefit to AIMCOR had the contract not been breached by VOTORANTIM (T. 250, line 22 through 251, line 18).

6

AIMCOR received what purports to be an assignment of PREMCOR's rights against it (AIMCOR Damages Exhibit 17), and the Panel is aware that a suit, presently stayed, was brought on behalf of PREMCOR against AIMCOR in the District Court of Jefferson County, Texas. The Affirmation of James O' Malley, former Director of Power and Energy of PREMCOR (AIMCOR Damages Exhibit 66), was offered, in which it is claimed the difference between the PREMCOR contract price to AIMCOR and PREMCOR's mitigation sales was $1,296,393. AIMCOR Damages Exhibit 17, a letter from PREMCOR's Texas counsel dated April 2, 2007, assigns PREMCOR's "claim" of $1,834,950.20, "For purposes of the arbitration [with VOTORANTIM] only," to AIMCOR. Since PREMCOR's suit has been stayed, and there has been no judgment awarding damages to PREMCOR and chargeable to AIMCOR by the Texas Court, the Panel declines to consider what is, at this juncture, only a "claim" and, therefore speculative.

Based upon the foregoing, the Panel concludes that had VOTORANTIM not breached the Contract during the first two (2) quarters of 2002, AIMCOR would have realized a net profit of $301,500.

## (b) VOTORANTIM'S DAMAGES

VOTORANTIM sought $4,247,405.60 in damages, contending that such sum represented the difference between what it had to pay for replacement cargoes and the price per the Contract entered into with AIMCOR (AIMCOR Damage Exhibit 2).

In support of its claim, counsel for VOTORANTIM offered testimony from Julio Rocha, who testified that he was in North America between 2001 through 2005 and not in Brazil in 2002 (Damages T. 861, lines 20/22).

7

Notwithstanding, the Panel required VOTORANTIM to produce a list of all shipments of petcoke made in the second half of 2002 and in all of 2003. The initial exhibits offered did not reflect all shipments made during these two (2) intervals (VOTORANTIM Damages Exhibit C and AIMCOR Damages Exhibit 26), as a result of which the Panel required a schedule of all such shipments.

In response to the Panel's direction, VOTORANTIM Damages Exhibits Bates 2001 and 2002 (covering the year 2002, including the second half thereof) and 3001 and 3002 (covering the year 2003) were produced by VOTORANTIM. While Rocha was not in Brazil during the intervals in question, the evidence submitted on behalf of VOTORANTIM supported his testimony (VOTORANTIM Damages Exhibits C, Bates 2001, 2002, 3001 and 3002). On review, the Panel accepted the data reflected in VOTORANTIM Damages Exhibit C and AIMCOR Damages Exhibit 26, as reflecting the correct data, and bases its findings (later herein) on said Exhibit.

The Panel next concerned itself with what shipments reflected in 2002 and 2003 were "replacement shipments" or were shipments made pursuant to contracts which VOTORANTIM had with other companies, as only "replacement shipments" would be considered as purchases made in mitigation.

Once the mitigation shipments were determined, the Panel next examined what the quality of the petcoke was in these shipments, as witnesses for both parties testified that PREMCOR quality petcoke could not be used in VOTORANTIM's plants in the north of Brazil (Damages T. 760, lines 16/20); rather, only petcoke of a higher quality then PREMCOR petcoke could be used there (Liability T. 1680, lines 10/20; Liability T. 1309, lines 18/22).

8

Of the 150,000 MT mitigation purchases made in the second half of 2002 (actually, 149,955.96 MT), the differential in price between those purchases and the AIMCOR/VOTORANTIM Contract price was $1,139,861.61 (AIMCOR Liability Exhibit 26; VOTORANTIM Damages Exhibits C, Bates Nos. 2001 and 2002). The Panel found that while most of the cargoes were discharged in southern Brazilian ports, some petcoke was discharged in northern Brazilian ports, but that such cargo was of a better quality than that discharged in southern Brazilian ports.

In 2003, eight (8) different vessels carried mitigation shipments to Brazil, totaling 294,354.61 MT (VOTORANTIM Damages Exhibit C). These shipments were made between January 7 and July 27, 2003. Counsel for AIMCOR argued that the Contract (AIMCOR Damages Exhibit 2) required "ratable" shipments, whereas the Contract quantity was fulfilled within the first seven (7) months. Having breached the said Contract as of August 2002 and not having scheduled or shipped petcoke thereafter, AIMCOR should not be heard to complain that the mitigation shipments were not spread out over the whole of 2003, but were made on an as needed basis.

Of the eight (8) vessels utilized, only one (1), the MV DENBULK, carried petcoke of a like quality as that stipulated under the A/V Term Supply Contract (AIMCOR Damages Exhibit 2) to a northern Brazilian port. As a result, the Panel declines to accept said shipment of 34,499.11 MT (differential in price $271,439) as a proper mitigation effort. See reference to testimony of both parties, supra.

The Panel also found that the remaining seven (7) vessels carried shipments totaling 258,855.50 MT and were either discharged at ports in the south of Brazil or, if discharged in the north, were of a better quality than PREMCOR petcoke.

9

The differential between the Contract prices (AIMCOR Damages Exhibit 2) and the mitigation shipments, excepting the MV DENBULK shipment, amounts to $2,836,104.99 (VOTORANTIM Damages Exhibits C, Bates Nos. 3001 and 3002).

Counsel for AIMCOR sought to discredit the damages claimed by VOTORANTIM, principally through the testimony of its expert, Mario Sirca, as well as the testimony of VOTORANTIM's witness, Julio Rocha.

Sirca testified that he bought petcoke for his Italian employer, Italcementi, which had no plants in Brazil (Damages T. 1263, lines 12/21) and had no experience in purchasing petcoke for use in Brazil (Damages T. 700, line 25 through 701, lines 2/3; 1383, lines 10/13) and little experience in purchasing petcoke in the United States (Damages T. 1264, lines 4/13).

Yet, Sirca expressed the opinion that, at the relevant times, PREMCOR quality petcoke was available in the market at the same time that VOTORANTIM was buying petcoke of a higher quality and greater price.

Sirca offered a list of sales/purchases made in the U.S. Gulf (AIMCOR Damages Exhibit 18.a). With regard to said list, arbitrator Ring remarked that there is a difference between what is reported and what is actually done (Damages T. 1315, lines 3/5).

Additionally, in response to arbitrator Ring's inquiries, Sirca testified (Damages T. 1317, lines 16/23):

> "MR. RING: So a lot of these reported deals are just that, reported in the marketplace?
> THE WITNESS: Right.
> MR. RING: As opposed to substantiated or supported by documents or whatever.
> THE WITNESS: Correct."

10

On cross-examination, as well as on inquiry by the Panel, Sirca testified that he did not know what was available to VOTORANTIM at the relevant times (Damages T. 1385, line 11 through 1387, line 9):

Further on cross-examination, Sirca testified as follows:

"Q   As of November 26, PREMCOR quality petcoke for the spot purchase you identified, was roughly $19 a ton, right?
A   Correct.
Q   And Votorantim went out and mitigated its damages roughly the same time and paid $22 a ton, right?
A   Correct.
Q   You have no idea whether or not that was the best price that Julio [Rocha] could have gotten at that time, do you?
A   I have no idea, okay." (Damages T. 1400, line 16 through 1401, line 3)

When asked about his knowledge of VOTORANTIM's plants in Brazil, Sirca replied "I haven't been there. I don't know the details" (Damages T. 1320, line 23 through 1321, line 3).

Having observed the expert witness and heard his testimony, the Panel was of the unanimous opinion that Sirca's testimony had been discredited and was of no probative value.

The Panel disallows VOTORANTIM's claim for $25,838.61 in attorneys' fees, said to have been incurred in opposing AIMCOR's Petition to Vacate the Partial Final Award. In such regard, the Panel is guided by Judge Sand's Memorandum and Order dated January 17, 2007, wherein no attorneys' fees were awarded and both parties' motions for sanctions were denied.

## FINAL AWARD

In summary, it is the unanimous finding of the Panel that the damages recoverable by each party are as follows:

11

1.  As a result of VOTORANTIM's breach of the A/V Term Supply Contract during the first six (6) months of 2002, AIMCOR is entitled to recover the following sums:

> a) $156,750.00 for damages sustained during the 1st Quarter of 2002, plus interest at the rate of five (5) percent per annum, calculated from March 31, 2002 to February 29, 2008 (i.e., 5 years, 11 months), $7,837.50 per annum x 5.91 years, equivalent to $46,319.62;
>
> b)  $144,750.00 for damages sustained during the 2nd Quarter of 2002, plus interest at the rate of  five (5) percent per annum, calculated from June 30, 2002 to February 29, 2008 (i.e., 5 years, 8 months), $7,237.50 per annum x 5.66 years, equivalent to $40,964.25.

The total damages awarded to AIMCOR by the Panel are $301,500.00, plus interest of $87,283.87, totaling $388,783.87.

2.  As a result of AIMCOR's breach of the A/V Term Supply Contract during the last six (6) months of 2002 and for the calendar year 2003, VOTORANTIM is entitled to recover the following sums:

> a) $1,139,861.61 for damages sustained during the second half of 2002, plus interest at the rate of five (5) percent per annum, calculated from December 31, 2002 to February 29, 2008 (i.e., 5 years, 2 months), $56,993.08 per annum x 5.16 years, equivalent to $294,084.29;
>
> b) $2,836,104.99 for damages sustained during calendar year 2003, plus interest at the rate of five (5) percent per annum, calculated from July 31, 2003 to February 29, 2008 (i.e., 4 years, 7 months), $141,805.24 per annum x 4.58 years, equivalent to $649,467.99.

The total damages awarded to VOTORANTIM by the Panel are $3,975,966.60, plus interest of $943,552.28, totaling $4,919,518.88.

Therefore, the Panel directs AIMCOR to pay the net amount of $4,530,735.01 ($4,919,518.88 – 388,783.87) to VOTORANTIM.

Appendix A hereto details arbitrators' fees and costs and is an integral part of this Final Award. Pursuant thereto, arbitrators' fees and costs are to be shared equally by the parties, but each party is jointly and severally responsible for said fees and costs in toto.

Each party is responsible for its own counsel's legal fees and Court reporting costs.

Annexed to this Final Award, and also made an integral part hereof, is Appendix B, Chairman's Statement.

Arbitrator Walter R. Muff's travel and related expenses are the sole responsibility of AIMCOR.

Dated: New York, New York
       February 29, 2008

Walter R. Muff

John F. Ring

Peter J. Zambito, Chairman

```
-------------------------------------------------X
```
*In the Matter of the Arbitration between*

APPLIED INDUSTRIAL MATERIALS
CORPORATION,

               Claimant,                         **APPENDIX A**

- and -

VOTORANTIM CIMENTOS LTDA,

               Respondent.
```
-------------------------------------------------X
```

    The Arbitrator's fees in this matter are to be shared equally between the claimant and the respondent in the total amount of $145,262.50.

    The fees are payable as follows:

|  | **Total during damage phase** | **Less previously disbursed** | **Due now** |
|---|---|---|---|
| Walter R. Muff | $44,212.50 | $20,000.00 | $24,212.50 |
| John F. Ring, Jr. | $49,750.00 | $20,000.00 | $29,750.00 |
| Peter J. Zambito | $51,300.00 | $20,000.00 | $31,300.00 |

    These fees are payable from the escrow account established, with equal deposits made by Claimant and Respondent for this purpose, with the Society of Maritime Arbitrators, Inc. (SMA).

    In addition, the Chairman incurred out-of-pocket expenses amounting to $366.66.

    The Panel's fees and Chairman's out-of-pocket costs are to be paid from the SMA escrow account within ten (10) days of the date of issuance of this Final Award.

14

---------------------------------------------------X

*In the Matter of the Arbitration between*

APPLIED INDUSTRIAL MATERIALS
CORPORATION,

      Claimant,       **APPENDIX B**

  - and -

VOTORANTIM CIMENTOS LTDA,

      Respondent.
---------------------------------------------------X


### CHAIRMAN'S STATEMENT

During the third Damages hearing held on April 12, 2007, I became exasperated with the documentation submitted on behalf of VOTORANTIM as to replacement shipments and asked counsel for AIMCOR to leave the room. During his absence, I chided the witness (Rocha) and made it clear that the Panel wanted data reflecting "all" shipments made during the second half of 2002 and all of 2003, which were pursuant to other contracts, as well as those which were replacement purchases. I was wrong to ask counsel for AIMCOR to leave the room during this interval, but on his return, explained fully what had transpired and reiterated what the witness (Rocha) was directed to produce (Damages T. 870, lines 9 through 25).

> "THE CHAIRMAN: If you produce all of the documentation, you ought to earmark what you were contractually obligated to take aside from the AIMCOR contract and what you specifically went out in the market to get to replace AIMCOR – to replace PREMCOR cargo, okay?
>
> You see where we are going? We are trying to find the lowest value. I mean, anything that is contractually – they were contractually obligated to take, other contracts, should be outside the scope of this, right?
>
> But what they went in the spot market to take, is other than contractually. To me, that should be segregated."

At the fifth and last Damages hearing, counsel for AIMCOR referred to my having asked him to leave the room during the third Damages hearing, as follows (Damages T. 1463, line 12 through 1465, line 3):

> "MR. MAVRONICOLAS:  Well, it begins with an off-the-record, and then the questions start.
>
> During that off-the-record period, I was asked – I was out of the room. When I returned to the room when those questions started, I found the panel – I found the witness and I found opposing counsel.
>
> I wasn't present in the room when we were off the record.  I don't know what occurred in the room.  But I know there was a series of questions that came after it, and so my request is we strike those questions from the records.
>
> MR. CHALOS:  You weren't out of the room.
>
> THE CHAIRMAN:  Yes, he was out of the room.  I asked him to excuse himself and that's when I said to Mr. Rocha, I asked for all of the data that wound up in Bates 2001 and 2002, 3001, 3002, because – and I mentioned this to you, I know I mentioned this to you subsequently, that I was concerned that mitigation efforts had not be exercised and that we didn't have the full data to determine whether they went out and sought the lowest price cargoes of that ilk.
>
> MR. MAVRONICOLAS: In fact, you did do that, Mr. Chairman, but you do it later.  It's after that point.
>
> You make that statement actually on page 870 of the transcript, and you begin and talk about production, and ask him to produce.  That happens later, Mr. Chairman."

Based upon my explanation, counsel for AIMCOR accepted it, stating (Damages T. 1467, lines 5 through 24):

> "MR. MAVRONICOLAS:  Mr. Zambito, based on what you said to me today, what occurred outside the room, I of course accept what you have said as the facts as represented by you.
>
> And on that basis, and of course as an advocate for my client, I always have to preserve whatever objections we have, and I do that.
>
> However, as a matter of response to what you said, I believe that what your representation is what occurred in that room, and for everything that I know is absolutely accurate, and I will leave it at that, sir, and thank you very much for even discussing it with me.
>
> MR. CHAIRMAN: Do you drop your motion to excise that portion?
>
> MR. MAVRONICOLAS:  The necessity for a motion is unnecessary."

Despite having accepted my explanation, counsel for AIMCOR reserved his objection, which I found to be inconsistent (Damages T. 1467, line 25 through 1470, line 13) to wit:

"Again, as I say, I will reserve my objection. I need to do that. I am not going to –
MR. CHALOS: Objection for what?
THE CHAIRMAN: He is objecting to the text. You objecting to what Mr. Ring asked you, whereas I am the one that sent you out of the room. So I am having trouble putting that together.
MR. MAVRONICOLAS: I'm just preserving my client's rights with respect to whatever the process was, the procedure.
THE CHAIRMAN: To the process?
MR. MAVRONICOLAS: The procedure.
THE CHAIRMAN: The procedure.
MR. CHALOS: No, Mr. Chairman, this is unacceptable to me.
THE CHAIRMAN: It doesn't effect you.
MR. CHALOS: Of course it does.
THE CHAIRMAN: No, it doesn't. It effect me. It effects you, yes indirectly. It effects you because if a court – and I want all this down – if a court should determine that I acted improperly sending him out of the room, I get criticized in the judge's opinion.
   However, if the damages turned out to be unanimous, the fact that the judge may knock me out, doesn't amount to a hill of beans.
MR. CHALOS: Well, Mr. Chairman, I think its appropriate at this point in time while there is a contemporaneous issue and not after Mr. Mavronicolas gets to go back to his house and cook up a story, what is it that he thinks he is prejudiced, that he should articulate it, if there was a prejudice.
THE CHAIRMAN: He did articulate it. He said that he was sent out of the room, the reporter was out of the room, he has no idea what was said unilaterally, if you will.
   So I understand that he is suggesting that was inappropriate activity, and that's he is going to reserve his right of objection to me having followed that procedure. Okay.
MR. CHALOS: Well, I am struggling because I don't recall, neither does my partner, Mr. Corsa, recall unilateral ex parte communications.
THE CHAIRMAN: I understand that, but the mere sending him out of the room is what the problem may be. Okay?
   With that in mind, this proceeding is concluded at 4:30 pm..
MR. MAVRONICOLAS: Mr. Chairman, thank you very much."

Despite directing AIMCOR's counsel to set forth his objection in his BRIEFS, I could find no reference to counsel's reservation in either his MAIN or REPLY BRIEF on Damages (Damages T. 1461, lines 16/23).

Notwithstanding, as the Panel's findings were "unanimous," the issue becomes moot in the last analysis.

Peter J. Zambito, Chairman