IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

VOTORANTIM CIMENTOS LTDA,

                                    Petitioner,

                    - against -

OXBOW CARBON AND MINERALS LLC,
SUCCESSOR IN INTEREST BY MERGER TO
APPLIED INDUSTRIAL MATERIALS
CORPORATION,

                                    Respondent.

08 CV 02232 (LBS)

**DECLARATION OF DANIEL B.
GOLDMAN IN SUPPORT OF
MOTION TO VACATE PARTIALLY
AND CONFIRM PARTIALLY
FINAL ARBITRATION AWARD**

DANIEL B. GOLDMAN, an attorney duly admitted to practice law in the Courts of the State of New York and the United States District Court for the Southern District of New York, under penalty of perjury, hereby declares:

1.      I am a Partner at the law firm of Paul, Hastings, Janofsky & Walker LLP, counsel to Oxbow Carbon and Minerals LLC, Successor in Interest by Merger to Applied Industrial Materials Corporation ("Oxbow"), respondent in this action.

2.      I submit this declaration in support of Oxbow's Motion to Vacate Partially and Confirm Partially the Final Arbitration Award.

3.      Annexed as Exhibit A is a true and correct copy of the Final Award, dated February 29, 2008.

4.      Annexed as Exhibit B is a true and correct copy of the Partial Final Award, dated June 28, 2006.

5.      Annexed as Exhibit C is a true and correct copy of the Letter from Anthony J. Mavronicolas to the Panel, dated July 18, 2006.

6.     Annexed as Exhibit D is a true and correct copy of the Email from Chairman Peter J. Zambito to Anthony J. Mavronicolas, dated August 15, 2006.

7.     Annexed as Exhibit E is a true and correct copy of the Judgment, dated January 19, 2007 and Memorandum & Order, dated January 17, 2007.

8.     Annexed as Exhibit F is a true and correct copy of excerpts from the Transcript of Hearing dated July 16, 2007.

9.     Annexed as Exhibit G is a true and correct copy of Oxbow's Main Brief in Support Damages.

10.    Annexed as Exhibit H is a true and correct copy of Oxbow's Preliminary Brief in Support of Damages for 2002.

11.    Annexed as Exhibit I is a true and correct copy of Oxbow's Reply Brief in Support of Damages.

12.    Annexed as Exhibit J is a true and correct copy of excerpts from the Transcript of Hearing dated April 12, 2007.


Dated:  New York, New York
        May 23, 2008

_____
Daniel B. Goldman (DG-4503)

## CERTIFICATE OF SERVICE

I hereby certify that on May 23, 2008, the foregoing Declaration of Daniel B. Goldman in Support of Motion to Vacate Partially and Confirm Partially the Final Arbitration Award was filed electronically and served upon the following counsel of record by UPS overnight mail in accordance with the Federal Rules of Civil Procedure and the Southern District of New York Local Civil Rules.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.

George M. Chalos, Esq.
Chalos, O'Connor & Duffy, LLP
366 Main Street
Port Washington, New York 11050
*Attorneys for Petitioner*

PAUL, HASTINGS, JANOFSKY
& WALKER LLP


/s/ Lawrence J. Conlan
Lawrence J. Conlan (LC 2170)
75 East 55th Street
New York, New York 10022
(212) 318-6000

# EXHIBIT A

---------------------------------------------------X

*In the Matter of the Arbitration between*

APPLIED INDUSTRIAL MATERIALS
CORPORATION,

              Claimant,                         FINAL AWARD

    - and -

VOTORANTIM CIMENTOS LTDA,

              Respondent.

---------------------------------------------------X

                Before:      Walter R. Muff
                              John F. Ring, Jr.
                              Peter J. Zambito, Chairman

Representations:
For Applied Industrial Materials Corporation
Law office of Anthony J. Mavronicolas
By Anthony J. Mavronicolas, Esq.

For VOTORANTIM Cimentos Ltda.
Chalos O'Connor & Duffy, LLP
By George M. Chalos, Esq.
    LeRoy S. Corsa, Esq.

## INTRODUCTION

    The disputes which are the subject of this arbitration arose out of a Petroleum Coke Sales Agreement (hereinafter the "A/V Term Supply Contract") entered into on October 24, 2000 between Applied Industrial Material Corporation (hereinafter "AIMCOR" or "SELLER") and VOTORANTIM Cimentos Ltda. (hereinafter "VOTORANTIM" or "BUYER").

It should be noted that the A/V Term Supply Contract which is the subject of this arbitration was related, in turn, to a supply Contract between PREMCOR, as suppliers and sellers of petcoke, to AIMCOR, as buyers, AIMCOR having acted as a principal in both of these separate and distinct Contracts.

A PARTIAL FINAL AWARD dealing with liability was issued dated June 28, 2006. A majority of the arbitrators found therein that VOTORANTIM breached the Contract dated October 24, 2000 by not scheduling and accepting 150,000 MT petcoke during the first half of 2002 and was liable for the damages sustained by AIMCOR as a result; and further unanimously found that AIMCOR breached the same Contract by not providing petcoke for delivery to VOTORANTIM for the balance of the A/V Term Supply Contract, after it was informed in writing on August 16, 2002 that VOTORANTIM was in a position to resume regular shipments and was prepared to schedule and accept the remaining shipments as stipulated in the A/V Term Supply Contract.

The Panel incorporates herein the facts and findings of the Partial Final Award dated June 28, 2006. This FINAL AWARD deals with the issue of damages only.

Counsel for AIMCOR filed a Petition to Vacate the PARTIAL FINAL AWARD in the United States District Court for the Southern District of New York, and VOTORANTIM's attorneys cross-moved to dismiss the Petition. The Honorable Leonard B. Sand of the Southern District of New York, on January 17, 2007, issued a Memorandum and Order denying the Petition to Vacate and granting the cross-motion.

A Judgment to the above effect was issued and was entered on or about January 19, 2007.

## PROCEEDINGS

Five (5) hearings on damages were held before the Panel, specifically on April 10, 11 and 12 and July 16 and 17, 2007, during which one (1) witness and one (1) expert testified on behalf of AIMCOR, and one (1) witness testified on behalf of VOTORANTIM.    Prior thereto, counsel for AIMCOR submitted a Preliminary Memorandum on Damages.  Extensive exhibits relative to the issue of damages were offered on behalf of both parties and were accepted by the Panel and given the weight the Panel deemed each was entitled to be given.

The fifth and last hearing ended at 4:30 p.m. on July 17, 2007.  Counsel for AIMCOR submitted and the Panel accepted additional Exhibits.

Thereafter, counsel for the parties submitted Main and Reply Post Hearing Briefs on Damages.  Counsel for AIMCOR also submitted a bound volume of CITED LEGAL AUTHORITIES referred to his Main and Reply Briefs.

By email dated November 20, 2007 to both Counsel, the Chairman on behalf of the Panel formally declared the proceedings closed.

## FACTS AND DECISION

AIMCOR, in its MAIN and REPLY BRIEFS, at the end, raised seven (7) points, only two (2) of which we deem necessary to address below.

Point 2 asks for money damages in the amount of $2,164,471, resulting from a breach by VOTORANTIM of the A/V Term Supply Contract, whereas on page 12 of the MAIN BRIEF the contract loss is alleged to be $2,279,450.  In its consideration of the discrepancy, the Panel utilized the summary of AIMCOR's claims as set forth in said Point 2.

3

Point 3 of the summary seeks lost commissions of $1,089,380, despite the Panel's earlier ruling in the PARTIAL FINAL AWARD that AIMCOR was a principal in the A/V Term Supply Contract, not a Broker and, therefore, not entitled to commissions. Here, too, AIMCOR's Briefs offered conflicting figures.

Overall, AIMCOR sought damages in Points 2 and 3 of $3,253,851.

Counsel for VOTORANTIM sought $4,247,405.60 in damages for the second half of 2002 and all of 2003 as a result of AIMCOR's breach.

Counsel for both parties also sought interest, costs and attorneys' fees.

In addition, counsel for VOTORANTIM sought $25,838.61 in attorneys' fees incurred in having to oppose AIMCOR's Petition to Vacate the Partial Final Award.

### (a) AIMCOR'S DAMAGES

The Panel determined that for the first half of 2002, AIMCOR was entitled to its "lost profits," the theory of damages being to place the aggrieved party in the same position it would have been had there been no breach, i.e., to make it whole.

AIMCOR's Damages Exhibit 4 (also VOTORANTIM's Exhibit H) reflects that for the 1st Quarter of 2002, 75,000 MT of petcoke was purchased from PREMCOR for $12.39 MT FOB, whereas the contract price to VOTORANTIM was $14.07 MT FOB, the difference being $1.68 MT. Said Damages Exhibit 4 includes a footnote reading, "Note: The commission per MT includes the US$0.41 deduction for the S. African btu discrepancy – Amendment #1."

The Panel notes an arithmetical error of $0.01 in AIMCOR Damages Exhibit 4, in that the difference in price, when $0.41 is added, computes to $2.09 per MT. As the computation for the second quarter of 2002 also gives credit for a differential of $0.41,

4

we accept $2.09 as the proper measure of damages. On such basis, the "lost profits" for the first quarter of 2002 are $156,750.

For the second quarter of 2002, AIMCOR Damages Exhibit 4 and VOTORANTIM Damages Exhibit H reflect that AIMCOR contracted to purchase 75,000 MT from PREMCOR for $11.51 MT FOB, whereas the contract price to VOTORANTIM was $13.03 MT FOB, the difference being $1.52 MT. Adding the $0.41 differential per AIMCOR Damages Exhibit 4, the measure of damages is $1.93 per MT.

Thus, the "lost profits" for the second quarter of 2002 amount to $144,750 (figure in Damages Exhibit 4 was incorrectly calculated).

Overall, for the first two (2) quarters of 2002, the total "lost profits" to AIMCOR amount to $301,500.

It is to be noted that the testimony of Dave Nestler as to the damages sustained, given during the Liability phase of this proceeding, did not account for the $0.41 differential, so that the Panel accepts the testimony of Matthew Scott-Hansen and Damages Exhibit 4, as the correct formula for damages for the first two (2) quarters of 2002, the Panel having corrected an arithmetical error.

Scott-Hansen was an employee of AIMCOR, who reported to Nestler, the senior executive in charge of marketing and sale of petcoke at AIMCOR (Damages T. 28, lines 3/9; T. 160, lines 13/16).

Also of importance is the testimony of Nestler in the liability phase of this proceeding, to wit (T. 839, lines 16/23).

"Q: Okay. Now, just so I am clear, if VOTORANTIM doesn't take the

2002 tonnage, AIMCOR doesn't go out of pocket to PREMCOR, correct?

You don't have to pay for this stuff?

A: Mr. Nestler: No.

Q: That's your interpretation of the contract?

A: Mr. Nestler: Yes."

Scott-Hansen confirmed Nestler's testimony that AIMCOR had not "paid a penny yet" to PREMCOR "for the petcoke under this [VOTORANTIM] contract" (Damages T. 215, lines 22/25).

In furtherance of the above and pursuant to a question by arbitrator Ring, Scott-Hansen testified that AIMCOR never took any of the PREMCOR petcoke destined for VOTORANTIM and sold it elsewhere (Damages T. 229, lines 14/17, 23/25).

Scott-Hansen confirmed his response to arbitrator Ring, on questioning by Chairman Zambito, and added, "PREMCOR took it themselves and found better deals" (Damages T. 234, lines 8/18).

There was also testimony from Scott-Hansen that he recalled hearing that PREMCOR may have oversold petcoke by 200,000 MT (Damages T. 202, lines 23 through T. 204, line 7).

On questioning of Scott-Hansen by VOTORANTIM's counsel, the witness acknowledged that AIMCOR Damage Exhibit 4 (also VOTORANTIM Damage Exhibit H) reflected the net benefit to AIMCOR had the contract not been breached by VOTORANTIM (T. 250, line 22 through 251, line 18).

AIMCOR received what purports to be an assignment of PREMCOR's rights against it (AIMCOR Damages Exhibit 17), and the Panel is aware that a suit, presently stayed, was brought on behalf of PREMCOR against AIMCOR in the District Court of Jefferson County, Texas. The Affirmation of James O' Malley, former Director of Power and Energy of PREMCOR (AIMCOR Damages Exhibit 66), was offered, in which it is claimed the difference between the PREMCOR contract price to AIMCOR and PREMCOR's mitigation sales was $1,296,393. AIMCOR Damages Exhibit 17, a letter from PREMCOR's Texas counsel dated April 2, 2007, assigns PREMCOR's "claim" of $1,834,950.20, "For purposes of the arbitration [with VOTORANTIM] only," to AIMCOR. Since PREMCOR's suit has been stayed, and there has been no judgment awarding damages to PREMCOR and chargeable to AIMCOR by the Texas Court, the Panel declines to consider what is, at this juncture, only a "claim" and, therefore speculative.

Based upon the foregoing, the Panel concludes that had VOTORANTIM not breached the Contract during the first two (2) quarters of 2002, AIMCOR would have realized a net profit of $301,500.

### (b) VOTORANTIM'S DAMAGES

VOTORANTIM sought $4,247,405.60 in damages, contending that such sum represented the difference between what it had to pay for replacement cargoes and the price per the Contract entered into with AIMCOR (AIMCOR Damage Exhibit 2).

In support of its claim, counsel for VOTORANTIM offered testimony from Julio Rocha, who testified that he was in North America between 2001 through 2005 and not in Brazil in 2002 (Damages T. 861, lines 20/22).

7

Notwithstanding, the Panel required VOTORANTIM to produce a list of all shipments of petcoke made in the second half of 2002 and in all of 2003. The initial exhibits offered did not reflect all shipments made during these two (2) intervals (VOTORANTIM Damages Exhibit C and AIMCOR Damages Exhibit 26), as a result of which the Panel required a schedule of all such shipments.

In response to the Panel's direction, VOTORANTIM Damages Exhibits Bates 2001 and 2002 (covering the year 2002, including the second half thereof) and 3001 and 3002 (covering the year 2003) were produced by VOTORANTIM. While Rocha was not in Brazil during the intervals in question, the evidence submitted on behalf of VOTORANTIM supported his testimony (VOTORANTIM Damages Exhibits C, Bates 2001, 2002, 3001 and 3002). On review, the Panel accepted the data reflected in VOTORANTIM Damages Exhibit C and AIMCOR Damages Exhibit 26, as reflecting the correct data, and bases its findings (later herein) on said Exhibit.

The Panel next concerned itself with what shipments reflected in 2002 and 2003 were "replacement shipments" or were shipments made pursuant to contracts which VOTORANTIM had with other companies, as only "replacement shipments" would be considered as purchases made in mitigation.

Once the mitigation shipments were determined, the Panel next examined what the quality of the petcoke was in these shipments, as witnesses for both parties testified that PREMCOR quality petcoke could not be used in VOTORANTIM's plants in the north of Brazil (Damages T. 760, lines 16/20); rather, only petcoke of a higher quality then PREMCOR petcoke could be used there (Liability T. 1680, lines 10/20; Liability T. 1309, lines 18/22).

Of the 150,000 MT mitigation purchases made in the second half of 2002 (actually, 149,955.96 MT), the differential in price between those purchases and the AIMCOR/VOTORANTIM Contract price was $1,139,861.61 (AIMCOR Liability Exhibit 26; VOTORANTIM Damages Exhibits C, Bates Nos. 2001 and 2002). The Panel found that while most of the cargoes were discharged in southern Brazilian ports, some petcoke was discharged in northern Brazilian ports, but that such cargo was of a better quality than that discharged in southern Brazilian ports.

In 2003, eight (8) different vessels carried mitigation shipments to Brazil, totaling 294,354.61 MT (VOTORANTIM Damages Exhibit C). These shipments were made between January 7 and July 27, 2003. Counsel for AIMCOR argued that the Contract (AIMCOR Damages Exhibit 2) required "ratable" shipments, whereas the Contract quantity was fulfilled within the first seven (7) months. Having breached the said Contract as of August 2002 and not having scheduled or shipped petcoke thereafter, AIMCOR should not be heard to complain that the mitigation shipments were not spread out over the whole of 2003, but were made on an as needed basis.

Of the eight (8) vessels utilized, only one (1), the MV DENBULK, carried petcoke of a like quality as that stipulated under the A/V Term Supply Contract (AIMCOR Damages Exhibit 2) to a northern Brazilian port. As a result, the Panel declines to accept said shipment of 34,499.11 MT (differential in price $271,439) as a proper mitigation effort. See reference to testimony of both parties, supra.

The Panel also found that the remaining seven (7) vessels carried shipments totaling 258,855.50 MT and were either discharged at ports in the south of Brazil or, if discharged in the north, were of a better quality than PREMCOR petcoke.

The differential between the Contract prices (AIMCOR Damages Exhibit 2) and the mitigation shipments, excepting the MV DENBULK shipment, amounts to $2,836,104.99 (VOTORANTIM Damages Exhibits C, Bates Nos. 3001 and 3002).

Counsel for AIMCOR sought to discredit the damages claimed by VOTORANTIM, principally through the testimony of its expert, Mario Sirca, as well as the testimony of VOTORANTIM's witness, Julio Rocha.

Sirca testified that he bought petcoke for his Italian employer, Italcementi, which had no plants in Brazil (Damages T. 1263, lines 12/21) and had no experience in purchasing petcoke for use in Brazil (Damages T. 700, line 25 through 701, lines 2/3; 1383, lines 10/13) and little experience in purchasing petcoke in the United States (Damages T. 1264, lines 4/13).

Yet, Sirca expressed the opinion that, at the relevant times, PREMCOR quality petcoke was available in the market at the same time that VOTORANTIM was buying petcoke of a higher quality and greater price.

Sirca offered a list of sales/purchases made in the U.S. Gulf (AIMCOR Damages Exhibit 18.a). With regard to said list, arbitrator Ring remarked that there is a difference between what is reported and what is actually done (Damages T. 1315, lines 3/5).

Additionally, in response to arbitrator Ring's inquiries, Sirca testified (Damages T. 1317, lines 16/23):

> "MR. RING: So a lot of these reported deals are just that, reported in the marketplace?
> THE WITNESS: Right.
> MR. RING: As opposed to substantiated or supported by documents or whatever.
> THE WITNESS: Correct."

On cross-examination, as well as on inquiry by the Panel, Sirca testified that he did not know what was available to VOTORANTIM at the relevant times (Damages T. 1385, line 11 through 1387, line 9):

Further on cross-examination, Sirca testified as follows:

"Q   As of November 26, PREMCOR quality petcoke for the spot purchase you identified, was roughly $19 a ton, right?
A  Correct.
Q  And Votorantim went out and mitigated its damages roughly the same time and paid $22 a ton, right?
A  Correct.
Q  You have no idea whether or not that was the best price that Julio [Rocha] could have gotten at that time, do you?
A  I have no idea, okay." (Damages T. 1400, line 16 through 1401, line 3)

When asked about his knowledge of VOTORANTIM's plants in Brazil, Sirca replied "I haven't been there. I don't know the details" (Damages T. 1320, line 23 through 1321, line 3).

Having observed the expert witness and heard his testimony, the Panel was of the unanimous opinion that Sirca's testimony had been discredited and was of no probative value.

The Panel disallows VOTORANTIM's claim for $25,838.61 in attorneys' fees, said to have been incurred in opposing AIMCOR's Petition to Vacate the Partial Final Award. In such regard, the Panel is guided by Judge Sand's Memorandum and Order dated January 17, 2007, wherein no attorneys' fees were awarded and both parties' motions for sanctions were denied.

## FINAL AWARD

In summary, it is the unanimous finding of the Panel that the damages recoverable by each party are as follows:

11

1. As a result of VOTORANTIM's breach of the A/V Term Supply Contract during the first six (6) months of 2002, AIMCOR is entitled to recover the following sums:

>   a) $156,750.00 for damages sustained during the 1st Quarter of 2002, plus interest at the rate of five (5) percent per annum, calculated from March 31, 2002 to February 29, 2008 (i.e., 5 years, 11 months), $7,837.50 per annum x 5.91 years, equivalent to $46,319.62;
>
>   b) $144,750.00 for damages sustained during the 2nd Quarter of 2002, plus interest at the rate of five (5) percent per annum, calculated from June 30, 2002 to February 29, 2008 (i.e., 5 years, 8 months), $7,237.50 per annum x 5.66 years, equivalent to $40,964.25.

The total damages awarded to AIMCOR by the Panel are $301,500.00, plus interest of $87,283.87, totaling $388,783.87.

2. As a result of AIMCOR's breach of the A/V Term Supply Contract during the last six (6) months of 2002 and for the calendar year 2003, VOTORANTIM is entitled to recover the following sums:

>   a) $1,139,861.61 for damages sustained during the second half of 2002, plus interest at the rate of five (5) percent per annum, calculated from December 31, 2002 to February 29, 2008 (i.e., 5 years, 2 months), $56,993.08 per annum x 5.16 years, equivalent to $294,084.29;
>
>   b) $2,836,104.99 for damages sustained during calendar year 2003, plus interest at the rate of five (5) percent per annum, calculated from July 31, 2003 to February 29, 2008 (i.e., 4 years, 7 months), $141,805.24 per annum x 4.58 years, equivalent to $649,467.99.

The total damages awarded to VOTORANTIM by the Panel are $3,975,966.60, plus interest of $943,552.28, totaling $4,919,518.88.

Therefore, the Panel directs AIMCOR to pay the net amount of $4,530,735.01 ($4,919,518.88 – 388,783.87) to VOTORANTIM.

Appendix A hereto details arbitrators' fees and costs and is an integral part of this Final Award. Pursuant thereto, arbitrators' fees and costs are to be shared equally by the parties, but each party is jointly and severally responsible for said fees and costs in toto.

Each party is responsible for its own counsel's legal fees and Court reporting costs.

Annexed to this Final Award, and also made an integral part hereof, is Appendix B, Chairman's Statement.

Arbitrator Walter R. Muff's travel and related expenses are the sole responsibility of AIMCOR.

Dated: New York, New York
        February 29, 2008

Walter R. Muff

John F. Ring

Peter J. Zambito, Chairman

-------------------------------------------------X

*In the Matter of the Arbitration between*

APPLIED INDUSTRIAL MATERIALS
CORPORATION,

              Claimant,                      **APPENDIX A**

    - and -

VOTORANTIM CIMENTOS LTDA,

              Respondent.

-------------------------------------------------X

The Arbitrator's fees in this matter are to be shared equally between the claimant and the respondent in the total amount of $145,262.50.

The fees are payable as follows:

| | Total during damage phase | Less previously disbursed | Due now |
|---|---|---|---|
| Walter R. Muff | $44,212.50 | $20,000.00 | $24,212.50 |
| John F. Ring, Jr. | $49,750.00 | $20,000.00 | $29,750.00 |
| Peter J. Zambito | $51,300.00 | $20,000.00 | $31,300.00 |

These fees are payable from the escrow account established, with equal deposits made by Claimant and Respondent for this purpose, with the Society of Maritime Arbitrators, Inc. (SMA).

In addition, the Chairman incurred out-of-pocket expenses amounting to $366.66.

The Panel's fees and Chairman's out-of-pocket costs are to be paid from the SMA escrow account within ten (10) days of the date of issuance of this Final Award.

```
-------------------------------------------------X
```

*In the Matter of the Arbitration between*

APPLIED INDUSTRIAL MATERIALS
CORPORATION,

    Claimant,       **APPENDIX B**

  - and -

VOTORANTIM CIMENTOS LTDA,

    Respondent.
```
-------------------------------------------------X
```

## CHAIRMAN'S STATEMENT

During the third Damages hearing held on April 12, 2007, I became exasperated with the documentation submitted on behalf of VOTORANTIM as to replacement shipments and asked counsel for AIMCOR to leave the room. During his absence, I chided the witness (Rocha) and made it clear that the Panel wanted data reflecting "all" shipments made during the second half of 2002 and all of 2003, which were pursuant to other contracts, as well as those which were replacement purchases. I was wrong to ask counsel for AIMCOR to leave the room during this interval, but on his return, explained fully what had transpired and reiterated what the witness (Rocha) was directed to produce (Damages T. 870, lines 9 through 25).

> "THE CHAIRMAN: If you produce all of the documentation, you ought to earmark what you were contractually obligated to take aside from the AIMCOR contract and what you specifically went out in the market to get to replace AIMCOR – to replace PREMCOR cargo, okay?
> You see where we are going? We are trying to find the lowest value. I mean, anything that is contractually – they were contractually obligated to take, other contracts, should be outside the scope of this, right?
> But what they went in the spot market to take, is other than contractually. To me, that should be segregated."

15

At the fifth and last Damages hearing, counsel for AIMCOR referred to my

having asked him to leave the room during the third Damages hearing, as follows

(Damages T. 1463, line 12 through 1465, line 3):

> "MR. MAVRONICOLAS:  Well, it begins with an off-the-record, and
> then the questions start.
>     During that off-the-record period, I was asked – I was out of the room.
> When I returned to the room when those questions started, I found the
> panel – I found the witness and I found opposing counsel.
>     I wasn't present in the room when we were off the record.  I don't know
> what occurred in the room.  But I know there was a series of questions
> that came after it, and so my request is we strike those questions from the
> records.
> MR. CHALOS:  You weren't out of the room.
> THE CHAIRMAN:  Yes, he was out of the room.  I asked him to excuse
> himself and that's when I said to Mr. Rocha, I asked for all of the data
> that wound up in Bates 2001 and 2002, 3001, 3002, because – and I
> mentioned this to you, I know I mentioned this to you subsequently, that I
> was concerned that mitigation efforts had not be exercised and that we
> didn't have the full data to determine whether they went out and sought
> the lowest price cargoes of that ilk.
> MR. MAVRONICOLAS: In fact, you did do that, Mr. Chairman, but you
> do it later.  It's after that point.
>     You make that statement actually on page 870 of the transcript, and you
> begin and talk about production, and ask him to produce.  That happens
> later, Mr. Chairman."

Based upon my explanation, counsel for AIMCOR accepted it, stating (Damages

T. 1467, lines 5 through 24):

> "MR. MAVRONICOLAS:  Mr. Zambito, based on what you said to me
> today, what occurred outside the room, I of course accept what you have
> said as the facts as represented by you.
>     And on that basis, and of course as an advocate for my client, I always
> have to preserve whatever objections we have, and I do that.
>     However, as a matter of response to what you said, I believe that what
> your representation is what occurred in that room, and for everything that
> I know is absolutely accurate, and I will leave it at that, sir, and thank you
> very much for even discussing it with me.
> MR. CHAIRMAN:  Do you drop your motion to excise that portion?
> MR. MAVRONICOLAS:  The necessity for a motion is unnecessary."

Despite having accepted my explanation, counsel for AIMCOR reserved his objection, which I found to be inconsistent (Damages T. 1467, line 25 through 1470, line 13) to wit:

"Again, as I say, I will reserve my objection. I need to do that. I am not going to –
MR. CHALOS: Objection for what?
THE CHAIRMAN: He is objecting to the text. You objecting to what Mr. Ring asked you, whereas I am the one that sent you out of the room. So I am having trouble putting that together.
MR. MAVRONICOLAS: I'm just preserving my client's rights with respect to whatever the process was, the procedure.
THE CHAIRMAN: To the process?
MR. MAVRONICOLAS: The procedure.
THE CHAIRMAN: The procedure.
MR. CHALOS: No, Mr. Chairman, this is unacceptable to me.
THE CHAIRMAN: It doesn't effect you.
MR. CHALOS: Of course it does.
THE CHAIRMAN: No, it doesn't. It effect me. It effects you, yes indirectly. It effects you because if a court – and I want all this down – if a court should determine that I acted improperly sending him out of the room, I get criticized in the judge's opinion.
However, if the damages turned out to be unanimous, the fact that the judge may knock me out, doesn't amount to a hill of beans.
MR. CHALOS: Well, Mr. Chairman, I think its appropriate at this point in time while there is a contemporaneous issue and not after Mr. Mavronicolas gets to go back to his house and cook up a story, what is it that he thinks he is prejudiced, that he should articulate it, if there was a prejudice.
THE CHAIRMAN: He did articulate it. He said that he was sent out of the room, the reporter was out of the room, he has no idea what was said unilaterally, if you will.
So I understand that he is suggesting that was inappropriate activity, and that's he is going to reserve his right of objection to me having followed that procedure. Okay.
MR. CHALOS: Well, I am struggling because I don't recall, neither does my partner, Mr. Corsa, recall unilateral ex parte communications.
THE CHAIRMAN: I understand that, but the mere sending him out of the room is what the problem may be. Okay?
With that in mind, this proceeding is concluded at 4:30 pm..
MR. MAVRONICOLAS: Mr. Chairman, thank you very much."

Despite directing AIMCOR's counsel to set forth his objection in his BRIEFS, I could find no reference to counsel's reservation in either his MAIN or REPLY BRIEF on Damages (Damages T. 1461, lines 16/23).

Notwithstanding, as the Panel's findings were "unanimous," the issue becomes moot in the last analysis.

Peter J. Zambito, Chairman

18

# EXHIBIT B

```
---------------------------------------------------X
```
*In the Matter of the Arbitration between*

**APPLIED INDUSTRIAL MATERIALS**
**CORPORATION,**

<div align="center">

**CLAIMANT**

</div>

**PARTIAL FINAL AWARD**

<div align="center">

– **AND** –

</div>

**VOTORANTIM CIMENTOS LTDA.,**

<div align="center">

**RESPONDENT**

</div>

```
---------------------------------------------------X
```

<div align="center">Before:</div>   Walter R. Muff
John F. Ring, Jr.
Peter J. Zambito, Esq., Chairman

Representations:
For Applied Industrial Materials Corporation
Law Offices of Anthony J. Mavronicolas
By Anthony J. Mavronicolas, Esq.

For Votorantim Cimentos Ltda.
Fowler, Rodriguez & Chalos, LLP
By George M. Chalos, Esq.
    LeRoy S. Corsa, Esq.

**Introduction**

The disputes which are the subject of this arbitration arose out of a Petroleum Coke Sale

Agreement (hereinafter the "Contract") entered into on October 24, 2000 between

Applied Industrial Materials Corporation (hereinafter "AIMCOR" or ""SELLER) and

Votorantim Cimentos Ltda. (hereinafter "VOTORANTIM" or "BUYER").

**Background**

The terms of the Agreement provided for AIMCOR to supply and VOTORANTIM to lift

a quantity of 300,000 MT +/- 10% in each calendar year from January 1, 2001 until

December 31, 2003, FOB vessel Port Arthur, Texas, in accordance with delivery schedules presented by Buyer to Seller.

The clauses of the Contract pertinent to this dispute appear in Appendix A to this Partial Final Award.

Some differences arose between the parties during the 2001 delivery period, but these were resolved prior to this arbitration. It is the second and third year, i.e., 2002 and 2003, which that are the subject of this arbitration.

## Proceedings

The Agreement between the parties provided for arbitration in New York before the American Arbitration Association, but the parties mutually agreed to proceed before two (2) members of the Society of Maritime Arbitrators, Inc. (hereinafter "SMA") and an admiralty attorney as chairman pursuant to the SMA Rules, with minor exceptions. AIMCOR initiated this arbitration against VOTORANTIM by giving Notice of Demand for Arbitration to VOTORANTIM on October 4, 2002, seeking damages in the amount of $1,306,641, plus interest, costs and attorneys' fees as a result of VOTORANTIM's alleged wrongful refusal to accept shipments under the Contract during calendar year 2002. AIMCOR also seeks additional damages as a direct result of VOTORANTIM's alleged wrongful refusal to accept the aforesaid shipments, which have caused Premcor Refining Group, Inc. (hereinafter "PREMCOR"), as supplier of the petcoke to AIMCOR, to initiate legal proceedings in Texas against AIMCOR. AIMCOR seeks indemnity and contribution from Votorantim.

VOTORANTIM served a Statement of Defense and Counter-Claim on November 22, 2002.

Thus, Walter R. Muff was appointed by AIMCOR and John F. Ring, Jr. by VOTORANTIM. Peter J. Zambito, Esq. was appointed as third arbitrator and chairman by counsel. The Panel made written disclosures and was accepted by the parties and their counsel.

Thereafter, in his Preliminary Memorandum, counsel for AIMCOR demanded damages of $1.3 million, plus interest from 2002, lost commissions of approximately $800,000, together with full indemnity, attorney fees and costs for any and all damages claimed by PREMCOR against AIMCOR in the Texas Proceedings.

Counsel for VOTORANTIM, in their Preliminary Memorandum, denied any liability whatsoever and included a counterclaim for damages suffered for alleged failure by AIMCOR to perform during the second half of 2002 and all of 2003.

During the proceedings, counsel and the Panel agreed to proceed solely on the issue of liability, with subsequent hearings on the issue of damages to be held, if necessary, after an Award as to liability was issued.

Five (5) hearings were held before the Panel, specifically on June 30, 2004 and on January 19, July 19 and on August 30 and 31, 2005, at which two (2) witnesses on behalf of AIMCOR and one (1) witness on behalf of VOTORANTIM testified. A further witness on behalf of VOTORANTIM was deposed on November 10, 2005, and the transcript of this testimony was furnished to the Panel.

Extensive exhibits were offered on behalf of both parties and were accepted by the Panel. The proceedings were closed early this year, and the parties submitted Main and Reply Post Hearing Briefs dated March 3 and 13, 2006 respectively.

3

**Facts**

Subsequent to the October 24, 2000 Contract entered into between AIMCOR and VOTORANTIM, AIMCOR entered into a Supply Agreement with PREMCOR on December 1, 2000 which, where pertinent, provided as follows:

> Clause 1....(AIMCOR) to purchase green petcoke, fuel grade, ...destined for fuel use to "Votorantim", a Brazilian Cement Manufacturer

> Clause 2....The term of the Contract shall commence on January 1, 2001 and terminate on December 31, 2003.

> Clause 3....Buyer will purchase from Seller approximately 300,000 Metric Tons a year of Petroleum Coke delivered reasonably ratably during a year. .....

This Supply Agreement incorporated PREMCOR's Terms and Conditions, inclusive of a Force Majeure provision. It also provided that "Under no circumstances shall Buyer and Seller be deemed to have an agency, joint venture or partnership relationship."

Previously, on September 13, 1999, AIMCOR had entered into a separate and distinct petcoke sales contract with VOTORANTIM to annually sell 200,000 MT, +/- 10% in VOTORANTIM'S option, green delayed petcoke. The term was January 1, 2000 to and including December 31, 2002. The petcoke was destined for Brazil and was to be produced by Shell Deer Park Refinery in Texas. VOTORANTIM had the option for an additional 100,000 MT, +/- 10%, final quantity to be mutually agreed. As it developed, the price of petcoke under this Agreement was cheaper than under the Contract which is the focus of this arbitration.

None of the aforesaid contracts were back-to-back where pertinent to the disputes in this Arbitration.

Early on, the grade of AIMCOR petcoke supplied by PREMCOR and provided to VOTORANTIM under its Contract of October 24, 2000 with AIMCOR did not conform to the Contract specifications, but this issue was resolved amicably and does not appear to be a concern in the issues that are the subject of this arbitration.

According to the testimony of Mr. Julio Caesar Rocha, a witness on behalf of VOTORANTIM, Clause 2 (Quantity) of the October 24, 2000 Contract was drafted jointly between him and Mr. Frank Swertz of AIMCOR (now retired). The negotiations regarding Clause 2 included quantity and provisions for a reduction of tonnage. Swertz memorialized these discussions in writing and sent them to Rocha, who approved the text.

Mr. João Brenha also testified on behalf of VOTORANTIM. Although not involved in the initial contract negotiations with AIMCOR, he became VOTORANTIM's supply manager in September 2002, responsible for managing the Contract.

On October 3, 2001, Brenha wrote to Mr. Matthew Scott-Hansen of AIMCOR, the successor of Swertz, to inform him that due to "technical constraints" in some of the VOTORANTIM plants, it was VOTORANTIM's intention to reduce the number of shipments of AIMCOR petcoke supplied by PREMCOR for 2002 from six (6) to five (5) in accordance with the provisions of Clause 2.2 of the Contract.

On November 30, 2001, in a further email to Scott-Hansen, Brenha referred to VOTORANTIM's consumption needs and lack of energy in Brazil, which he stated created a problem with respect to 2002 shipments. Specifically, he stated:

> " ...There is no room in our next year's [2002] plants fuel
> Consumption matrix to hard and unstable petcoke <u>as</u>
> <u>Premcor's used to be</u>." (emphasis added)
> ...........

5

He referred to Clause 2.2 of the Contract as consistent with this problem and stated that, as a result, VOTORANTIM would not schedule AIMCOR petcoke supplied by PREMCOR for 2002.

In the same message, he stated that he would send VOTORANTIM'S proposition for 2002 Shell petcoke shipments.

The Brazilian Government issued a Decree, No. 4.261, dated June 6, 2002, which restricted the use of electrical power in Brazil.

During his testimony, Brenha referred to an energy crisis in Brazil in the second half of 2001 and first half of 2002. Scott-Hansen testified that he read in the petcoke reports that "there were electricity cutbacks in Brazil [in 2001] due to droughts and the fact that the hydroelectric dams, which produce 85 percent of Brazil's electricity, could not generate enough electricity for the entire country and there would be cutbacks to electricity production. However, no formal edicts by the Brazilian Government in the latter half of 2001 or first five (5) months of 2002 were ever produced, if in fact ever issued.

Scott-Hansen and Brenha cooperated in written efforts to have PREMCOR modify AIMCOR's contract with PREMCOR by reducing the quantity AIMCOR was required to buy from PREMCOR. PREMCOR refused the request and insisted that AIMCOR comply with the terms of the contract of December 1, 2000.

Despite the fact that PREMCOR was not a party to the October 24, 2000 contract between AIMCOR and VOTORANTIM, it participated extensively in meetings regarding petcoke, which involved AIMCOR, VOTORANTIM and PREMCOR. The reason for this participation was never fully explained. However, it should be noted that AIMCOR, with respect to the PREMCOR/AIMCOR supply contract, did not have the same right to reduce shipment quantities as Votorantim did with respect to the AIMCOR/Votorantim contract pursuant to Clause 2.2. thereof.

6

In a letter dated March 18, 2002, Votorantim formally invoked clauses 2.2 and 13 of the contract and requested a reduction in the contractual tonnage in all the deliveries scheduled for 2002.

AIMCOR responded on April 2, 2002, requesting performance by VOTORANTIM under the Contract for the year 2002, failing which AIMCOR would hold VOTORANTIM responsible for all losses and expenses incurred as a result of VOTORANTIM'S breach of Contract.

According to Rocha and Brenha, VOTORANTIM had thirteen (13) plants in Brazil and, sometime in 2000, got permits to import petcoke and use it in most of the plants (9 to 10).

Fines were levied on VOTORANTIM  by the Brazilian Government, but none appear to have involved imports or technical or Government constraints.  Some of the fines concerned the method of storage of petcoke.

According to Rocha and Brenha, VOTORANTIM took all Shell Deer Park petcoke in 2002 for which it had contracted with AIMCOR on September 19, 1999.

In 2001, VOTORANTIM consumed its highest quantity of petcoke (about 1.4 million MT).  In 2002, VOTORANTIM planned to use 1.6 million MT of petcoke, but instead used only 1.25 million MT, its second highest annual consumption during the years 1997 to 2004.

While on November 30, 2001, VOTORANTIM stated that it  would not schedule any PREMCOR petcoke for 2002, on January 24, 2002 VOTORANTIM stated that it "would consider the partial reduction if the other party were willing to help us bearing some part of the costs which should be achieved restructuring the price…."

According to David Nestler, a witness for AIMCOR, VOTORANTIM's January 24, 2002 message does not state that VOTORANTIM wanted to cancel the contract.

In a letter dated August 16, 2002, VOTORANTIM notified AIMCOR that the energy crisis in Brazil "no longer exists," and that it was in a position to resume regular shipments in September, October and December 2002 (presumably, a total of 150,000 MT, as each prior shipment was 50,000 MT). Nothing was produced on the record that AIMCOR responded to that letter.

AIMCOR did not provide any petcoke to VOTORANTIM during the months of September, October and December 2002.

No evidence as to 2003 shipments was presented, although 2003 shipments were alluded to in the Post Arbitration Briefs.

As mentioned in the PROCEEDINGS section of this Partial Final Award, on October 4, 2002, counsel for AIMCOR wrote VOTORANTIM demanding arbitration.

Suit by PREMCOR against AIMCOR was commenced in the District Court of Jefferson County, Texas, alleging a breach of the PREMCOR/AIMCOR contract dated December 1, 2000. The suit has been stayed pending the outcome of this arbitration.

**Arguments**

The following is a summary of the parties' contentions as presented during the hearings and in their Main and Reply Post Arbitration Briefs:

AIMCOR'S contentions:

It claims that the Agreement between the parties was breached by Votorantim because neither Clauses 2.2 nor 13 of the Agreement permitted Votorantim to reduce the contractual tonnage or to suspend deliveries respectively while an energy crisis existed in Brazil in the latter part of 2001 and first half of 2002.

8

VOTORANTIM's contentions:

It claims that the energy crisis in Brazil permitted it to reduce contractual tonnage pursuant to Clause 2.2 of the Agreement and to suspend deliveries pursuant to the Force Majeure Clause, No. 13, of the Agreement. Further, Votorantim contends that AIMCOR failed to resume shipments of petcoke, as per contract, once the energy crisis ended.

## DISCUSSION AND MAJORITY DECISION

The Panel has carefully reviewed and evaluated all the evidence presented. In so doing, the Panel agreed unanimously that a Force Majeure event did not occur. In such regard, the Panel noted that the quantity provided for in the Shell Deer Park petcoke contract was accepted in full by Votorantim in 2002, so that there was no suspension in toto of petcoke shipments in 2002. Further, it was agreed unanimously that AIMCOR was at all times acting as a principal, not as an agent or broker, in this transaction.

Thus, the focus turned to Clause 2.2 of the October 24, 2000 Contract between the parties to this arbitration, and the Panel unanimously agreed that if technical or governmental constraints existed in Brazil, Votorantim had the right to reduce the quantity of petcoke it contracted to receive.

The Panel also was of the unanimous opinion that an energy crisis existed in Brazil in the second half of 2001 and first half of 2002.

In the opinion of the Panel, the law of Missouri had no impact on the decision.

At this juncture, the members of the Panel differed on the effect of the energy crisis on Votorantim.

The majority finds that Votorantim failed to prove how the energy crisis affected Votorantim per se. Rather, it argued "generally" that the energy crisis prompted a reduction in the use of electricity necessary to grind the petcoke and produce cement, but failed to provide evidence of how, where (among its many plants throughout Brazil) and to what degree it affected them, i.e., what limitations were imposed on them.

Although a Decree was issued by the Brazil Government on June 6, 2002, considerably after the energy crisis began, insofar as Votorantim was concerned, proof of its impact on it was lacking.

Also, fines levied on Votorantim by the Brazilian Government related to the storage of petcoke and not to the use of electricity.

Other, provisional, measures were issued on May 15 and August 24, 2001 by the Government of Brazil, creating a Chamber for the Management of Electrical Power Crisis but it was not shown whether or how and to what extent these provisions had an impact upon Votorantim's use of electricity.

Joao Brenha was asked what stages of penalties would have been imposed if Votorantim had failed to comply with Government regulations. In part, he replied:

> "Well, actually, I am not very, let's say, comfortable in responding like that because I am not absolutely qualified to discuss what happened in terms of energy in Brazil and so forth." (emphasis added) (p. 1186, lines 14/22, hearing of August 30, 2005)

Brenha was also asked "did the amount of electricity available to your plants start to increase at some point in time," to which he replied:

> "Sure, but I would not be able to say where and when."

Further, Brenha sent an email to Scott-Hansen of AIMCOR on January 24, 2002, stating in pertinent part:

> "2 ....There is no way for us to move to a partial reduction, as suggested in your draft letter, without supporting another costs increase. The point is we would consider the partial reduction if the other party were willing to help us bearing some part of the costs which should be achieved restructuring the price ..." (emphasis added) (Ex. 11)

The majority infers from this comment that the energy crisis may not have had an impact on Votorantim, sufficient to warrant a reduction of 150,000 MT during the first half of 2002, but rather that the refusal to accept shipments during that interval was based upon the cost of the PREMCOR petcoke.

Thus, for the foregoing reasons, primarily Votorantim's failure to provide what specific effect the energy crisis had on its ability to receive, store and grind PREMCOR petcoke, the majority finds that Votorantim breached the Contract during the first seven (7) months of 2002 by not scheduling and accepting 150,000 MT of PREMCOR petcoke.

The majority also finds that AIMCOR breached the Contract by not responding to Votorantim's letter of August 16, 2002, in which Votorantim notified AIMCOR that the energy crisis was over and that it was in a position to resume regular shipments in September, October and December 2002 (presumably, each shipment of 50,000 MT or a total of 150,000 MT), or in providing petcoke during those months.

It is to be noted that Nestler of AIMCOR testified that the actions of Votorantim did not amount to an abandonment of the Contract.

## PARTIAL FINAL AWARD

In summary, the Majority of arbitrators (Mr. John F. Ring, Jr. dissenting in part) finds that Votorantim breached the Contract dated October 24, 2000 by not scheduling and accepting (150,000 MT petcoke) during the first half of 2002 and is liable for the damages sustained by AIMCOR as a result.

The Majority also finds that once Votorantim informed AIMCOR on August 16, 2002 that it was prepared to schedule and accept shipments in September, October and December 2002, AIMCOR breached the Contract of October 24, 2000 by not providing petcoke for delivery to Votorantim and is liable for the damages sustained by Votorantim as a result.

Appendix B hereto details arbitrators' fees and costs and is an integral part of this Partial Final Award. Pursuant thereto, arbitrators' fees are to be shared equally by the parties, but each party is jointly and severally responsible for said fees in toto.

Each party is responsible for its own counsel's legal fees, and Court reporting costs are to be shared equally.

Annexed to this Partial Final Award and also made an integral part hereof is Appendix C, a Partial Dissent by Mr. John F. Ring, Jr.

The Panel remains constituted to hear and determine the damages which flowed from the foregoing breaches.

This Partial Final Award may be reduced to a judgment in any court of competent

jurisdiction.

Dated: New York, New York
       June 28, 2006

                                 _____
                                 Walter R. Muff

                                 _____
                                 John F. Ring, Jr. (Dissenting in part)

                                 _____
                                 Peter J. Zambito, Chairman

13

# EXHIBIT C

LAW OFFICES OF

ANTHONY J. MAVRONICOLAS

75 WASHINGTON PLACE, SUITE ONE
NEW YORK, NEW YORK 10011
———
TEL: (212) 253-6040  FAX: (212) 253-7171
amavronicolas@ajmlaw.us

July 18, 2006

<u>Via Telefax and E-Mail Attachment</u>

Peter J. Zambito, Esq., Chairman  -  <u>Via Fax (212) 889-1288</u>
Dougherty, Ryan
131 East 38<sup>th</sup> Street
New York, New York 10016

Mr. Walter Muff  -  <u>Via Fax (913) 381-3494</u>
6505 West 92<sup>nd</sup> Street
Overland, KS 66212

Mr. Jack F. Ring, Jr. - <u>Via Fax (516) 739-1261</u>
550 Roslyn Road
East Williston, New York 11596

        Re:    Votorantim / AIMCOR
              Partial Final Award
        - - - - - - - - - - - - - - - - - - - - - - - -

Gentlemen:

      We write the Panel pursuant to CPLR 7509 and 7511 to request that the Panel
modify and correct its Partial Final Award of June 28, 2006 to the extent that it reaches
matters that exceed the scope of the authority given to the Panel by the parties with
respect to the issuance of the Partial Final Award.  In particular, the Panel has
erroneously made a preliminary ruling on the issue of liability as to the counterclaim that
Votorantim advised at the beginning of these proceedings that it might pursue after the
initial question of liability regarding the alleged force majeure situation in Brazil was first
resolved by the Panel.

      In that regard, we draw the Panel's attention to a number of places in the
transcripts in which the scope of the bifurcation that was being requested was discussed.
Thus at the first hearing, during opening statement, counsel for Aimcor on page 8, lines
6-16, specifically requested a bifurcation of the hearings under which the question of
liability regarding the alleged force majeure situation in Brazil was first resolved without
regard to Votorandim's as yet undefined counterclaim regarding its claim for resumption
of the contract in August of 2002.

1

> . . . , and then it's our view what we would like to see here
> is a bifurcation. We think the case is clearly set up for that
> as to here's a contract, has it been broken, what's the
> liability. To establish that, so we can do in a more efficient
> manner, so our intention would be to ask the panel to do
> that. . . . (p. 8, lines 6-16)

With respect to the counterclaim, counsel for Votorantim advised the Panel at the first hearing:

> . . . As a result, Votorantim had to go out to the spot
> market, had to go out and cover some of the supplies and
> was forced to incur damages.
> At this point in time, we are not able to give you a sum
> certain, but in excess of $500,000. And during the course
> of the proceedings, we will be able to provide more detail
> with respect to the counterclaim.
> By agreement with counsel for AIMCOR, we agreed not
> to address those issues until after the AIMCOR
> presentation and the Votorantim rebuttal presentation
> presented to the panel. . . . (p. 115, lines 5-19)

At that hearing, however, counsel for Votorantim did object to bifurcation, but not to separating Votorantim's counterclaim from Aimcor's claim under the contract. Rather the objections was with respect to bifurcating Aimcor's liability claim under the subject contract from the quantum of Aimcor's damages.

> MR. CHALOS: Well, also, it's a mixed question,
> whether liability and damages go hand in hand. There is
> really two questions of liability here. Votorantim can only
> be liable to AIMCOR.
> AIMCOR had asked for damages relating to
> whatever their liability may be to PREMCOR. To the
> extent that whatever AIMCOR's liability may be to
> PREMCOR, we believe that should be presented, because it
> would also go hand in hand with the question of liability.
> (p. 118, lines 5-16)

At the conclusion of the first hearing, Chairman Zambito advised counsel for Aimcor and for Votorantim that the Panel instructed that counsel for the parties discuss the question of bifurcation to see whether it could be resolved between counsel.

In fact, prior to the second hearing, counsel did discuss the issue of bifurcation. Thus, at the beginning of the second hearing counsel for Aimcor advised the panel:

MR. MAVRONICOLAS: But what the panel – the idea was we were going to go forward today, put on our witness with respect to the question of liability, also give the panel something on damages, and then hear whatever defense Votorantim had to those issues.

As you know from the background, Votorantim said they may have a counterclaim and also have a question regarding the corporate identy (sic) of the parties – the claimant here. And what the idea was, we would go forward on the question of laying out our case on liability and laying out our case on damages, they would put on their defense, and we would probably ask the panel for a ruling on those questions laid before the panel.

And then depending on how that turns out, have subsequent proceedings to address the question of a counterclaim and anything that still remains.

THE CHAIRMAN: So you are bifurcating on your own?

MR. MAVRONICOLAS: Bifurcating is not the point. He wants to hear damages, and we will take about damages. The question is doing it in stages. First stage we are going to come forward and lay out our case in terms of our contractual case.

MR. RING: You are going to be looking for a partial final award?

MR. MAVRONICOLAS: Yes, so that the panel can go forward and still have the ability to consider a counterclaim and whatever else –

THE CHAIRMAN: You are putting in your whole case but you are bifurcating his counterclaim, if any?

MR. MAVRONICOLAS: Exactly. Because – and I should add in this, because there is a question of the – we have two types of damages. We have a damage claim for lost commissions. We also have this indemnity claim. I may ask the panel for a ruling on the commissions and hold on in terms of the indemnity claim for subsequent part of the proceedings on the indemnity claim.

THE CHAIRMAN: The panel will take that under advisement. I mean I am not going to commit on that on my own, whether I agree with that or not. . . .(p. 436, lines 19-25; p. 437, lines 1-25; p. 438, lines 1-25)

Thus as is clear, the bifurcation that was sought still was focused on the principal liability issue in the case, the question of the force majeure in Brazil, and its impact on Votorantim Thus separating that issue on the force majeure from both Aimcor's damage issues, as well as Votorantim's counterclaim as to both liability and damages. In that

regard, counsel for Votorantim also recognized the nature of the bifurcation that was sought when he advised the Panel:

> MR. CHALOS: I am not 100 percent sure as we sit here today. If the panel wishes to issue a partial ruling on AIMCOR's case in chief and find that there has been no breach by Votorantim, that may end the case for everybody and Votorantim may forgo its counterclaim.
>
> If there is a ruling in favor of AIMCOR, I would presume we will go forward on our counterclaim, first off as a setoff and an affirmative award in our favor.
>
> To answer that question right now, I don't think I am in a position to do so, but we are amenable to whatever the panel decides. . . .(p. 439, lines 5-19)

In any event, at the second hearing the Panel took the question of bifurcation under advisement.

> THE CHAIRMAN: Since there is not agreement at this time, the panel will take under advisement your request, Mr. Mavronicolas, and we will give you a decision.
>
> Personally, I don't like things floating around without resolution. It makes it very difficult to proceed and know exactly what we are going to be asked to do partially, finally. It seems to be the pattern so far that there are a lot of open issues that are not being brought to a head, and that just makes it difficult for the panel. . . . (p. 440, lines 11-24)

In fact, such a bifurcation, separating Aimcor's claim on its case in chief and limiting the first part of the arbitration to a consideration of the issue of Votorantim's liability under the subject contract in light of Votorantim's defense of alleged force majeure in Brazil, and its impact on Votorantim, was in fact the stipulated bifurcation made by agreement of the parties at the third arbitration hearing.

> MR. MAVRONICOLAS: So what happens is get on with the proceedings. We get the question – I have always said from the beginning the first issue is liability.
>
> I said let's bifurcate, let's not even get into the damages, because that is what it is about. I said this from the beginning, **if you determine the question of liability, force majeure or no force majeure, all of the rest of it starts to vanish,** because then the parties know, look, there is a force majeure, or there is not a force majeure and then the whole damages –

MR. RING:  Are you asking for a partial final award on liability only?

MR. MAVRONICOLAS:  I sure –

THE CHAIRMAN:  The panel denied it.

MR. MUFF:  We already ruled.

THE CHAIRMAN:  We ruled that we would not bifurcate, but now I am hearing stuff where we have to go back to the drawing board.

MR. RING:  If it's asked.

MR. MAVRONICOLAS:  I'm saying to you, the question really before the panel and it resolves this dispute is really the question of liability.  Was there a force majeure?  Did they have a defense under that contract?

We heard our witnesses on what the contract was and how it was.  Bring these guys in who we were supposed to have today.  I want to address this before we get out of here.

We were supposed to have today, we would have had the God-damn liability question before the panel and then we could have presented it.

I said to you from the outset, if you resolve that question then our relationship with Votorantim resolves itself, because, quite frankly, if we win, it's one thing; if we lose, it's another.

MR. CHALOS:  Mr. Chairman –

THE CHAIRMAN:  May I interrupt you for a second?

I think we have to reconsider the issue of bifurcation.

MR. CHALOS:  Well, can I be heard on that before the panel rules?

THE CHAIRMAN:  Go.

MR. CHALOS:  **We would consent to a partial final award on the understanding that AIMCOR reproduces witnesses or a witness on damages, if there is an adverse award against Votorantim.**

**On the other side of the coin, if there is a favorable award on the defense award by this panel, then as Mr. Mavronicolas correctly states, it resolves the issue.  The panel closes the proceedings and away we go and AIMCOR goes on in the Texas proceeding against PREMCOR.**

MR. MAVRONICOLAS:  It makes sense.

THE CHAIRMAN:  I didn't realize the first time around, but I am one out of three.  So three people have to

consider that issue.  We have to revisit the bifurcation
issue.

MR. MAVRONICOLAS:  Can we jointly say –

MR. RING:  Give us something in writing jointly
agreed by you two guys.

MR. CHALOS:  Subject to AIMCOR going to
bring – for example bring back Mr. Nestle–

MR. MAVRONICOLAS:  If I understand correctly
what we are trying to accomplish here, let's get to the
liability, let's put our witnesses on, which we have done,
put their witnesses on, and then depending on what happens
here, we then come forward and prove our damages.

THE CHAIRMAN:  Mr. Ring has put it very
succinctly, do that jointly.  Make it joint.

MR. RING:  Don't write us two separate letters that

MR. MAVRONICOLAS:  We will do it right here
on the record.  Let's just do it here, can't we?

MR. CHALOS:  If you don't mind.  I would prefer
to do it – follow up with a letter, but do it on the record,
because if we are going to go with that – proceed in that
manner, then I will pass on further examination of Mr.
Nestler subject to further inquiry about the damages solely
on the issue of damages.

THE CHAIRMAN:  That's fair.

MR. MAVRONICOLAS:  Let me – off the record.
(Discussion off the record.)

MR. MAVRONICOLAS:  Back on the record.

So to recapitulate what is going to happen is we
are going to complete the presentation of the case with
the witnesses on the question of liability.

We are going to brief that issue to the panel and
ask for a partial final award on it, reserving the right to
then recall witnesses with respect to damages to prove
them, and have Mr. Chalos, giving him an opportunity
to cross-examine him on the question of damages.

THE CHAIRMAN:  You agree, Mr. Chalos?

MR. CHALOS:  I do and reiterate for the panel
that there is still an outstanding question of whether or
not Votorantim is going to present a counterclaim
should the matter proceed beyond the issue of liability.

MR. MAVRONICOLAS:  Yes, absolutely.
In other words, if there's additional – a counterclaim
that Votorantim believes that they should be bringing
after the question of liability, they'll have an
opportunity to do that.

THE CHAIRMAN: That answer you question?

MR. CHALOS: Yes. The statement that I think we just agreed to.

THE CHAIRMAN: Okay. So before we get to that issue now, are you going to go for redirect or what are you going to do?

MR. MAVRONICOLAS: Actually, I have no redirect for the witness. I reserve the right to bring him back on rebuttal if I need him, and obviously I am going to reserve the right to bring him back on the damages.

THE CHAIRMAN: Rebuttal on –

MR. MAVRONICOLAS: On the question of liability.

THE CHAIRMAN: You are saying to us you are gong to send us a brief and then depending on what Mr. Chalos says –

MR. MAVRONICOLAS: No, no, no.

THE CHAIRMAN: Rebuttal on what? What are you talking about?

MR. MAVRONICOLAS: What I am saying, we are doing a case on liability. We now put our witnesses on liability. They're going to put on their defense. I . . . . (p. 1014, lines 11-25; p. 1015; p. 1016, p. 1017; p. 1018; p. 1019; and p.1020)

Thus, as counsel for Votorantim's comments make clear, the bifurcation that had been stipulated to between counsel on the record, and jointly requested by the parties at the hearings, was that the Panel consider the questions of liability as to the existence and impact of the alleged force majeure on Votorantim, and that Votoranim's counterclaim as to both liability and damages would then be heard after the initial liability issues regard the claim of force majeure were fully presented to the Panel in Aimcor's case in chief and Votorantim's defenses to that case in chief.

However, because the Panel apparently did not fully understand the request for bifurcation, it was discussed again at the fourth arbitration hearing despite the fact that counsel understood that they had already stipulated to the bifurcaton on the record at the third hearing.

THE CHAIRMAN: Okay. Pages 1017 to 1019. I was very, very confused by a lot of the dialogue here. But what I came away with was you were to jointly request bifurcation?

MR. CHALOS: I thought we did it on the record last time.

> THE CHAIRMAN: Is that your understanding,
> Jack?
> MR. RING: I am confused.
> THE CHAIRMAN: I was very confused.
> MR. MAVRONICOLAS: No, on the record we did.
> My understanding was we did. That's why we proceeded
> as we had. Then it missed on the record but it was done at
> the hearing.
> MR. RING: It's not on the record.
> MR. CHALOS: It was on the record.
> . . . . (p. 1149; line 1-16)

Again at the fifth arbitration hearing, counsel for Aimor confirmed in response to a question from the Chairman that the only witnesses remaining at that point were Votorantim's on Votorantim's defenses on liability regarding the alleged force majeure situation in Brazil and no testimony at all was suggested regarding Votorantim's alleged counterclaim as to its assertion that the contract should have been recommenced in August of 2003 on Votorantim's request. (p.1735, line 5-24)

No joint letter was ever sent to the Panel confirming the bifurcation request. But an e-mail by counsel for Votornatim did in fact confirm to the panel that both parties had agreed to the discussed bifurcation.

In fact, the Partial Final Award refers to the fact that there was no testimony or evidence presented by Aimcor regarding it response to Votorantim's Ausgust 16th letter upon which Votoranitim based its counterclaim asserting that Aimcor should have started performing the contract again in August of 2002. Obviously, no evidence was presented regarding Votorantim's letter of August 2002 allegedly seeking resumption of the breached contract because the issue of Votorantim's counterclaim, regarding both liability and damages, was reserved for consideration after the Panel addressed the fundamental issue in the case as to whether the alleged force majeure condition in Brazil in the first part of 2002 excused Votorantim from performing under the subject contract. Nor was the Panel briefed on the legal issues as to the consequences of a breached long term supply contract-termination of the contract or merely suspension of the contract. In fact, at page 20 of Aimcor's Reply Brief counsel specifically reminded the Panel that Aimcor understood that Votorantim's counterclaim was not then before the Panel by agreement of the parties, and cited to the transcripts in support of that agreement.

Accordingly, Aimcor respectfully requests that the Panel modify and correct its award to withdraw any preliminary ruling regarding Votorantim's counterclaim as to liability and/or damages since the Panel exceeded the authority given by the parties as to the liability issues the Panel was to first consider in its partial final award-the existence and impact of the force majeure Votorantim claimed as a defense to its failure to perform under the contract. This, of course, would neither dispose of Votorantim's counterclaim nor prejudice Votorantim, but would only require that Votorantim be required to come forward with its counterclaim on both the question of liability and damages and that

Aimcor be given an opportunity to raise any and all defenses by witnesses, documentary evidence and briefing regarding Aimcor's defenses to that counterclaim as had been agreed to by the parties. In other words, that Aimcor be given the same opportunity to make its defense to Votorantim counterclaim as Votorantim was given in the five hearings leading up to the Partial Final Award.

Thank you for your attention to this matter.

Very truly yours,

Anthony J. Mavronicolas.

AJM:mgw

Cc:    Fowler Rodriguez & Chalos - <u>Via Fax: (516) 767-3605</u>
       366 Main Street
       Port Washington, New York 11050
       Attention: George M. Chalos, Esq.

# EXHIBIT D

## Anthony J. Mavronicolas

**From:** &lt;Peterzambito@aol.com&gt;
**To:** &lt;a.mavronicolas@ajmlaw.us&gt;
**Cc:** &lt;WalterMuff@aol.com&gt;; &lt;gmc@frc-law.com&gt;; &lt;centuryshipping@optonline.net&gt;
**Sent:** Tuesday, August 15, 2006 10:57 AM
**Subject:** AIMCOR

Dear Mr. Mavronicolas,

The Panel has read email exchanges between yourself and Mr. Chalos and reviewed the file. On so doing, we see no reason to amend the Partial Final Award on liability.

The Panel is prepared to move to the next phase of hearings relative to damages.

Kindly let the Panel know when counsel are prepared to present evidence on damages.

Sincerely/Peter J. Zambito

Dougherty, Ryan, Giuffra, Zambito & Hession
131 East 38th Street
New York, NY 10016
Telephone (212) 889-2300
Facsimile (212) 889-1288
E-mail: drgzh@aol.com
Direct e-mail: peterzambito@aol.com

The information contained in this email message may be privileged and confidential. If the reader is not the intended recipient, or the agent of the intended recipient, any unauthorized use, disclosure, copying, distribution or dissemination is strictly prohibited. If you have received this communication in error, please notify the sender immediately by telephoning (212) 889-2300 and return this message to the above address. Thank you.

# EXHIBIT E

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------X
OXBOW CARBON AND MINERALS LLC, ET.AL.,

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/19/07
```

                      Petitioner,                    06 **CIVIL** 7763 (LBS)

        -against-                                    **JUDGMENT**

VOTORANTIM CIMENTOS LTDA.,
                      Respondent.
-------------------------------------------------X

    Petitioner having moved to vacate an arbitration award, and respondent having cross
moved to dismiss the petition, and the matter having been brought before the Honorable Leonard
B Sand, United States District Judge, and the Court, on January 17, 2007, having issued its
Memorandum and Order denying petitioner's motion to vacate the arbitration award, and granting
respondent's cross-motion to dismiss, it is,

    **ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the
Court's Memorandum and Order dated January 17, 2007, petitioner's motion to vacate the arbitration
award is denied, respondent's cross-motion to dismiss is granted, and both motions for sanctions
are denied; accordingly, the case is closed.

**Dated:** New York, New York
      January 19, 2007

                                              J. MICHAEL MCMAHON
                                              _____
                                                  Clerk of Court
                                    BY:
                                              _____
                                                  Deputy Clerk


                        **THIS DOCUMENT WAS ENTERED**
                        **ON THE DOCKET ON** _____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

OXBOW CARBON AND MINERALS LLC,   :
SUCCESSOR IN INTEREST BY MERGER TO  :
APPLIED INDUSTRIAL MATERIALS CORP.,  :

                Petitioner,   :

                         :         **MEMORANDUM &**
                         :         **ORDER**
         -against-           :         06 Civ. 7763 (LBS)

                         :

VOTORANTIM CIMENTOS LTDA.,       :

              Respondent.  :

                         :

------------------------------------------------------------x

SAND, J.,

      Before the Court is Oxbow Carbon and Minerals LLC's ("Oxbow") petition to

vacate an arbitration award pursuant to 9 U.S.C. § 1 (2000) et seq., petitioner's motion to

vacate the arbitration award, and Votorantim Cimentos LTDA.'s ("Votorantim") motion

to dismiss the petition.


FACTUAL BACKGROUND

      Oxbow is a company organized and existing under the laws of Delaware with its

principal place of business in Stamford, Connecticut.  (Pet. ¶ 1.)  Votorantim is a

Brazilian corporation with its principal place of business in Sao Paolo, Brazil.  (Pet. ¶ 2.)

Oxbow, and its predecessor in interest Applied Industrial Materials Corp. ("AIMCOR")

buy and sell petroleum coke in bulk.  (Pet. ¶ 1.)  Votorantim buys petroleum coke for fuel

in Brazil.  (Pet. ¶ 2.)  The parties are diverse and the amount in controversy exceeds

$75,000.

The parties entered into a two year supply contract for petroleum coke on October 24, 2000, with supply beginning on January 1, 2001. (Pet. ¶ 5.) Votorantim temporarily ceased scheduling shipments of the petroleum coke from January 2002 through August 2002, claiming that force majeure protection under the contract permitted it to do so because of a Brazilian energy crisis. (Id.) Oxbow objected to the suspension of shipments under the contract's force majeure clause. (Id.) After the energy crisis ended, Votorantim attempted to restart the shipments, but was rebuffed. Votorantim counterclaimed against Oxbow for breach of contract.

The contract contains a concise alternative dispute resolution provision under clause 15, entitled "Arbitration." (Pet. Ex. 1.) The arbitration clause provides that "[i]n the event of any dispute arising in connection with this contract, the parties hereby agree to submit such dispute to arbitration under the rules of the American Arbitration Association in New York, United States of America." (Id.) Oxbow demanded arbitration of the propriety of seeking force majeure protection for the cessation of shipments on October 4, 2002. (Pet. ¶ 6.) Five arbitration hearings were held between June 30, 2004, and August 31, 2005. (Id.)

During the hearings the parties discussed a bifurcation of the arbitration to first deal with the issue of liability and later, if needed, with damages. These discussions, some of which took place on the record (which is only partially reproduced for the Court), resulted in high levels of confusion amongst the arbitrators and the parties themselves. What the agreement to bifurcate encompassed is the heart of this motion. The chronology of the agreement to bifurcate is set forth below.

The issue of bifurcation first came up at the first hearing, on June 30, 2004. Counsel for Oxbow requested bifurcation in order to resolve more expeditiously whether the contract was broken by Votorantim. (Mavronicolas Affirmation in Supp. of Pet., Ex. 9 at 119.) ("The bifurcation accomplishes two things, gets us there [to the issue of liability] fast, gives the panel something to focus on immediately, and then we can proceed from there.") Votorantim initially rejected the bifurcation, believing that it "wasn't the agreement between counsel. Clearly, if we bifurcated liability, then the whole proceeding will have to change, because we have a counterclaim, and our counterclaim is a question of liability as to whether or not the breach which we submit is wrongful by [Oxbow] gave rise to damages." (Id. at 120.)

At a subsequent hearing, on January 19, 2005, the chairman of the arbitration panel informed Oxbow that "[s]ince there is not agreement at this time, the panel will take under advisement your request, Mr. Mavronicolas, and we will give you a decision." (Id. at 440.)

At the July 19, 2005 hearing, the parties revisited the issue of bifurcation of the process. After an off the record discussion, counsel for Oxbow stated that after presenting their cases on the issue of liability, "[w]e are going to brief that issue to the panel and ask for a partial final award on it, reserving the right to then recall witnesses with respect to damages to prove them." (Id. at 1018-19.) Oxbow's counsel added that "if there's additional – a counterclaim that Votorantim believes that they should be bringing after the question of liability, they'll have an opportunity to do that." (Id. at 1019.) Votorantim's counsel hesitantly agreed to this plan when asked by the arbitrators if he consented, answering "[y]es. The statement that I think we just agreed to." The

parties were directed to give the panel something in writing memorializing the agreement to bifurcate, which they did not do. (Id. at 1017.) ("Give us something in writing jointly agreed by you two guys.")

At the following hearing, on August 30, 2005, the arbitrators expressed confusion as to what, if anything, was agreed to. (Id. at 1149.) One arbitrator stated "I was confused" while the chairman added "I was very confused." (Id.) After reprimanding the parties for not submitting a joint letter as requested, the chairman expressed that "I understand what you are saying. But it was very confusing and it did not come across clearly that you were requesting it [bifurcation]." (Id. at 1151.)

Eventually, counsel for Votorantim sent an email on September 2, 2005, to counsel for Oxbow and the panel of arbitrators, memorializing that "the parties have requested, and the Panel has agreed, to resolve issue(s) of liability first, with the issue(s) of damages to be presented and decided later, if at all. Of course, should my understanding of the procedure to be followed in this matter is [sic] incorrect, I look forward to a corrective message in return." (Mavronicolas Affirmation in Supp. of Pet., Ex. 12.) The above is the entirety of the agreement; at no point is the issue of when to consider Votorantim's possible counterclaim addressed. Oxbow received the email, and took no corrective measures.

The parties each submitted briefs on the issue of liability to the arbitration panel. In its brief, Votorantim argued not only that it was not liable for breaching the contract, but that Oxbow should be liable for not resuming the sale of petroleum coke for the remainder of the contractual term when the energy crises subsided in Brazil. (Chalos Affirmation in Supp. of Mot. to Dismiss, Ex. C at 27.) Oxbow objected to Votorantim's

4

raising the counterclaim issue in its brief. (Mavronicolas Affirmation in Supp. of Pet., Ex. 17.)

The three person panel of arbitrators returned a partial final award on June 28, 2006 finding that Votorantim breached the contract and was not protected by the force majeure clause and also found that Oxbow breached the contract by not providing petroleum coke for delivery for the remainder of the contract when Votorantim attempted to restart the shipments. (Pet., Ex. 2 at 12.)

In a July 18, 2006 email Oxbow vehemently objected to the panel's finding of liability on Votorantim's counterclaim, arguing that the panel exceeded the scope of its authority given Oxbow's interpretation of the scope of the bifurcation agreement and requesting modification of the partial award. (Mavronicolas Affirmation in Supp. of Pet., Ex. 18 at 8.)  The email raises substantially the same claims as those presently before the Court.  Votorantim objected to any modification and reconsideration of the findings made by the panel. (Id.)

On August 15, 2006, the arbitration panel rejected the request for modification, stating in an email that "[t]he Panel has read email exchanges between yourself [Mr. Mavronicolas, attorney for Oxbow] and Mr. Chalos and reviewed the file.  On so doing, we see no reason to amend the Partial Final Award on liability." (Id., Ex. 20.)

Oxbow filed the instant petition on September 27, 2006 alleging that the arbitrators exceeded their authority in issuing their partial final award and that the Court should modify the award or vacate it either in part or in whole. (Pet. ¶ 10.)  Votorantim filed its motion to dismiss arguing that the arbitrator's did not exceed their authority. Both parties have brought cross motions for sanctions as well.

APPLICABLE LAW

The scope of a district court's review of an arbitral award is very limited. See Bancos de Seguros del Estado v. Mut. Marine Office, Inc., 344 F.3d 255, 260 (2d Cir. 2003). An arbitration award should be enforced even if a court disagrees with the award on the merits so long as there is a "barely colorable justification for the outcome reached." Id. The Federal Arbitration Act, 9 U.S.C. § 1 et seq., permits vacatur of an arbitral award where the arbitrators have exceeded their power. But the Second Circuit has interpreted that provision narrowly. "We have consistently accorded the narrowest of readings to the Arbitration Act's authorization to vacate awards." Westerbeke Corp. v. Daihatsu Motor Co., 304 F.3d 200, 220 (2d Cir. 2002). The inquiry for a district court "focuses on whether the arbitrators had the power based on the parties' submissions or the arbitration agreement, to reach a certain issue, not whether the arbitrators correctly decided that issue." Bancos de Seguros del Estado, 344 F.3d at 262. The court "must determine whether the arbitrator[s] acted within the scope of [their] authority, or whether the arbitral award is merely the arbitrator[s'] own brand of justice." Id.

DISCUSSION

Oxbow's burden in asking the Court to vacate the arbitration panel's award is a heavy one that is not met in this case. From the outset, the Court notes that the parties covenanted to arbitration with a very broad scope, agreeing to arbitrate any dispute arising under the contract. The parties then agreed to limit the scope of the arbitral proceeding, which they are entitled to do. The precise parameters of this limitation are at

6

issue here, but the Court does not find that the arbitration panel exceeded the scope of its authority in rendering its partial final award.

Based on the record before it, the Court finds that the arbitration panel was within its powers in making its decision. While the panel at one point commented that the bifurcation was confusing, it later stated that it understood what the parties sought and ordered the parties to memorialize their agreement in writing. When counsel for Votorantim did this in a very short email, he explicitly stated that "the parties have requested, and the Panel has agreed, to resolve issue(s) of liability first, with the issue(s) of damages to be presented and decided later, if at all. Of course, should my understanding of the procedure to be followed in this matter is [sic] incorrect, I look forward to a corrective message in return." (Mavronicolas Affirmation in Supp. of Pet., Ex. 12.) At no point did the arbitration panel, which previously had maintained open dialogue with the parties via email, email Votorantim to correct the scope of the bifurcation. Neither did Oxbow make any attempt to correct the email.[1] Contrary to Oxbow's contention, at no point in this email did Votorantim's counsel limit his client to asserting its counterclaim only after the issue of its initial liability was determined.

The arbitration panel had made it patently clear to the parties that no matter their level of understanding at the time of the hearing, they wanted the stipulation for bifurcation submitted to them in writing, or else it would not take effect. To wit, at the August 30, 2005 hearing the panel proceeded under the impression that no bifurcation was sought because there had been no written stipulation. Both parties were aware of the

---

[1] Oxbow's contention that this email was sent over the Labor Day Holiday weekend does not further its case, as this email came months before either party submitted post hearing briefs and were still in the process of deposing certain witnesses on the issue of liability. Further, any hint of bad faith in the timing of the email's transmission is misplaced, as the email came three days after the panel requested (for the second time) a joint writing on behalf of the parties regarding the bifurcation.

panel's preference, and both parties agreed to the simple stipulation they finally submitted, which on its face bifurcated the hearing into liability and damages. The stipulation did not explicitly address placement of the counterclaim in either half of the bifurcation but the counterclaim is unquestionably an issue of liability.[2] Oxbow was presented with an opportunity to correct whatever discrepancies it felt were embodied in the September 2, 2005 email, and also to provide evidence against Votorantim's counterclaim in its post hearing briefs.

Furthermore, after the panel rendered its decision, Oxbow requested and received a second look by the panel. The panel, which was in a better position than the Court to evaluate the intent of the parties' stipulation based on the myriad discussions held, upheld its interpretation of the stipulation. The panel allowed the parties to brief the issue and received numerous lengthy emails from Oxbow arguing almost exactly the same issues that it brings to this Court in its petition. (See Mavronicolas Affirmation in Supp. of Pet., Ex. 18.) In these emails Oxbow provided the panel with excerpts of the hearing transcript which it claimed delineated the scope of the stipulation. Oxbow did not convince the panel. After a review of the record the panel upheld its previous interpretation of the scope of the stipulation which was based on the one written submission by the parties. Mavronicolas Affirmation in Supp. of Pet., Ex. 20.) Oxbow is not seeking a referral to the arbitrators to revisit the issue on which it has already ruled

---

[2] This calls to mind Votorantim's initial hesitation when bifurcation was first broached on the record, when counsel stated at the initial hearing "Clearly, if we bifurcated liability, then the whole proceeding will have to change, because we have a counterclaim, and our counterclaim is a question of liability as to whether or not the breach which we submit is wrongful by [Oxbow] gave rise to damages." (Mavronicolas Affirmation in Supp. of Pet. Ex. 9 at 120.) It should be noted that the agreement to bifurcate came after the close of the hearings over a year after the topic was first raised, which certainly has led to some of the confusion.

but to have this Court overrule the arbitrators' interpretation of the parties' agreement to bifurcate. (Hr'g Tr. 11-12, Dec. 7, 2006.)

There is far more than a barely colorable justification for the decision to include the issue of liability on the counterclaim in the partial final liability award. The arbitration panel was well within the scope of its power in considering the counterclaim when it did based upon the language of the parties' stipulation.

CONCLUSION

Because the arbitration panel acted within the scope of its authority in rendering its partial final award, the Oxbow's petition to vacate the arbitration award is denied and Votorantim's motion to dismiss is granted.[3] Both motions for sanctions are denied.

SO ORDERED.

Dated:    New York, New York

          January 17, 2007

                                    _____

                                              U.S.D.J.

---

[3] Because the Court decides this case on the scope of arbitrators' authority it does not need to reach the issue of timeliness of the petition to vacate.

# EXHIBIT F

**7/16/07 - Applied Industrial and Votorantim Cimentos Arbitration - HEARING #4**

**Mel Winter & Associates, Inc.**

**Page 887 to Page 1253**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY: MEL WINTER & ASSOCIATES, INC.

*MEL WINTER & ASSOCIATES, INC.*
*317 Madison Avenue, 21st Floor*
*New York, NY    10017*
*Phone:   212-925-1222*
*FAX:   212-687-8435*

7/16/07 - Applied Industrial Materials Corp. and Votorantim Cimentos Ltda. Arbitration
Hearing #4

Page 1116

Scott-Hansen - Direct (Mavronicolas)
1
2    balance of 2002 and all of 2003.
3        MR. CHALOS:  How?
4        THE CHAIRMAN:  Wait. Let me
5    finish.
6        Are you suggesting that you are
7    going beyond neutralizing their damages
8    by what AIMCOR would have earned, or are
9    you saying you're looking for an
10   affirmative recovery for 2003?  Yes or
11   no.
12       MR. MAVRONICOLAS:  Yes, we are
13   looking for an affirmative recovery.
14       THE CHAIRMAN:  That's out.
15       MR. MAVRONICOLAS:  Can I make a
16   legal argument?
17       THE CHAIRMAN:  Can you save it for
18   your brief?  It's not going to go
19   anyplace here.  We are here to get
20   testimony.
21       And I am saying to you that if
22   you're thinking in terms of getting an
23   affirmative recovery for the second half
24   of 2002 and/or 2003, to the extent that
25   such would reduce Votorantim's damages,

Page 1118

Scott-Hansen - Direct (Mavronicolas)
1
2    Votorantim breached it between January
3    and August of 2002, that under the
4    Uniform Commercial Code, under the Law of
5    Contracts, our argument is, hey, look,
6    what happens then is there are two
7    remedies that are available that the
8    panel can rule on for damages; one is
9    rescission of the contract, the contract
10   is over and, two is, what damages
11   resulted from that.
12       We are going to argue in our brief
13   that in fact under a long-term supply
14   contract that goes for three years, once
15   you breach one year of that, you lost the
16   fundamental benefits of that contract,
17   $1 million plus, and the result is that
18   the remedies available for that breach to
19   AIMCOR and to PREMCOR are twofold.
20       One, contract comes to an end,
21   regardless of what they asked for or
22   don't ask for, that's a damage ruling on
23   your part that you can make, and two,
24   that once that contract comes to an end,
25   if that's the case under the Law of

Page 1117

Scott-Hansen - Direct (Mavronicolas)
1
2    fine.
3        If it's affirmative recovery, I say
4    it's not fine.
5        MR. MAVRONICOLAS:  The only thing
6    with regard to the second, we'll have an
7    opportunity to brief that to the panel.
8        THE CHAIRMAN:  You can brief
9    whatever you want.  I am telling you in
10   advance that the damages should conform
11   to what the panel held in the liability
12   award.
13       MR. MAVRONICOLAS:  And I believe
14   what the panel held, and we will submit
15   the briefs, if you will let me say it for
16   a moment, that you have now gotten to the
17   point of saying, hey, what were damages
18   for 2000-2003.  That's what you came to.
19       Well, what you have before you is a
20   long-term supply contract and under a
21   long-term supply contract, we submit that
22   the law is quite clear, that regardless
23   of what happens in terms of the breach,
24   that once a long-term supply contract is
25   breached, and you have already ruled that

Page 1119

Scott-Hansen - Direct (Mavronicolas)
1
2    Damages, under the Uniform Commercial
3    Code, then the question then becomes,
4    okay, what damages are either party
5    entitled to.  And that's what we intend
6    to brief.
7        It's a legal argument and it's
8    going to be made to panel.  That's why we
9    are presenting it this way.
10       THE CHAIRMAN:  Because we said we
11   would take everything, okay, we will
12   permit you to do that.  That is not to be
13   taken as that I agree with your legal
14   premise.
15       MR. MAVRONICOLAS:  Absolutely not.
16   You're going to have an opportunity to
17   hear both of us.
18       THE CHAIRMAN:  In the interest of
19   giving everybody an opportunity to put
20   whatever evidence they want to put before
21   the panel, we will let you proceed, but
22   again, for the first half of '02, okay,
23   be brief.
24       MR. MAVRONICOLAS:  Thank you, sir.
25       MR. CHALOS:  Mr. Chairman --

59 (Pages 1116 to 1119)

# EXHIBIT G

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

IN THE MATTER OF ARBITRATION BETWEEN

APPLIED INDUSTRIAL MATERIALS
CORPORATION,

CLAIMANT,

- AND –

VOTORANTIM CIMENTOS LTDA.,

RESPONDENT.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

BEFORE:
PETER J. ZAMBITO, ESQ.
CHAIRMAN
WALTER R. MUFF
JACK F. RING

MAIN  BRIEF IN SUPPORT OF AIMCOR DAMAGES

LAW OFFICES OF ANTHONY J. MAVRONICOLAS
ATTORNEYS FOR AIMCOR
915 BROADWAY, SUITE 1309
NEW YORK, NEW YORK 10003
TEL: (212) 253-6040
FAX: (212) 253-7171

ANTHONY J. MAVRONICOLAS
OF COUNSEL

1

PRELIMINARY STATEMENT

Applied Industrial Materials Corporation ("Aimcor"), submits this Main Brief in support of its claim for damages against Votorantim Cimentos Ltda. ("Votorantim").

This dispute arose out of Aimcor's demand that Votorantim proceed with arbitration as a result of Votorantim's breach of the October 24, 2000 term supply contract ("A/V Term Supply Contract") by failing to schedule and take delivery of petcoke produced by the Premcor Refinery ("Premcor") between January and August of 2002. Aimcor was supplying the Premcor petcoke to Votorantim under the A/V Term Supply Contract with a supply contract and marketing agreement ("A/P Contracts") it had with Premcor. Although Votorantim refused to take delivery of the Premcor petcoke under the A/V Term Supply Contract in the first half of 2002 on the claim that a force majeure conditions prevented it from performing under that contract, it continued to take from Aimcor under another contract for petcoke supply during all of 2002 of less expensive petcoke produced by the Shell Refinery, of identical quality and annual contract quantities as the more expensive Premcor petcoke it was refusing to accept delivery of during the first half of 2002.

In its partial final award of June 28, 2006 a majority of the Panel found that Votorantim had not proved that force majeure conditions had existed in Brazil in the first half of 2002 to excuse Votorantim's failure to perform under the A/V Term Supply Contract. The majority thus found Votorantim liable for breaching the A/V Term Supply Contract during the first seven months of 2002. But the Panel also found that "...Aimcor breached the Contract by not responding to Votorantim's letter of August 16, 2002." Immediately upon receipt of the Panel's partial final award, counsel for Aimcor wrote the

2

Panel to advise that the Panel had prematurely granted Votorantim's counterclaim before allowing Aimcor to present any evidence in defense in the form of testimony and documents proving the nature of Votorantim demand that the A/V Term Supply Contract resume in August of 2002 and Aimcor's response to the August 16th letter. Counsel for Aimcor also advised the Panel at that time that by leaving the matter for the court to address, given the great deference and limited review by the courts, it was unlikely that the court would intervene in the arbitration process. As predicted, the court refused to intervene in the arbitration process. And the Panel now knows through Mathew Scott-Hansens sworn testimony and contemporaneous correspondence supporting that testimony[1], Aimcor did in fact respond to Votorantim's August 16th letter with numerous substantive settlement proposal attempting to compromise with Votorantim's demand that Aimcor and Premcor accept Votorantim's force majeure claim for the first seven months of 2002 in order for the A/V Term Supply Contract to resume.

In the damages portion of these proceedings Aimcor has presented the Panel with sworn testimony and evidence which support the Panel granting the remedies of money damages for lost commissions as foreseeable incidental damages , contractual damages and in the alternative termination of the A/V Term Supply Contract term contract as of August 2002 for Votorantim's material breach of that contract by that date. Emboldened by the partial final award, despite having first breached the contract, Votorantim has presented the Panel with a damage claim in excess of $4,247,405 for "mitigation" purchases it claims to have made between August of 2002 and December of 2003. As the evidenced and testimony adduced at the hearings, which will be discussed below demonstrates, not only were Votorantim's claimed purchases not an effort to mitigate

---

[1] . Reference to pages 8-10 below.

damages and are in fact a transparent attempt to outrageously inflate its alleged damages. But by not being required to perform on the A/ V Term Supply Contract, Votorantim actually realized a significant savings in not having to take delivery of the Premcor petcoke through December of 2003.

As Judge Sand in declining to look behind the partial final award noted, arbitrators are granted broad powers in rendering their awards. Those powers are specifically identified under the SMA Arbitration Rules:

> "Section 30. **Scope**  The Panel, in its Award, shall grant **any remedy or relief which it deems just and equitable, ...**"

Please exercise that equitable power here. Do justice according to your oaths, do not allow Votorantim, that created this dispute in the first half of 2002 by initially walking away from an unfavorable contract, while continuing to accept the benefits of a favorable contract, to now reap a huge unwarranted windfall.

## FACTS

### A. EVIDENCE DOCUMENTING AIMCOR'S DAMAGES:

#### 1. The First Seven Months of 2002.

As the Panel found in the partial final award, Votoranitim was the first to breach

the A/V Term Supply Contract by wrongfully refusing to take schedule, let alone take

delivery of any Premcor petcoke in the first seven months of 2002. AD 1[2]  Aimcor was

supplying the Premcor petcoke to Votorantim under the A/V Term Supply Contract

pursuant to a 1999 marketing agreement and petcoke term supply agreement under which

Aimcor was to obtain term supply contracts with third parties for Premcor petcoke.AEx2[3]

As part of that marketing agreement, Aimcor entered into a long term supply contract

with Premcor in 2002 to obtain the petcoke it would provide to Votorantim under the

A/V Term Supply Contract. AEx 2 The Panel thus found in the partial final award that

Aimcor was a principal, as a seller, to Votorantim as buyer, under the A/V Term Supply

Contract.  But under the joint marketing agreement under which Aimcor was required to

enter into term supply agreements with the third party buyers such as Votorantim, and

corresponding long term supply agreements with Premcor to market the Premcor petcoke,

Aimcor was engaged, as defined in Clause 2.01 of the marketing agreement, as

Premcor's: "exclusive representative" for marketing and sale of coke. AEx.2  Julio Rocha

("Rocha") who negotiated the A/ V Term Supply Contract for Votorantim  was aware of

the existence of such contractual arrangements between Aimcor and Premcor, including

---

[2] References to Aimcor Damage Exhibits 1-77 submitted in the five Damage Hearings which commenced April 10, 2007
[3] References to Aimcor Exhibits 1-70 submitted in the six Liability Hearings

the terms of the marketing agreement under which Aimcor would earn commissions. LT.1805-6,1871[4], ABEx.52[5]

Under the marketing agreement, Aimcor entered into the A/V Term Supply Contract with Votorantim and into the corresponding term supply contract with Premcor to supply that petcoke to Votorantim. Thus, as a seller to Votorantim, when Votorantim breached the A/V Term Supply Contract, Aimcor would be entitled as seller to Votorantim to be made whole for Votorantim's breach. Similarly, as a buyer from Premcor under the corresponding term supply contract, Aimcor would be held by Premcor liable for failing to take and redeliver the petcoke to Votorantm. As a matter of simple contract law, and not what a commercial person might opine about Aimcor's right to walk away from the Premcor supply contract, Premcor commenced proceedings in Texas in June of 2002 for breach of contract seeking contract damages for all the petcoke not taken under that contract. AD14

Thus, as a party in the middle when Votorantim refused to perform in the first seven months of 2002, with a sales contract with Votorantim and the corresponding purchasing contract with Premcor, as well as separate marketing agreements as representative for Premcor, Aimcor informed Votorantim in April of 2002 that as the party in the middle it was attempting to bring all three parties into a resolution of the dispute brought about by Votorantim's refusal to schedule deliveries. AEx.21 Votorantim, as it would continue to demand, would not proceed under the contract until Aimcor acknowledge that the claimed force majeure excused its performance. AEx 27,33,34, AD31 By April 19, 2002 Aimcor advised Votorantm that it had begun to

---

[4] Reference to transcript pages  made during liability hearings 1-6
[5] References to Aimcor Brenha Exhibits 38-60 introduced during liability hearings.

mitigate damages by seeking alternative buyers for the Premcor petcoke Votorantim was

refusing to take. AEx29 Aimcor also requested that if Votorantim had alternate buyers

that Votorantim advise Aimcor of such buyers immediately. AEx29 Votorantim took no

action in response, so that Aimcor continued to alternative buyers for the Premcor

petcoke and to present those alternate buyers to Premcor. AEx30 Votorntim was kept

timely advised of those efforts to sell the Premcor petcoke Votorantim was refusing to

take. AEx32 By the end of April of 2007, Premcor proceeded to mitigate damages by

making alternate mitigation sales and Votorantim was contemporaneously advised of

those mitigation efforts. AEx35 Thus, under the term supply contract with Aimcor, as

well as under the marketing agreement under which Aimcor was also Premcor's

exclusive representative, Premcor mitigated both its damages under the Premcor term

supply contract with Aimcor as well as Aimcor's damages under the A/V Term Supply

Contract with Votorantim.  Premcor thus sold the petcoke Votorantim failed to take the

first seven months of 2002 and then the petcoke for the balance of the contract period

from August of 2002 through December of 2003 at the best available prices. AD8,66

As a result of these mitigation efforts, timely advised to Votorantim, 225,000MT

of the Premcor petcoke was sold to alternate buyers by August 13,2002. AD8  All the

witness to testify at the hearings agreed that the PACE high sulfur and the low HGI

specifications, known as PACE low for green petcoke is the appropriate  market price

record for petcoke of Premcor quality. DT637,1140[6] During the first seven months of

2002 the FOB price of the A/V Term Supply Contract was significantly higher than either

the Pace market prices during that period and the actual prices received in the mitigation

sales. AD5,8,22,53 Measured against the PACE market price,  those losses were

---

[6] Reference to transcript pages made during damages hearings 1-6

calculated as $1,564,927 based on monthly prorate shipments of 25,000MT to comply

with the prorate delivery term of the A/V Term Supply Contract and Rocha's testimony,

in response to an arbitrator's question, that Votorantim mitigation purchase shipments

were no larger than 33,000MT. AD2,5 DT1105 Based upon 50,000MT prorated

shipments those loses are $1,610,799 (App A)[7] Measured against the prices obtained for

specific shipment amounts to accomplish 75,000MT each contract quarter through

August of 2002 totaling 225,000MT in the Premcor mitigation sales to alternate buyers,

those losses were $1,296,393 calculated upon the lower contract prices of Aimcor's

corresponding long term supply contract with Premcor. AD7,8[8]

## 2. Votorantim's Demand that Aimcor and Premcor accept Votorantim's Claimed Force Majeure before Votorantim would Re-Commence Performance under the A/V Term Supply Contract

A month after finally declaring force majeure in March of 2002, Votorantim

demanded that Aimcor and Premcor accept Votorantim's claim of force majeure before

Votorantim would consider even discussing resumption of its performing under the A/V

Term Supply Contract: "...there will never be any 'Votorantims's possible proposal to

settle this problem', or even a Votorantim's acceptance to a possible such Aimcor's

proposal, until Aimcor assume a formal recognition of the force majeure situation notice

in our letters..." AEx33 As the Panel now knows from the sworn testimony of Scott-

Hansen and the contemporaneous exchange of correspondence between Aimcor and

Votorantim in August and September of 2002, Votorantim continued to demand

---

[7] Reference to calculations attached as Appendix A to Aimcor Main Brief.

[8] With interest to date Premcor is seeking $1,834,950 for those market loses during those seven months which now includes interest and specifically reserving Premcor's rights to seek additional amounts due on the full balances of the term supply contract through December of 2003 claimed in the Texas litigation which the parties agreed to abate pending the results of this arbitration. AD13,15,16

recognition of its claimed force majeure before it would actually schedule and take

delivery of any shipments of the Premcor petcoke after August 16, 2002. DT 1225,1229

AD38-43[9]. As Scott-Hansen testified, as part of that continued effort to have Votorantim

re-commence performance the second half of 2002, but without either Aimcor or

Premcor having to concede the legitimacy of Votorantim's claimed force majeure and

thus excusing Votorantim's failure to perform, Aimcor made various proposal to

Votorantim offering delivery of Premcor petcoke under terms acceptable to all parties.

DT1190 Those discussions ended on September 27 when Aimcor reported to Premcor

that Votorantim had again repeated its demand that the contract be re-commenced on

Aimcor's recognition of Votorantim's force majeure. AD43 Those conditions where

unacceptable to Aimcor which passed on Premcor response to Votorantim that Premcor

had commenced the Texas litigation against Aimcor[10]. In that action Premcor has alleged

a material breach of contract and anticipatory breach on the basis of Votorantim's failure

---

[9] As the Panel is aware, after the issuance of the partial final award, counsel for Aimcor beseeched the Panel to allow Aimcor to present both sworn testimony and exhibits in defense to Votorantim's counterclaim. These exhibits and Scott-Hansens testimony were part of that evidence. Five of these six exhibits were e-mail exchanges between Aimcor and Votorantim from August 23, 2002 and September 27, 2002-directly relating to Votorantim's August 16, 2002 letter to Aimcor which the majority prematurely concluded no response has been made to in its partial final award. During discovery Aimcor repeatedly requested the production of such e-mails form Votorantim. Votorantim eventual took the preposterous position for a company of its significant size, facing an arbitration that was commenced by Aimcor in October of 2002, that it had retained no e-mails in this matter, despite the fact Rocha had given his e-mails to Brenha when he changed positions at Votorantim. LT1780,1781-2 Aimcor thus located these e-mails in its own archives in March of 2007 and has now, for the first and only time, had an opportunity to present them as part of its defense.

[10] Numerous questions have been asked by the arbitrators of the commercial fact witnesses to testify at the hearings regarding whether Aimcor is legally liable to Premcor for the failure to take delivery of the Premcor petcoke under the Premcor term supply contract with Aimcor for redelivery to Votorantim. That is an issue of law to be ultimately determined by the Texas court if not settled by the parties. It is not an issue of fact dependant upon what a commercial person such as Mr. Nestler, who did not even negotiate that contract, may hold as his opinion. Whatever commercial people may have to say about those contractual liabilities would not even be considered by the court unless the written contract was so ambiguous that it required the court to consider parol evidence of that contract. But even in response to a question about Premcor's damage claim against Aimcor, Scott-Hansen was able to respond, as any first year law student in a contract law course would-that Premcor would seek from Aimcor as damages, as it has in the Texas litigation, the difference between Premcor's contract price to Aimcor and the amounts realized by Premcor in the mitigation sale of that petcoke to alternative buyers. DT1223-4

to schedule and take delivery of any Premcor petcoke through Aimcor. AD13,43 Thus by the end of September of 2002 that Premcor advised Aimcor, and Aimcor in turn advised Votorantim, that Votorantim's condition that Aimcor accept Votorantim's claim of force majeure in order to re-commence performance was unacceptable and that the term supply contracts were terminated as a result of Votorantim's material breach of contract. AD43,DT1229 Aimcor commenced arbitration against Votorantim a week later alleging material breach of contract by Votorantim having failed to schedule and take delivery of any Premcor petcoke through October of 2002. AD14

### 3. Premcor/Aimor's Mitigation Sales Between September/ December 2003

Premcor, as the principal in the marketing agreement in which Aimcor was the exclusive representative, and as the seller to Aimcor in the long term supply contract which was going to be used to provide Votorantim with the petcoke, Premcor sold in mitigation, at the best available prices it could obtain, the balance 375,000MT of petcoke Aimcor was to deliver to Votorantim during the remaining five quarters of the A/V Term Supply Contract which was to run through December of 2003. AD 66  Aimcor, as Premcor's exclusive representative under the marketing agreement with Premcor, assisted by identifying alternative buyers. Those sales were necessary because the A/V Term Supply Contract and the corresponding term supply contract between Aimcor and Premcor were terminated as a result of Votorantim's material breach of the A/V Term Supply Contract the first seven months of 2002. Those sales, as well as the market information presented at the damages hearings, document both the market losses incurred by Aimcor in those remaining tons of petcoke having been sold to alternative buyers, on Aimcor's behalf by Premcor, as well as the fact that by not accepting delivery for the

balance of the Contract Votorantim actually saved hundreds of thousands of dollars instead of having suffered any damages as it now alleges. Thus the evidence of the mitigation sales made by Premcor, with Aimcor's assistance (AEx30), goes not only to establishing Aimcor's contractual damages, but also goes to establish that Votorantim would not be entitled to any damage award because it actually saved money by no longer taking deliver under the A/V Term Supply Contract after August of 2002.

As James O'Malley who oversaw Premcor's mitigation sales explains in his affirmations, Premcor proceeded to sell the petcoke Votorantim did not take in the first three quarters of 2002, through August, and then for the remaining five quarters, through December 2003 to alternate buyers at the best available prices. AD8,66 For the fourth quarter of 2002, September to December, Premcor sold the remaining 75,000MT for year 2002, for a loss of $283,991. AD55, DT1127   Those mitigation sales for both 2002 and 2003 were documented for the Panel AD7.8,64,66, DT 1207 As a result the mitigation losses from alternates for all of 2002 totaled $1,906.572. AD55 But even if the Panel were instead to want to consider the results of Premcor having sold 150,000MT the last half of 2002, those losses in ratable shipments of 50,000MT would have totaled $524,789 based on Premcor's sales during that period.AD58,DT1135-6

The 300,000MT of Premcor petcoke that Votorantim was to take under the A/V Term Supply Contract in 2003 was also sold to alternative buyers. AD56,T1133 The differences between the price Votorantim would have paid to Aimcor under the A/V Term Supply Contract and the prices paid by the alternate buyers resulted in contract losses of $1,754,661. As a result, the mitigation sales to alternate buyers of 225,000MT during the first three quarters of 2002, January through August, 75,000MT the last

11

quarter of 2002, September through December, and all four quarters of 2003, January through December, resulted in contract total losses of $3,661,232.30. AD57 Even if the Panel decided to consider that the quantity at issue after August of 2002 was 150,000MT, the contract losses between August 2002 and December 2003 to alternate buyers in mitigation sales, results in contract losses for the seller Aimcor under that A/V Term Supply Contract of $2,279,450. AD60

If the Panel were to elect instead to disregard these actually mitigation sales of the 2003 Premcor petcoke to alternate buyers, and instead look to the PACE low prices which all the witnesses to testify agreed are the actual report market sales for Premcor quality petcoke, it is indisputable that the party suffering the losses would have been the seller under the A/V Term Supply Contract, Aimcor, and not the buyer. At the beginning of 2003 the reported market price for petcoke of Premcor quality was above the A/V Term Supply Contract price, but after May of 2003 the market price remained below the contract price through the end of the year. AD68, DT1140-1  As a result, the differences between the market prices in 2003 sold in ratable/regular shipments of 50,000MT would have been a $462,497 loss to the seller. AD69,DT1141-5 Making that same comparison of reported market price for Premcor quality petcoke after August of 2002, in ratable shipments of 50,000MT for a total of 150,000MT by December of 2002, would result in a $86,175 loss to the seller. AD69 Here again, not only is the market evidence proof supporting the losses the seller suffered over the balance of the A/V Term Supply Contract, but it again demonstrates the preposterous claim that Votorantim would have suffered any damages in having to go to the market to obtain Premcor quality petcoke

after August 16, 2002-it was a buyers market overall through December of 2003 when the market is compared to the A/V Term Supply Contract.AD68

### 4. Aimcor's Lost Commissions

The majority held in the partial final award that Votorantim breached that contract between January and August of 2002 by not taking any of the petcoke Premcor. As a seller under the A/V Term Supply contract Aimcor would be entitled to its contract damages. But Aimcor also had both a marketing agreement in which Aimcor was a representative for Premcor. AEx2  The difference in purchase price from Premcor and sale price to Votorantim in the term supply contract was to be the commission Aimcor was to earn as Premcor's representative. AD4,AEx2, DT132 Rocha, who negotiated the A/V Term Supply Contract with Aimcor for Votorantim, was aware of these arrangements between Aimcor and Premcor and was aware of the marketing agreement under which Aimcor would earn commissions. ABEx52, LT1805-6,1871 As such, Aimcor's lost commissions, over the entire term of the A/V Term Contract, are foreseeable incidental damages arising out of Votorantim's initial breach of the A/V Term Supply Contract which disrupted both Aimcor purchase contract from Premcor and sale contract to Votorantim through which these commissions would have been earned by Aimcor but for Votorantim's breach.

Aimcor has broken down those lost commissions in 2002 by quarters. AD4 For all of 2002 those lost commissions total $527,758. AD4,DT1113 For the first three quarters of 2002 alone, January to August 2002, those lost commissions would have totaled $423,888.AD4 For 2003, those commissions would have been $543,620. AD62

## B.  VOTORANTIM'S CLAIMED DAMAGES OF FOUR MILLION DOLLARS

Perhaps no part of this now misbegotten arbitration is more disturbing, and an affront to just common decency and any notion of justice, than the fact that Votorantim, the party who precipitated this entire matter by breaching its more expensive contract for Premcor Petcoke the first half of 2002, while taking every ounce of equal quality, but less expensive, Shell petcoke, has now exacerbated that first injustice by demanding that the Panel awarded it in excess of four million dollars in damages for having to make alleged substitute purchases.  However, the irrefutable evidence establishes that Votorantim actually saved hundreds of thousands of dollars by not having to purchase any Premcor petcoke under the A/V Term Supply Contract after August of 2002.  Votorantim has not only failed to prove it mitigated its alleged contractual losses, but in fact attempts to foist an inflated claim on the Panel in the hopes of reaping an unjust windfall.

### 1. Votorantim's Alleged 2002 Mitigation Purchases

#### a. Delivery to Non-Premcor Ports in the North of Brazil

During the hearings on liability Votorantim was required by the Panel to provide a list of its shipments of imported petcoke into Brazil in 2002 in light of Aimcor's claim that Votorantim had not been precluded by the energy crisis in Brazil in 2002 from importing petcoke on other spot and contract purchases.  Votorantim thus produced a list of those shipments and bills of lading for those shipments which were introduced as Votorantim exhibits with the direct testimony of Brenha. VEx G,H[11]  At the  liability hearings documentary evidence was introduced establishing that the only ports Premcor petcoke was imported into by Votorantim were Impituba, Santos (also identified as

---

[11] References to Votorantim Exhibits A-Z introduced into evidence at the liability hearings in this matter

Cosipa) and Sepetiba. AEx57 Rocha during his testimony at the damage hearings

confirmed that these three ports were the ports to which the Premcor petcoke had been

imported and that these ports where located in Southern Brazil. DT 752-3,755 When

asked to confirm during his cross-examination that these ports in southern Brazil were the

only ports to which Votoratim ever intended to take the Premcor petcoke, Rocha,

obviously under oath, testified "No". DT755 But unfortunately for Rocha, during the

liability hearings in this matter, Brenha, the only person who managed the A/V Term

Supply Contract for Votorantim, repeatedly testified that Votorantim was unable to use

the Premcor quality petcoke in Votorantim's plants in northern Brazil. AD29a,29c,

LT1680,1309,DT758-761 Brenha in fact repeatedly testified to this fact, and even went

so far in one of his direct examinations by Mr. Chalos to ask if he could "make a point":

> A. Can I make a point, if I could?
> **Mr. Mavronicolas:** Mr. Chairman---
> **The Chairman:** We understand it. Go ahead, finish your thought.
> A. Actually, it doesn't matter which port is accessible south of Brazil.
> All the ports there were under, let's say, threat which because it
> inventories were too high, which were Sepetiba, Cosipa and Impituba, are
> those ports that could supply petcoke for the plants where petocke
> provided by Shell with Premcor petcoke could be used,**which means
> there is no point in moving petcoke from Sepetiba or whatever to
> north Brazil, because the plants in north cannot use Premcor petcoke.**
>       All the ports that were able to take petcoke and ship petcoke-
> Aimcor petcoke provided by Premcor were under constraints-
> AD29a,LT1680

During his initial direct examination Brenha was even more emphatic as to the fact that

Premcor petcoke could not be taken to ports in Northern Brazil:

> **Q.** Could the Premcor quality petcoke be used in the plants in the
>      Northern part of Brazil?
> **The Witness:** (In English) Absolutely not. AD29,LT1309,DT760

15

But Brenha's testimony repeatedly, and voluntarily, that Premcor petcoke was never to go to the plants in the north of Brazil was merely an echo of Votorantim's counsel's own representation to the Panel when pressed to have Votorantim produce additional documentation as to where and what petcoke Votorantim was importing into Brazil in 2002:

> **MR. CHALOS: Mr. chairman, we'll make that search, but I would like to object to the request insofar as it was always contemplated that whatever petcoke was going to come from the Premcor facility, it was going to be delivered to the southern and the southern plant only. AD29c, LT1297, DT763**

Examining Votorantim's claimed mitigation purchases in light of these statements that the Premcor petcoke to be shipped could only be used by Votorantim's plants in the south of Brazil, Votorantim claims five vessel shipments as it efforts to mitigate its damages after August 16, 2003 when it sent its letter to Aimcor. AD26 In additional expense over what it would have paid for the Premcor petcoke during this last part of 2002, Votorantim claims $1,139,346 for these five alleged mitigation shipments. AD26 Three of those shipments, M/V Tsuru, A/V Agia and the M/V Dipper, for which Votorantim claims $889,224.04 as additional expenses, 78% of its entire 2002 mitigation claim, went to ports in Northern Brazil-the ports Brenha and its counsel are on the record representing that the Premcor petcoke could never have gone to. AD26,AD27-D4,-D5,-D6,DT797,815,834,835

### b. Purchases in 2002 of the Highest Quality Petcoke

Not only were the M/V Tsuru, Agia and Dipper taken to non-Premcor ports ,the largest part of Votorantim's mitigation claim for 2002, and not only of higher quality

16

than the Premcor petcoke and the most expensive shipments Votorantim claims as mitigation for 2002, they were all of the highest quality. DT1267,792,806,816,832, AD70, VSEx2001-2[12] In fact, the second claimed mitigation shipment for 2002, the Norsul Santos, was also better quality than the Premcor petcoke. DT772,836, AD70  And the shipment of superior quality, including low sulphur, on the Tsuru discharged in northern Brazil, went to a Votorantim's plant, Cimesa, Brenha testifies could only use petcoke with low sulfur specifications. LT1292, DT936

     That Premcor quality petcoke was available in the market during the last part of 2002 for purchase is undeniable. Both Scott-Hansen and Mario Sirca who were active participants in the petcoke market in 2002 have testified that Premcor quality petcoke was available for purchase in the market during that time.DT1187,1277,1293 In fact Sirca, purchasing in late 2002 for the fifth largest cement producer in the world, testified that he had purchased shipments of Premcor quality petcoke from the same world market that was available to Votorantim at the time.DT1278,1280, AD11[13].  In point of fact, total exports of Premcor quality petcoke just from the US Gulf Coast in 2002 exceeded five million tons out of which Votorantim claimed it was unable to purchase 150,000MT. AD23

     Among those shipments available to the market in late 2002 were cargoes from the Sincor Refinery which came on line with a new petcoke production in August 2002 with 500,000MT of available at qualities somewhat better than Premcor, towards the middle ranges, at prices of eight dollars a metric ton which is significantly lower than the

---

[12] References to Votorantim Supplemental Supporting Claims Documents
[13] Aimcor Damage Exhibit 11 compiling petcoke purchases in the world market in 2002 as compiled by M. Sirca based on his own purchases and documentation/publications available in that market.DT1271-2, 1278-9,1280,1290

in excess of twenty dollars a ton Votorantim claims to have purchased in mitigation.
DT1298-9   Although Votorantim may claim that lower priced, Premcor quality petcoke
was not made available to it between August and December of 2002, such a claim is
simply incredible. We now know that one of Votoranitm's supplier/sellers was SSM in
both 2002 and 2003 from which Votorantim claims to have made mitigation purchases.
AD70,73, VSEx2001-2,3001-2 We now also know that in the first week of September of
2002, at the very time Votorantim was allegedly attempting to make its mitigation
purchases, SSM was in the position to sell over 750,000MT of ChevronTexaco
Pascagoula petcoke, of Premcor quality, at the PACE low report market price plus one
dollar FOB. AD76 We now also know that SSM was in a position to make additional
sales of that Pascagoula, Premcor quality material, in October of 2002 as well.AD77

### c. Votorantim's Failure to Mitigate Damages and Manipulation of its 2002 Damage Claim to Inflate those Alleged Damages

No legal principal of contract damages could be more fundamental than the
requirement that one damaged by a breach of a contract take reasonable steps to make
itself whole in a manner that is as inexpensive as circumstances will allow.  No principle
of the arbitration process is more fundamental, if the process itself is to have any
credibility, than although parties may dispute and disagree, that they do so with veracity.
What Votorantim has presented here fails on both counts.

Rocha testified that the list of 2002 mitigation shipments he made was complete
and accurate. AD26,DT655 Asked why Votorantim need to make those 2002 mitigation
purchases he replied: "Well, over the volume that we needed to take over the Aimcor
contract they did not perform" DT619 And in selecting which of Votorantim's 2002

shipments he chose out of Votorantim's total shipments that period to arrive at that
volume, he testified:

> Q. And in taking them out of the list of all of your
> shipments for 2002, you selected some and not
> others, you were making those choices, correct?
> A. Yes, but to achieve the volume. DT841

However, selecting the lowest priced shipments for mitigation had no place in Rocha's
selection of Votorantim's alleged mitigation shipments:

> Q. So you took no consideration in terms of what the
> cost of these cargoes were when you put them in?
> A. In some way, no, I was just trying to match up
> 150,000 tons. DT918

But not only did Votorantim not take price into consideration when Rocha
compiled the tonnage for Votorantim 2002 claim, but he disregarded the terms of the A/V
Term Supply Contract. The A/V Term Supply Contract required delivery in "ratable
shipments" AD2 Rocha understood that the A/V Term Supply Contract required, ratable,
regular shipments. DT877,932 Nonetheless, Votorantim claims that it mitigated with
30,000MT delivered on the Maritime Talent in August 2002, 31,000MT delivered on the
Norsul in September 2002, 29,000MT in October delivered on the Tsuru and an
additional 33,000MT delivered on the Agia in October, as well and a final 25,000MT
shipment delivered in November on the Dipper. AD26,DT932 This disregard for the
price of Votorantim's alleged mitigation purchases is manifest in the fact that the
weighted average of Votorantim's purchases for its own account in 2002 was $6.09/MT
while the weighted average for the alleged mitigation purchases was $18.02/MT.
AD65,p9 As Sirca testified, the claimed 2002 mitigation cost was three times the cost for
its own petcoke. DT1308

In point of fact, although Rocha was the one to make up Votorantim's mitigation list for 2002 and 2003 by selecting out of Votorantim's total number of cargoes for those years to arrive at the quantities Votorantim intended to make up its claim, not one of these shipments could have been initially purchased as mitigation purchases by Rocha on behalf of Votorantim. It was Brenha who managed the A/V Term Supply Contract who appears on all the correspondence between the parties after August 2002, who would have been in the position to make mitigation purchases for the Votorantim plants in Brazil where he was located in 2002 and 2003. LT1168,DT861   In fact, according to Rocha's own testimony, from 2001 through 2005, Rocha was in North America purchasing for Votorantim's North American operations and only became director of trading for Votorantim in 2005. LT1760 Rocha was not even in Brazil in 2002 or the United States, he was in Canada. DT861

Clearly, these were not mitigation purchases by Votorantim that it now claims for 2002, instead, the claim Votorantim finally presented as "mitigation" for 2002 was obviously manipulated in an attempt to inflate the claim.

The first schedule of alleged mitigation shipments Votorantim presented in these proceedings, and then attempted to withdraw, listed the Norsul 1-4 and the Agia as 2002 mitigation shipments. AD25 The schedule of alleged mitigation shipments Votorantim finally settled on as their claim increased the claim by nearly a million dollars overall, and added the Maritime Talent, and the expensive cargoes on the Tsuru and Dipper shipments to Votorantim's 2002 claim. AD25,26 But even in this obvious manipulation of its claim Votorantim offers the Maritime Talent as a mitigation purchase despite the fact the bill of lading date for the shipment, let alone the actual earlier date it purchased

this cargo, was August 3, 2002-almost two weeks before the infamous August 16,2002 letter Votomatim claims through which it demanded the re-commencement of the contract. AD28,p8,DT750 As it turns out, the Maritime Talent was the least expensive shipment Votorantim claims as a mitigation purchase for 2002. But Rocha specifically decided to drop 5,000MT of the cargo in that shipment in making up his 150,000MT for 2002. AD26,DT767,909,919 Similarly, the Maritime Talent and the significantly more expensive and highest quality petcoke purchases on the Tsuru and the Dipper were made on contracts Votorantim had with Koch since 1999 and not spot purchases. AD49,50,70 VDEx2001-2 ,DT934 The Tsuru, the most expensive 2002 claimed mitigation purchase, and the Dipper, however, were only added to Votorantim's claim after Rocha's original mitigation list was sent to Votorantim's lawyers in New York. DT794-5, AD25,26 Those changes to list for 2002 alone dropped tonnage valued at $90,796 and added the more expensive tonnage, including the Tsuru, valued in excess of $600,000 in additional costs. DT839,842 The final 2002 mitigation claim also dropped 10,000MT of the Norsul Rio shipment from Votorantim's claim. AD925, AD25,26 And even though the Norsol Rio shipment was of better than Premcor quality, the difference in cost in dropping the Norsul Rio tonnage and adding equal amounts of Tsuru tonnage in the claim alone increases the claim by $136,000. AD926,928

Perhaps no fact is more revelatory of Votorantim's manipulation of its 2002 mitigation claim than the significantly less expensive shipment Rocha failed to include in his mitigation list. In December of 2002 Votorantim received 40,906MT of Premcor quality petcoke on the Norsul Santos at the port of Impituba under the Koch 24 contract. AD70, VDEx2002 This petcoke was of the same quality as the Maritime Talent, and was

21

purchased under the same Koch 24 contract as the Maritime Talent purchase which

Votorantim claimed as its first 2002 mitigation purchase. AD70, VDEx2002, DT942-3

Both, according to Rocha, were Premcor quality shipments. AD943  The Norsul Santos

discharged at a port in southern Brazil and actually went to the same cement plant the off-

spec Premcor went to in 2001. AD944,742 Rocha testified that he had "flexibility" on

this Koch 24 contract under which Votorantim purchased both the Maritime Talent cargo

shipped in August 2002  and Norsul Santos shipment in December 2002. DT957  But

Votorantim's failure to mitigate its damages here, and effort to present an inflated claim

are most obvious in Rocha's response to a question as to why he didn't use the less

expensive Norsul Santos cargo in Votorantim's 2002 mitigation claim:

> **Q.** You don't include this December shipment on the
> Norsul Santos in your mitigation summary which
> is Aimcor Damage Exhibit No.26, do you?
> **A.** No.
> **Q.** And if fact, if you take the Norsul Santos cargo
> 40,000 some metric tons and you multiply it by
> the tonnage-I have done a quick little math of
> 7.75, and you then, instead of using the Tsuru,
> which is the most expensive vessel, you substitute
> the Norsul Santos cargo for the Tsuru vessel, you
> would have had $727,722 less in damages, just
> according to that math?
> **Mr. Chalos:** Objection.
> **A.** Why I do that?
> The Chairman: Overruled. It's overruled subject to
> your being correct on your math. DT945

## 2. Votorantim's Alleged 2003 Mitigation Purchases

### a. Delivery to Ports in North  Brazil, the Purchase of Petcoke with Better Specifications and Non-Ratable Purchases

As the with the 2002 mitigation list, four (Toki, Denbulk, Dipper, Ontario) of the eight of the vessels on Votorantim's 2003 list of mitigation shipments included vessels that discharged at non-Premcor ports in the north of Brazil. AD70, VDEx3001-2  As with the 2002 mitigation list, five of the eight shipments (Rosina Topic, Toki, Norsul Rio, Dipper, Ontario) Votorantim claims as mitigation purchases in 2003 were petcoke with specifications significantly better than Premcor quality.DT976,1322-24, AD70, VDEx3002 As with the 2002 mitigation list, Votorantim claims to have made its eight mitigation purchases in the first seven month of 2003, with two shipments in May of 2003 alone totaling 88,885MT despite the fact that the A/V Term Supply Contract provided for ratable shipments and he knew that the contract required regular shipments .AD26,70. DT978,932

As with its claimed mitigation in 2002 by allegedly purchasing better quality, more expensive petcoke, Votorantim's position that it was unable to purchase Premcor quality petcoke in 2003 is again incredible. Both Scott-Hansen and Mario Sirca testified that Premcor quality petcoke was available for purchase in the market in 2003 for sale to buyers. DT1187,1277,1293  In fact, Sirca had personal knowledge of at least 350,000MT of Premcor quality petcoke in the market in 2003 and purchased 150,000MT of Premcor quality petcoke for his own company in 2003.DT1325  We now also know that SSM, one of Votorantim suppliers in 2003, marketed over 1.5 million tons of ChevronTexaco Pascagoula petcoke, of Premcor quality, at an average weighted price of $10.35/MT in 2003. AD75  In contrast, the weighted average of the mitigation purchases Votorantim claims to have made in 2003 was $21.31/MT.AD65,p14

But none of this should be surprising in light of Rocha's testimony on cross-examination, before having the benefit of leading questions from others to rehabilitate him, that he made no effort to minimize damages by selecting the lowest possible prices for the shipments he was including in Votorantim's mitigation claims, DT841,918

### c. Votorantim's Failure to Mitigate Damages and Manipulation of its 2003 Damage Claim to Inflate those Alleged Damages

It is no coincidence that Votorantim claims to have made its alleged mitigation purchases the first seven months of 2003. AD26  The record market price published by PACE for Premcor quality petcoke in 2003 began the year at over 20 dollars a ton and ended the year at a little over 5 dollars a ton.AD68  Rocha testified that he was aware of this significant drop in Premcor quality petcoke prices during 2003. DT991  As a result, between January and May the reported market price for Premcor quality petcoke was higher than what the contract price would have been under the A/V Term Supply Contract, but after May the contract price was higher than the market price. AD68  Thus, although mitigation purchases between January and May would have cost more than the contract prices, after May market purchases would have been cheaper than the contract prices. If Votorantim had made ratable purchases of 50,000MT of Premcor quality petcoke beginning in February of 2003 and ending in December of 2003, Votorantim would have saved $462,497 over the prices it would have paid under the A/V Term Supply Contract. AD69  What Votorantim has done instead is to load all its alleged mitigation purchases in the first seven months of 2003 with mostly better quality, more expensive petcoke, half of which were delivered to ports in the north of Brazil to which Premcor quality petcoke was not intended to be sent to, in order to outrageously inflate its 2003 damage claim to $3,108,059. AD26

24

As with Votorantim's 2002 mitigation claim, Votorantim's blatant effort to inflate its damage claim is revealed when comparing the shipments Votorantim claimed as mitigation for 2003 to its total petcoke import shipments for 2003. AD26,70,VDEx3001 Beginning in January of 2003, Rocha included the Lian Hua Feng as Votorantim's first 2003 mitigation vessel. AD26 But that same month Votorantim's shipment on the Norsul Vitoria for virtually equal tonnage of Premcor quality petcoke cost $7.75/MT as opposed to $23.05/MT.DT964, AD70,VDEx3001 Both shipments went to Premcor ports in the south of Brazil. DT964 Votorantim purchased the Norsul Vitoria from Koch under its Koch 24 contract, the very same contract it had purchased the Maritime Talent shipment from Koch in August of 2002 which Votorantim claimed as its first mitigation shipment for 2002. AD26,70,VDEx2001 Rocha testified that he had "flexibility" under this very same Koch 24 contract to obtain shipments as he had done on the Maritime Talent. DT957 But if Rocha had selected the Norsul Vitoria instead of the Lian Hua Feng as the January shipment to make up his mitigation tonnage, Votorantim's 2003 mitigation claim would have been $671,884 less expensive.DT966

In March of 2003, Rocha included the Vaky Junior for its mitigation shipment at a cost of $20.15/MT.AD26,VDEx3001 That same month Votorantim received a similar sized shipment on the Nicolas Smile, of similar Premcor quality petcoke, to the same Premcor ports in the southern part of Brazil, but at a price of $7.75/MT. DT968-9AD70,VDEx3001 This cargo was also purchased from Koch under the Koch 24 contract in which Rocha testified he had "flexibility". DT969 But if Rocha had used the Nicolas Smile shipment in Votorantim's 2003 mitigation claim instead of the three times more

expensive per ton shipment on the Vaky Junior in March, Votorantim's 2003 mitigation claim would have been $576,749.29 less expensive.DT970,AD70,VDEx3001

Votorantim received another shipment under its Shell contract of Premcor quality petcoke delivered to a port in the south of Brazil aboard the Vaky Junior again in July of 2003 which Rocha decided not to include in Votorantim's mitigation claim. AD26,70, VDEx3002 The March 2003 Vaky Junior shipment, also a contract shipment from Shell as was the July shipment, cost $20.14/MT while the July 2003 shipment from the same seller under the very same contract, to the same ports, of identical quality, cost $12.80/MT. AD70,VDEx3001-2 This Shell contract is the one Rocha testified that Votorantim had unwritten terms and conditions which allowed Votorantim flexibility under that Shell contract.DT1066 But if Rocha had used those unwritten arrangements under the Shell contract, he could have included the July shipment instead of the March shipment on the Vaky Junior in Votorantim's 2003 mitigation claim, which would have made its mitigation claim $442,503.05 smaller.DT984

Votorantim claims as its last mitigation shipment, the Ontario in July of 2003.AD26 The Ontario's cargo, of petcoke of significantly higher quality than Premcor petcoke went to a non-Premcor port in the north of Brazil at a price of $22.00/MT. AD70,VDEx3002  However, Rocha left out of his list the Agios Rapheal shipment in September of 2003, of Premcor quality petcoke, delivered to a Premcor port in the south of Brazil, purchased under the same Shell contract that Votorantim made its mitigation purchase shipment in the March 2003  on the Vaky Junior. DT994-5,AD70,VDEx3001-2 But here again, the better quality petcoke claimed as a mitigation shipment on the Ontario was $13/MT  more expensive than the Agios Raphael shipment. DT995

26

Rocha also did not include either Votorantim's October 2003 shipment on the Mihalis P or the November 2003 shipment on the Agios Raphael of Premcor quality petcoke, delivered to Premcor ports in the south of Brazil, under the same Shell contract Votorantim claimed to have purchased the March 2003 Vaky Junior under, in Votorantim's 2003 mitigation claim. DT996-8,AD70,VDEx3001-2 The Ontario shipment was $15/MT more expensive than the shipments on both the Mihalis P and the Agios Raphael. DT997, AD70,VDEx3002

These three less expensive, Premcor quality shipments in September, October and November of 2003 which Rocha chose not to include on Votorantim's 2003 mitigation claim totaled approximately 150,000MT and were purchased at FOB prices of between 7 and 9 dollars a ton. DT799 During that September to November of 2003 the reported market prices, PACE, for Premcor quality petcoke was between 7 and 8 dollars a ton. AD68 During this same September to November 2003 period, the contract prices under the A/V Term Supply Contract would have been 14 dollars a ton. As a result, when compared to market prices or the actual purchases Votorantim was making between September and November of 2003 Votorantim would have saved a million dollars by covering in the market rather than paying for the Premcor petcoke under the A/V Term Supply Contract. DT1005 In fact in 2002 Votorantim claims to have taken delivery of its mitigation shipments of 150,000MT in this same August/November period. AD26 And if Votorantim had truly been mitigating its damages in 2003, it should have made its purchases ratably through out the year, rather than during the first seven months of 2003 when the market for petcoke was at its heights for the year.

27

### d. Votorantim had Already Provided for its Entire 2003 Requirement for Premcor Quality Petcoke in 2001

In 2001, Votorantim had two long term supply contracts in place for its supply of Premcor quality petcoke. AD1,AE36 The first contract is the A/V Term Supply Contract entered into by Aimcor and Votorantim in 2000 providing for the delivery of 300,000MT of Premcor petcoke in ratable shipments in 2001, 2002 and 2003. AD2 The second contract was a term supply contract entered into by Aimcor and Votorantim in 1999 for the delivery of 300,000MT of Shell petcoke, also of Premcor quality specifications to be delivered in 2000, 2001 and 2002.AE36 Thus, under both of these contracts, Votorantim would received through Aimcor 600,000MT of Premcor quality petcoke in 2001 and 2002, but only 300,000MT in 2003.AE36,AD2  But, as Aimcor learned after the fact, in November of 2001, at the same time Votorantim was first claiming that it would not be able to consume and take delivery under the A/V Term Supply Contract because of the electricity crisis in Brazil, Votorantim went directly to Aimcor's supplier, Shell, and entered into a November 21, 2001 term supply contract to receive 600,000MT of Shell petcoke, of Premcor quality, in 2003, 2004 and 2005. AD51 Under these term arrangements, Votorantim would then have received 600,000MT of Shell petcoke, of Premcor quality, in 2004 and 2005, as it had arranged identical tonnage under its Aimcor term supply contracts for 2002 and 2003. AD51,AD2,AE36 Indeed, if Votorantim had intended when it made its direct contract with Shell in November of 2001, the last year of the A/V Term Supply Contract in 2003 would have overlapped with the first year of the direct contract Votorantim made with Shell that month so that Votorantim would have received 900,000MT of Shell and Premcor petcoke in 2003. But as early as October of

2001 Brenha was already advising Aimcor that it was not going to be taking delivery of the Premcor petcoke in 2002 because of electric crisis in Brazil. AE3,6 By November of 2001, the month Rocha signed the direct contract with Shell cutting out Aimcor, Brenha advised Aimcor that Votorantim would not be taking any Premcor petcoke under the A/V Term Supply Contract in 2002. AE7,36  So, if Votorantim actually intended to terminate the A/V Term Supply Contract for both 2002 and 2003, it would still receive 600,000MT of Premcor quality petcoke in 2003 from Shell, but without having Aimcor in the middle.

In examining Votorantim's purchases in 2003, Sirca who purchased petcoke for his companies cement plants in 2003, concluded that Votorantim's direct Shell term supply contract made in 2001 for deliveries beginning in 2003 of 600,000MT of Premcor quality petcoke completely met Votorantim's needs for that quality petcoke in 2003. AD65,p12 That conclusion is supported by the incontrovertible fact that Votorantim took delivery of only 543,096MT of that Shell petcoke in 2003, with an additional 34,441MT of Shell petcoke being taken the beginning of 2003 as the last shipment under Votorantim's contract with Aimcor for term supply of Shell petcoke which ended in 2002. AD65,p12 Thus, Votorantim's purchase of the Shell Premcor quality petcoke in 2003 totaled 577,345MT. AD65,p12 Rocha confirmed that Votorantim was taking 600,000MT of the Premcor quality petcoke annually when he testified that Votorantim had taken 600,000MT in 2003 and 2004 and 650,000 in 2005 and 2006.DT1077 But despite that testimony, to account for the 300,000MT extra Premcor quality petcoke it would have had to take delivery of in 2003 if it had intended to actually perform under the A/V Term Supply Contract after 2001, Rocha claimed that Votorantim intended to take delivery of 900,000MT of Premcor quality petcoke in 2003.DT1098  As an

29

experienced buyer of petcoke for use in Cement plants, Sirca testified that the use of that large a quantity of that quality of petcoke by any cement producer would produce problems. DT1330-1 In point of fact, Votorantim took delivery of 1.2 million tons of petcoke in 2003. AD70, VDEx3001 If Rocha's testimony is to be believed, that means that 75% of its deliveries that year would have been of that Premcor quality. AD70,VDEx3002 But as Sirca extract from Votorantim's Shipping Receipts Summary for 2003 (VDEx3001-2), Votorantim took delivery of 577,345MT of Premcor quality petcoke in 2003 from Shell, which was actually only 48% of Votorantim's total purchases in 2003 and the amounts Votorantim was taking between 2003 and 2005. DT 1077.

## LAW

### I. THE UNIFORM COMMERCIAL CODE IN NEW YORK PROVIDES SELLERS THE REMEDY OF CONTRACT CANCELLATION UPON THE BREACH OF A SALES CONTRACT BY A BUYER

In the June 28, 2006 partial final award in this matter the majority found that Votorantim breached the A/V Term Supply Contract during the first seven months of 2002. AD1,p11 Votorantim thus commited the first breach of the A/V Term Supply Contract prior to August 16, 2002.

It was in fact on November 30, 2001 that Brenha wrote to Aimcor on behalf of Votorantim, in response to Aimcor's request for the shipping schedule for the Premcor petcoke in 2002, unequivocally stating that Votorantim would not perform in 2002 under the A/V Term Supply Contract: "...**For that reason we will not schedule Premcor petcoke shipments to year 2002**..."AEx7  In light of that November 30th notice, the majority found as a finding of fact in the partial final award that: ". **VOTORANTIM would not schedule AIMCOR petcoke supplied by PREMCOR for 2002.**"AD1,p6 As the record also established, what ensued between December of 2001 and April of 2002 were discussions between Aimcor and Votorantim, and in turn between Aimcor and Premcor, in which Aimcor, as the party in the middle between the petcoke supplier Premcor and the third party buyer Votorantim, attempted to arrive at a commercial settlement under which Votorantim would agree to schedule 2002 shipments. AEx8-18 As the majority again concluded as a finding of fact in the partial final award, those initial efforts to arrive at a commercial settlement concluded on April 2, 2002:

> **AIMCOR responded on April 2, 2002, requesting performance by VOTORANTIM under the Contract for the year 2002, failing which AIMCOR would hold VOTORANTIM responsible for all losses and expenses incurred as a result of VOTORANTIM's breach of Contract.AD1,p7**

In that April 2, 2002 notice Aimcor not only held Votorantim in breach of the A/V Term Supply Contract, but advised that all of Aimcor's efforts to arrive at a commercial settlement were without prejudice to Aimcor's rights and in the event Votorantim continued to fail to perform, Aimcor would commence arbitration proceedings.AEx18

The Uniform Commercial Code in New York specifically provides a Seller, such as Aimcor, with the remedy of cancellation of the balance of the sales contract that a buyer, such as Votorantim in 2002, breached by refusing to take delivery of any petcoke the first seven months of 2002 as the majority found in the Partial Final Award:

> ### § 2-610. Anticipatory Repudiation
>
> When either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may
> (a) for a commercially reasonable time await performance by the repudiating party; or
> (b) resort to any remedy for breach (Section 2-703 or Section 2-711), even though he has notified the repudiating party that he would await the latter's performance and has urged retraction; and
> (c) in either case suspend his own performance or proceed in accordance with the provisions of this Article on the seller's right to identify goods to the contract notwithstanding breach or to salvage unfinished goods (Section 2-704).

Thus, when Votoranitm breached the A/V Term Supply Contract, Votorantim by initially advising in November of 2001 that it would not perform under the contract in 2002, its actions were an unequivocal anticipatory repudiation of the contract. Then between

January and August of 2002, as each month passed and Votorantim refused to accept any

Premcor petcoke, it materially breached the contract. Then, by repeatedly refusing to

confirm that it would schedule any Premcor petcoke for delivery the first seven months of

2002, Votorantim continued to anticipatorily breach the A/V Term Supply Contract.

UCC 2-610(b) provides Aimcor with an explicit remedy for Votorantim's anticipatory

breach:

> (b)  resort to any remedy for breach (Section 2-703 or
> Section 2-711), even though he has notified the repudiating
> party that he would await the latter's performance and has
> urged retraction; and
> (c)  in either case suspend his own performance or

In addition to UCC2-610(c) providing a Seller such as Aimcor with the right to

suspend its own performance under a sales contract a buyer has anticipatorily breached,

UCC 2-610(b) specifically provides the aggrieved seller with the right to resort to any of

the various sellers' remedies enumerated in UCC 2-703. Here again in UCC 2-703 the

code explicitly gives the seller the remedies of both withholding the seller's own

performance and the right to cancel the breached contract:

> § 2-703.  Seller's Remedies in General
> Where the buyer wrongfully rejects or revokes
> acceptance of goods or fails to make a payment due on or
> before delivery or repudiates with respect to a part or the
> whole, then with respect to any goods directly affected and,
> if the breach is of the whole contract (Section 2-612), then
> also with respect to the whole undelivered balance, the
> aggrieved seller may
>
> (a)  withhold delivery of such goods;
>
> *  *  *  *
> (f)  cancel.

33

Thus, Aimcor was fully within its rights as a seller faced with a buyer's anticipatory breach in first suspending any further Aimcor performance and in canceling that contract.

It has long been settled under New York law that when a buyer's refusal to accept delivery under a sales contract is deemed to be a breach of that contract, the buyer's refusal to perform by accepting delivery is a repudiation of that contract. Thus in *Winter v. American Aniline*, 236 NY 199 (Ct Ap 1923) a buyer agreed to purchase vegetable oil from a seller, but before the oil arrived the buyer notified the seller that it would not take delivery of the oil on the grounds that the seller had not shipped the oil in accordance with the terms of the sales contract. *Winter* at 201 The court, in an unanimous decision, in which Judge Cardoza participated as a member of the New York Court of Appeals held that the buyer's advice that it would not accept delivery was an anticipatory breach of the sales contract. *Winter* at 203 [14]

In *Tenavison v. Newuman*, 408 NYS2d 36 (Ct Ap, 1978) the New York Court of Appeals was presented with a case in which a buyer of televisions for nursing homes notified its seller that it would not perform under their sales contract by accepting delivery of the television sets it had agreed to buy. Finding an anticipatory repudiation, applying the UCC in the circumstances of a repudiated contract, the court held:

> "...While ordinarily a tender of the goods is required ..., the repudiation of a contract by the buyer eliminates the need for further performances by the seller..."
> *Tenavision* at 149

---

[14] Although *Winter* was decided as matter of the New York of the law of sales before the adoption of the Uniform Commercial, unless displaced by specific provisions of the Uniform Commercial Code, the law of sales and contracts in New York remains applicable to contracts of sale falling under the UCC. 107 NY Jur2nd §12,p299 (2004)

Most recently, in *In Re Asia Glogal Crossing Ltd* 326 B.R.240 (SDBC, 2005) a federal bankruptcy judge was called upon to apply the New York doctrine of anticipatory breach to case before him. The court there pointed out that if a contracting party states to his contract counterpart that they "cannot or will not perform" such a statement amounts to an anticipatory breach under New York law. *Global Crossing* at 249 The contract counter-part, presented with an anticipatory breach, is excused from further performance, cancels the repudiated contract and can avail themselves of the remedies afforded by law, Id.

Brenha's November 30, 2001 e-mail to Aimcor stating that Votorantim would not perform is unequivocal in stating that Votornatim will not perform: "…**we will not schedule Premcor petcoke shipments…**" as was majority's finding of fact in the Partial Final award that: "…,**VOTORANTIM would not schedule AIMCOR petcoke supplied by PREMCOR for 2002…**"AEx7, AD1,p6 The majority's ruling in the partial final award that Votorantim breached the A/V Term Supply Contract for the first seven months follows from the majority's findings of fact. Thus, in light of Votorantim's anticipatory repudiation of the contract, pursuant to the remedies afforded to sellers under UCC 2-703(a) and (e), Aimcor both withheld its performance and treated the A/V Term Supply Contract as cancelled, as a matter of law.

Such a legal conclusion is binding regardless of how any individual might have interpreted what any of the parties may have been doing at the time. In its partial final award the Majority also found that Nestler testified that the actions of Votorantim did not amount to an "abandonment" of the contract. AD2,p11 But whatever Nestler's opinion as a commercial man may have been, can have no bearing on whether Votorantim's

actions amounted to an anticipatory repudiation of the contract, any more than a contrary

opinion by Nestler, or any of the other witnesses, that Votorantim's actions amounted to

an "abandonment" of the contract, would have on what the legal consequences of

Votorantim's conduct was. No provision of the New York Commercial Code, or any

applicable New York case law, makes the legal conclusion of anticipatory breach

dependant upon what any of the participants' conduct may mean to other participants.

What the law looks to is a finding a fact of what that conduct was and then have the court

apply the law to that conduct to arrive at the legal conclusion of law as to whether that

conduct was an anticipatory breach of the contract at issue. The conduct expressed in the

words:"...we **will not schedule**...", could warrant no other legal conclusion, when

applying the applicable law, than that it was an anticipatory repudiation.

But Brehna's statement and Votorantim's conduct in refusing for the first seven

months of 2002 was not only an anticipatory repudiation of the contract under UCC2-

610, but was also a simple repudiation of the contract pursuant to UCC2-609. That

provision of the UCC gives a party with reasonable grounds for insecurity with respect to

the contract performance of their contract counterpart the right to ask for adequate

assurance of their counterpart's performance:

> § 2-609. Right to Adequate Assurance of Performance
>   (1) A contract for sale imposes an obligation on each
> party that the other's expectation of receiving due
> performance will not be impaired. When reasonable
> grounds for insecurity arise with respect to the performance
> of either party the other may in writing demand adequate
> assurance of due performance and until he receives such
> assurance may if commercially reasonable suspend any
> performance for which he has not already received the
> agreed return.

(2) Between merchants the reasonableness of grounds for insecurity and the adequacy of any assurance offered shall be determined according to commercial standards.

(3) Acceptance of any improper delivery or payment does not prejudice the aggrieved party's right to demand adequate assurance of future performance.

(4) After receipt of a justified demand failure to provide within a reasonable time not exceeding thirty days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract.

This provision of the UCC is straightforward and Aimcor's actions in the face of Votorantim's refusal to perform between November 2001 and April of 2002 comports with the UCC. Faced with Votorantim's repeated statements that it would not schedule any shipments, Aimcor wrote Votorantim a number of times between April 2nd and April 11th, 2002 demanding a shipping schedule for 2002 which would give assurance of Votorantim's performance under the A/V Term Supply Contract. AEx18,21,22,24,26 Votorantim gave no assurance of its performance in any form, whether by providing even a reduced shipping schedule, let alone a schedule for all of the 2002 tonnage. Having received no assurance of performance from Votorantim, Aimcor wrote Votorantim again on April 11, 2001 to recapitulate the events to date and to notify Votorantim that Aimcor was beginning to seek alternate buyers for the Premcor petcoke. AEx26 On April 19th Aimcor wrote Votorantim again to inform them that, having not received a shipping schedule for 2003 as requested as assurance of Votorantim's performance, and having in fact received responses from Votoratim advising that Votoranim continued to refuse to perform under the A/V Term Supply Contract, Aimcor advised that it had identified an alternate buyer to which it would sell unless Votorantim proposed an alternate buyer. AEx29

Under UCC2-609(4) the result of Votorantim's failure to give any assurance of performance amounts to a repudiation of the contract:

> (4) After receipt of a justified demand to provide within a
> reasonable time not exceeding thirty days such assurance
> of due performance as is adequate under the circumstances
> of the particular case is a repudiation of the contract.
> NY UCC2-609(4)

In the light of that repudiation, Aimcor as a seller facing a breached sales contract governed by the New York Commercial Code was therefore afforded the remedy of both suspending its own performance and treating the contract as cancelled pursuant to UCC2-703(a) and (f).

Finally, as the majority ruled in the partial final award, Votorantim having materially breached the contract by not performing the first seven months of 2002, a full third of the total time remaining under the contract, Votorantim could not then in August demand that Aimcor start performing under the contract after August 16, 2002. As White and Summers, the preeminent authorities on the UCC have explained, once a contract has been materially breached , the contract comes to an end and the breaching party no longer has a conract they can demand that their contractual counterpart perform under:

> **One party's cancellation of a contract after the**
> **others material breach is not repudiation. Once**
> **the contract has been materially breached, there**
> **is nothing to repudiate** White and Summers,
> "Uniform Commercial Code", p202 (4[th] Ed, 2004)

See: *Hope Architectural Products v. Lundy's Construction*, 781 F.Supp. 711 (DKn, 1991); *William Sumner v. Fel-Air*, 680 P2d 1190 (Sup.AS, 1984); *Mayflower Farms v. Tech-Mark*, 666 P2d 1384 (Ca. Or, 1983)

Here the Panel has already ruled that Votorantim first materially breached the A/V Term Supply Contract by not scheduling and accepting the Premcor petcoke the first

half of 2002. AD1,p12  Beginning in April of 2002, after Votorantim's initial breach  and repudiation by failing to give any assurance of performance, Aimcor notified Votorantim in April that Aimcor was proceeding to seek alternate buyers for the Premcor petcoke Votorantim was not scheduling or accepting  for delivery. Between April and September Aimcor, with specific and repeated reservation of its rights, attempted to obtain an acceptable commercial settlement with Votorantim. Votorantim on its part persisted through out those discussions that Aimcor accept the legitimacy of the claimed force majerue so that Votorantim's non-performance the first half of 2002 would not be prosecuted by Aimcor as a breach of contract by Votorantim. By the end of September 2002 those discussions came to an end with Aimcor notifying Votorantim that  Aimcor were not prepared to re-commence performance on the terms Votorantim was demanding. A week later Aimcor commenced the formal arbitration proceedings it had been threatening since the April but which it held back from commencing as it attempted to commercial settle the dispute with Votorantim.. In those circumstances, Votorantim having first materially breached the contract, did not have the right to demand that Aimcor start performing under that contract after August 1th.

## II. THE UNIFORM COMMERCIAL CODE IN NEW YORK PROVIDES THAT A SELLER'S MEASURE OF DAMAGES FOR A BUYER'S BREACH OF SALES CONTRACT BY REFUSAL TO ACCEPT DELIVERY IS THE DIFFERENCE BETWEEN THE CONTRACT PRICE AND MARKET PRICES

In New York UCC 2-703 sets out the remedies afforded to a seller upon a buyer's breach of a sales contract. In particular, with respect to a buyers breach for by the non-acceptance of goods, UCC 2-703(e) provides:

§ 2-703.  Seller's Remedies in General

39

> Where the buyer wrongfully rejects or revokes
> acceptance of goods or fails to make a payment due on or
> before delivery or repudiates with respect to a part or the
> whole, then with respect to any goods directly affected and,
> if the breach is of the whole contract (Section 2-612), then
> also with respect to the whole undelivered balance, the
> aggrieved seller may
>
> *    *    *    *
>
> (e) recover damages for non-acceptance (Section 2-708) or
> in a proper case the price (Section 2-709);

In its partial final award the majority has already held that: "... **Votorantim breached the Contract during the first seven (7) months of 2002 by not scheduling and accepting 150,000 MT of PREMCOR petcoke.**" AD1,p11 Thus Aimcor's recoverable damages for non-delivery as provided for in UCC2-703(e) are set forth in UCC2-708 which provides:

> § 2-708. Seller's Damages for Non-acceptance or
> Repudiation
>    (1) Subject to subsection (2) and to the provisions of
> this Article with respect to proof of market price (Section
> 2-723), the measure of damages for non-acceptance or
> repudiation by the buyer is the difference between the
> market price at the time and place for tender and the unpaid
> contract price together with any incidental damages
> provided in this Article (Section 2-710), but less expenses
> saved in consequence of the buyer's breach.

As a result, Aimcor's damages for either "non-acceptance" or "repudiation" by Votorantim is the difference between the contract price of the A/V Term Supply Contract and the market price of the petcoke at the time of performance together with incidental damages allowed for under UCC2-710. Finally, with respect to the proof of market prices, UCC2-724 specifically recognizes the use of trade journals such as PACE as appropriate proof of market prices:

40

§ 2-724. Admissibility of Market Quotations
Whenever the prevailing price or value of any goods
regularly bought and sold in any established commodity
market is in issue, reports in official publications or trade
journals or in newspapers or periodicals of general
circulation published as the reports of such market shall be
admissible in evidence. The circumstances of the
preparation of such a report may be shown to affect its
weight but not its admissibility.

As with the doctrine of anticipatory breach, the law in New York establishing that

the measure of damages for the non-acceptance of goods by a buyer such as Votorantim

has long been settled. In *Windmuller v. Pope*, 107 NY 674 (1887) the New York Court of

Appeals had to consider a case in which a buyer of iron rails breached a sales contract by

advising the seller that it would not perform under the sales contract requiring the buyer

to accept delivery of goods. The court held that the seller's measure of damages for

buyer's non-acceptance of goods is the difference between maket and contract price.

*Windmuller* at 675    In *Foglino v. Webster/Kidder Paepody*, 244 NY 516 (CtAp,1926) a

seller had contracted to deliver two shipments of coal to a buyer. The buyer breached the

contract by withdrawing its payment method before the seller was able to deliver the

coal. The trial court, affirmed by a unanimous court in which Judge Cardoza was a

member of the panel, applied the measure of damages based upon the difference between

the contract price and market price for the coal which the buyer had not accepted.

*Foglino* at 517 The buyer argued that the seller had suffered no damage because the seller

had not paid for the coal because the supplier of the coal to the seller had consented to

canceling the supply contract. *Foglino* at 518 In rejecting that argument, the unanimous

court wrote:

" It is argued, however, that on the facts before us such a
situation is but theoretical. The original seller of the coal

41

> has consented to abrogate the contract. Even so, the rule
> to be adopted does not vary because of the generosity of
> a third party. Id.

Thus in a case of non-acceptance and repudiation by a buyer, the measure of damages is

the difference between market and contract prices, regardless of whether the seller paid

or, is even contractually bound, to pay its own supplier. Here Aimcor has not taken

delivery, nor yet paid for the Premcor petcoke. But Premcor has not abrogated its sales

contract with Aimcor which is the subject of the stayed Texas litigation. AD13[15] As the

New York Court of Appeals in *Foglino* held, the proper measure of damages is the

difference between contract price and market price regardless of what, if any, amount

Aimcor may be found by the Texas court to be liable to pay to Premcor.

A decision written by Judge Learned Hand in the Second Circuit a decade after

*Foglino* explains why the measure of damages in repudiation and non-acceptance cases

utilize as the measure of damages the difference between contract prices and market

prices. In *Bisbeee Linseed Corp v. Paragon*, 96 F2d 464 (2nd Cir,1938) a seller had

contracted to deliver linseed oil to a buyer over a term of months against specification

that the buyer would provide to the seller prior to delivery. Prior to the delivery period

the seller asked the buyer for its specifications, which the buyer did not provide. After

accepting initial deliveries, the buyer repudiated the contract by refusing to give

schedules for further deliveries because of prior delivery shortage claimed under the

contract. *Bisbee* at 465 Applying New York law Judge Hand held that the measure of

damages was the difference between the contract price and the market price. *Bisbee* at

---

[15] Regardless of what Nestler or any of the commercial men's opinions may be as to whether Aimcor may be liable to Premcor for failing to take delivery and pay for the Premcor petcoke, it is the Texas court alone that is able to make that determination regardless of who any of the commercial men who participated in the transaction may believe.

467 He went on to explain that actual spot mitigation sales should serve in such cases as proof of market for the purposes of calculating damages, but that because the contract was to be performed over a period of time, proof of the market prices each month in which delivery was to take place had to be presented to the jury. Id.

In the more recent case of *Bache & Co. v. International Controls* , 339 F.Supp 341 (SDNY, 1972) a buyer had breached a sales contract under which a broker/dealer/ seller was to deliver various securities to the buyer. There the court applied UCC2-708 as adopted in New York when measuring the seller's damages as the difference between market price and contract price for some of the securities the buyer had not purchased as provided for in the repudiated sales contract. *Bache* at 353

Both Rocha and Scott-Hansen testified that the PACE market reports for low HGI, high sulfur, are the market prices for the Premcor petcoke that was to be sold under the A/V Term Supply Contract. DT637,1140  Measuring Aimcor's contract damages under UCC2-708 as the difference between the contract price and the PACE market price over the first seven months of 2002, those damages totaled $1,564,927 based on monthly prorate shipments of 25,000MT to comply with the prorate delivery term of the A/V Term Supply Contract and Rocha's testimony, in response to an arbitrator's question, that Votorantim mitigation purchase shipments were no larger than 33,000MT. AD2,5 DT1105 In the Partial Final Award the majority found that the earlier shipments had been 50,000MT.AD1,p8  Thus, measuring Aimcor's damages based upon ratable shipments of that tonnage, beginning in January of 2002 and ending in July 2002, by comparing the contract price to the market price as reported by PACE during that time results in a loss to Aimcor over that period of $1,615,799.(App 1)

But Votorantim's initial breach of the contract and failure to provide Aimcor with adequate assurance of Votorantim's performance was a repudiation of the contract for which the UCC provides Aimcor with the remedy of cancellation. With the cancellation of the contract as a result of Votorantim's repudiation of the contract, UCC 2-708 provides that Aimcor's damages for the entire term of the contract, for which Votorantim did not take delivery, would be measured by the difference between the market and contract price during the entire term of the contract. The majority in the partial final award found that 150, 000MT would have been delivered after August 16, 2002 in shipments of 50,000MT.AD1,p11 Comparing the difference between the contract price during the August to October 2002 period to PACE during that period, ratably in shipments of 50,000MT, results in a loss, and corresponding savings to Votorantim of $86,175. AD69 Using those same shipment sizes to again measure Aimcor's damages for the balance of the A/V Term Supply Contract period through December 2003, results in a $462,497 loss to Aimcor and corresponding saving by Votorantim.AD69 Thus, when measuring Aimcor's damages, as provided for as a remedy under UCC 2-708, by comparing the difference between the market price and the contract prices in 50,000MT ratable shipments during the period January 2002 to December 2003, Aimcor's damages would be $2,164,471.

As Learned Hand held in *Bisbee* , supra, actual spot sales of the very goods the buyer refused to accept can also serve as further proof of market prices. Comparing then Premcor's spot mitigation sale price through all 2002 to the A/V Term Supply Contract prices over that entire period, the measure of Aimcor's damages under UCC2-708 would be $1,906,572. AD57 The same comparison of mitigation sale prices to contract prices

44

through 2003 results in damages of $1,754,661. AD57 Total damages for the entire
balance of the contract after Votorantim's repudiation of the contract would be
$3,661,232 based on Premcor's mitigation sales. AD57

### III. UNDER UCC 2-710 AIMCOR'S COMMISSIONS WHICH WOULD HAVE BEEN PAID UNDER THE MARKETING AGREEMENT WITH PREMCOR ARE RECOVERABLE FROM VOTORANTIM AS INCIDENTAL DAMAGES

Aimcor and Premcor entered into a Marketing Agreement on August 1, 1999 in
which Aimcor became Premcor's sales representative for the purposes of selling
Premcor's petcoke to third parties under term supply contracts at a term of at least one
year. AEx2 Clauses 2.02 and 5.01 provided that Aimcor would be compensated by
commissions which would be calculated by the difference between the price Aimcor
would pay to buy the petcoke from Premcor and the price Aimcor would in turn
simultaneously sell that same petcoke to third party buyers such as Votorantim. AEx2
Clause 5.01 of the Marketing Agreement further provided that Premcor had to approve
both its sale price to Aimcor and Aimcor's sale price to any third party buyer so that
Premcor would completely control the price of its petcoke and also control the amount of
Aimcor's commissions. AEx2

As the majority concluded as a finding of fact in its Partial Final Award,
Votorantim participated extensively in business meetings with both Aimcor and Premcor.
AD1,p6 Rocha further testified during the liability hearings that Votorantim was aware of
the contractual arrangements between Aimcor and Premcor.T1805-6 At both meetings
and in contemporary correspondence Rocha was informed by both Aimcor and Premcor
that Aimcor would earn commissions under marketing agreement based upon the term

supply contracts Aimcor completed with Premcor as supplier and third party buyers such

as Votorantim AREx52

UCC 2-708(1) which provides for the measure of a seller's damages in the event

of a buyer's non-acceptance or repudiation of a contract specifies that incidental damages

as provided for under UCC2-710 are recoverable by sellers as part of their damage

award. UCC 2-710 states:

§ 2-710 Sellers Incidental Damages

Incidental damages to an aggrieved seller include any
commercially reasonable charges, expenses or commissions incurred
in stopping delivery, in the transportation, care and custody of goods
after the buyers breach, in connection with return or resale of the goods
or otherwise resulting from the breach. (emphasis added)

In *Bulk Oil v. Sun Oil Trading*, 697 F2d. 481 (2nd Cir, 1983), the Second Circuit

was presented with the opportunity to determine the scope of incidental damages under

UCC 2-710 in a case in which a buyer had breached a sale contract for the purchase of oil

by refusing to pay. The seller sought as incidental damages financing cost incurred in

purchasing the oil from its supplier. *Bulk Oil* at 482 The court examined precedents

dealing with the UCC and the UCC itself, concluded that it should give a "broad

meaning" to incidental damages and held that the seller's interest charges were

recoverable as incidental damages under UCC 2-710. *Bulk Oil* at 484 Similarly, in *Bache*

*& Co. v. International Controls Corp.* 339 F.Supp 341 (SDNY,1972) a seller sought

commissions as incidental damages which would have been earned if the buyer had taken

delivery of securities under a sales contract in the form of a tender offer. Applying New

York law and UCC 2-710 the court held that the commissions were recoverable as

incidental damages. *Bache* at 3

46

Aimcor and Premcor[16] had entered into a marketing agreement under which Aimcor as Premcor's sales representative would earn commissions by marketing half of Premcor's annual petcoke production. AEx2.Aimcor's commission was structured in that marketing agreement to be derived from the difference in price between the price Aimcor purchased the petcoke from Premcor for and the price Premcor would simultaneously deliver it to third party buyers such as Votorantim on price terms previously disclosed and approved by Premcor. AEx.2 In the partial final award the majority made factual findings that Votorantim participated extensively in meetings with Aimcor and Premcor AD1,p6 Rocha testified that he was aware of the arrangements between Aimcor and Premcor as well as of the terms of that marketing agreement under which Aimcor would earn commissions LT 1805,1871, AREx52.

If Votorantim had taken delivery of the Premcor petcoke the first seven months of 2002, Aimcor would have earned $ 432,892 in commissions over that period. AD4 If the contract had been performed the last quarter of 2002, Aimcor would have earned an additional $103,868 in commissions. AD4 Performance through all of 2003 would have earned Aimcor an additional $543,620 in commissions. Thus if the contract had been performed completely in both 2002 and 2003 by Votorantim, Aimcor would have earned $1,089,380 in commissions over those two years.

## IV. VOTORANTIM'S ALLEGED MITIGATION PURCHASES ARE NOT RECOVERABLE DAMAGES BECAUSE THEY FAILED TO SATISFY THE REQUIREMENTS OF UCC 2-712

As the legal authorities discussed in point I of this legal argument demonstrate, Votorantim's actions in the first seven months of 2002 in both refusing to perform and

---

[16] The marketing agreement was originally between Clark Refinery which subsequently changed its name to Premcor.

47

refusing to give assurance that it would perform in the future constituted a material

breach of the contract as held by the majority in its partial final award and a repudiation

of the contract as a matter of law. (Supra p 31) Once the contract had been materially

breached by Votorantim, the contract came to an end and Votorantim could no longer

demand that Aimcor perform under the contract as Votorantim did in August- with the

unacceptable condition that Aimcor and Premcor accept Votorantim's claimed force

majeuer and forego any claim on Votorantim's failure to perform during the first half of

2002. The contract came to an end with Votorantim's repudiation and material breach of

the contract. The black letter law on this point is unambiguous and clear:

> **One party's cancellation of a contract after the
> others material breach is not repudiation. Once
> the contract has been materially breached, there
> is nothing to repudiate** White and Summers,
> "Uniform Commercial Code", p202 (4[th] Ed, 2004)

But even if the Panel was prepared to disregard the law on this issue, Votorantim

would still not be entitled to a damage award because its alleged mitigation purchases

completely failed to satisfy the requirements for such mitigation sales under UCC 2-712.

UCC 2-712 provides:

> § 2-712. "Cover": Buyer's Procurement of Substitute
> Goods
>
> (1) After a breach within the preceding section the buyer
> may "cover" by making in good faith and without
> unreasonable delay any reasonable purchase of or contract
> to purchase goods in substitution for those due from the
> seller.

Thus any mitigation purchases must be both reasonable and made in good faith. The New York Official Comment to UCC 2-712 sets out the test for determining whether a buyers purchases satisfy the requirements of UCC 2-712:

> "... The test of proper cover is whether at the time and place the buyer acted in good faith and in a reasonable manner,..." 62½ Mckinney p.219 (2007)

The courts in New York have held that whether a buyers actions in making mitigation purchases were reasonable and done in good faith is a question of fact. *Tynan Incinerator v. International Fidelity* 499 NSY2d. 118,120 ( 2nd Dept, 1986) Not only must an attempt to mitigate damages be reasonable  and done in good faith, but as Judge Brieant explained in *M. Golodetz Export Corp v. S/S Lake Anja*, 751 F2d. 1103,1112 (SDNY, 1985), a case in which he considered the manner in which mitigation of damages must be done, cost which might have been avoided are not cost that may be charged  as mitigation:

> The damage rule in admiralty cases generally does not differ from ordinary contract rules....As in any other action for contract damages, a shipper is under a duty to mitigate his losses.....The venerable rule that requires a plaintiff to mitigate his damages has been explained by the principle that "damages which the plaintiff might have avoided with reasonable effort ... are ... not caused by the defendant's wrong ... and, therefore, are not to be charged against him." 2 *Williston on Contracts* § 1353 at 274 (1962)

Votorantim's alleged 2002 and 2003 mitigation purchase were neither reasonable efforts  to obtain Premcor quality petcoke nor made in good faith. In the second half of

2002, 78% of the total petcoke Votorantim claims to have purchased in mitigation was delivered to ports in the north of Brazil which Brenha testified, and Votorantim's counsel represented to the Panel, were ports to which Premcor petcoke could not be taken. Supra, p.18 Not only were these alleged mitigation purchases taken to non-Premcor ports, but the petcoke was of significantly better quality than Premcor petcoke and of dramatically higher cost. Supra, p18-19 But as both Scott-Hansen and Sirca who were active in the petcoke market in 2002 testified, and as the record of sales in the market demonstrate, Premcor quality petcoke was available for purchase in the market the second half of 2002. Sirca in fact purchased some of it for his own Cement plants the second half of 2002. Supra p.18 And one of Votorantim's own suppliers, from which it claims to have made mitigation purchases, SSM, was selling Premcor quality petcoke in September 2002 at significantly lower prices than Votorantim claims to have been paying for its mitigation purchases. Supra p.18, AD76 Further, as Rocha testified, when he selected the alleged mitigation shipments out of all of Votorantim's shipments the second half of 2002, he made no effort to select the least expensive petcoke, for he took no account of cost and only selected to make up the appropriate tonnage. Supra p.20-21 Nor did he select ratable shipments for the alleged 2002 mitigation purchases as the delivery terms of the A/V Term Supply Contract required. Supra p.21 However, the manner in which Rocha obviously manipulated the alleged 2002 mitigation claim which resulted in an outrageously inflated claim is certainly the most telling. Supra p.23-24 Less expensive tonnage was included in the first version of Rocha's mitigation list and included in the second AD,25,26 Supra p.23-24 Significantly more expensive tonnage not included on the original mitigation list was added to the final list. AD25,26, Supra 23-24

Significantly less expensive petcoke of Premcor quality shipments made the second half
of 2002 were never included as mitigation shipments despite the fact that it went to
Premcor ports, under the same contract with the same supplier Votorantim claims to have
made the very first 2002 mitigation purchase with on the Maritime Talent. AD2670,
VDEx2001 Such actions as alleged mitigation were neither reasonable nor done in a good
faith effort to mitigate damages.

Votorantim's alleged 2003 mitigation purchases are equally infirm. Four out of
the eight shipments it claims as mitigation in 2003 went to ports in the north of Brazil
which Votoranim claimed Pemcor petcoke could not be taken. Supra p.25 Five of the
eight alleged mitigation shipments were of petcoke of significantly better petcoke than
the Premcor quality Votorantim calims to have been replacing. Supra p.25 Here again
both Scott-Hansen and Sirca testified that Premcor quality petcoke at significantly lower
prices than what Votorantim claims to have been paying was available in the market for
purchase. Supra p.25-26 And here again in 2003, SSM who Votorantim claims to have
made two migration purchases from was offering in the market for sale hundreds of
thousands of tons of Premcor quality petcoke at prices significantly less than what
Votorantim claim to have had to pay to replace the Premcor shipments in 2003, Supra
p.26, AD74  Furthermore, despite knowing that the contract it was allegedly trying to
replace the tonnage for provided for ratable shipments, Votorantim claims to have taken
all of its mitigation shipments on eight ships the first seven months of 2003 when the
petcoke market was at its annual heights. Supra p.26  At the same time, Votorantim did
not need additin Premcor quality petcoke  in 2003 because in 2001 it had cut Aimcor out
and gone directly to Aimcor's supplier Shell and obtained a contract which began in 2003

51

to supply the same amount of petcoke, of identical quality, it was taking through Aimcor .

in 2001 and supposed to take in 2002. Supra 30 Finally, as with the 2002 mitigation

claim, Rocha's selection of some shipments as mitigation from Votorantim's total 2003

shipments and decision not to include other shipments as mitigation, of identical quality,

purchased form the same suppliers, under the same contracts, but which were

significantly less expensive, glaring revels the lack of good faith in attempting to present,

let alone to have actually been mitigating Votorantim's alleged damages. Supra 27-30

It is well settled law in New York and without doubt in every jurisdiction in the

United States if not the world, let the party claiming damages has the burden of proving

those damages. *Hersey Farms v. State,* 110 NYS2d.324,330 (CtCl ,1952) When parties

fail to prove their damages they are not  awarded. *Hindustan Zinc V. Tennant,* 667

F.Supp 1000,1011(SDNY,1987) Votorantim's alleged mitigation purchases were not

reasonable, made in good faith as an effort to reduce its alleged damages nor proven. As a

result, if the Panel were prepared to consider them, they should be denied in their

entirety.

## V. THE MEASURE OF A BUYER'S DAMAGES FOR A SELLER'S FAILURE TO DELIVER IS THE DIFFEERENCE BETWEEN THE CONTRACT PRICE AND THE MARKET PRICE

In the event the Panel were prepared to disregard the black letter law that

mandates that once a buyer materially breaches a sales contract by refusing to accept the

delivery of goods, that repudiation terminates the contract so that the buyer no longer can

demand performance from the seller, any damages which Votorantim as buyer may have

suffered must be measured by the difference in price between the market at the time

delivery would have occurred and the price of the A/V Term Supply contract at that same time.

As a seller's damages under the UCC caused by a buyer's material breach by non-acceptance or repudiation is measured by the difference between market and contract prices, so also is the measure of a buyer's damages for seller's breach by failing to deliver goods. UCC 2-713 thus provides:

> § 2-713. Buyer's Damages for Non-Delivery or Repudiation
>
> (1) Subject to the provisions of this Article with respect to proof of market price (Section 2-723), the measure of damages for non-delivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages provided in this Article (Section 2-715), but less expenses saved in consequence of the seller's breach.
>
> (2) Market price is to be determined as of the place for tender or, in cases of rejection after arrival or revocation of acceptance, as of the place of arrival.

It is apparent that UCC 2-713 provides the measure of damages for a seller's non-delivery and repudiation is the very mirror image of UCC 2-708, which was discussed in legal point II above, which provides the measure of damages for a buyer's non-acceptance and repudiation. The measure of damages for both buyer and seller is the same: the difference between the market price at during the period the goods would have been delivered and the contract price of the sales contract the buyer breach by not accepting delivery under or the seller breached by not delivering under.

As Judge Hand explained in the *Brisbee*, supra, also discussed in legal point II above, when a party, such as the buyer in that case, refuses to perform under a sales contract that requires deliveries through some future date specified in the breached contract, the measure of damages necessarily must be measured against the market prices on those future dates when performance was supposed to occur, Of course by the time the question of damages are tried, in most circumstances, as is the matter in this arbitration, the period for delivery under the sales contract has long passed and a historical record and other evidence is available t prove what the market prices actually were for the goods that were either not accepted or delivered depending on whether the buyer or the seller breached the sales contract.

Measuring difference between the contract price for the second half of 2002 against the market price for PACE low and the contract price for the Premcor petcoke delivered in ratable shipments of 50,000MT, which the majority concluded in the partial final award had been done when the contact had been performed in 2001, reveals that by not taking delivery under the contract during that time Votorantim would have saved $86,175 AD69  Making the same comparison, again with retable shipments of the same tonnage; by not taking delivery under the contract for all of 2003 Votorantim would have saved $462,497. AD69 Thus, for the entire period of August 2002 through December 2003, comparing prevailing market prices for each month with contract prices during that same time for ratable shipments of 50,000T, the difference between market and contract results in a savings of $548,672 to Votorantim by not taking delivery under the A/V Term Supply Contract after August of 2003.AD69

54

Thus, even if the Panel decided to look to what damages Votorantim would have been entitled to receive under the UCC for non delivery or repudiation by Aimcor after August of 2002, Votorantim would have suffered no damages but would have actually benefited by not performing during the remaining term of the A/V Term Supply Contract.

## VI.  IN THE ALTERNATIVE THE PANEL SHOULD APPLY THE DOCTRINE OF RECOUPMENT TO OFFSET ALL OF AIMCOR'S CLAIMS AGAINST ANY DAMAGE CLAIM VOTORANTIM MIGHT BE AWARDED

This arbitration has been conducted under the SMA Arbitration Rule which in Section 30 empowers the Panel to: "grant any remedy or relief which it deems just and equitable." UCC 2-106 provides that the remedies of the UCC should be administered liberally. Further, unless displaced by specific provisions of the UCC, the principles of law and equity supplement the UCC. 107 NYJur2d, §12, p.299 (2004)

The law of New York recognizes the equitable doctrine of recoupment. As explained in one of the leading treatises:

> "Recoupment is a common-law, equitable doctrine that permits a defendant to assert a defensive claim aimed at reducing the amount of damages recoverable by a plaintiff. It allows a court to look at the whole contract, sum up the grievances on each side, strike a balance, and give plaintiff judgment for only such difference as may be found in his favor. The doctrine of recoupment allows a defendant to "defend" against a claim by asserting, up to the amount of the claim, the defendant's own claim against the plaintiff growing out of the same transaction, or set of transactions, strictly for the purpose of abatement or reduction of the plaintiff's claim.....
>
> In the absence of a statute providing otherwise, recoupment is a defensive action that operates to diminish a plaintiff's recovery rather than to assert affirmative relief, at least when employed in a court of law.  It goes to the foundation, justice or existence of plaintiff's claim, and

> only to the abatement, reduction, or mitigation of the
> damages claimed by plaintiff.  Recoupment is thus in the
> nature of a defense, as it denies the validity of plaintiff's
> claim in the amount claimed, and does not entitle a
> defendant to any affirmative relief or any amounts in
> excess of the amount demanded by plaintiff."
> 80 Corpus Juris Secundum § 2,p7-8 (2006)

The doctrine of equitable recoupment allows a claim to be asserted as a defense

even though the claim may be legally unenforceable as in the case of a time barred claim

that has exceeded a limitation period. *Town of Amherst v. County of Erie*, 668 NYS2d.

848, 849 (4th Dept,1998)  And when the recoupment claim arises out of a contract from

which it arose, the courts in New York have explained that it goes to the very heart of the

parties bargain:

> "...The recoupment claim goes to the heart of the parties
> bargain and, indeed, is akin to a defense of lack or failure
> of consideration ..." *Enrico & Sons Contracting v.
> Bridgemarke*t, 675 NYS2d. 351,353 (1[st] Dept,1998)

Arbitrators have also applied the doctrine of equitable recoupment to allow a

party to offset a claim which may be otherwise not enforceable against an award of

damages. See:  Captain John Livanos, SMA 2549 (1989); M/V Georgios Matsas, SMA

2294 (1986); M/V Wind Endeavor, SMA 1533 (1981)

In these proceedings the use of the doctrine of recoupment to allow Aimcor to

offset any damage award Votorantim might be granted would be undoubtedly

appropriate. It was Votorantim that precipitated these proceedings by initially breaching

the A/V Term Supply Contract while continuing to take delivery of a cheaper petcoke of

the same quality. AD1,p7,AEx36 Aimcor was in turn a dealer/broker that stood between

as a buyer from Premcor and a seller to Votorantim. AEx1,2 Once the contract had been

breached by Votorantim's declaration that it would take no delivery under the A/V Term

Supply contract in 2002, Aimcor strived to arrive at a commercial settlement while

Votorantim insisted that Aimcor and Premcor accept its claim of force majeure and thus

forego any claims against Votorantim for having refused to take delivery of any petcoke

the first seven months of 2002. AEx25,33 Clearly, equity would call for the Panel to use

the doctrine of recoupment to protect Aimcor from the impact of an inequitable award.

## CONCLUSION

Accordingly, based on the foregoing, Aimcor respectfully request that the Panel make the following award:

1. Rule that Votrantim's material breach and repudiation of the A/V Term Supply Contract the first half of 2002 resulted in the cancellation of the contract as provide for under the sellers remedies set forth in UCC 2-609,UCC 2-610 and UCC 2-703 as adopted in New York.

2. Rule that Aimcor as a seller under the A/V Term Supply Contract which Votorantim breached by not scheduling or taking delivery of the Premcor petcoke the first half of 2002 be awarded the remedy of money damages for such a breach as provided for in UCC 2-708 in the amount of $2,164,471

3. Rule that Aimcor as seller under the A/V Term Supply Contract which Votroantim breached by not scheduling or taking delivery of the Premcor petcoke the first half of 2002 be awarded the remedy of incidental damages for lost commissions as provided for in UCC 2-710 in the amount of $1,089,380

4. Rule, in the alternative, that Votorantim as buyer under the A/V Term Supply Contract not be awarded any of its alleged mitigation loses as the remedy of money damages because those alleged purchases failed to satisfy the requirements of reasonableness and good faith as required under UCC 2-712 for buyers cover

5 Rule, in the alternative, that the remedy pursuant to UCC 2-713 for Votorantim as buyer under the A/V Term Supply Contract for non-delivery is money

damages measure by the difference between contract and market prices which resulted in a contract saving rather than any loss between August 2002 and December 2003

6. Rule, in the alternative, that if Votorantim be awarded money damages in any amount, that Aimcor Recoup against that amount awarded Aimcor's lost commissions in the amount of $1,089,380 together with the loses in the amount of $3,661,232 from the mitigation sales by Premcor as Aimcor's principal under the marketing agreement and seller to Aimcor under the term supply contract between Aimcor and Premcor

7. Award Aimcor interest on any amounts awarded to Aimcor together with attorneys fees and grant any and such further relief as may be deemed just and equitable.

Respectfully submitted,

LAW OFFICES OF ANTHONY J. MAVRONICOLAS
ATTORNEYS FOR AIMCOR
915 BOADWAY, SUITE 1309
NEW YORK, NEW YORK 10003
TEL: (212) 253-6040
FAX: (212) 253-7171

ANTHONY J. MAVRONICOLAS
OF COUNSEL

# EXHIBIT H

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
```

IN THE MATTER OF ARBITRATION BETWEEN      BEFORE:

                                  PETER J. ZAMBITO, ESQ.

APPLIED INDUSTRIAL MATERIALS              CHAIRMAN
CORPORATION,                         WALTER R. MUFF

                                        JACK F. RING

                          CLAIMANT,

       - AND –

VOTORANTIM CIMENTOS LTDA.,

                        RESPONDENT.

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
```

PRELIMINARY BRIEF IN SUPPORT OF AIMCOR DAMAGES FOR 2002

LAW OFFICES OF ANTHONY J. MAVRONICOLAS
ATTORNEYS FOR AIMCOR
915 BROADWAY, SUITE 1309
NEW YORK, NEW YORK 10003
TEL: (212) 253-6040
FAX: (212) 253-7171

ANTHONY J. MAVRONICOLAS
OF COUNSEL

## PRELIMINARY STATEMENT

Applied Industrial Materials Corporation ("Aimcor"), submits this Preliminary Memorandum in support of its claim for damages against Votorantim Cimentos Ltda. ("Votorantim") for all losses incurred in 2002. Aimcor reserves the right to supplement and amend this Preliminary Memorandum in Support of Aimcor Damages as a result of any evidence that will be adduced at the hearings in this matter during Aimcor's case in chief on damages and Votorantim case-in-chief on damages and Aimcor's rebuttal to Votorantim's case-in-chief.

This Preliminary Memorandum will be accompanied with Aimcor Damage Exhibits 1-18 which have been submitted prior to the commencement of hearings in this matter on April 10 and 11. As previously advised by e-mail to the Panel on March 1, 2007, Aimcor further reserves the right to introduce any and all additional exhibits during Aimcor's case-in-chief, Aimcor's rebuttal case and Aimcor's cross examination of Votorantim's witnesses in support of Aimcor's claim for damages and in opposition to any claim for damages by Votorantim in 2002.

2

<u>FACTS</u>

<u>A.The June 28, 2006 Partial Final Award on Liability for 2002:</u>

With respect to any disputes for 2003, in its recitation of findingss at page 8 of the

Partial Final Award, the Panel found:

> "No evidence as to 2003 shipments was presented, although
> 2003 shipments were alluded to in the Post Arbitration Briefs"
> AD. Ex 1,p 8[1]

As a result, the ruling by the Panel majority in its Partial Final Award of June 28, 2006

provided:

> "In summary, the Majority of arbitrators (Mr. John F. Ring Jr.
> dissenting in part) finds that Votorantim breached the Contract
> dated October 24, 2000 by not scheduling and accepting (150,000MT)
> during the first half of 2002 and is liable for the damages sustained
> by Aimcor as a result.
>
> The Majority also finds that once Votorantim informed AIMCOR
> on August 16, 2002 that it was prepared to schedule and accept
> shipments in September, October and December 2002, AIMCOR
> breached the Contract of October 24, 2000 by not providing petcoke
> for delivery to Votorantim and is liable for the damages sustained by
> Votorantim as a result" AD.Ex 1, p12

Consequently, the Panel is now called upon to decide the parties respective damages for

2002.

<u>B. Description of Aimcor's Damages:</u>

In compliance with the Panel's mandate, Aimcor's claim for damages for 2002

includes lost commissions for the first three quarters of 2002 as well as the last quarter of

2002 for which Aimcor would have earned commissions when Votorantim should have

accepted the delivery of Premcor petcoke in the first three quarters of 2002. Aimcor also

---

[1] References to Aimcor Damages Exhibits 1-18

claims as damages for the commissions it would have earned during the last quarter of 2002 when Votorantim has asserted it would have accepted delivery of Premcor petcoke under the October 24, 2000 contract. Aimcor's additional damages for the first three quarters of 2002 would also include, in the alternative, either the difference between the contract price Votorantim would have paid Aimcor under the October 24, 2000 contract less the prevailing market price for that petcoke during that first three quarters of 2002, or the difference between the contract price Votorantim would have paid Aimcor under the October 24, 2000 contract and the mitigation sales Premcor made during the first three quarters of 2002 as a result of Votorantim's breach of the October 24, 2000 contract. In addition, Aimcor's damages would also include interest on those sums from January 2002 to date at least at the statutory prejudgment rate of 9%, plus attorney's fees and the cost of these proceedings.

C. The Calculation of Aimcor's Damages:

The quantum of Aimcor's damages for 2002 total $2,645,018.95 exlcusive of attorney's fees and the cost of these proceedings. This total consists of the following:

1. Total lost commissions for 2002....................................$527, 758  AD Ex.4

2. Contract market losses January-August 2002............ $1,564,927   AD Ex 5

3. Interest at statutory pre-judgment rate of 9%...............$ 941,708.25

Total....................................................................................$3,034,393.25

(Alternate Premcor Mitigation Sale Claim January-August 2002..$1,834,950.20)

## LAW

The law is well settled that supports Aimcor's claim for lost commissions based on the difference between the cost for the petcoke under the Premcor contract and the Votorantim contract price, the contractual losses based on the difference in price between the agreed petcoke price under the October 24, 2000 contract between Aimcor and Votorantim, and the prevailing market price for petcoke during the first three quarters of 2002. Similarly, it is also firmly established under New York law that, as an alternative to Aimcor's contractual damages , Aimcor would be entitled to recover from Votoranitm any and all loses Aimcor would sustain from Premcor's claim and suit against Aimcor seeking recovery of the losses sustained by Premcor as a direct result of Premcor's mitigation sales for the first three quarters of 2002 of the petcoke Votorantim was bound to take delivery of for the first three quarters of 2002. AD Ex. 12

### A. The Uniform Commercial Code:

With respect to a buyer such as Votorantim's breach of a sales contract for failing to take delivery of goods under a long term delivery contract, Article 2 of the Uniform Commercial Code specifies that the seller's general remedies include the right to : "(e) recover damages for non-acceptance( Section 2-708)…" UCC § 2-703  Further, Section 2-708 of the Uniform Commercial Code then goes on to provide that a seller's damages for non-acceptance by a buyer would be:

> "… ,the measure of damages for non-acceptance or repudiation by the buyer is the **difference between the market price at the time and place for tender and the unpaid contract price** together with any incidental damages,…" UCC 2 § 708(2)(emphasis added)

Here the difference between the contract price due under the October 24, 2000 and the market price for the first three quarters of 2002 total $1,564,927 exclusive of

interest. AD Exh. 5 The incidental damages in the form of lost commissions by Aimcor

for the first three quarters of 2002 total $371,644 exclusive of interest. AD Exh. 4

Further, the commissions Aimcor would have earned in the event Votorantim had taken

additional Premcor during the last quarter of 2002 total $128,302 in additional incidental

damages exclusive of interest for a total claim of commissions of $527, 758 in 2002.

B. New York Contract Law :

      Even under general principles of contract law in New York, Aimcor would be

entitled to recover both its lost commissions for 2002 as well as its contractual loses for

2002, and in the alternative, the mitigation loses sustained by Premcor for the first three

quarters of 2002 which Premcor has claimed against Aimcor in the abated Texas

proceedings, and which Premcor, now Valero,  has assigned to Aimcor for the purposes

of these proceedings AD Ex 15,16,17   It is well settled law in New York that:

> "...all damages which can be said to be the immediate and
> proximate result of that breach and which were in contem-
> paltion of the parties when the contract was made, including
> those which can be said to be reasonably certain to accrue in
> the future as well as already sustained, may and must be
> claimed in an action." 36 NY Jur 2nd §19, p.36 (2007)

      The New York courts have,therefore, long held that in a breach of contract action,

an aggrieved party can, and indeed must, claim as damages prospective damages such as

those claimed by Premcor in the Texas proceedings against Aimcor. AD Ex. 13,15

> "...it has been long settled that as a plaintiff must recover for
> a single wrong, either tort or breach of contract, all his damages
> in one action, so he may prove at trial all the damages that he
> has suffered up to that time that is the necessary or natural result
> of that wrong, and in many cases prospective damages, if they are
> reasonably certain to follow." *Park v. Hubbard*, 198 NY 136 (1919)

Similarly, under New York law, it has long been settled that a party who breaches a contract is liable to its aggrieved contractual counterparty for damages incurred by that counterparty as a result of a litigation precipitated by that breach of contract brought against the counterparty by a third party. See *Schnurmacher v. Kennedy*, 122 NY 944 (App. Term, 1903)

Finally, for the purposes of these proceedings, Premcor has assigned its claim to Aimcor to be pursued against Votorantim. AD Ex. 15,16  This assignment provides an additional legal basis for Aimcor to be awarded these prospective damages in the amount of $1, $1,834,950.20 inclusive of interest and claimed attorney fees of $20,000 through July of 2005. AD Ex. 17

<u>CONCLUSION</u>

Accordingly, Aimcor request that the Panel award it damages in the amount of $ 3,034,939.25 and any and such further relief as may be deemed appropriate in this matter.

Respectfully submitted,

LAW OFFICES OF ANTHONY J. MAVRONICOLAS
ATTORNEYS FOR AIMCOR
915 BOADWAY, SUITE 1309
NEW YORK, NEW YORK 10003
TEL: (212) 253-6040
FAX: (212) 253-7171

ANTHONY J. MAVRONICOLAS
OF COUNSEL

# EXHIBIT I

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

IN THE MATTER OF ARBITRATION BETWEEN    BEFORE:
                 PETER J. ZAMBITO, ESQ.

APPLIED INDUSTRIAL MATERIALS     CHAIRMAN
CORPORATION,           WALTER R. MUFF
                 JACK F. RING
         CLAIMANT,

 - AND –

VOTORANTIM CIMENTOS LTDA.,

         RESPONDENT.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

REPLY BRIEF IN SUPPORT OF AIMCOR DAMAGES

LAW OFFICES OF ANTHONY J. MAVRONICOLAS
ATTORNEYS FOR AIMCOR
915 BROADWAY, SUITE 1309
NEW YORK, NEW YORK 10003
TEL: (212) 253-6040
FAX: (212) 253-7171

ANTHONY J. MAVRONICOLAS
OF COUNSEL

## PRELIMINARY STATEMENT

Applied Industrial Materials Corporation ("Aimcor"), submits this Reply Brief in Support of Aimcor Damages in reply to Votorantim Cimentos Ltda.'s ("Votorantim") Votorantim Cimentos Ltda Post-Arbitration Brief (Damages) ("V.Brief"). Aimcor has previously submitted Aimcor's "Main Brief in Support of Aimcor Damages" ("A.Brief")

Votorantim begins its brief with its effort to characterize the Petition to Vacate the Partial Final Award Aimcor was forced to make by putting words into Judge Sand's mouth. What the Court ruled, and what counsel for Aimcor repeatedly attempted to point out to the Panel when first coming to the Panel to clarify the Partial Final Award before turning to the Court for relief, was that the Court would more than likely defer to the Panel's authority and not be willing to intervene in the arbitral process.[1] By adding the language: [on all issues pertaining to liability] as Votorantim's counsel has done to the partial sentence he has extracted from Judge Sand's opinion, that opinion is mischaracterized. V.Brief, p3   Instead, what the Court specifically held was that the "...panel acted within the scope of its authority in rendering its partial final award..." VDExB,p9 [2]

What the majority of the Panel found in the Partial Final Award was that: "...AIMCOR breached the Contract by not responding to Votorantim's letter of August 16, 2002..." AD 1[3] What Aimcor's counsel advised the Panel, before being forced to proceed in the Court for relief, was that by prematurely ruling on Votorantim's counterclaim in the Partial Final Award, Aimcor had not been given an opportunity to put

---

[1] See Fax of July 18, 2006 from Aimcor Counsel to Panel and e-mail exchanges of August 8, 2006
[2] References to Exhibit B attached to Votorantim Cimentos Ltda Damages Brief.
[3] References to Aimcor Damage Exhibits 1-77

in either its factual or legal defense to Votorantim's counterclaim.[4] What the evidence

before the Panel, in both exhibits including contemporaneous correspondence exchanged

between the parties during August and September of 2002 and in Scott-Hansen's sworn

testimony unequivocally prove was that Aimcor repeatedly responded to Votorantim's

request that shipments recommence after August 16, 2002. AD38-43, DT263,276

1225,1229[5] And as the Panel now also knows, again based on contemporaneous

documentary evidence and sworn testimony, was that Votorantim's position after August

16th regarding recommencing shipments, and before August 16th as to Votorantim's

refusal even to give a proposed schedule for reduced tonnage shipments, remained

unchanged-Aimcor and Premcor had to accept the legitimacy of Votorantim's claimed

force majeure and forgo any claim for breach of contract before Votorantim would agree

to anything. AEx33[6],AD38-43, DT263,267,1190,1225,1229  Chairman Zambito asked

why this evidence had not been presented earlier, and Scott-Hansen and counsel,

explained that the documents were compiled to present as part of Aimcor's defense to

Votorantim's counterclaim which Aimcor had not been given an opportunity to present

during the liability hearings. DT284

Despite these facts, Votorantim now urges the Panel to award it in excess of

4.2 million dollars as its "mitigation" damages and attorney's fees in excess of 300,000

dollars to compensate Votorantim for being forced to respond to Aimcor's "frivolous"

effort to have the majority Panel's grievous error here corrected by the Courts. V.Brief,

p3-4.

---

[4] See Fax of July 18, 2006 from Aimcor Counsel to Panel and e-mail exchanges of August 8, 2006
[5] References to transcript pages made during Damages Hearings 1-6
[6] References to Aimcor Exhibits 1-39 submitted at Liability Hearings

In this damage portion of these proceedings the Panel has the opportunity to deny Votorantim the outrageous, and indeed unconscionable, windfall it now demands, by simply applying the New York law of damages. The Panel need not reach any liability issues in arriving at a just result here. It need only apply the law of damages and remedies to the facts before it. Please do so to avoid a grave injustice here and grievous harm to the New York arbitration process by signaling to foreign buyers, such as Votorantim, that New York arbitrators, not only will countenance material breaches of sales contracts with American exporters, but will offer those breaching buyers huge windfalls for doing so.

As noted in Aimcor's main brief on damages, Judge Sand in declining to look behind the partial final award, noted that arbitrators are granted broad powers in rendering their awards. Some of those powers are specifically identified under the SMA Arbitration Rules:

> "Section 30. **Scope**  The Panel, in its Award, shall grant **any remedy or relief which it deems just and equitable, ...**"

Please exercise those power here. Do justice according to your oaths.

# FACTS

## A. EVIDENCE DOCUMENTING AIMCOR'S DAMAGES:

### 1. The First Seven Months of 2002.

Votorantim argues that Aimcor would not be entitled to damages for

Votorantim's material breach of the October 24, 2000 Term Supply Contract ("A/V Term

Supply Contract") on the ground that Aimcor never had the Premcor petcoke to sell.

Nonsense, both factually and legally.

First, beginning in April of 2002 Aimcor advised Votorantim that Aimcor was

attempting to identify buyers for the Premcor petcoke Votorantim was refusing to take

the first seven months of 2002. AEx29-30[7] Alternate buyers were found by Aimcor, but

as the principal under the marketing agreement between Aimcor and Premcor, and the

seller under the term supply contract between Premcor and Aimcor, Premcor directly sold

the petcoke to the alternate buyer at the highest available prices. AEx35, AD8 Scott-

Hansen testified that Aimcor and Premcor worked together to find buyers for these

mitigation sales in order to obtain the best available prices and to avoid a shut down of

the Premcor refinery. DT 200, 204,233,299

Further, during his testimony Mario Sirca testified that he met a petcoke

trader/broker from Energy Coal at the Milan airport in July of 2002 that was on his way

to meet Jim O'Malley, who oversaw the mitigation sales for Premcor, to attempt to

market the Premcor petcoke Votorantim's refusal to perform in the first half of 2002 that

was obviously threatening a refinery shut down due to overstocked petcoke

inventories.DT1337-8 And although there were indications Votorantim's production plan

---

[7] References to Aimcor Exhibits 1-39 and Aimcor Brenha Exhibit 39-61 submitted in the six Liability
Hearings

in February of 2002, after Votorantim had already refused to provide a shipping schedule for the first quarter of 2002 as required under the A/V Term Supply Contract, was to then be oversold by 100,000MT, the Energy Coal trader was being asked in July of 2002 to market 500,000MT of Premcor petcoke that remained unsold as for July. DT1337, AD8,66 Energy Coal marketed at least 330,000MT of that Premcor petcoke as a result of the meeting with O'Malley. AD64 In fact, we now know from Premcor's records of shipments out of Port Arthur which was to provide the supply for Votorantim under the A/V Term Supply Contract that Premcor sold and shipped over 600,000MT between July and December of 2002. AD63

    Second, during the liability hearings and then again in damage hearings, one of the arbitrators asked questions as to fact witnesses as to whether the term supply contract between Premcor and Aimcor was a "take or pay" contract in a form that Aimcor was not bound to pay for the petcoke it had not taken from Premcor for delivery on to Votorantim. Such a description of a sales contract under the UCC is, of course, legally meaningless. Either that contract is enforceable or it is unenforceable under the UCC. This Panel has already held that the A/V Term Supply Contract, with minor variations in terms from the term supply contract between Aimcor and Premcor, is enforceable such that the majority has attached liability to Aimcor and Votorantim. Similarly, Premcor in filling its suit in the Texas courts has unequivocally asserted that Aimcor is liable for breaching the term supply contract by not "taking" any of the Premcor petcoke the first seven months of 2002. AD13 Then again in 2005 and again in 2007, Premcor has asserted that Aimcor was in breach of the term supply contract with Premcor. AD16,17 To thus characterize the Premcor/Aimcor term supply contract as being some type of

6

"take or pay" contract under which Aimcor could simply walk away from is dead wrong on the facts alone.

Finally, as Aimcor had pointed out in its main brief, and will again be briefly discussed in the legal argument to follow, no less a Judge than Benjamin Cardozo has joined in a decision of New York's highest court in *Foglino v. Webster/Kidder Peapody*, 244 NY 516 (Ct App, 1926), which unequivocally held that a breaching buyer can not escape damages for non-performance by arguing that its seller faced no liability from its supplier up the supply chain for failing to first take delivery of the goods they were to then pass on to the breaching buyer. A.Brief, p41-42

### 2. Votorantim's Demand that Aimcor and Premcor accept Votorantim's Claimed Force Majeure before Votorantim would Re-Commence Performance under the A/V Term Supply Contract

In support of its claim in excess of four million dollars, Votorantim offers the Panel but one fact in support of those damages: "The Panel has ruled that once Votorantim informed Aimcor on or about August 16, 2002 that it was prepared to schedule and accept shipments under the contract, Aimcor breached the contract...V.Brief, p4 According to Votorantim's view of the facts and law, all a buyer in a dispute under a sales contract need do to hold its contract seller liable and receive millions of dollars in damages is demand that the seller immediately re-commence performance under a sales contract already breached by the buyer. Nonsense, both factually and legally.

Although never given an opportunity to do so before the Panel issued its Partial Final Award on liability, the Panel now has before it numerous contemporaneous exchanges in August and September in which Aimcor and Votorantim were negotiating

7

the terms under which Votorantim was prepared to re-commence shipments after August 16, 2002. AEx33, AD38-43 Scott-Hansen further testified that Votorantim's position before August 16th as to providing even a reduced shipping schedule and then after August 16th on re-commencing shipments under the A/V Term Supply Contract remained unchanged: Aimcor and Premcor first had to accept the legitimacy of Votorantim's force majeure claim and waive any claim for breach of contract the first seven months of 2002 or Votorantim would not schedule or accept any shipments. DT 260,263,267, 1225,1229 In Votorantim's own words: "...**there will never be any 'Votorantims's possible proposal to settle this problem, or even a Votorantim's acceptance to a possible such Aimcor's proposal, until Aimcor assume a formal recognition of the force majeure situation notice in our letters...**" AEx33 Further, Scott-Hansen testified, in his effort to have Votorantim re-commence performance the second half of 2002, without either Aimcor or Premcor having to concede the legitimacy of Votorantim's claimed force majeure, Aimcor made various proposals to Votorantim offering delivery of Premcor petcoke under terms acceptable to all parties. DT1190 Those discussions ended on September 27, 2002 upon Aimcor advising Premcor that Votorantim had again repeated its demand that the contract be re-commenced only upon Aimcor's recognition of the legitimacy of Votorantim's force majeure. DT 267, AD43

Scott-Hansen testified that his testimony as to Votorantim's position that it would not re-start the contract without Aimcor recognizing the legitimacy of Votorantim's claim of force majeure was based upon his personal knowledge. DT261 Chairman Zambito then asked whether Scott-Hansen had obtained his knowledge from personal contact with Votorantim and Scott-Hansen confirmed that he had spoken directly with Brenha of

Votorantim. DT264 Chairman Zambito then asked, for the first time in the course of these proceedings during a witness's testimony whether any documentary evidence which he described as "hard evidence" to support Scott-Hansen's existed. DT272. Counsel for Aimcor responded that he intended to introduce such "hard evidence" in the form of e-mail exchanges between the parties in August and September of 2002 as part of his cross-examination of Rocha who was scheduled to testify the next day as Votorantim's sole witness on damages. DT273  The Panel directed that those e-mails be instead provided to the Panel and Votorantim's counsel that evening. DT281 As a result, those e-mails, marked as Aimcor Damage Exhibits 31-43 were provided that evening as well as all of the other exhibits Aimcor was considering for use during Rocha's cross-examination. DT300,302 The existence of these documents and Scott-Hansen's testimony as to the condition Votorantim was demanding in order to re-start the contract after August 16th prompted the following question from Chairman Zambito and response from counsel for Aimcor:

> The Chairman: Do you have the documents with you?
>> **Mr. Muff: He is talking about documents post August 16, 2002.**
> **The Chairman: I am trying to understand why these weren't**
>> **offered in the liability phase, because they were**
>> **relevant. They were relevant to the award we made**
>> **in favor of Votorantim. I don't understand.**
> **Mr. Mavronicolas:** If you will recall, there's been an issue here about
>> how the partial final award was issued. There was
>> a challenge in the court. **I wrote the panel and said**
>> **we haven't had a chance to put in exhibits on the**
>> **counterclaim...** DT284

Simply put, Aimcor was not given an opportunity to present in the first set of hearings either Scott-Hansen's testimony or the e-mail exchanges after August 16, 2002 regarding Votorantim's notice that it was prepared to restart the contract, but only if

9

Aimcor accepted the legitimacy of Votorantim's force majeure claim, because the panel interpreted the bifurcation agreement to include Votorantim's counterclaim despite Aimcor counsel understanding, and advice to the Panel even during the submission of briefs for the partial final award[8], that the initial partial final award was to determine whether a force majeure condition or Clause 2.2 of the contract excused Votorantim's failure to perform and not yet reach any other issues.

### 3. Premcor/Aimor's Mitigation Sales Between September/ December 2003

In its main brief Votorantim totally ignores the mitigation sales made by Premcor as a result of Votorantim's failure to schedule any shipment for the first seven months of 2002 or that Votorantim was not willing to re-commence scheduling shipments after August of 2002 without demanding that Aimcor accept the legitimacy of Votorantim's claimed force majeure.

The losses from the Premcor mitigation sales alone for the first seven months of 2002 totaled $1,296,393. AD 8,55 The losses for all of 2002 mitigation sales totaled $1,906,572. AD55 Votorantim has put in no evidence, in either documentary or testimony form, suggesting let alone proving, that Premcor's mitigation sales failed to satisfy the reasonableness and good faith requirements under the UCC in New York which Aimcor has discussed the legal basis for in its Main Brief. A.Brief,p.47-52 That being the case, for Votorantim to argue that its purported "mitigation" purchases the second half of 2002 resulted in losses in excess of one million dollars to Votorantim

---

[8] "G. Votorantim's Alleged Counterclaim prematurely Before the Panel : Surprisingly, Votorantim has incorrectly presented the Panel with arguments in support of its alleged counterclaim in this set of briefs. V.Brief, p.12 But the issues as to Votorantim's alleged counterclaim were specifically reserved for any subsequent proceedings after the issuance of a partial final award on Aimcor's case-in-chief on Votorantim's liability under the V/A Contract alone. T438-439"

makes no sense. In any market, a buyer could not have lost when it was actually the seller that lost in having to make mitigation sales as Premcor's un-refuted mitigation sales prove.

Even if Votorantim had put in evidence attempting to rebut the actual mitigation sales in 2002 of the Premcor petcoke to alternate buyers, the Panel would instead look to the PACE low prices, which all the witnesses to testify agreed are the actual reported market sales for Premcor quality petcoke, it is indisputable that the party suffering the losses would have been the seller under the A/V Term Supply Contract, Aimcor, and not the buyer.(App 1)[9] Comparing the Pace market price to the contract price reveals that the seller's damages would have been $1,444,454.(App 1)

### 4. Aimcor's Lost Commissions

Votorantim incorrectly characterizes the commissions Aimcor would have earned if Votorantim had not breached the A/V Term Supply Contract as "lost profits". Those lost commissions were not Aimcor's "profit" under the A/V Term Supply Contract with Votorantim, they were "incidental damages" under that sales contract. V.Brief,p29

In its partial final award, the unanimous Panel found that Aimcor was a principal and not an agent under the A/V Term Supply Contract between Aimcor and Votorantim. AD1,p9 As such, Aimcor, as the principal seller under that sales contract, would be entitled to the damages provided for under the UCC, discussed in the legal section of Aimcor's briefs, which would first be the difference between the contract price and the market price at the time of delivery which would have been Aimcor's "profit" under the sales contract.  In contrast, Aimcor's commissions would have been earned under

---

[9] Reference to Appendix 1 to Aimcor Main Brief in Support  of Damages which demonstrates ratable shipments of 50,000MT throughout 2002 comparing the Pace Market Price to the A/V Term Supply Market Price

Aimcor's marketing agreement with Premcor. As Scott-Hansen testified, Aimcor's commissions under the marketing agreement would be measured and then approved by Premcor as the difference between what Aimcor would have paid for the Premcor petcoke under its term supply contract with Premcor and the price that same petcoke was sold to Votorantim. DT132, AD4, AEx2  Rocha testified that he was aware of this commission arrangement between Aimcor and Premcor under their marketing agreement. LT1805-6,1871[10] The lost commissions would thus have been the remuneration, or profit, Aimcor would have earned under the marketing agreement with Premcor which Votorantim's failure to perform the first seven months of 2002  prevented Aimcor from earning throughout 2002 and 2003, but for Votorantim's initial breach of the A/V Term Supply Contract.  The fact that Aimcor's damages under the New York UCC included both the contractual damages measured by the difference between market at the time of breach and the breached contract price, in addition to incidental damages in the form of commissions Aimcor would have earned under the marketing agreement with Premcor if Votorantim had not breached the A/V Term Supply Contract was explained to the Panel in response to a question from one of the arbitrators. DT43

Under the provisions of the UCC in New York, those commissions would be recoverable as incidental damages which Aimcor discusses at length in the sections of its briefs in which the relevant legal authorities are presented. A.Brief, p13,45

Aimcor has broken down those lost commissions in 2002 by quarters. AD4 For all of 2002 those lost commissions total $527,758. AD4,DT1113 For the first three quarters of 2002 alone, January to August 2002, those lost commissions would have totaled $423,888.AD4  For 2003, those commissions would have been $543,620. AD62

---

[10] References to transcripts  made at Liability Hearing 1-6

### B.  VOTORANTIM'S CLAIMED DAMAGES OF FOUR MILLION DOLLARS

It was Aimcor that commenced proceedings by demanding arbitration in October of 2002. AD14 In its Answer to that demand for arbitration, Votorantim did not even assert a counterclaim on any basis, let alone on Aimcor not having responded to Votorantim's August 16, 2002 letter. AD14 Aimcor's counsel first learned when he received Votorantim's Main Brief on Liability that Votorantim was attempting to assert its Counterclaim at that stage of these proceedings. Without an opportunity at that point, in the middle of the briefing schedule, to then present any evidence in defense to that counterclaim, Aimcor's counsel advised the Panel in Aimcor's reply brief that the presentation of Votorantim's counterclaim at that point in the proceedings had not been agreed to as part of the parties bifurcation request to the Panel and that consideration of the counterclaim was premature. (See footnote 8 above)  Upon receipt of the Partial Final Award, Aimcor's counsel immediately wrote the Panel to advise that it was his understanding that the parties in their bifurcation request to the Panel had never agreed to have the Panel consider Votorantim's counterclaim in the partial final award, but instead had agreed to have the Panel consider whether Votorantim's defense of force majeure excused Votorantim from performing under the A/ V Term Supply Contract the first seven months of 2002.[11] The Panel then refused to correct the partial final award despite Aimcor's counsel's advice that in prematurely ruling as it did, the Panel had denied Aimcor any opportunity to put in its defense to Votorantim's counterclaim.

---

[11] "With respect to what the parties agreed to with respect to bifurcation, I am disappointed by Mr. Chalos' response, **I KNOW WHAT I UNDERSTOOD WE WERE AGREEING TO AND TO WHAT WE AGREED TO--TO HAVE THE PANEL FIRST DECIDE THE ISSUES OF LIABILITY AS TO WHETHER A FORCE MAJEURE EVENT OCCURRED IN BRAZIL AND WHETHER THAT EVENT EXCUSED VOTORANTIM FROM PERFORMING.** All other issues, Votorantim's counterclaim, damages and anything else would logically flow from that ruling."

In its partial final award, the majority ruled that Aimcor breached the A/V Term Supply Contract on the sole basis that Aimcor did not respond to Votorantim's August 16, 2002 claim that the alleged force majeure had ended and that shipments for 2002 should recommence. AD1,p12 In these entire proceedings, which have now covered a dozen hearings, the one and only document that Votorantim put into evidence in support of its counterclaim, besides exhibits limited to damages issues, has been that August 16th letter. But as the Panel now has both documentary and sworn testimony before it irrefutably establishing, Aimcor not only responded to the August 16th letter, but the parties engaged in extensive negotiations in August and September of 2002 attempting to get the contract re-started.DT1225,1229, AD38-43 Those discussions ended by the end of September when Votorantim continued to demand that Aimcor accept the legitimacy of Votorantim's force majeure as a condition for the contract being restarted. AD43

Despite these facts, Votorantim has demanded that the Panel award it over four million dollars based on obviously inflated and manipulated alleged mitigation purchases which are not awardable under the applicable provisions of the New York UCC and has also sought an award of attorney's fees as compensation for having to respond to Aimcor's "frivolous" attempt to have the court correct the Panel's error in prematurely ruling on Votorantim's counterclaim before Aimcor had been given an opportunity to put in its defense to that counterclaim.

With respect to the request for attorney's fees, what Votorantim has not advised the Panel is the fact that they asked Judge Sand for those very sanctions and he specifically denied that request.  V.Brief,ExB

14

With respect to Votorantim's alleged "mitigation" damages claim of four million dollars, the claim is not only without legal foundation in New York law as discussed in the legal sections of Aimcor's briefs, but is without factual foundation as is demonstrated below.

### 1. Votorantim's Alleged 2002 Mitigation Purchases

#### a. Delivery to Non-Premcor Ports in the North of Brazil

Votorantim argues in its brief that Rocha "unambiguously testified" that he personally made each of the mitigation purchases for 2002 and 2003. V.Brief,p12-14 But it was Brenha who managed the A/V Term Supply Contract who appears on all the correspondence between the parties after August 2002, who would have been in the position to make mitigation purchases for the Votorantim plants in Brazil where he was located in 2002 and 2003. LT1168,DT861 Brenha was, however, never called as a witness on damages. In fact, according to Rocha's own testimony, from 2001 through 2005, Rocha was in North America purchasing for Votorantim's North American operations and only became director of trading for Votorantim in 2005. LT1760 Rocha was not even in Brazil in 2002 or the United States, he was in Canada. DT861 Simply put, his claim of personal knowledge as to the mitigation shipments is incredible and alone a significant failure of proof.

In its brief Votorantim makes no mention of the fact that three of its five claimed mitigation purchases in 2002 were delivered to ports in Northern Brazil, which Votorantim repeatedly claimed in the liability hearings Premcor quality petcoke could not be shipped to for use by Votorantim's plants in the North. A,Brief,p 14-16 Rocha of course, despite not having even been involved with the contract in 2002, denied under

oath that the plants in the North of Brazil could not use Premcor or Premcor quality

petcoke. DT755 But  Brenha, and Votorantim's counsel, in effort to explain to the Panel

during the liability hearings why Votorantim was taking shipments of other petcoke into

these same ports in Northern Brazil in 2002, testified that those same ports were never

intended for Premcor petcoke use and that those plants required higher quality petcoke.

A.Brief, p 14-16, LT1680,1297 Again, simply put, those purchases of higher quality

petcoke, delivered to these ports in the North, were clearly not replacements for the

Premcor petcoke but part of Votorantim's supply program for those Northern plants

which Rocha included in Votorantim's 2002 claim to inflate its alleged damages.

### b. Purchases in 2002 of the Highest Quality Petcoke

Votorantim further argues in its brief, through Rocha's incredible testimony, that

he attempted in 2002 to purchase as close to Premcor quality at the best available price.

V.Brief,p12 He also testified: "...As soon as they know we don't have volume in the

contract, we try to buy as soon as we can and cover our needs for the year. That's the way

we work..." DT1024, V.Brief,p14  His testimony is again belied by the record before the

panel.

One of Votorantim's principal suppliers of petcoke was SSM. AD26 In fact the

first alleged mitigation shipment in January 2003 was purchased by Votorantim from

SSM. AD26  The Panel now knows that in the first week of September of 2002, when

Rocha clams Votorantim was acting as quickly as possible to cover the Premcor petoke it

would not get in 2002 and 2003, SSM had 780,000MT of Pascagoula petcoke to sell of

Premcor quality at a price of Pace plus one dollar. AD76 The Panel now also has SSM

sales records before it proving that SSM had in excess of 1.5 million tons of that Premcor

quality petcoke to sell at a FOB price of $10,35. AD75 But Votorantim claims that

instead of purchasing from SSM this less expensive petcoke in the large quantities which

well exceeded the 350,000MT it claimed it needed to cover the A/V Term Supply

Contract shortfall, Votorantim purchased a $23.05/MT shipment from that same supplier

SSM. AD26 To claim that less expensive, lower quality petcoke was not made

"available" to Votorantim after August of 2002 as it has repeatedly asserted before the

Panel is simply untenable given these facts.

Here again, Votorantim suffers a failure of proof. Aimcor presented both the

sworn testimony of Scott Hansen and Mario Sirca who were active in the petcoke

markets in 2002 and 2003, as well as documentary evidence in the form of market reports

and actual sale contracts demonstrating the ready availability of Premcor quality petcoke

at lower prices to buyers in 2002 and 2003. DT1187,1271,1277,1278,1280,1293,

AD11,73-76 Votorantim presented not one document of "hard evidence" in support of

Rocha's testimony that cheaper petcoke of Premcor quality petcoke was not made

"available" to Votorantim. In its brief Votorantim notes that Mr. Ring "keenly observed"

that evidence on the market prices should be "substantiated or supported by documents"

V.Brief, p19 The Panel now has before it SSM contracts for 2002 and 2003 which

provide that documentation which Mr. Ring sought which prove that Votorantim's own

suppliers were offering Premcor quality petcoke to the market at the very time

Votorantim claims it was looking to cover the Premcor petcoke it was not going to

receive. AD 73-76  And as for Votorantim's failure to provide one document supporting

Rocha's testimony that Premcor quality petcoke was not "available", as Chairman

Zambito observed regarding testimony without supporting documentation:

17

The Chairman:  If you leave it right here, okay. If this is the end of your redirect of him, without any background, any foundation, any reference to documents, you have established zero. You understand?

Mr. Mavronicolas:  Yes.

The Chairman:  It's not evidence, as far as I am concerned. It's not hard evidence, just so you understand. DT272

Thus, Votorantim has failed to carry its burden of proving that cheaper, Premcor quality petcoke was not made "available" to it for purchase in 2002 or 2003.

### c. Votorantim's Failure to Mitigate Damages and Manipulation of its 2002 Damage Claim to Inflate those Alleged Damages

In its brief, Votorantim offers the Panel no part of the record beyond Rocha's incredible testimony that Votorantim tried to obtain the least expensive petcoke in its alleged mitigation efforts. No legal principal of contract damages could be more fundamental than the requirement that one damaged by a breach of a contract take reasonable steps to make itself whole in a manner that is as inexpensive as circumstances will allow. As noted above, Votorantim has failed to offer any "hard evidence" in support of its claim that cheaper Premcor petcoke was unavailable for purchase in 2002 and 2003. In fact, Rocha's testimony itself demonstrates that he had no interest in obtaining the least expensive petcoke Votorantim could obtain for its alleged mitigation purchases.

In Rocha's own words, his only concern in making up his alleged mitigation list was volume and not price:

Q. So you took no consideration in terms of what the cost of these cargoes were when you put them in?

A. In some way, no, I was just trying to match up 150,000 tons. DT918

18

At the same time, again in his own words, Rocha had no interest in keeping Votorantim's damages as inexpensive as possible:

> Q. You don't include this December shipment on the Norsul Santos in your mitigation summary which is Aimcor Damage Exhibit No.26, do you?
> A. No.
> Q. And in fact, if you take the Norsul Santos cargo 40,000 some metric tons and you multiply it by the tonnage-I have done a quick little math of 7.75, and you then, instead of using the Tsuru, which is the most expensive vessel, you substitute the Norsul Santos cargo for the Tsuru vessel, you would have had $727,722 less in damages, just according to that math?
> Mr. Chalos: Objection.
> A. Why I do that?
> The Chairman: Overruled. It's overruled subject to your being correct on your math. DT945

Clearly, Votorantim, according to Rocha's own testimony, did not even attempt to mitigate its damages by trying to obtain the least expensive price it could for its alleged mitigation purchases.

2. **Votorantim's Alleged 2003 Mitigation Purchases**

   a. **Delivery to Ports in North Brazil, the Purchase of Petcoke with Better Specifications and Non-Ratable Purchases**

As with the 2002 mitigation list, Votorantim's 2003 list of mitigation shipments included vessels that discharged at non-Premcor ports in the north of Brazil with petcoke of significantly better quality than the Premcor petcoke it was supposed to replace. AD70, VDEx3001-2[12],DT976,1322-24, VDEx3002

---

[12] References to Votorantim Supplemental Supporting Claim Documents

19

Here again  for the alleged 2003 alleged mitigation purchases Votorantim relies on Rocha's testimony that Votorantim made its mitigation purchases as soon as it knew of its problem in having  to cover the Premcor petcoke it would not receive. V.Brief,p 14 The record before the Panel again refutes Rocha's claim that Votorantim purchased the least expensive petcoke that was available to replace the 2003 Premcor shipments and that Premcor quality was unavailable to it in the market in either 2002 or 2003. V.Breif,p16, DT1940  As the "hard evidence" proves, SSM, one of Votorantim's main suppliers, had made available in the market in September of 2002 over 700,000MT of Pascagoula petcoke of Premcor quality, sold at Pace low prices, for delivery of 240,000MT beginning in 2003-the very period Rocha claims Votorantim was attempting to purchase as soon as it knew it had a problem with the Premcor supply-presumably in August of 2002. AD76 In fact, SSM, Votorantim's own supplier of petcoke in 2003, sold and shipped over a million and a half tons of that Premcor quality petcoke in the market in 2003 at prices significantly cheaper than the mitigation purchases Votorantim claimed to have made in 2003. AD75 In point of fact, Mario testified that he had purchased 150,000MT of Premcor quality petcoke in 2003 for his own cement plants. DT1325 And as with the claimed 2002 mitigation purchases, at least half of the 2003 claimed shipments were of better quality that again went to the non-Premcor ports in the North of Brazil. A.Brief, p22-3

### c. Votorantim's Failure to Mitigate Damages and Manipulation of its 2003 Damage Claim to Inflate those Alleged Damages

As pointed out in Aimcor's Main Brief, it is no coincidence that Votorantim claims to have made its alleged mitigation purchases the first seven months of 2003. A.Brief, p24  Between January and May the reported market price for Premcor

quality petcoke was higher than what the contract price would have been under the A/V Term Supply Contract, but after May the contract price was higher than the market price. AD68  If Votorantim had made ratable purchases of 50,000MT of Premcor quality petcoke beginning in February of 2003 and ending in December of 2003, Votorantim would have saved $462,497 over the prices it would have paid under the A/V Term Supply Contract. AD69 In Votorantim's brief it offers Rocha's answer to that fact to the affect that he could not have foreseen what the market was going to do in 2003. V.Brief,p17, But Votorantim  didn't have to a soothsayer, all they had to do was act on what Rocha told the Panel Votorantim's practice was-purchase their cover as soon as they learned after August 16th that they would not be receiving any more Premcor petcoke. DT1024 And as noted above, Votorantim's own supplier, SSM, was selling hundreds of thousands of tons of the Premcor quality petcoke into the market in September of 2002.

But what Votorantim did instead of buying Premcor quality from its suppliers such as SSM, that were selling that quality in large quantities in 2002 for 2003 deliveries, was to load all of Votorantim's alleged mitigation purchases in the first seven months of 2003 with mostly better quality, more expensive petcoke, half of which was delivered to ports in the north of Brazil, in order to outrageously inflate its 2003 damage claim to $3,108,059. AD26

### d. Votorantim had Already Provided for its Entire 2003 Requirement for Premcor Quality Petcoke in 2001

Mario Sirca who was first vetted and then accepted by the Panel as an expert on the purchase of petcoke for cement plants had an opportunity to examine Votorantim's

contracts directly with Shell after cutting out Aimcor in 2001 and the A/V Term Supply Contract. Based on his experience as a buyer of petcoke for cement plants in 2003 and his review of Votorantim's purchases in 2001, 2002 and 2003 he concluded that with 650,000MT of the Shell petcoke purchased in 2001 for 2003 delivery. Votorantim had no need for an additional 300,000MT of Premcor quality petcoke for 2003. AD65,p12 On this point, here again, Votorantim's main brief is silent other than to mischaracterize Mr. Sirca's testimony as "confusing" and "unintelligible". It seems that Votorantim missed the opportunity to make the same type of ad hominum attach on Mr. Sirca's report.

## LAW

### I. THE UNIFORM COMMERCIAL CODE IN NEW YORK PROVIDES SELLERS THE REMEDY OF CONTRACT CANCELLATION UPON THE BREACH OF A SALES CONTRACT BY A BUYER

Votorantim's brief makes no mention of remedies despite the fact that the law of remedies is that area of the law that the Panel is called upon to apply when considering damages issues. See, 11 Corbin on Contracts-Damages §57.25, §983 (Rv. Ed, 2005)  In its partial final award the Panel held that the law of Missouri is not the law to apply to the A/V Term Supply Contract. AD1, p9  Thus an arbitration such as this conducted under the SMA rules calls for the application of New York law. (SMA) The Panel must therefore apply in its decision on damages the Uniform Commercial Code as adopted in New York, and in particular those provisions of the Code which include both sellers' and buyers' remedies for breach of sales contracts. In considering these remedies the Panel need not address issues of liability, but need only consider what remedy under the Code as seller Aimcor would be entitled to as a result of Votorantim's initial breach of the A/V

Votorantim Term Supply Contract and what remedy, if any, Votorantim as buyer would be entitled to as a result of the Panel ruling that Aimcor breached that same contract by not responding to Votorantim's demand that the A/V Term Supply Contract Votorantim had initially breached be restarted after August 16, 2002.

On November 30, 2001, Votorantim unequivocally stated that it would not perform in 2002 under the A/V Term Supply Contract: "...**For that reason we will not schedule Premcor petcoke shipments to year 2002...**"AEx7  In light of that November 30th notice, the majority found  in the partial final award that: ". **VOTORANTIM would not schedule AIMCOR petcoke supplied by PREMCOR for 2002.**"AD1,p6

As Aimcor has explained in its main brief, New York law, UCC § 2-610, provides a seller with the remedy of cancellation of the balance of the sales contract that a buyer, such as Votorantim in 2002, anticipatorily breaches by refusing to take delivery of any petcoke "for 2002" as the Panel found in its partial final award A.Brief,p32

In light of  Votorantim's anticipatory repudiation of the contract, UCC § 2-610(b) provided Aimcor with the right to immediately suspend its own performance and resort to any of the additional buyer's remedies provided for in UCC § 2-703. A.Brief,p33 And UCC § 2-703(f) provides that cancellation of the balance of the remaining contract is a seller's remedy. A.Brief, p33 Numerous New York cases have recognized a seller's right under a sales contract breached by a buyer to cancel the balance of that sales contract. A.Brief, p.34-35  Thus the Panel, as a matter of damages, without having to consider any issues of liability, should  apply the New York UCC to hold that the A/V Term Supply Contract was cancelled as a seller's  remedy and terminated a matter of law upon Votorantim's initial material breach of the A/V Term Supply Contract.

Further, as Aimcor has demonstrated in its main brief, Votorantim's initial breach of the contract by refusing to schedule and accept any shipments in 2002 was not only an anticipatory repudiation of the contract under UCC § 2-610, but was also a simple repudiation of the contract pursuant to UCC § 2-609. A.Brief, p36  UCC § 2-609(1) gives a party with reasonable grounds for insecurity with respect to the contract performance of their contract counterpart the right to ask for adequate assurance of their counterpart's performance. Faced with Votorantim's repeated statements that it would not schedule any shipments, beginning in April of 2002 Aimcor wrote Votorantim on a number of occasions demanding that Votorantim give adequate assurance, in the form of either a shipping schedule, and then even a shipping schedule for reduced tonnage, for 2002.AEx18,21,22,24,26 Votorantim gave no assurance of its performance in any form. Instead, Votorantim demanded that Aimcor accept Votorantim's claim of force majeure as a defense for not having accepted any petcoke in the first part of 2002. DT260,263,267,1225,1229, AD33,38-43 As a result, after receipt of the August 16, 2002 letter demanding that the contract be re-started for at least 2002, and the negotiations that followed in which Votorantim's position continued to be that Aimcor had to accept the legitimacy of the claimed force majeure, the contract was terminated by the end of September 2002. DT267, AD43

Under UCC2-609(4) the result of Votorantim's failure to give assurance of performance amounted to a repudiation of the contract. A.Brief,p.38  Thus, without regard to any issue of liability, the Panel should find that Aimcor's remedy  as a seller facing a breached sales contract governed by the New York Commercial Code properly

24

suspended its own performance and ultimately treated the contract as cancelled pursuant to UCC2-703(a) and (f).

Finally, as Aimcor demonstrates in its main brief, the majority ruled in the partial final award that Votorantim initially breached the contract, Votorantim could not demand that Aimcor start performing under the contract after August 16, 2002. A.Brief, p38 Once a contract has been materially breached , the contract comes to an end and the breaching party no longer has a contract they can demand that their contractual counterpart perform under:

> **One party's cancellation of a contract after the others material breach is not repudiation. Once the contract has been materially breached, there is nothing to repudiate** White and Summers, "Uniform Commercial Code", p202 (4th Ed, 2004)

Here the Panel has already ruled that Votorantim first materially breached the A/V Term Supply Contract the first half of 2002. AD1,p12. In those circumstances, the Panel should rule as an issue of damages that Votorantim having first materially breached the contract, did not have the right of the remedy of demanding that Aimcor start performing under that contract after August 16th.

## II. THE UNIFORM COMMERCIAL CODE IN NEW YORK PROVIDES THAT A SELLER'S MEASURE OF DAMAGES FOR A BUYER'S BREACH OF SALES CONTRACT BY REFUSAL TO ACCEPT DELIVERY IS THE DIFFERENCE BETWEEN THE CONTRACT PRICE AND MARKET PRICES

In its first legal argument to the Panel, Votorantim asserts that Aimcor failed to mitigate damages by not taking delivery of any petcoke from Premcor and then reselling that petcoke to alternate buyers and cites not one provision of the New York UCC or New York case in support of its position. V.Brief, p28-29 Instead, Votorantim cites

Missouri law in support of its argument despite the Panel having already ruled in its partial final award that Missouri law is not the law of the A/V Term Supply Contract. AD 1,p9 Votorantim's argument therefore fails on both factual and legal grounds.

First, to have required Aimcor to have taken possession of the Premcor petcoke and then sold it to alternate buyers would have increased the time, cost and expenses of mitigation sales, rather than to have reduced the costs of mitigation. Premcor was the producer, storage facility and FOB loader of the Premcor petcoke. To have Aimcor first take possession of that petcoke, store it and load it would have obviously substantially increased costs. As the record establishes, Aimcor worked closely together with Premcor to find alternate buyers at the highest possible price for the petcoke Votorantim refused to accept. DT200,204,233,299 As a result the mitigation expenses only included FOB prices with no additional storage or handling charges. AD8,9,66

Furthermore, unlike Votorantim that neither gave Aimcor notice of the fact that it would proceed to mitigate damages by purchasing replacement petcoke after August 16th, let alone having given Aimcor the opportunity to provide Votorantim with less expensive replacement petcoke than Votorantim was planning to allegedly purchase, Aimcor repeatedly advised Votorantim of the alternate buyers that had been found by Aimcor or Premcor and offering Votorantim the opportunity to find alternate buyers who were willing to pay more than the alternate buyers that had been found by Aimcor and Premcor. AEx29,32,35

Second, with respect to the legal basis for awarding damages to a seller, the relevant provisions of the UCC in New York specify that a seller's remedy for a buyer's failure to accept the delivery of goods is quantified as the difference between the contract

price the seller would have received for the goods and the market price of those same

goods at time the contract was to be performed. A.Brief,p 39-45 In its partial final award

the majority has already held that: "... **Votorantim breached the Contract during the**

**first seven (7) months of 2002 by not scheduling and accepting ... petcoke.**" AD1,p11

UCC § 2-708 (1) specifies how Aimcor's recoverable damages for non-delivery must be

calculated under New York law:

> § 2-708. Seller's Damages for Non-acceptance or
> Repudiation
> (1) Subject to subsection (2) and to the provisions of
> this Article with respect to proof of market price (Section
> 2-723), the measure of damages for non-acceptance or
> repudiation by the buyer is the difference between the
> market price at the time and place for tender and the unpaid
> contract price together with any incidental damages
> provided in this Article (Section 2-710), but less expenses
> saved in consequence of the buyer's breach.

The courts in New York had long held that the measure of damages for a buyer's

failure to accept goods must be measured by the difference between contract and market

prices. A. Brief, p41-43

Moreover, to argue as Votorantim now does, that Aimcor must first have taken

possession of the petcoke from Premcor or paid it in order to be awarded damages has

long been contrary to the law in New York. As noted in Aimcor's main brief, in *Foglino*

*v. Webster/Kidder Peapody*, 244 NY 516 (Ct Ap, 1926) a trial court, affirmed by a

unanimous court in which Judge Cardoza was a member of the panel, applied the

measure of damages for breach of a sales contract measured by the difference between

the contract price and market price for the coal which the buyer had not accepted.

*Foglino* at 517 As Votorantim has done in its main brief, the buyer in that case before

Judge Cardoza argued that the seller had suffered no damage because the seller had not

paid for the coal because the supplier of the coal to the seller had consented to canceling

the supply contract. _Foglino_ at 518 In rejecting that argument, the unanimous court

wrote:

> " It is argued, however, that on the facts before us such a
> situation is but theoretical. The original seller of the coal
> has consented to abrogate the contract. Even so, the rule
> to be adopted does not vary because of the generosity of
> a third party. Id.

Thus in a case of non-acceptance and repudiation by a buyer, the measure of damages is

the difference between market and contract prices, regardless of whether the seller paid

or, is even contractually bound, to pay its own supplier.

Without doubt, PACE market reports for low HGI, high sulfur, are the market

prices for the Premcor petcoke that was to be sold under the A/V Term Supply Contract.

DT637,1140   Measuring Aimcor's contract damages under UCC2-708 as the difference

between the contract price and the PACE market price over the first seven months of

2002, those damages totaled $1,564,927 based on monthly prorate shipments of

25,000MT AD2,5 DT1105 In the Partial Final Award the majority found that the earlier

shipments had been 50,000MT.AD1,p8  Thus, measuring Aimcor's damages based upon

ratable shipments of that tonnage, beginning in January of 2002 and ending in July 2002,

by comparing the contract price to the market price as reported by PACE during that time

results in a loss of $1,615,799.(App 1)

But as Aimcor has demonstrated, Votorantim's initial breach of the contract and

failure to provide Aimcor with adequate assurance of Votorantim's performance was a

repudiation of the contract for which the UCC provides Aimcor with the remedy of

cancellation.  With the cancellation of the contract as a result of  Votorantim's

repudiation of the contract, UCC 2-708 provides that Aimcor's damages for the entire term of the contract, for which Votorantim did not take delivery, would be measured by the difference between the market and contract price during the entire term of the contract. The majority in the partial final award found that 150, 000MT would have been delivered after August 16, 2002 in shipments of 50,000MT.AD1,p11 Comparing the difference between the contract price during the August to October 2002 period to PACE during that period, ratably in shipments of 50,000MT, results in a loss, and corresponding savings to Votorantim of $86,175. AD69 Using those same shipment sizes to again measure Aimcor's damages for the balance of the A/V Term Supply Contract period through December 2003, results in a $462,497 loss to Aimcor and corresponding saving by Votorantim.AD69 Thus, when measuring Aimcor's damages, as provided for as a remedy under UCC 2-708, by comparing the difference between the market price and the contract prices in 50,000MT ratable shipments during the period January 2002 to December 2003, Aimcor's damages would be $2,164,471.

Finally, as Aimcor noted in its main brief, Learned Hand held in *Bisbee Linseed Corp v. Paragon*, 96 F2d 464,465 (2nd Cir,1938), that actual spot sales of the very goods the buyer refused to accept can also serve as further proof of market prices. A.Brief, p.42-43 Comparing then Premcor's spot mitigation sale price through all 2002 to the A/V Term Supply Contract prices over that entire period, the measure of Aimcor's damages under UCC2-708 would be $1,906,572. AD57 The same comparison of mitigation sale prices to contract prices through 2003 results in damages of $1,754,661. AD57 Total damages for the entire balance of the contract after Votorantim's repudiation of the contract would be $3,661,232 based on Premcor's mitigation sales. AD57

29

### III. UNDER UCC 2-710 AIMCOR'S COMMISSIONS WHICH WOULD HAVE BEEN PAID UNDER THE MARKETING AGREEMENT WITH PREMCOR ARE RECOVERABLE FROM VOTORANTIM AS INCIDENTAL DAMAGES

Again without any citation to the law of New York, relying instead on the law of Missouri to make its legal argument, Votorantim claims that Aimcor's damages would be the net profit, or commissions, Aimcor would have earned under the A/V Term Supply Contract. V.Brief, p29 That argument both misconstrues the facts and misstates the law.

First, no provision of the A/V Term Supply Contract provided that Aimcor would earn commissions. AEx1 Nor does the term supply purchase contract Aimcor had with Premcor to source the Premcor to provide Votorantim provide for Aimcor to earn commissions. AEx2 These were contracts for the sale of goods under which Aimcor was a seller to Votorantim under the A/V Term Supply Contract and a buyer from Premcor under the term supply purchase contract between Aimcor and Premcor. AEx1,2 As both Mr. Ring and Chairman Zambito observed during the hearings, a seller in a sales contract does not normally earn commissions. Aimcor's commissions were, in fact, going to be earned under the separate marketing agreement Aimcor had with Premcor. AEx2 The only role the two sales contracts had with respect to commissions is that the marketing agreement provided that the commission Aimcor would earn under the marketing agreement would be fixed as the difference between what Aimcor purchased the petcoke at from Premcor and the price Aimcor would obtain from Votorantim for purchase of that Premcor petcoke from Aimcor. AEx2 This was not Aimcor's "profit" to be earned under the A/V Term Supply Contract with Votorantim, but the additional compensation Premcor was to pay Aimcor under the marketing agreement for acting as Premcor's

exclusive sales representative in finding buyers such as Votorantim for all of the petcoke

Premcor was producing, and needed to ship out of the Premcor Refinery, to avoid

shutting down the refinery. AEx2 As such, Aimcor's lost commissions were incidental

damages which Votorantim was aware which are recoverable as additional damages

under UCC § 2-708 and not contract damages. In contrast, as has been discussed above,

Aimcor's contract damages under the A/V Term Supply Contract under the New York

UCC are the difference between market prices and the contract price.

Second, as noted, Aimcor's main brief on this issue, UCC 2-708(1) provides

that the measure of a seller's damages in the event of a buyer's non-acceptance or

repudiation includes incidental damages. A.Brief,p46 Under UCC2-710 incidental

damages are losses that result from the breach of a sales contract. And the courts have

specifically held in applying the New York UCC that lost commissions are recoverable as

incidental damages. *Bache & Co. v. International Controls Corp.* 339 F.Supp 341,353

(SDNY,1972)

## IV. VOTORANTIM'S ALLEGED MITIGATION PURCHASES ARE NOT RECOVERABLE DAMAGES BECAUSE THEY FAILED TO SATISFY THE REQUIREMENTS OF UCC 2-712

As Aimcor has pointed out in its main brief, it is well settled law in New York

that the party claiming damages has the burden of proving those damages. *Hersey Farms*

*v. State,* 110 NYS2d.324,330 (CtCl ,1952) When parties fail to prove their damages they

are not awarded. *Hindustan Zinc V. Tennant*, 667 F.Supp 1000,1011(SDNY,1987)

Votorantim's alleged mitigation purchases were not reasonable, made in good faith as an

effort to reduce its alleged damages nor proven as required under the New York UCC § 2-712.

Votorantim failed to carry its burden on damages because Votorantim's alleged 2002 and 2003 mitigation purchases were neither reasonable efforts to obtain Premcor quality petcoke, nor made in good faith. In the second half of 2002, 78% of the total petcoke Votorantim claims to have purchased in mitigation was delivered to ports in the north of Brazil, ports to which Premcor petcoke could not be taken. AD29a,AD29c,LT1297,1309,1680,DT758-61,DT763  The petcoke was also of significantly better quality than Premcor petcoke. DT792,806,816,832,1267, AD70,VSEx2001-2  Premcor quality petcoke was available for purchase in the market the second half of 2002.DT1187,1277,1293  Mario Sirca in fact purchased some  for his own Cement plants in 2002. DT1278,1280,AD11  And one of Votorantim's own  supplier SSM, was selling Premcor quality petcoke in September 2002 at significantly lower prices than Votorantim claims to have been paying for  its mitigation purchases. AD76 Further, as Rocha testified, when he selected the alleged mitigation shipments out of all of Votorantim's shipments the second half of 2002, he made no effort to select the least expensive petcoke and only selected to make up the appropriate tonnage. DT841,918 In fact, as Aimcor had documented in its main brief, Votorantim undoubtedly manipulated its claimed 2002 mitigation list to include more expensive shipments and to leave out less expensive shipments made the second half of 2002. A.Brief, p20-22 .

Votorantim has also failed to carry its burden on Votorantim's alleged 2003 mitigation purchases. Four out of the eight shipments it claims as mitigation in 2003 went to ports in the north of Brazil. AD70  Five of the eight alleged mitigation shipments were

32

of petcoke of significantly better petcoke than the Premcor quality. DT976,1322-24,AD70 Premcor quality petcoke at significantly lower prices was available in the market for purchase. DT1187,1277,1293 In point of fact, one of Votorantim's own suppliers, SSM, was offering in the market for sale hundreds of thousands of tons of Premcor quality petcoke at significantly lower prices. AD74 Furthermore, ignoring the ratable term of the contract it was allegedly covering for, Votorantim claims to have taken all of its mitigation shipments on eight ships the first seven months of 2003 when the petcoke market was at its annual heights. AD68,70, At the same time, Votorantim did not need additional Premcor quality petcoke in 2003 because in 2001 it had cut Aimcor out and gone directly to Aimcor's supplier Shell for that same petcoke. Finally, Rocha's selection of the expensive shipments as mitigation from Votorantim's total 2003 shipments and decision not to include significantly less expensive shipments as mitigation, of identical quality, purchased from the same suppliers, under the same contracts, glaring revels the lack of good faith in attempting to present Votorantim's alleged damages. A.Brief, p25-27

## V. THE MEASURE OF A BUYER'S DAMAGES FOR A SELLER'S FAILURE TO DELIVER IS THE DIFFEERENCE BETWEEN THE CONTRACT PRICE AND THE MARKET PRICE

As with the other portions of the brief to present legal argument, Votorantim offers no New York law and again relies on inapplicable Missouri legal authority to support its theory of how Votorantim's damages should be calculated. V.Brief, p4-5

As noted in Aimcor's main brief, a buyer's damages for a seller's not delivery under New York UCC § 2-713(1) must be measured by the difference between market

and contract prices. A.Brief, p53   Thus the measure of damages for both buyer and seller is the same: the difference between the market price during the period the goods would have been delivered and the contract price of the sales contract the buyer breached by not accepting delivery under or the seller breached by not delivering under.

Measuring difference between the contract price for the second half of 2002 against the market price for PACE low and the contract price for the Premcor petcoke delivered in ratable shipments of 50,000MT, reveals that by not taking delivery under the contract during that time Votorantim saved $86,175 AD69  Making the same comparison, again with ratable shipments of the same tonnage; by not taking delivery under the contract for all of 2003 Votorantim would have saved Votorantim an additional $462,497. AD69 Thus, for the entire period of August 2002 through December 2003, comparing prevailing market prices for each month with contract prices during that same time for ratable shipments of 50,000T, the difference between market and contract results in a savings of $548,672 to Votorantim by not taking delivery under the A/V Term Supply Contract after August of 2003.AD69

Thus, even if the Panel decided to look to what damages Votorantim would have been entitled to receive under the UCC for non-delivery or repudiation by Aimcor after August of 2002, Votorantim would have suffered no damages but would have actually benefited by not performing during the remaining term of the A/V Term Supply Contract.


## VI. IN THE ALTERNATIVE THE PANEL SHOULD APPLY THE DOCTRINE OF RECOUPMENT TO OFFSET ALL OF AIMCOR'S CLAIMS AGAINST ANY DAMAGE CLAIM VOTORANTIM MIGHT BE AWARDED

As Aimcor noted in its main brief, both the New York UCC and the SMA Arbitration Rules provide the Panel with broad powers to grant any remedy it deems just and equitable. A.Brief,p 55 In the event that the Panel was not prepared to follow the well settled New York law discussed above, which provides that Votorantim would be entitled to no award of damages in the circumstances of this case and awarded Votorantim any damages, the Panel should utilize the doctrine of recoupment to offset Aimcor's claim against any damage award granted to Votorantim.

The facts for applying doctrine of recoupment could be no more compelling than in this case.  What the majority of the Panel found in the partial final award was that: "...AIMCOR breached the Contract by not responding to Votorantim's letter of August 16, 2002..." AD 1 What Aimcor's counsel advised the Panel, before being forced to proceed in the Court for relief, was that by prematurely ruling on Votorantim's counterclaim in the partial final award, Aimcor had not been given an opportunity to put in either its factual or legal defense to Votorantim's counterclaim.[13] What the evidence before the Panel, in both exhibits including contemporaneous correspondence exchanged between the parties during August and September of 2002 and in Scott-Hansen's sworn testimony unequivocally prove was that Aimcor repeatedly responded to Votorantim's request that shipments recommence after August 16, 2002. AD38-43, DT263,276 1225,1229 And as the Panel now also knows, again based on contemporaneous documentary evidence and sworn testimony, was that Votorantim's position after August 16th regarding recommencing shipments, and before August 16th as to Votorantim's refusal even to give a proposed schedule for reduced tonnage shipments, remained unchanged-Aimcor and Premcor had to accept the legitimacy of Votorantim's claimed

---

[13] See Fax of July 18,2006 by Aimcor counsel

force majeure and forgo any claim for breach of contract before Votorantim would agree to anything. AEx33,AD38-43, DT263,267,1190,1225,1229  Chairman Zambito asked why this evidence had not been presented earlier, and Scott-Hansen and Aimcor's counsel, explained that the documents were compiled to present as part of Aimcor's defense to Votorantim's counterclaim which Aimcor had not been given an opportunity to present during the liability hearings. DT284

As Aimcor has noted in its main brief, both the courts and SMA arbitrators have had occasion to apply the doctrine of recoupment to both court proceedings in New York and arbitrations. A.Breif,p 55-56, See *Town of Amherst v. County of Erie*, 668 NYS2d. 848, 849 (4th Dept,1998), *Enrico & Sons Contracting v. Bridgemarket*, 675 NYS2d. 351,353 (1st Dept,1998), Captain John Livanos, SMA 2549 (1989); M/V Georgios Matsas, SMA 2294 (1986); M/V Wind Endeavor, SMA 1533 (1981)

In these proceedings the use of the doctrine of recoupment to allow Aimcor to offset any damage award Votorantim might be granted would be undoubtedly appropriate. Votorantim precipitated these proceedings by initially breaching the A/V Term Supply Contract while continuing to take delivery of a cheaper petcoke of the same quality. AD1,p7,AEx36 Aimcor was in turn a dealer/broker that stood between as a buyer from Premcor and a seller to Votorantim. AEx1,2 Once the contract had been breached by Votorantim's declaration that it would take no delivery under the A/V Term Supply contract in 2002, Aimcor strived to arrive at a commercial settlement while Votorantim insisted that Aimcor and Premcor accept its claim of force majeure and thus forego any claims against Votorantim for having refused to take delivery of any petcoke the first seven months of 2002. AEx25,33 And as the party in the middle of the transaction, any

36

award Aimcor might obtain in these proceedings would be presented to Premcor in an effort to settle the stayed Texas litigation commenced by Premcor in 2002. AD245, AD17,18  Clearly, equity would call for the Panel to use the doctrine of recoupment  to protect Aimcor from the impact of an inequitable award.

## CONCLUSION

Accordingly, based on the foregoing, Aimcor respectfully request that the Panel make the following award:

1. Rule  that Votorantim's material breach and repudiation of the A/V Term Supply Contract the first half of 2002 resulted in the cancellation of the contract as provided for under the seller's remedies set forth in UCC 2-609,UCC 2-610  and UCC 2-703 as adopted  in New York.

2. Rule that Aimcor as a seller under the A/V Term Supply Contract which Votorantim breached by not scheduling or taking delivery of the Premcor petcoke the first half of 2002 be awarded the remedy of money damages for such a breach as provided for in UCC 2-708 in the amount of $2,164,471

3. Rule that Aimcor as seller under the A/V Term Supply Contract which Votorantim breached by not scheduling or taking delivery of the Premcor petcoke the first half of 2002 be awarded the remedy of incidental  damages for lost commissions as provided for in UCC 2-710 in the amount of $!,089,380

4. Rule, in the alternative, that Votorantim as buyer under the A/V Term Supply Contract not be awarded any of its alleged mitigation losses as the remedy of

money damages because those alleged purchases failed to satisfy the requirements of reasonableness and good faith as required under UCC 2-712 for buyers cover

5. Rule, in the alternative, that the remedy pursuant to UCC 2-713 for Votorantim as buyer under the A/V Term Supply Contract for non-delivery is money damages measured by the difference between contract and market prices which resulted in a contract saving rather than any loss between August 2002 and December 2003

6. Rule, in the alternative, that if Votorantim be awarded money damages in any amount, that Aimcor Recoup against that amount awarded Aimcor's lost commissions in the amount of $1,089,380 together with the losses in the amount of $3,661,232 from the mitigation sales by Premcor as Aimcor's principal under the marketing agreement and seller to Aimcor under the term supply contract between Aimcor and Premcor

7. Award Aimcor interest on any amounts awarded to Aimcor together with attorney's fees and grant any and such further relief as may be deemed just and equitable.

Respectfully submitted,

LAW OFFICES OF ANTHONY J. MAVRONICOLAS
ATTORNEYS FOR AIMCOR
915 BOADWAY, SUITE 1309
NEW YORK, NEW YORK 10003
TEL: (212) 253-6040
FAX: (212) 253-7171

ANTHONY J. MAVRONICOLAS
OF COUNSEL

# EXHIBIT J

**4/12/07; Applied Industrial Materials and Votorantim Cimentos Arbitration**

**Mel Winter & Associates, Inc.**

**Page 737 to Page 886**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY: MEL WINTER & ASSOCIATES, INC.

*MEL WINTER & ASSOCIATES, INC.*
*317 Madison Avenue, 21st Floor*
*New York, NY    10017*
*Phone:   212-925-1222*
*FAX:   212-687-8435*

4/12/07 - Applied Industrial Materials Corp. and Votorantim Cimentos Ltda. Arbitration
Hearing #3

Page 862

1    Rocha - Cross (Mavronicolas)
2    page 646 -- I am sorry, 1646.
3        (Transcript excerpt was marked as
4    AIMCOR Damage Exhibit No. 29H for
5    identification, as of this date.)
6        MR. RING: What page?
7        MR. MAVRONICOLAS: 1646.
8        THE CHAIRMAN: Before you read
9    anything from it, tell us the lines.
10        MR. MAVRONICOLAS: Line 5 through
11    12 on page 1646.
12   Q    Mr. Rocha, the question I put to
13   Mr. Brenha, and it says:
14       "Question: Well, Mr. Brenha, do
15   you remember saying to AIMCOR there is no way you
16   are going to get a shipping schedule and nothing
17   is going to happen until you accept the force
18   majeure situation; you remember that?
19       "Answer: I don't remember like
20   that. But I said that we need AIMCOR to accept
21   the force majeure situation and move ahead."
22       You agree with that?
23   A    No.
24       MR. MAVRONICOLAS: Mr. Chairman, if
25   you give me a minute, off the record for

Page 863

1    Rocha - Cross (Mavronicolas)
2    a second.
3        (Discussion off the record)
4        THE CHAIRMAN: Back on the record.
5        MR. RING: We were talking about
6    expediting this thing and maybe it helps
7    you.
8        Mr. Rocha, can you tell me,
9    please, what was the total amount of
10   imports in the last half of '02 of
11   petcoke to all Brazilian ports, roughly?
12       THE WITNESS: Half of '02, you mean
13   the six months?
14       MR. RING: Yes.
15       THE WITNESS: Could be around
16   600,000 tons.
17       MR. RING: Would that include the
18   replacement for the AIMCOR?
19       THE WITNESS: Yes.
20       MR. RING: Which would be 150?
21       THE WITNESS: 150.
22       MR. RING: The same question for
23   the year 2003.
24       THE WITNESS: 2003, I believe that
25   for the year we should have been

Page 864

1    Rocha - Cross (Mavronicolas)
2    10 percent higher.
3        MR. RING: Total tons?
4        THE WITNESS: Total tons. 1.1,
5    1.3.
6        MR. RING: That would include the
7    300,000 tons replacement PREMCOR?
8        THE WITNESS: Yes.
9        MR. RING: Okay. Now, when you
10   were drafting this --
11       THE WITNESS: I don't know if it's
12   important or not, should be a little
13   less, 1.1.
14       MR. RING: 1.1, 1.2?
15       THE WITNESS: Yes.
16       MR. RING: When you were drafting
17   this Exhibit C, what criteria did you use
18   to select the ships that you put in this
19   schedule?
20       THE WITNESS: Well, basically I
21   tried to select all the cargos that I was
22   not obligated to take to complete my
23   total volume.
24       MR. RING: Would you call these
25   spot-market purchases?

Page 865

1    Rocha - Cross (Mavronicolas)
2        THE WITNESS: I call it spot
3    market, but I went in the market that I
4    brought and some that I had some
5    flexibility.
6        MR. RING: On other contracts?
7        THE WITNESS: On other contracts.
8        MR. RING: But these particular
9    ships lifted the cargo that you would
10   otherwise have gotten from AIMCOR?
11       THE WITNESS: Yes.
12       MR. RING: Now, the last and most
13   important question, these purchases,
14   these supplemental purchases, if you
15   will, were they all purchased at the
16   lowest possible costs for replacement?
17       THE WITNESS: Yes. Well, that is
18   our job. What we have to do every day,
19   to buy the low cost possible for the
20   quality that the plant can handle.
21       MR. RING: But I mean specifically
22   the purchases listed on here are the
23   lowest ones, not the highest ones,
24   question?
25       THE WITNESS: The highest one,

33 (Pages 862 to 865)

4/12/07 - Applied Industrial Materials Corp. and Votorantim Cimentos Ltda. Arbitration
Hearing #3

Page 866

Rocha - Cross (Mavronicolas)
1
2   well, because they are the cargo that we
3   bought. Higher compared with others, is
4   that we bought during the year?
5       MR. RING: Yes, relative to what
6   you purchased during the second half of
7   '02 or '02. These ones that you selected
8   to put on the schedule, are these the
9   higher priced purchases or the lowest
10  purchased prices?
11      THE WITNESS: Well, I say, I didn't
12  pay so much attention to the price. I
13  was paying attention to the volume. Then
14  I cannot be precise, maybe some are --
15  are higher, some are lower, because what
16  I was looking for was the cargos that I
17  was not under contract to take.
18      I don't know it was the lowest
19  price in the market for sure, because
20  that is our job. But I have some other
21  cargos under contract that was lower
22  price than that.
23      MR. RING: This is very important.
24  These purchases, were they the
25  lowest purchases available, prices

Page 867

Rocha - Cross (Mavronicolas)
1
2   available, to purchase these goods for
3   replacement of the AIMCOR cargo?
4       THE WITNESS: Yes, for sure.
5       MR. RING: For sure?
6       THE WITNESS: For sure.
7       MR. RING: That's the only question
8   I have.
9       MR. MAVRONICOLAS: I have a
10  question.
11      MR. MUFF: I have a question.
12      We are going to receive records of
13  all your purchases for this list and for
14  the previous list, right?
15      THE WITNESS: Yes.
16      MR. MUFF: Plus all your other
17  purchases you may have had.
18      Do you know at this point -- your
19  list of March 24, the revised list, it
20  goes through July. Do you know if there
21  were any purchases from July to December?
22      THE WITNESS: Yes, we have.
23      MR. MUFF: Because you had a
24  contract with AIMCOR for 300,000 tons for
25  2003?

Page 868

Rocha - Cross (Mavronicolas)
1
2   THE WITNESS: 2003.
3       MR. MUFF: Spread over the year?
4       THE WITNESS: Right.
5       MR. MUFF: Yet you were showing us
6   here the first seven months shipments,
7   right?
8       THE WITNESS: Right.
9       MR. MUFF: But you had --
10      THE WITNESS: Other.
11      MR. MUFF: -- other purchases from
12  July onwards?
13      THE WITNESS: Yes.
14      MR. MUFF: So we will see when you
15  supply us your information, we will see
16  what kind of purchases these were and
17  what pricing you paid and so forth?
18      THE WITNESS: Yes, because of when
19  I did these purchases, I was not
20  concerned about replacing AIMCOR. I was
21  going in to the market to get the petcoke
22  that we need.
23      We did not know we were in a
24  lawsuit. I was not trying to replace
25  exactly each cargo.

Page 869

Rocha - Cross (Mavronicolas)
1
2   I was trying to do the best with
3   the contract that we had and trying to
4   buy in the market for the low price, and
5   then I bought -- I used some contracts
6   made before the end of the year, and then
7   I didn't have to go in the market. I
8   went more in the markets in the beginning
9   of the year.
10      I did all the things during the
11  whole year, not exactly concerned about
12  to replacing the exact month, because I
13  didn't have the contracts no more.
14      Then I had some contract that I
15  could use in the beginning of the year, I
16  did that.
17      At the end of the year, maybe I
18  could not use the contract because I was
19  already committed. Then of course I
20  didn't follow exactly the same ratable
21  division that we had in the contract that
22  should be, I don't know, 60,000 tons
23  every two months.
24      MR. MUFF: But you were trying to
25  replace the quantities that AIMCOR did

34 (Pages 866 to 869)

4/12/07 - Applied Industrial Materials Corp. and Votorantim Cimentos Ltda. Arbitration
Hearing #3

Page 870

Rocha - Cross (Mavronicolas)

1
2 not ship to you?
3     THE WITNESS: Yes, that's true.
4     MR. MUFF: So we'll have to examine
5 all the papers that you will submit to
6 see what prices you paid and what the
7 differences were.
8     THE WITNESS: Yes.
9     THE CHAIRMAN: If you produce all
10 of this documentation, you ought to
11 earmark what you were contractually
12 obligated to take aside from the AIMCOR
13 contract and what you specifically went
14 out in the market to get to replace
15 AIMCOR -- to replace PREMCOR cargo, okay?
16     You see where we are going? We are
17 trying to find the lowest value. I mean,
18 anything that is contractually -- they
19 were contractually obligated to take,
20 other contracts, should be outside the
21 scope of this, right?
22     But what they went in the spot
23 market to take, is other than
24 contractually. To me, that should be
25 segregated.

Page 871

Rocha - Cross (Mavronicolas)

1
2     MR. MAVRONICOLAS: The only thing I
3 can say to you, Mr. Chairman, is that if
4 I were to try to make an argument to
5 defend the position that I think has been
6 developed here today, that might be one
7 of the defenses we would try to make.
8     So it seems to me that what is very
9 important is that we see a number of
10 things. We need to see what they were
11 purchasing, against which contracts, at
12 which time through the entire year of
13 2002 -- the last part of 2002 and all of
14 2003, and to have them just earmark
15 saying this is a contract and this is
16 this and this is that is not sufficient.
17     We need to see documentation
18 demonstrating that, I believe, in order
19 to figure out -- well, how do these
20 things fit together?
21     Of course that doesn't address the
22 question that Mr. Muff raised, which is,
23 wait a minute, the AIMCOR contract is a
24 contract that provides for delivery over
25 the entire year.

Page 872

Rocha - Cross (Mavronicolas)

1
2     THE CHAIRMAN: That's what we are
3 talking about. We're talking about the
4 entire year, we're not talking about
5 seven months.
6     MR. MAVRONICOLAS: Right. Of 2002,
7 right.
8     THE CHAIRMAN: Of course. If all
9 of that data is produced and reviewed, we
10 may be able to avoid Mr. Rocha coming
11 back or going into extensive inquiry.
12     Are we clear?
13     MR. CHALOS: I want to ask
14 Mr. Rocha how long will it take to
15 coordinate all that?
16     How long will it take you to
17 coordinate to get all the documents?
18     I know from my discussions with him
19 most of the records -- all the records
20 for what he did are in his office, but
21 there is other records that he was
22 reviewing in Brazil.
23     THE CHAIRMAN: So what does he
24 think -- how long does he think it would
25 take?

Page 873

Rocha - Cross (Mavronicolas)

1
2     THE WITNESS: I was trying to
3 figure. I don't know how long you need.
4     MR. CHALOS: The panel will tell
5 you.
6     THE WITNESS: What is reasonable?
7     MR. RING: Tomorrow.
8     THE WITNESS: Tomorrow? Then I say
9 no.
10     THE CHAIRMAN: As promptly as
11 reasonably possible. We realize the job
12 you have to do when you go back.
13     THE WITNESS: Because I am going
14 from here to another trip and I will be
15 back in the middle of next week, but by
16 the end of the following week.
17     THE CHAIRMAN: That's terrific.
18     THE WITNESS: In fact, most of the
19 information are already in the process.
20     THE CHAIRMAN: The following week
21 is Monday, is the 23rd, so he is talking
22 the end of the month.
23     MR. MUFF: The 30th is a Monday.
24 30th of April is a Monday.
25     MR. RING: To be clear, let's give

35 (Pages 870 to 873)

MEL WINTER & ASSOCIATES (212) 925-1222