IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VOTORANTIM CIMENTOS LTDA,<br><br>                   Petitioner,<br><br>    - against -<br><br>OXBOW CARBON AND MINERALS LLC, SUCCESSOR IN INTEREST BY MERGER TO APPLIED INDUSTRIAL MATERIALS CORPORATION,<br><br>                  Respondent. | **08 CV 02232 (LBS)**<br><br>**MEMORANDUM OF LAW<br>IN SUPPORT OF<br>MOTION TO VACATE PARTIALLY<br>AND CONFIRM PARTIALLY<br>FINAL ARBITRATION AWARD** |

**TABLE OF CONTENTS**

I. PRELIMINARY STATEMENT ..................................................................................................1

II. BACKGROUND ........................................................................................................................2

    A. The A/V Term Supply Contract between Votorantim and Oxbow ..............................2

    B. The Liability Phase of the Arbitration and Oxbow's Motion to Vacate the
       Partial Award ..................................................................................................................3

    C. The Remedy Phase of the Arbitration..........................................................................4

          1. Oxbow's Arguments on Breach of Contract Remedies........................................5

          2. The Panel's *Ex Parte* Communication with Votorantim .......................................7

III. THE PANEL'S MANIFEST DISREGARD OF THE LAW AND ITS
     MISBEHAVIOR REQUIRE *VACATUR* OF VOTORANTIM'S FINAL AWARD ................9

    A. The Panel Manifestly Disregarded the Law in Awarding Damages to
       Votorantim After Awarding Damages to Oxbow............................................................9

    B. The Panel's *Ex Parte* Communication with Votorantim Was Inherently
       Prejudicial to Oxbow ...................................................................................................13

IV. CONCLUSION.........................................................................................................................14

## TABLE OF AUTHORITIES

### CASES

*Created Gemstones, Inc. v. Union Carbide Corp.*,
  47 N.Y.2d 250, 417 N.Y.S.2d 905 (1979) ..........................................................................12

*DeGaetano v. Smith Barney, Inc.*,
  983 F. Supp. 459 (S.D.N.Y. 1997)......................................................................................9

*Halligan v. Piper Jaffray, Inc.*,
  148 F.3d 197 (2d Cir. 1998)................................................................................................9

*Merrill Lynch, Pierce, Fenner & Smith, Inc., v. Bobker*,
  808 F.2d 930 (2d Cir. 1986)...........................................................................................9, 10

*Regatos v. N. Fork Bank*,
  257 F. Supp. 2d 632 (S.D.N.Y. 2003)................................................................................10

*Spector v. Torenberg*,
  852 F. Supp. 201 (S.D.N.Y. 1994)....................................................................................13

*Tenavision, Inc. v. Neuman*,
  45 N.Y.2d 145, 408 N.Y.S.2d 36 (1978) ..........................................................................12

*Totem Marine Tug & Barge, Inc. v. North America Towing, Inc.*,
  607 F.2d 649 (5th Cir. 1979) ............................................................................................13

*Turntables, Inc. v. Gestetner*,
  52 A.D.2d 776, 382 N.Y.S.2d 798 (1st Dep't 1976)..........................................................12

*Westerbeke Corp. v. Daihatsu Motor Co., Ltd.*,
  304 F.3d 200 (2d Cir. 2002).........................................................................................9, 10

### NON-NEW YORK CASES

*Engel Industries, Inc. v. First America Bank, N.A.*,
  798 F. Supp. 9 (D.D.C. 1992) ...........................................................................................10

*Fesperman v. Silver Dollar City, Inc.*,
  796 S.W.2d 384 (Mo. Ct. App. 1990)................................................................................12

*Plasco, Inc. v. Nixdorff-Krein Manufacturing Co.*,
  547 F.2d 86 (8th Cir 1977) ................................................................................................12

## STATUTES

9 U.S.C. § 10 ...................................................................................................................... 13

U.C.C. § 2-609 ............................................................................................................ 6, 10-12

U.C.C. § 2-610 ............................................................................................................ 6, 10-12

U.C.C. § 2-703 ............................................................................................................ 6, 10-12

Respondent Oxbow[1] moves this Court to vacate the Final Award made to Petitioner Votorantim[2] and to confirm the Final Award made to Oxbow in the underlying arbitration.

## I.

## PRELIMINARY STATEMENT

The Panel manifestly and expressly disregarded one of the most fundamental and well-established tenets of the law of contractual remedies, that a party may suspend its performance under a contract when the other party breaches it. The Panel held that Votorantim breached a petroleum coke ("petcoke") sales agreement with Oxbow (the "Agreement") by refusing to take delivery of petcoke under the guise of a pre-textual declaration of force majeure. The Panel properly awarded Oxbow damages for this breach, and this court should confirm that award. Yet, notwithstanding its ruling that Votorantim breached the Agreement, the Panel found Oxbow liable for damages for refusing to deliver petcoke to Votorantim after Votorantim's breach. As Oxbow made clear in its argument and its briefs to the Panel, once Votorantim breached the Agreement, under the applicable provisions of the Uniform Commercial Code, Oxbow could not possibly be liable for damages. The Panel's disregard of that hornbook law mandates *vacatur* of its damages award to Votorantim.

The Panel's refusal to follow the well-established law was compounded by its misbehavior -- in contravention of Section 10 of the Federal Arbitration Act -- in engaging in an off-the-record, *ex parte* communication with the sole Votorantim witness during the hearing. In a statement appended to the Panel's decision, the Chairman of the Panel acknowledged that he

---

[1] Oxbow Carbon and Minerals LLC, Successor in Interest by Merger to Applied Industrial Materials Corporation

[2] Votorantim Cimentos Ltda.

wrongfully ordered counsel for Oxbow to leave the room in the midst of counsel's cross-examination of Votorantim's witness. During that time, the Chairman engaged the witness, in the absence of the court reporter, concerning, at a minimum, the purported damages related to Votorantim's counterclaim. That *ex parte* discussion was directly related to the underlying basis for Votorantim's damages, an issue central to the award, and therefore inherently prejudicial to Oxbow.

The motion should be granted.

## II.

## BACKGROUND[3]

**A.    The A/V Term Supply Contract between Votorantim and Oxbow**

On October 24, 2000, Oxbow and Votorantim entered into the Agreement pursuant to which Oxbow would supply and Votorantim would accept delivery of a quantity of 300,000 MT +/- 10% of petcoke each calendar year from January 1, 2001 until December 31, 2003 in accordance with delivery schedules presented by Votorantim to Oxbow. *See* Goldman Decl., Exh. B; Partial Final Award, dated June 28, 2006 at pp.1-2. Approximately one year later, on October 3, 2001, Votorantim informed Oxbow that it intended to reduce the number of shipments of petcoke for 2002, pursuant to Section 2.2 of the Agreement. *Id*. at p. 5. Then, on November 30, 2001, Votorantim informed Oxbow that, in fact, it would not schedule any shipments for 2002, again pursuant to Section 2.2 of the Agreement. *Id*. at pp. 5-6 (emphasis supplied). Votorantim contended it was entitled, under the force majeure clause in the

---

[3] References to the factual record herein are, to the extent possible, to the Final Award. Where relevant facts are not explicitly detailed in the Final Award, Oxbow cites to the Partial Final Award, the facts and findings of which the Panel expressly incorporated into the Final Award. *See* Goldman Declaration ("Goldman Decl."), Exhibit ("Exh.") A; Final Award, dated February 29, 2008, at p. 2 ("The Panel incorporates herein the facts and findings of the Partial Final Award dated June 28, 2006."). In addition, where necessary, Oxbow cites to its damages briefs.

Agreement, to limit and then cancel shipments because government energy restrictions in Brazil interfered with its ability to process and store the petcoke. *Id.*

Despite having already repudiated the contract by refusing to take any shipments of petcoke in 2002, Votorantim made several further overtures to Oxbow, beginning in early 2002. Specifically, on January 24, 2002, Votorantim suggested that it would consider a "partial reduction" in 2002 shipments on the condition that Oxbow restructure the price. *Id.* at p. 7. On March 18, 2002, Votorantim again demanded a reduction for 2002 shipments. *Id.* In response, on April 2, 2002, Oxbow notified Votorantim that it was required to fully perform under the contract, and that it would be held liable for losses and expenses as a result of any breach. *Id.* Finally, four months later, on August 16, 2002, Votorantim sought to resume regular shipments. *Id.* at p. 8. On October 4, 2002, with Votorantim in breach, Oxbow demanded arbitration with Votorantim.

      **B.**      **The Liability Phase of the Arbitration and Oxbow's Motion to Vacate the Partial Award**

The arbitration was bifurcated into liability and remedy phases. After several hearings and submission of evidence and briefs at the liability phase, the Panel issued a Partial Final Award. *See* Goldman Decl., Exh. B. The Panel held that Votorantim had breached the Agreement during the first seven months of 2002 by not scheduling and accepting petcoke from Oxbow. *Id.* at pp. 11-12. In effect, the Panel found that Votorantim had failed to provide sufficient evidence that the energy restrictions had any specific effect on its ability to accept delivery of the petcoke and, therefore, no force majeure event had occurred. *Id.* The Panel concluded that Votorantim's refusal to accept shipments of petcoke from Oxbow was based on cost issues rather than the energy restrictions. *Id.*

Remarkably, after holding Votorantim liable for breach, the Panel then determined that Oxbow had breached the Agreement by not responding to Votorantim's August 16, 2002 letter seeking to resume shipments. *Id*. The Panel's decision regarding Oxbow's liability, however, is supported by minimal analysis, and the factual and legal basis for the Panel's decision is unclear. Moreover, because Oxbow believed that the liability phase would only encompass its own claim, it did not have an opportunity to present to the Panel the hornbook law that once Votorantim breached the Agreement, Oxbow was relieved from any further performance under it.

Oxbow asked the Panel reconsider its decision, contesting, as the sole issue, the scope of the Panel's liability findings. Goldman Decl., Exh. C; Letter from Anthony J. Mavronicolas to the Panel, dated July 18, 2006. Oxbow contended that the parties and the Panel had stipulated that liability phase would proceed in stages, where the Panel would first decide Oxbow's breach of contract claim, and then, if necessary, decide Votorantim's counterclaim. The Panel, however, declined to modify its decision. Goldman Decl., Exh. D; Email from Peter J. Zambito, dated August 15, 2006. Oxbow subsequently filed a motion with this Court, seeking to vacate the award on the same grounds. This Court denied Oxbow's motion to vacate the Partial Final Award on the grounds that the Panel had acted within the scope of its power and the parties' stipulation in deciding both Oxbow's claim and Votorantim's counterclaim. Goldman Decl., Exh. E; Judgment, dated January 19, 2007 and Memorandum & Order, dated January 17, 2007.

  C. **The Remedy Phase of the Arbitration**

After the liability phase, the parties proceeded to the remedy phase of the arbitration. The Panel held five hearings during which one witness and one expert testified on

-4-

behalf of Oxbow, and one witness testified on behalf of Votorantim. *See* Goldman Decl. Exh. A, at p. 3. The parties submitted exhibits during the hearings, as well as preliminary, main, and reply briefs on remedies. *Id.*

>    1.    *Oxbow's Arguments on Breach of Contract Remedies*

During the hearing, Oxbow made clear that it would argue in its post-arbitration briefs that the law of contractual remedies dictated that Oxbow could not be liable for damages to Votorantim.

> MR. MAVRONICOLAS:    And I believe what the panel held, and we will submit the briefs, if you will let me say it for a moment, that you have now gotten to the point of saying, hey, what were damages for 2000-2003. That's what you came to.
>
> Well, what you have before you is a long-term supply contract and under a long-term supply contract, we submit that the law is quite clear, that regardless of what happens in terms of the breach, that once a long-term supply contract is breached, and you have already ruled that Votorantim breached it between January and August of 2002, that under the Uniform Commercial Code, under the Law of Contracts, our argument is, hey, look, what happens then is that there are two remedies that are available that the panel can rule on for damages; one is rescission of the contract, the contract is over and, two is, what damages resulted from that.
>
> We are going to argue in our brief that in fact under a long-term supply contract that goes for three years, once you breach one year of that, you lost the fundamental benefits of that contract, $1 million plus, and the result is that the remedies available for that breach to [Oxbow] and to PREMCOR are twofold.
>
> One, contract comes to an end, regardless of what they asked for or don't ask for, that's a damage ruling on your part that you can make, and two, that once that contract comes to an end, if that's the case under the Law of Damages, under the Uniform Commercial Code, then the question then becomes, okay, what damages are either party entitled to. And that's what we intend to brief.
>
> It's a legal argument and it's going to be made to the panel. That's why we are presenting it this way.

*See* Goldman Decl., Exh. F; Transcript of Hearing dated July 16, 2007, at pp. 1117-1119.

The Chairman of the Panel expressly ruled that Oxbow could raise such argument in its post-arbitration briefing when he responded, "[b]ecause we said we would take everything, okay, we will permit you to do that." *Id*.

Oxbow then presented in its briefs a detailed analysis of the law of contract remedies, beginning with the remedy of cancellation upon breach of a sales contract by a buyer, and concluding with the seller's ability to seek damages. *See* Goldman Decl. Exhs. G, H, I; (Oxbow Main Brief in Support of Damages, at pp. 31-39; Oxbow Preliminary Brief in Support of Damages, at pp. 5-7; Oxbow Reply Brief, at pp. 22-25). The threshold analysis of Oxbow's remedies requires the application of specific provisions of the Uniform Commercial Code. Goldman Decl., Exh. G, at pp. 31-39. As Oxbow outlined, U.C.C. sections 2-610, 2-703 and 2-609 clearly provide that once a buyer has breached, the seller may suspend its own performance and cancel the contract. It follows that once the contract is cancelled, the non-breaching party cannot later be liable for damages under such contract. *Id*. at p. 38. Oxbow made it clear that, in light of the Panel's finding that Votorantim had first breached the Agreement, Votorantim was not entitled to any award of damages. *See* Goldman Decl., Exh. G, at pp. 31-39; Exh. I, at pp. 22-25.

The Panel, however, explicitly ignored this well-established, hornbook law of remedies. The Panel stated in its Final Award that Oxbow, "in its main and reply briefs, at the end, raised seven (7) points, <u>only two (2) of which we deem necessary to address below</u>." *See* Goldman Decl., Exh. A, at p. 3 (emphasis supplied). The Panel refused to address Oxbow's first point of argument, which requested that the Panel:

> Rule that Votrantim's [sic] material breach and repudiation of the A/V Term Supply Contract the first half of 2002 resulted in the cancellation of the contract as provide [sic] for under the sellers [sic] remedies set forth in UCC 2-609, UCC 2-610 and UCC 2-703 as adopted in New York.

Goldman Decl., Exh. G, at p. 58.

The Panel awarded Oxbow $388,784 in lost profits and interest as a result of Votorantim's breach. Goldman Decl., Exh. A, at p. 12. Ignoring the governing law, the Panel awarded Votorantim an astounding $4,919,519 in lost profits and interest, attributable to Oxbow's supposed breach. *Id*.

### 2. *The Panel's Ex Parte Communication with Votorantim*

At the April 12, 2007 hearing during Oxbow's cross-examination of Votorantim's witness, Mr. Rocha, the Chairman of the Panel asked counsel for Oxbow, but not Votorantim's counsel, to leave the room and, inexplicably, continued to question Mr. Rocha outside of the presence of both counsel for Oxbow and the court reporter. *See* Goldman Decl. Exh. A, at pp. 15-18 (attached as Appendix B to the Final Award).

Recognizing the obvious impropriety of this *ex parte* procedure, the Chairman of the Panel attempted to justify his behavior in a statement appended to the Final Decision. The Chairman acknowledged that he "became exasperated with the documentation submitted on behalf of Votorantim as to replacement shipments and asked counsel for [Oxbow] to leave the room." *Id*. at p. 15. With Oxbow counsel absent, the Chairman "chided the witness (Rocha) and made it clear that the Panel wanted data reflecting 'all' shipments during the second half of 2002 and all of 2003." *Id*.

Mr. Ring, the arbitrator chosen by Votorantim[4], conducted an examination of Mr. Rocha immediately following the *ex parte* procedure:

> The Chairman: Back on the record.
>
> Mr. Ring: <u>We were talking about expediting this thing and maybe it helps you.</u>
> Mr. Rocha, can you tell me, please what was the total amount of imports in the last half of '02 of petcoke to all Brazilian ports, roughly?
>
> The Witness: Half of '02, you mean the six months?
>
> Mr. Ring: Yes.
>
> The Witness: Could be around 600,000 tons.
>
> Mr. Ring: Would that include the replacement for the [Oxbow]?
>
> The Witness: Yes.
>
> Mr. Ring: Which would be about 150?
>
> The Witness: 150.
>
> Mr. Ring: The same question for the year 2003.
>
> The Witness: 2003, I believe that for the year we should have been 10 percent higher.
>
> Mr. Ring: Total tons?
>
> The Witness: Total tons. 1.1, 1.3.

*See* Goldman Decl., Exh. J; Transcript of April 12, 2007 Hearing, at pp. 862-64.

Mr. Ring continued to conduct what amounted to a re-direct examination of Mr. Rocha, eliciting script-like testimony regarding the alleged support for Votorantim's damages claim. *Id*. at pp. 864-67.

---

[4] The Panel consisted of three arbitrators. Mr. John F. Ring was appointed by Votorantim, Mr. Walter R. Muff was appointed by Oxbow, and Mr. Peter J. Zambito was appointed as third arbitrator and chairman by counsel. Goldman Decl., Exh. B at p. 3.

The Chairman acknowledged in his statement that he "was wrong to ask counsel for [Oxbow] to leave the room during this interval." Goldman Decl., Exh. A, at p. 15. The Chairman further recognized that Oxbow was prejudiced by the mere act of sending its counsel out of the hearing room and denying Oxbow any understanding of what was discussed "unilaterally." *Id*. at p. 17.

### III.

### THE PANEL'S MANIFEST DISREGARD OF THE LAW AND ITS MISBEHAVIOR REQUIRE *VACATUR* OF VOTORANTIM'S FINAL AWARD

Where, as here, the Panel has awarded damages based on a knowingly improper application of the law, and further compromised the integrity of the arbitration process by engaging in improper *ex parte* communications, the award should be vacated.

**A.    The Panel Manifestly Disregarded the Law in Awarding Damages to Votorantim After Awarding Damages to Oxbow**

The law is well-settled that an arbitral decision may be vacated when an arbitrator has exhibited a "manifest disregard" of law. *Westerbeke Corp. v. Daihatsu Motor Co., Ltd.*, 304 F.3d 200, 208 (2d Cir. 2002); *Halligan v. Piper Jaffray, Inc.*, 148 F.3d 197, 204 (2d Cir. 1998) (reversing, on the grounds of manifest disregard, a district court order refusing to vacate an arbitration award); *DeGaetano v. Smith Barney, Inc.*, 983 F. Supp. 459, 464, 471 (S.D.N.Y. 1997) (vacating award denying attorneys fees which were permitted under Title VII).

In ascertaining whether the Panel has manifestly disregarded the law, the Court applies a two-prong test that includes an objective and a subjective component. *Westerbeke*, 304 F.3d at 209. First, the Court should consider whether the "governing law alleged to have been ignored by the arbitrators [was] well defined, explicit, and clearly applicable." *Id*. (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc., v. Bobker,* 808 F.2d 930, 934 (2d Cir. 1986).

Second, the Court should look to the knowledge actually possessed by the Panel to determine whether the Panel appreciated "the existence of a clearly governing legal principle but decides to ignore or pay no attention to it." *Merrill Lynch*, 808 F.2d at 933. If both prongs are met, the Court may find that there has been a manifest disregard of law. *Westerbeke*, 304 F.3d at 209.

A legal principle clearly governs the resolution of an issue when its applicability is "obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator." *Merrill Lynch*, 808 F.2d at 933. Here, it is a well-established hornbook principle that when one party materially breaches a contract, the other party is relieved from further performance under the contract and cannot possibly be liable for any damages for such non-performance. The primary source for this proposition, which was cited by Oxbow to the Panel, is the U.C.C.[5], which provides as follows:

> § 2-610.    Anticipatory Repudiation
>
> When either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may:
>
> (a)    for a commercially reasonable time await performance by the repudiating party; or
>
> (b)    resort to any remedy for breach (Section 2-703 or Section 2-711), even though he has notified the repudiating party that he would await the latter's performance and has urged retraction; and

---

[5] While the Agreement provides that it is governed by Missouri law, the Panel concluded that such law "had no bearing" in its Partial Final Award. Goldman Aff., Exh. B, at p. 9. Thus, Oxbow cited New York law in its memorandum of law in the remedy phase. There is, however, no difference between the applicable New York and Missouri law. Both states have adopted the U.C.C. *See, e.g., Engel Indus., Inc. v. First Am. Bank, N.A.*, 798 F. Supp. 9, 12 (D.D.C. 1992) (applying Missouri law and explaining that the U.C.C. "is in force in Missouri and controls this case."); *see also Regatos v. N. Fork Bank*, 257 F. Supp. 2d 632, 640 (S.D.N.Y. 2003) (explaining New York's adoption of the U.C.C. with the goal of, among other things, simplifying, clarifying and modernizing the law governing commercial transactions). Thus, the respective state-adopted statues are identical in all material respects.

  (c) <u>in either case suspend his own performance</u> or proceed in accordance with the provisions of this Article on the seller's right to identify goods to the contract notwithstanding breach or to salvage unfinished goods (Section 2-704).

(Emphasis supplied).

  That provision expressly incorporates Section 2-703, which provides:

  § 2-703. Seller's Remedies in General.

Where the buyer wrongfully rejects or revokes acceptance of goods or fails to make a payment due on or before delivery or repudiates with respect to a part or the whole, then with respect to any goods directly affected and, if the breach is of the whole contract (Section 2-612), then also with respect to the whole undelivered balance, the aggrieved seller may:

  (a) withhold delivery of such goods;

           ***

  (e) recover damages for non-acceptance (Section 2-708) or in a proper case the price (Section 2-709);

  (f) <u>cancel</u>.

(Emphasis supplied).

  Finally, Section 2-609 permits a party to a contract to seek assurance of performance, and defines when assurance is adequate. Specifically, it provides as follows:

  § 2-609. Right to Adequate Assurance of Performance

(1) A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.

(2) Between merchants the reasonableness of grounds for insecurity and the adequacy of any assurance offered shall be determined according to commercial standards.

(3) Acceptance of any improper delivery or payment does not prejudice the aggrieved party's right to demand adequate assurance of future performance.

>    (4)   After receipt of a justified demand failure to provide within a reasonable time not exceeding thirty days such assurance of due performance as is adequate under the circumstances of the particular case <u>is a repudiation of the contract</u>.

(Emphasis supplied).

New York courts have long held that a material breach by one contracting party permits the other party to cancel the contract and excuses it from further performance. *See Created Gemstones, Inc. v. Union Carbide Corp.*, 47 N.Y.2d 250, 255-56, n.5, 417 N.Y.S.2d 905, 990 (1979) (reversing grant of summary judgment and holding that if defendant breached the contract, plaintiff would be "entitled to suspend its own performance."); *Tenavision, Inc. v. Neuman*, 45 N.Y.2d 145, 150, 408 N.Y.S.2d 36, 38 (1978) (holding that "the repudiation of a contract by the buyer eliminates the need for further performance by the seller.").[6] Likewise, where a seller demands adequate assurance and the buyer breaches, the buyer is barred from recovering damages. *Turntables, Inc. v. Gestetner*, 52 A.D.2d 776, 777, 382 N.Y.S.2d 798, 799 (1st Dep't 1976) (holding that where the seller demanded adequate assurance under § 2-609 and the buyer repudiated, the buyer could not later recover damages for non-delivery).

Here, the Panel held that Votorantim's invocation of the force majeure clause in the Agreement was not supported by facts and, on that basis, Votorantim breached the Agreement. Based on that factual finding, the Panel awarded damages to Oxbow. Goldman Aff., Exh. A, at p. 12. Under the U.C.C., the Panel's award of damages to Oxbow foreclosed any award of damages to Votorantim.

---

[6] Missouri law is no different. *See, e.g., Fesperman v. Silver Dollar City, Inc.*, 796 S.W.2d 384, 388 (Mo. Ct. App. 1990) (holding that the record abundantly showed that defendant buyer repudiated the contract and thereby excused seller's tender under §400.2-610(c) and §400.2-703; *Plasco, Inc. v. Nixdorff-Krein Mfg. Co.*, 547 F.2d 86, 88 (8th Cir 1977) (affirming district court's holding that where buyer had breached the contract when first two shipments of polystyrene beads did not conform to warranty, district court's denial of recovery for buyer's counterclaim for breach of contract was appropriate, citing Mo. Rev. Stat. §400.2-703).

There is no doubt, moreover, that the Panel was fully aware of the applicable provisions of the U.C.C. yet it specifically decided to ignore them. The Panel stated in the Final Award that Oxbow "raised seven (7) points, only two (2) of which we deem necessary to address below." One of the points the Panel refused to address was that Oxbow could not be liable for damages under the U.C.C.

After finding that Votorantim breached the Agreement, the Panel should also have held that Votorantim was not entitled to any damages. The Panel acted with manifest disregard of the governing law, and the Final Award should be vacated as to Votorantim's award.

### B. The Panel's *Ex Parte* Communication with Votorantim Was Inherently Prejudicial to Oxbow

The Panel compounded its manifest disregard of the law when it engaged in an egregious error by engaging in an *ex parte* communication with Votorantim during the course of a remedy hearing. That *ex parte* discussion, which went directly to the central remedies issues, was inherently prejudicial to Oxbow. The Court is empowered to vacate the Panel's award where its misbehavior was prejudicial to Oxbow. 9 U.S.C. § 10.[7]

To vacate an award on the basis of *ex parte* communications between an arbitration panel and a party to the arbitration, the moving party must make a two-part showing. First it must demonstrate "that [the *ex parte*] conversation deprived him of a fair hearing and influenced the outcome of the arbitration," and second, it must show that "the subject matter of the conversation [went] to the heart of the dispute's merits." *Spector v. Torenberg*, 852 F. Supp 201, 209 (S.D.N.Y. 1994); *see also Totem Marine Tug & Barge, Inc. v. N. Am. Towing, Inc.*, 607

---

[7] Under Section 10 of the Federal Arbitration Act, a district court may make an order vacating the award upon the application of any party to the arbitration where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.

F.2d 649, 653 (5th Cir. 1979) ("Arbitrators cannot conduct ex parte hearings or receive evidence except in the presence of each other and the parties unless otherwise stipulated.").

Here, the Chairman specifically asked that counsel for Oxbow leave the hearing room, and then, in the absence of the court reporter, the Chairman "chided" Mr. Rocha, Votorantim's witness, to produce documentation to substantiate Votorantim's claim. That exchange went to the merits at the "heart of the dispute" and it affected its outcome, as the Chairman effectively prompted Votorantim to produce documentation to meet its burden of proof on its counterclaim. But that was not all. Immediately after the *ex parte* procedure, Votorantim's arbitrator, Mr. Ring, admitted on the record that during the *ex parte* meeting, "[w]e were talking about expediting this thing . . ." Goldman Decl., Exh. J, at pp. 863. He then said, "maybe it helps you," at which time he conducted a redirect examination of the witness -- with scripted-precision -- to establish that Votorantim had mitigated its damages by purchasing replacement petcoke at the lowest possible prices. As the Chairman admitted, he was "wrong to ask counsel for [Oxbow] to leave the room." *Id*.

The motion should be granted.

## IV.
## CONCLUSION

For all the foregoing reasons, Oxbow respectfully requests that this Court vacate the award of damages to Votorantim and confirm the award of damages to Oxbow.

Dated: New York, New York
May 23, 2008

                    PAUL, HASTINGS, JANOFSKY & WALKER LLP

                    By: /s/ Lawrence J. Conlan
                        Daniel B. Goldman (DG4503)
                        Lawrence J. Conlan (LC2170)
                    Attorneys for Respondent Oxbow Carbon and Minerals LLC
                    75 East 55th Street
                    New York, NY  10022-3205
                    (212) 318-6000

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 23, 2008, the foregoing Memorandum of Law in Support of Motion to Vacate Partially and Confirm Partially the Final Arbitration Award was filed electronically and served upon the following counsel of record by UPS overnight mail in accordance with the Federal Rules of Civil Procedure and the Southern District of New York Local Civil Rules. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

George M. Chalos, Esq.
Chalos, O'Connor & Duffy, LLP
366 Main Street
Port Washington, New York 11050
*Attorneys for Petitioner*

PAUL, HASTINGS, JANOFSKY
  & WALKER LLP

/s/ Lawrence J. Conlan
Lawrence J. Conlan (LC 2170)
75 East 55th Street
New York, New York 10022
(212) 318-6000