UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X

VOTORANTIM CIMENTOS LTDA.,

                     Petitioner,          08 CV 02232 (LBS)

- against -                      **DECLARATION IN SUPPORT
OF VOTORANTIM'S
OPPOSITION TO OXBOW'S
MOTION TO PARTIALLY
VACATE FINAL
ARBITRATION AWARD**

OXBOW CARBON AND MINERALS LLC,
SUCCESSOR IN INTEREST BY MERGER
TO APPLIED INDUSTRIAL MATERIALS
CORPORATION

                     Respondents.
------------------------------------------------------X

Pursuant to 28 U.S.C. § 1746, George M. Chalos declares under penalty of

perjury, and upon information and belief:

1.      I am a member of the firm CHALOS & CO., P.C., attorneys for

VOTORANTIM CIMENTOS LTDA., (hereinafter "VOTORANTIM").

2.      I am familiar with the facts and circumstances of this case, and submit this

declaration in support of VOTORANTIM's Opposition to the Motion to Partially Vacate

Final Arbitration Award submitted to this Honorable Court by counsel acting on behalf of

OXBOW CARBON AND MINERALS LLC, SUCCESSOR IN INTERST BY

MERGER TO APPLIED INDUSTRIAL MATERIALS (hereinafter, "Oxbow") on or

about May 23, 2008 (See, Docket #6).

## FACTS AND PROCEDURAL HISTORY

3.      The Parties entered into a Petroleum Coke Sales Agreement on or about

June 21, 2001. (A copy of said Agreement is annexed hereto as Exhibit "A")

Section 15 of this Sales Agreement contained an Arbitration Clause requiring that the

"contract shall be governed by the laws of the State of Missouri, United States of

America, and; [i]n the event of any dispute arising in connection with this contract, the

parties hereby agree to submit such dispute to arbitration under the rules of the American

Arbitration Association in New York, United States of America. (See Exhibit "A,"

sections 15.1,and 15.3).

4.      Additionally, the contract specifically provided the following with respect

to the quantity to be bought/sold:

### Clause 2 – Quantity

2.1 Seller shall supply and Buyer shall lift the quantity of
300,00MT +/- 10% Buyers option, in each calendar year.
The optional tonnage of +/- 10% is understood as a balance
quantity to satisfy shipment conditions.

2.2 If Buyer is not able for technical or government
approval to use petroleum coke in one or more cement
plants.  Buyer has right to reduce contractual tonnage
according to reduced demand of plants affected. Buyer will
inform Seller in due time in such cases and provide
sufficient evidence accordingly.  In such case Buyer and
Seller will formulate a new delivery schedule in mutual
cooperation.

See Exhibit "A," sections 2.1 and 2.2.

5.      The parties also agreed an express procedure to be followed should one of

the parties default and the other wish to seek to terminate the agreement.  Specifically,

Clause 17.5 provides, in relevant part, the following:

**Clause 17 – General Terms**

        \*   \*   \*

        17.5 In the event that either party shall fail to perform any of its obligations hereunder and shall fail to remedy such default within 30 (thirty) days after written notice thereof has been given by the non defaulting party, the non defaulting party **_may_** terminate this Agreement with no further obligation or liability, at its option, by giving written notice to the defaulting party. . . (emphasis added)

See Exhibit "A," section 17.5.

6.      By agreement, a panel was convened and over the course of June 30, 2004 to November 10, 2005 six (6) arbitration hearings were conducted. On June 28, 2006, the Panel issued its Partial Final Award, with respect to all contested liability issues, concluding that, among other things, Aimcor had breached the contract at issue.

7.      Specifically, the Panel wrote:

        \*   \*   \*

        _. . . During the proceedings, counsel and the Panel agreed to proceed solely on the issue of liability, with subsequent hearings on the issue of damages to be held, if necessary, after an Award as to liability was issued. . ._

        \*   \*   \*

See the Panel's Partial Final Award attached hereto as Exhibit "B" at p.3.

8.      In summary, the Panel found that, despite the problems experienced by Votorantim, the Brazilian energy crisis did not rise to the level of a force majeure situation and found Votorantim had failed to schedule and accept 150,000 MT of petcoke during the first seven (7) months of 2002 (i.e. – the first half of the second year of a three year contract). See Exhibit "B," at p.3.

9.     The Panel further held that Oxbow (then referred to as Aimcor) had breached the contract by not responding to Votorantim's letter of August 16, 2002.  In its August 16, 2002 letter, Votorantim notified Aimcor that the Brazilian energy crisis was over and that it was in a position to resume regular shipments. See Exhibit "B" at p.3.

10.     In rendering its decision, the Panel made the following specific findings:

> According to David Nestler, a witness for AIMCOR, VOTORANTIM's January 24[th] message does not state that VOTORANTIM wanted to cancel the contract.  In a letter dated August 16, 2002, VOTORANTIM notified AIMCOR that the energy crisis in Brazil "no longer exists," and that it was in a position to resume regular shipments in September, October and December 2002 (presumably a total of 150,000 MT, as each prior shipment was 50,000MT).  Nothing was produced on the record that AIMCOR responded to that letter.

See Exhibit "B" at p.7-8.

\*     \*     \*

> The majority also finds that AIMCOR breached the Contract by not responding to Votorantim's letter of August 16, 2002, in which Votorantim notified AIMCOR that the energy crisis was over and that it was in a position to resume regular shipments in September, October and December 2002 (presumably, each shipment of 50,000 MT or a total of 150,000 MT),or in providing petcoke during those months.
>
> It is to be noted that Nestler of AIMCOR testified that the actions of Votorantim did not amount to an abandonment of the Contract.

See Exhibit "B" at p.11.

11.     Following the issuance of the Panel's Partial Final Award, Oxbow filed Petition to Vacate the Award primarily arguing that the Panel had exceeded its authority in conclusively deciding all issues of liability at that time.  A copy of the docket report

for the prior challenge by Oxbow (case no 1:06-cv-07763-LBS) is annexed hereto as Exhibit "C".

12.    On or about September 27, 2006, Oxbow submitted a Petition to Vacate the Partial Final Award on liability, which was assigned to this Honorable Court. See Exhibit "C" at Docket Entry #1.

13.    Thereafter, Votorantim opposed Oxbow's application by moving to dismiss Plaintiff's action. See Exhibit "C" at Docket Entries #4, 5 and 6.

14.    Following the submission of the parties complete briefing, oral argument was held before this Honorable Court on December 7, 2006.

15.    On January 17, 2007, a Memorandum and Order was issued granting Votorantim's motion to dismiss; denying Oxbow's motion to vacate; and finding that the arbitration Panel acted within the scope of its authority in deciding all issues concerning liability. See Exhibit "C" at Docket Entry #18).

16.    A Clerk's Judgment in favor of Votorantim was entered on January 19, 2007. See Chalos Exhibit "C" at Docket Entry #19.

17.    The Court's decision has been published on Lexis. Attached hereto as Exhibit "D" is a copy of this Honorable's decision available in Lexis as: Oxbow Carbon and Minerals LLC, Successor in Interest By Merger to Applied Industrial Materials Corp. v. Votorantim Cimentos Ltda., 2007 U.S. Dist LEXIS 5467)(January 17, 2007).

18.    Thereafter, five (5) additional hearings relating solely to *damages* were held by the Panel, during which one (1) witness and one (1) expert testified on behalf of Oxbow and one (1) witness testified on behalf of Votorantim. See a copy of the Panel's Final Award, annexed hereto as Exhibit "E" at p.3.

19.     Prior to the commencement of the damages hearings, counsel for Aimcor submitted a Preliminary Memorandum on Damages to the Panel.

20.     During the course of the damages proceedings, extensive exhibits and briefing relative to the issues of damages were offered and accepted and given the weight the Panel deemed each was entitled to be given.

21.     At the conclusion of the damages hearings, counsel for Aimcor requested an opportunity, and the Panel agreed, to allow Aimcor to submit additional documentary evidence, (which the Panel accepted). See Exhibit "E" at p.3.

22.     In rendering its Final Award on damages, the Panel reiterated that all issues relating to liability had been *previously* decided on June 28, 2006, (as per the Panel's Partial Final Award), and that the Final Award addressed *"the issue of damages only."* Specifically, the Panel wrote:

> ***A PARTIAL FINAL AWARD dealing with liability was issued dated June 28, 2006.*** *A majority of the arbitrators found therein that VOTORANTIM had breached the Contract dated October 24, 2000 by not scheduling and accepting 150,000 MT petcoke during the first half of 2002 and was liable for the damages sustained by AIMCOR as a result; and further unanimously found that AIMCOR breached the same Contract by not providing petcoke for delivery to VOTORANTIM for the balance of the A/V Term Supply Contract, after it was informed in writing on August 16, 2002 that VOTORANTIM was in a position to resume regular shipments and was prepared to schedule and accept the remaining shipments as stipulated in the A/V Term Supply Contract.*
>
> *The Panel incorporates hearing the facts and findings of the Partial Final Award dated June 28, 2006.* ***This FINAL AWARD deals with the issue of damages only.*** *(emphasis added).*

See Exhibit "E" at p.2.

23.    As for its findings concerning the damages claimed to be due and owing to Oxbow as a result of the Panel's prior liability finding against Votorantim, the Panel stated that it sought to put the Oxbow in the same position it would have been had Votoratim fully performed during the first seven (7) months of 2002, and determined that Oxbow would have earned a net profit of USD301,500. See Exhibit "E" at p.3-7,12. Accordingly, the Panel awarded Oxbow USD388,783.87 (i.e. – USD 301,500, plus interest in the amount of USD87,283.87).

24.    As for its calculation of damages claimed to be due and owing to Votorantim, the Panel sought to put Votorantim in the same position it would have been had it not been forced to go out to the marketplace and purchase substitute shipments during the second half of 2002, as well as during calendar year 2003 (i.e. – the last eighteen (18) months of the contract) as a result of Oxbow's breach of the contract. Specifically, the Panel found that, as a result of Oxbow's breach of the Contract during the second half of 2002 and for the calendar year 2003, Votorantim is entitled to damages in the aggregate amount of USD 4,919,518.88.    See Exhibit "E" at pps. 11-12.

25.    During the course of the damages hearing, Oxbow vigorously challenged the quantum claimed by Votorantim by presenting expert evidence and through grueling cross-examination of Votorantim's witness, Julio Rocha.  In this regard, the Panel noted:

> *Counsel for AIMCOR sought to discredit the damages claimed by VOTORANTIM, principally through the testimony of its expert, Mario Sirca, as well as the testimony of VOTORANTIM's witness, Julio Rocha.*

See Exhibit "E" at p. 10.

26.    However, after having an opportunity to observe the witnesses and hear their testimony, the Panel found the testimony of Oxbow's expert to have been "discredited" and "of no probative value." Specifically, the Panel wrote:

> *Having observed the expert witness and heard his testimony, the Panel was of the <u>unanimous opinion</u> that Sirca's testimony had been discredited and was of no probative value.* (emphasis added).

See Exhibit "E" at p. 11.

27.    In contrast, the Panel found Votorantim's witness credible, holding that "the [contemporaneous documentary] evidence submitted on behalf of VOTORANTIM" supported the testimony presented by Mr. Rocha. See Exhibit "E" at p. 8.

28.    Following the issuance of the Panel's Final Award, Votorantim filed a Petition to Confirm the Panel's findings as to damages on March 6, 2008. See Docket Entry #1. On March 14, 2008, this Honorable Court accepted the matter as a related case to the prior proceedings had in 1:06-cv-07763 (LBS). See Docket Entry #4.  Thereafter, on or about May 23, 2008, Oxbow filed the within motion seeking to "partially vacate" the Panel's Final Award on the grounds that: (1) the Panel manifestly disregarded the law, and (2) arbitrator misconduct.  See Docket Entries #5-8.

29.    Votorantim respectfully requests this Honorable Court to issue an Order: (1) denying Oxbow's motion in all respects; (2) confirming the Panel's Final Award as a judgment of this Court; (3) awarding Votorantim the costs and expenses it has had to incur in opposing this application; and (4) granting such further and additional relief as the Court deems just and proper under the circumstances.

30.    A true and complete copy of the Main Brief submitted to the arbitrators by Oxbow is annexed hereto as Exhibit "F".

31.     A true and complete copy of the Reply Brief submitted to the arbitrators by Oxbow is annexed hereto as Exhibit "G".

32.     A true and complete copy of the transcript of the oral argument held before this Honorable Court on December 7, 2006, is annexed hereto as Exhibit "H".

33.     A true and complete copy of relevant portions of the testimony of David Nastler on July 19, 2005, is annexed hereto as Exhibit "I".

34.     A true and complete copy of relevant portions of arbitration transcript, dated July 17, 2007, is annexed hereto as Exhibit "J".

35.     As a matter of law, this Honorable Court should dismiss this action on the ground the Petitioner has brought this action in an untimely manner and, therefore, is not properly before the Court.

36.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on June 27, 2008 in Oyster Bay, New York.

Dated:  June 27, 2008
        Oyster Bay, New York            George M. Chalos, Esq.


To:     PAUL, HASTINGS, JANOFSKY & WALKER, LLP
        Attn:   Daniel B. Goldman, Esq.
                Lawrence J. Conlan, Esq.
        Attorneys for Respondent
        OXBOW CARBON AND MINERALS LLC,
        SUCCESSOR IN INTERST BY MERGER
        TO APPLIED INDUSTRIAL MATERIALS
        75 East 55th Street
        New York, New York 10022-3205
        *Via Email & ECF*

LAW OFFICES OF ANTHONY J. MARVONICOLAS
Attn:   Anthony J. Mavronicolas, Esq
Attorneys for Respondent
OXBOW CARBON AND MINERALS LLC,
SUCCESSOR IN INTERST BY MERGER
TO APPLIED INDUSTRIAL MATERIALS
75 Washington Place, Suite One
New York, New York 10011
*Via Email*

EXHIBIT "A"

 

# Petroleum Coke Sales Agreement
# Contract Number 00299

between

## AIMCOR

(Applied Industrial Materials Corporation)
100 First Stamford Place
Stamford, CT 06902-6771

(hereinafter called "Seller")

and

Votorantim Cimentos Ltda.
Rua Amauri 255 10° Andar
01498-900 Sao Paulo, SP
BRAZIL

(hereinafter called "Buyer")

 

ORIGINAL

## Contents

| Clause | Subject |
|---|---|
| 1 | Term of the agreement |
| 2 | Quantity |
| 3 | Quality and Petroleum Coke Source |
| 4 | Price |
| 5 | Invoicing and Payment |
| 6 | Documents |
| 7 | Delivery |
| 8 | Weight Determination |
| 9 | Sampling and Quality Determination |
| 10 | Loading |
| 11 | Agents at Loadport |
| 12 | Title and Risk of Loss |
| 13 | Force Majeure |
| 14 | Limitation on Seller's Liability |
| 15 | Arbitration |
| 16 | Confidentiality |
| 17 | General Terms |
| Annex 1 | Petroleum Coke Specification |
| Annex 2 | Delivery Schedule year 2000 |





Seller agrees to sell and to deliver, Buyer agrees to purchase, take delivery and to pay for petroleum coke described hereunder, under the conditions set forth herein.

## Clause 1 – Term of the Agreement

1.1 This Agreement shall take effect as of January 1, 2001 and shall continue until December 31st 2003, unless terminated prior to such date under other provisions hereof. No suspension of an obligation under this contract by reason of force majeure shall extend the term except upon mutual agreement of Buyer and Seller.

1.2 At least six months prior to expiry date of this agreement, at written request of either Buyer or Seller, Buyer and Seller agree to meet to discuss the renewal of the Agreement on mutually agreeable terms as an option to extend this initial 3 year contract term for a further 1 – 3 years.

## Clause 2 – Quantity

2.1 Seller shall supply and Buyer shall lift the quantity of 300,000 MT +/- 10%, Buyer's Option, in each calendar year. The optional tonnage of +/- 10% is understood as a balance quantity to satisfy shipment conditions.

2.2 If Buyer is not able for technical or government approval to use petroleum coke in one or more cement plants, Buyer has right to reduce contractual tonnage according to reduced demand of plants affected. Buyer will inform the Seller in due time in such cases and provide sufficient evidence accordingly. In such case Buyer and Seller will formulate a new delivery schedule in mutual cooperation.

## Clause 3 – Quality and Petroleum Coke Source

3.1 Petroleum coke delivered shall consist of a homogeneous material in accordance with the specification and description as per ANNEX to this agreement.

3.2 The petroleum coke to be supplied shall be primarily produced at the PREMCOR refinery, Port Arthur, Texas, USA. However it is at the Seller's option, with Buyer's approval, to use an alternate source of petroleum coke of the same quality listed on the ANNEX to this agreement for lifting at a different loadport, provided notice is given within 30 (thirty) days prior to the first day of the vessel's laycan.

3.3 Buyer has the right to reject the cargo, if the quality doesn't attend the minimum specifications and description as per ANNEX to this agreement.

ORIGINAL

Clause 4 – Price

4.1 The FOB vessel Port Arthur price of each shipment in each quarter of each calendar year quarter will be based on the value of 55 (fifty-five) % of the average value of the range "FOB Richards Bay, South Africa 6,000 Kcal/kg" Quarterly steam coal price as quoted in the "Coal Week International" publication, less a discount of US$2.50/MT. This discount represents the freight differential between the weighted average ocean freight from Richards Bay, South Africa to specific Brazilian discharge ports as compared with the same from Port Arthur, Texas, USA.

4.2 The most recently published "Coal Week International – FOB Richards Bay, South Africa – 6,000 Kcal/kg - Quarterly" price at the time of vessel loading is to be used to calculate the final price.

4.3 All duties, taxes and licenses concerning production, selling, loading, etc.. until passage of title of petroleum coke in accordance with Clause 12 shall be borne by Seller.

4.4 The commercial terms contained herein shall be interpreted in accordance with INCOTERMS 2000, except as provided otherwise herein.

Clause 5 – Invoicing and Payment

5.1 Payment for each shipment of petroleum coke shall be received within 30 (thirty) days from Bill of Lading date by electronic bank transfer based on Invoice Price in accordance with Clause 5.2 and Certificate of Weight in accordance with Clause 8. Payment shall be made in US Dollars quoting Seller's Invoice number to:

> HARRIS BANK
> CHICAGO, ILLINOIS
> ACCT. #176-488-5
> APPLIED INDUSTRIAL MATERIALS CORP.
> ABA #0710-00288

5.2 Seller shall issue one invoice for the quantity loaded onboard vessel.

5.3 Invoices / Credit Notes shall be sent to:

> VOTORANTIM CIMENTOS
> RUA AMAURI 255 10° ANDAR
> 01496-900 SAO PAULO, SP
> BRAZIL

To facilitate timely payment, Invoices / Credit Notes shall be sent in advance by fax to:  (011-55-11) 282 – 1743.

5.4 Buyer shall pay Seller for all petroleum coke purchased hereunder, regardless of whether Buyer's cement plants, subsidiaries, or divisions pay the Buyer.

ORIGINAL

## Clause 6 – Documents

Seller shall supply the following documents to the Buyer:

- 1 Original Certificate of Weight from the weight determination according to Clause 8.
- 1 Original and 1 Copy of the Certificate of Analysis from the sampling and analysis according to Clause 9.
- 1 Original and 2 Copies of Seller's Commercial Invoice.
- 1 Original and 1 Non Negotiable Copy of the Bill of Lading.

If Seller fails to deliver Bills of Lading by the time vessel tenders Notice of Readiness at discharge port, Seller shall provide the Buyer with a Letter of Indemnity to allow for cargo discharge operation to commence. In case Buyer is responsible for delay in documentation issuance (i.e: failure to provide documentary instructions in a timely manner) Seller shall not be obligated to issue a Letter of Indemnity.

## Clause 7 – Delivery

7.1 In ratable shipments during the term period per vessel as chartered by Buyer. A delivery schedule shall be presented by Buyer to Seller thirty (30) days prior to the beginning of each quarter. A delivery schedule shall be mutually agreed between Buyer and Seller and be revised and updated for each Quarter. The delivery schedule for the year 2001 is attached in Annex 2.

7.2 Buyer shall provide Seller with regular, good faith estimates in writing of its inventory level for coke, and Seller shall accept and incorporate Buyer's reasonable requests regarding modifications thereto with a view toward compliance with Term Supply. At least 30 (thirty) days prior to the beginning of each quarter, Buyer shall provide Seller with a schedule of coke lifting for the next three months. If Buyer fails to comply with such schedule for a reason other than force majeure, Buyer shall be responsible for an shall pay any storage fees charged by the Vessel Loading Terminal as a result of noncompliance with such schedule.

7.3 Prior to each 1 (one) year supply period, Seller and Buyer shall work together to obtain best freight rate. Ultimate responsibility for freight is by Buyer.

7.4 It is the Buyer's ultimate responsibility to gather information about loading terminal, such as but not limited to draft conditions, loading rates, premiums etc.



## Clause 8 – Weight Determination

The quantity of this cargo shall be determined by Sabine Surveyors, Inc. at load port, with results final and binding for Buyer and Seller. Cost to be split 50/50 between Buyer and Seller and to be settled every quarter upon Seller's presentation of an invoice based on tonnage loaded at a current rate of $0.015/MT; Seller shall have the right to increase price rate to market value upon Buyer's authorization.

## Clause 9 – Sampling and Quality Determination

9. 1Cargo shall be sampled during loading and analyzed by A.J. Edmond Co. laboratory, according to ASTM, and the results shall be final and binding on both parties. Cost to be split 50/50 between Buyer and Seller and to be settled every quarter upon Seller's presentation of an invoice based on tonnage loaded at a current rate of $0.020/MT; Seller shall have the right to increase price rate to market value upon Buyer's authorization.

9.2 Any moisture in excess of 8% shall be deducted from invoice weight.

9.3 Any claims as to defects in quality or contamination must be made by written notice to Seller within 45 days after Bill of Lading date, otherwise any such claim shall be deemed to have been waived.

## Clause 10 – Loading

10.1 Buyer agrees for itself and its representatives while on or about the premises of the vessel loading terminal to comply with all applicable safety rules and regulations. Buyer agrees to indemnify and hold Seller harmless from claims of terminal, except to the extent of petroleum coke Manufacturer's negligence or its representatives.

10.2 Buyer to abide by terminal's governing rules and regulations. It is ultimately the Buyer's responsibility to learn the latest rules and regulations/tariff governing the loadport.

10.3 Upon completion of such, final terminal's rules and regulations, terms and conditions, tariff to be outlined and be made a part of this contract in the form of an addendum.

10.4 Loading conditions only shall be construed, enforced and/or arbitrated in accordance with and governed by the laws of the State of Texas, USA.





## Clause 11 – Agents at Loadport

Seller has the right to appoint vessel and cargo agents at Loadport.

## Clause 12 – Title and Risk of Loss

Title and risk of loss of coke that is sold via the Vessel Loading Terminal shall pass from Seller to Buyer as the coke is loaded onto Buyer's vessel at the Vessel Loading Terminal for Transportation to end user.

## Clause 13 – Force Majeure

13.1 Neither Buyer nor Seller shall be liable for loss or damage due to any delay or failure in the performance of its obligations herunder because of: (1) the compliance with any order or control of any governmental authority or persons purporting to act therefore, or (2) when and so long as the operations contemplated hereunder are interrupted, prevented, or delayed because of acts of God; perils of navigation; war hostilities; public disorders; acts of enemies; strikes; lockouts; labor or employment difficulties; fires, explosions; partial or total failure of the usual means of transportation, unloading, loading, or storage; the failure or delay in delivery to the Refinery of components or feedstocks necessary for the manufacture or production of coke; or any cause beyond its reasonable control, whether or not similar or any of the foregoing interfering with the production, supply, transportation, or storage of the coke. If there is any delay or failure in making or accepting deliveries of products hereunder for such cause or causes, Buyer or Seller, as the case may be, shall promptly notify the other of the estimated duration of the delay or failure. In the event either party finds it necessary to avail itself of the foregoing force majeure provisions, this Agreement shall not be extended thereby, but the quantity set forth herein shall be ratably reduced for the period during which said force majeure may exist. The affected party shall use all the reasonable good faith diligence, and efforts to remove or cure the force majeure as quickly as possible.

13.2 Any tonnage lost due to Force Majeure conditions only to be replaced subject to mutual agreement between Buyer and Seller.

## Clause 14 – Limitation on Seller's Liability

Except as expressly set forth in this Contract, Seller makes no representations, warranties or covenants of any kind or nature, and Seller hereby disclaims any and all implied warranties of any kind or nature. Furthermore, Buyer acknowledges and agrees that so long as Seller uses reasonable efforts to sell, lift and deliver coke pursuant to this Contract, Seller shall have no liability whatsoever to Buyer for the Seller's failure to so sell, lift or deliver coke pursuant to this Contract, whether such failure is due to operational or logistical difficulties or otherwise; it being understood and agreed that in the event of any

such failure Seller shall have no obligation to compensate Buyer at any time for any such failure, whether during term, or after the expiration of the term, of this Contract.

## Clause 15 – Arbitration

15.1 This contract shall be governed by the laws of the State of Missouri, United States of America.

15.2 Both Buyer and Seller recognize that circumstances may arise which would not have been foreseen at the time this Agreement entered into force. Both parties agree that they will use their best efforts to solve any problems due to any such unforeseeable circumstances in the spirit of mutual understanding.

15.3 In the event of any dispute arising in connection with this contract, the parties hereby agree to submit such dispute to arbitration under the rules of the American Arbitration Association in New York, United States of America.

15.4 Should the dispute not be resolved at the primary arbitration venue as noted on clause 15.3, the parties hereby agree to submit such dispute to arbitration under the rules of the Paris International Chamber of Commerce.

## Clause 16 – Confidentiality

Neither Party shall disclose the terms of this Agreement to a third Party except in order to comply with any applicable law, order, regulation or exchange rule; provide, each party shall notify the other party of any proceeding of which it is aware which may result in disclosure and use reasonable efforts to prevent or limit the disclosure. However, Seller has the right, without previous consent or advice, to share any information related to any sale/shipments under this contract with the Manufacturer and their representatives.

## Clause 17 – General Terms

17.1 Any amendment in connection with this Agreement can only be made by the written mutual agreement of both parties.

17.2 At all times to act towards each other in the utmost good faith and to cooperate with each other to procure the effective implementation of this Agreement.

17.3 Should any terms or conditions of this Agreement become void or impracticable, they will have no effect on the other terms or conditions.

17.4 Parties have to compensate the void or impracticable terms by new ones being equal or similar in their economic effectiveness.

ORIGINAL

17.5 In the event that either party shall fail to perform any of its obligations hereunder and shall fail to remedy such default within 30 (thirty) days after written notice thereof has been given by the nondefaulting party, the nondefaulting party may terminate this Agreement with no further obligation or liability, at its option, by giving written notice to the defaulting party. Upon such termination, the non defaulting party shall be entitled, in addition to, and not in lieu of such termination, any and all other legal or equitable remedies which may be available to it in connection with such default. Each party shall be required to mitigate its damages in the event of the other party's breach. It is understood and agreed that a failure by Buyer to take and pay for coke that has been agreed upon pursuant to and in accordance to this Agreement shall be a default of Buyer, unless excused hereunder. Seller's liability to Buyer for damages should not relate to other third parties (beyond Buyer), such as from Buyer's customers. Seller's liability for nonconforming coke shall not exceed fifty percent (50%) of the F.O.B. vessel price per ton.

17.6 The entire contract is contained herein, and there are not oral promises, representations, or other warranties affecting it. No amendment or modification of any of the terms or provisions of this Agreement shall be binding upon their Seller or Buyer unless the same be expressed in writing and signed by both parties.

17.7 The parties shall cooperate with and assist each other in the exchange and sharing of information and in the performance of all obligations hereunder reasonably necessary to achieve the objectives of the parties as set forth hereto.

17.8 For exclusive use by Buyer, otherwise with written approval of Seller.

17.9 Seller has provided to Buyer and Buyer hereby acknowledges receipt of a true, complete and correct copy of Seller's current Material Safety Data Sheet for coke.

17.10 All correspondence and notices in connection with this Agreement shall be written and sent by mail; faxes and telexes shall be confirmed by mail to the appropriate party addressed as follows:

As to Buyer:        VOTORANTIM
                    Rua Amauri, 255
                    Sao Paulo, SP 01498-900
                    Ph: (11) 3061-3799 / Fax: (011) 282-1743
                    Email: ricardoa@votorantim-cimentos.com.br
                           Juliom@votorantim-cimentos.com



ORIGINAL

As to Seller:    AIMCOR
100 First Stamford Place
P.O. Box 10388
Stamford, CT 06904-2388
Ph: (203) 328-2216 / Fax: (203) 967-8413
Email: anacristina.cunha@aimcornet.com
reynaely@centroin.com.br
matthew.scott-hansen@aimcornet.com
frank.zweerts@aimcornet.com

In witness whereof this written Agreement has been entered into the day and year written below.

Signed for and on behalf of VOTORANTIM

_Julio Cesar Mendonca Rosha_
_International Business Manager_
_Votorantim_

Signed for and on behalf of AIMCOR Applied Industrial Materials Corporation

_Matthew A. Scott - Hansen_
_International Marketing Director_
_Aimcor_

Enclosure:
Annex 1 Petroleum coke Specification
Annex 2 Delivery Schedule Year 2001

 

Annex 1

Petroleum coke Specification

| Specification on as received basis | | Typical | Min | Max |
|---|---|---|---|---|
| Calorific Value | BTU/lb NET | 13,800 – 14,000 | - | - |
| Moisture | % | 6.0 – 10.0 | - | 8.0* *(deduction if greater, no rejection) |
| Ash | % | 0.2 – 1.0 | - | 1.0 |
| Volatile Matter | % | 8.0 – 11.0 | - | - |
| Sulfur (S) | % | 5.5 – 6.7 | - | 6.7 |
| Hardgrove Index | HGI | 35 - 40 | - | - |

 

Annex 2     Sample Delivery Schedule

Delivery schedule for Calendar Year 2001

| Month | Basis Schedule |
|---|---|
| January | |
| February | 50,000 |
| March | |
| April | 50,000 |
| May | |
| June | 50,000 |
| July | |
| August | 50,000 |
| September | |
| October | 50,000 |
| November | |
| December | 50,000 |
| TOTAL | 300,000 |

All figures in MT, +/- 10%, Buyer's option, per individual shipment allowance.
Any deviation hereof shall be mutually agreed between Buyer and Seller.

Rcvd 10/30/00

   Houston Office

October 24, 2000

Applied Industrial Materials Corporation (AIMCOR)
100 First Stamford Place
P.O. Box 10388
Stamford, CT

Attn. Mrs. Ana Cristina Cunha

Dear Ana,

Please find enclosed the original petroleum coke contract numbered 00299, for long-term pet coke supply to Votorantim Cimentos by AIMCOR from the Premcor, Port Arthur Refinery, in Port Arthur, Texas, USA, that I am returning to yours records.

I received two original copies assigned by Matthew Scott-Hansen on behalf of AIMCOR, signed both originals on behalf of Votorantim Cimentos, and retained one original for ours records.

Votorantim appreciates to have AIMCOR as our supplier, and we look forward to a successful execution of this contract

With my personal best regards,

Julio Cesar M. Rocha
Votorantim Cimentos

4119 Midstream Dr.    Missoun City, TX – USA    77 459        Tel: 281 205 5902    Fax 281 205 4256

ORIGINAL 

June 21, 2001
Contract Nr. 00299
Amendment #2

Votorantim Cimentos Ltda.
Rua Amauri 255 10° Andar
01498-900 Sao Paulo, SP
BRAZIL

SUBJECT: PETROLEUM COKE CONTRACT AMENDMENT

Dear Sirs:
The following Amendment #2 applies to contract number 00299 between Applied Industrial
Materials Corporation (AIMCOR) and Votorantim Cimentos Ltda. and replaces the previous
Amendment #1 dated May 10, 2001 and signed in Brazil.

Amendment #2

Contract and Amendment #1 to be replaced as follows:

"4.1 The FOB vessel Port Arthur price per MT of each petcoke shipment in each calendar quarter
will be based on 55 (fifty-five) % of the "average quarterly mean" value of the "Current Price
Range FOB Richards Bay, South Africa 11,500 Btu/lb" steam coal price as quoted in the "Coal
Week International" publication, less a discount of US$3.32/MT. This discount represents the
freight differential between the weighted average ocean freight from Richards Bay, South Africa
to specific Brazilian discharge ports as compared with the same from Port Arthur, Texas, USA.

4.2 The "average quarterly mean" coal price will be calculated using each calendar quarter's
weekly "Current Price Range" information and will apply for all petcoke shipments scheduled to
load in the subsequent calendar quarter.

Price Calculation Example: 1st Quarter 2001 Coal Prices
US$ 34.94/MT = average quarterly mean coal price for Q1 2001

US$ 19.22/MT = 55% of the average quarterly mean coal price
US$  3.32/MT = freight differential
US$ 15.90/MT = FOB Port Arthur Petcoke Price for shipments loading during 2nd Quarter 2001"

All other terms and conditions per original contract to remain unchanged. Please sign and
return one copy of these amendments.

Very truly yours,

Applied Industrial                      ACCEPTED:
Materials Corporation                   Votorantim Cimentos Ltda.

_____                 _____
Authorized Signature                    Authorized Signature

                                        _____
                        Accepted as authorized by Premcor Refining Inc.

Carbon Products Group

EXHIBIT "B"

```
---------------------------------------------------------X
```
*In the Matter of the Arbitration between*

**APPLIED INDUSTRIAL MATERIALS
CORPORATION,**

**CLAIMANT**

    -    **AND –**

**VOTORANTIM CIMENTOS LTDA.,**

**RESPONDENT**

**PARTIAL FINAL AWARD**

```
---------------------------------------------------------X
```

                   Before:      Walter R. Muff
                                    John F. Ring, Jr.
                                      Peter J. Zambito, Esq., Chairman

Representations:
For Applied Industrial Materials Corporation
Law Offices of Anthony J. Mavronicolas
By Anthony J. Mavronicolas, Esq.

For Votorantim Cimentos Ltda.
Fowler, Rodriguez & Chalos, LLP
By George M. Chalos, Esq.
    LeRoy S. Corsa, Esq.

## Introduction

The disputes which are the subject of this arbitration arose out of a Petroleum Coke Sale

Agreement (hereinafter the "Contract") entered into on October 24, 2000 between

Applied Industrial Materials Corporation (hereinafter "AIMCOR" or ""SELLER) and

Votorantim Cimentos Ltda. (hereinafter "VOTORANTIM" or "BUYER").

## Background

The terms of the Agreement provided for AIMCOR to supply and VOTORANTIM to lift

a quantity of 300,000 MT +/- 10% in each calendar year from January 1, 2001 until

December 31, 2003, FOB vessel Port Arthur, Texas, in accordance with delivery schedules presented by Buyer to Seller.

The clauses of the Contract pertinent to this dispute appear in Appendix A to this Partial Final Award.

Some differences arose between the parties during the 2001 delivery period, but these were resolved prior to this arbitration. It is the second and third year, i.e., 2002 and 2003, which that are the subject of this arbitration.

## Proceedings

The Agreement between the parties provided for arbitration in New York before the American Arbitration Association, but the parties mutually agreed to proceed before two (2) members of the Society of Maritime Arbitrators, Inc. (hereinafter "SMA") and an admiralty attorney as chairman pursuant to the SMA Rules, with minor exceptions. AIMCOR initiated this arbitration against VOTORANTIM by giving Notice of Demand for Arbitration to VOTORANTIM on October 4, 2002, seeking damages in the amount of $1,306,641, plus interest, costs and attorneys' fees as a result of VOTORANTIM's alleged wrongful refusal to accept shipments under the Contract during calendar year 2002. AIMCOR also seeks additional damages as a direct result of VOTORANTIM's alleged wrongful refusal to accept the aforesaid shipments, which have caused Premcor Refining Group, Inc. (hereinafter "PREMCOR"), as supplier of the petcoke to AIMCOR, to initiate legal proceedings in Texas against AIMCOR. AIMCOR seeks indemnity and contribution from Votorantim.

VOTORANTIM served a Statement of Defense and Counter-Claim on November 22, 2002.

Thus, Walter R. Muff was appointed by AIMCOR and John F. Ring, Jr. by VOTORANTIM. Peter J. Zambito, Esq. was appointed as third arbitrator and chairman by counsel. The Panel made written disclosures and was accepted by the parties and their counsel.

Thereafter, in his Preliminary Memorandum, counsel for AIMCOR demanded damages of $1.3 million, plus interest from 2002, lost commissions of approximately $800,000, together with full indemnity, attorney fees and costs for any and all damages claimed by PREMCOR against AIMCOR in the Texas Proceedings.

Counsel for VOTORANTIM, in their Preliminary Memorandum, denied any liability whatsoever and included a counterclaim for damages suffered for alleged failure by AIMCOR to perform during the second half of 2002 and all of 2003.

During the proceedings, counsel and the Panel agreed to proceed solely on the issue of liability, with subsequent hearings on the issue of damages to be held, if necessary, after an Award as to liability was issued.

Five (5) hearings were held before the Panel, specifically on June 30, 2004 and on January 19, July 19 and on August 30 and 31, 2005, at which two (2) witnesses on behalf of AIMCOR and one (1) witness on behalf of VOTORANTIM testified. A further witness on behalf of VOTORANTIM was deposed on November 10, 2005, and the transcript of this testimony was furnished to the Panel.

Extensive exhibits were offered on behalf of both parties and were accepted by the Panel. The proceedings were closed early this year, and the parties submitted Main and Reply Post Hearing Briefs dated March 3 and 13, 2006 respectively.

**Facts**

Subsequent to the October 24, 2000 Contract entered into between AIMCOR and VOTORANTIM, AIMCOR entered into a Supply Agreement with PREMCOR on December 1, 2000 which, where pertinent, provided as follows:

> Clause 1....(AIMCOR) to purchase green petcoke, fuel grade, ...destined for fuel use to "Votorantim", a Brazilian Cement Manufacturer

> Clause 2....The term of the Contract shall commence on January 1, 2001 and terminate on December 31, 2003.

> Clause 3....Buyer will purchase from Seller approximately 300,000 Metric Tons a year of Petroleum Coke delivered reasonably ratably during a year. .....

This Supply Agreement incorporated PREMCOR's Terms and Conditions, inclusive of a Force Majeure provision. It also provided that "Under no circumstances shall Buyer and Seller be deemed to have an agency, joint venture or partnership relationship."

Previously, on September 13, 1999, AIMCOR had entered into a separate and distinct petcoke sales contract with VOTORANTIM to annually sell 200,000 MT, +/- 10% in VOTORANTIM'S option, green delayed petcoke. The term was January 1, 2000 to and including December 31, 2002. The petcoke was destined for Brazil and was to be produced by Shell Deer Park Refinery in Texas. VOTORANTIM had the option for an additional 100,000 MT, +/- 10%, final quantity to be mutually agreed. As it developed, the price of petcoke under this Agreement was cheaper than under the Contract which is the focus of this arbitration.

None of the aforesaid contracts were back-to-back where pertinent to the disputes in this Arbitration.

Early on, the grade of AIMCOR petcoke supplied by PREMCOR and provided to VOTORANTIM under its Contract of October 24, 2000 with AIMCOR did not conform to the Contract specifications, but this issue was resolved amicably and does not appear to be a concern in the issues that are the subject of this arbitration.

According to the testimony of Mr. Julio Caesar Rocha, a witness on behalf of VOTORANTIM, Clause 2 (Quantity) of the October 24, 2000 Contract was drafted jointly between him and Mr. Frank Swertz of AIMCOR (now retired). The negotiations regarding Clause 2 included quantity and provisions for a reduction of tonnage. Swertz memorialized these discussions in writing and sent them to Rocha, who approved the text.

Mr. João Brenha also testified on behalf of VOTORANTIM. Although not involved in the initial contract negotiations with AIMCOR, he became VOTORANTIM's supply manager in September 2002, responsible for managing the Contract.

On October 3, 2001, Brenha wrote to Mr. Matthew Scott-Hansen of AIMCOR, the successor of Swertz, to inform him that due to "technical constraints" in some of the VOTORANTIM plants, it was VOTORANTIM's intention to reduce the number of shipments of AIMCOR petcoke supplied by PREMCOR for 2002 from six (6) to five (5) in accordance with the provisions of Clause 2.2 of the Contract.

On November 30, 2001, in a further email to Scott-Hansen, Brenha referred to VOTORANTIM's consumption needs and lack of energy in Brazil, which he stated created a problem with respect to 2002 shipments. Specifically, he stated:

> " …There is no room in our next year's [2002] plants fuel
> Consumption matrix to hard and unstable petcoke <u>as</u>
> <u>Premcor's used to be.</u>" (emphasis added)
> ………..

He referred to Clause 2.2 of the Contract as consistent with this problem and stated that, as a result, VOTORANTIM would not schedule AIMCOR petcoke supplied by PREMCOR for 2002.

In the same message, he stated that he would send VOTORANTIM'S proposition for 2002 Shell petcoke shipments.

The Brazilian Government issued a Decree, No. 4.261, dated June 6, 2002, which restricted the use of electrical power in Brazil.

During his testimony, Brenha referred to an energy crisis in Brazil in the second half of 2001 and first half of 2002. Scott-Hansen testified that he read in the petcoke reports that "there were electricity cutbacks in Brazil [in 2001] due to droughts and the fact that the hydroelectric dams, which produce 85 percent of Brazil's electricity, could not generate enough electricity for the entire country and there would be cutbacks to electricity production. However, no formal edicts by the Brazilian Government in the latter half of 2001 or first five (5) months of 2002 were ever produced, if in fact ever issued.

Scott-Hansen and Brenha cooperated in written efforts to have PREMCOR modify AIMCOR's contract with PREMCOR by reducing the quantity AIMCOR was required to buy from PREMCOR. PREMCOR refused the request and insisted that AIMCOR comply with the terms of the contract of December 1, 2000.

Despite the fact that PREMCOR was not a party to the October 24, 2000 contract between AIMCOR and VOTORANTIM, it participated extensively in meetings regarding petcoke, which involved AIMCOR, VOTORANTIM and PREMCOR. The reason for this participation was never fully explained. However, it should be noted that AIMCOR, with respect to the PREMCOR/AIMCOR supply contract, did not have the same right to reduce shipment quantities as Votorantim did with respect to the AIMCOR/Votorantim contract pursuant to Clause 2.2. thereof.

In a letter dated March 18, 2002, Votorantim formally invoked clauses 2.2 and 13 of the contract and requested a reduction in the contractual tonnage in all the deliveries scheduled for 2002.

AIMCOR responded on April 2, 2002, requesting performance by VOTORANTIM under the Contract for the year 2002, failing which AIMCOR would hold VOTORANTIM responsible for all losses and expenses incurred as a result of VOTORANTIM'S breach of Contract.

According to Rocha and Brenha, VOTORANTIM had thirteen (13) plants in Brazil and, sometime in 2000, got permits to import petcoke and use it in most of the plants (9 to 10).

Fines were levied on VOTORANTIM by the Brazilian Government, but none appear to have involved imports or technical or Government constraints. Some of the fines concerned the method of storage of petcoke.

According to Rocha and Brenha, VOTORANTIM took all Shell Deer Park petcoke in 2002 for which it had contracted with AIMCOR on September 19, 1999.

In 2001, VOTORANTIM consumed its highest quantity of petcoke (about 1.4 million MT). In 2002, VOTORANTIM planned to use 1.6 million MT of petcoke, but instead used only 1.25 million MT, its second highest annual consumption during the years 1997 to 2004.

While on November 30, 2001, VOTORANTIM stated that it would not schedule any PREMCOR petcoke for 2002, on January 24, 2002 VOTORANTIM stated that it "would consider the partial reduction if the other party were willing to help us bearing some part of the costs which should be achieved restructuring the price…."

According to David Nestler, a witness for AIMCOR, VOTORANTIM's January 24, 2002 message does not state that VOTORANTIM wanted to cancel the contract.

7

In a letter dated August 16, 2002, VOTORANTIM notified AIMCOR that the energy crisis in Brazil "no longer exists," and that it was in a position to resume regular shipments in September, October and December 2002 (presumably, a total of 150,000 MT, as each prior shipment was 50,000 MT).   Nothing was produced on the record that AIMCOR responded to that letter.

AIMCOR did not provide any petcoke to VOTORANTIM during the months of September, October and December 2002.

No evidence as to 2003 shipments was presented, although 2003 shipments were alluded to in the Post Arbitration Briefs.

As mentioned in the PROCEEDINGS section of this Partial Final Award, on October 4, 2002, counsel for AIMCOR wrote VOTORANTIM demanding arbitration.

Suit by PREMCOR against AIMCOR was commenced in the District Court of Jefferson County, Texas, alleging a breach of the PREMCOR/AIMCOR contract dated December 1, 2000.  The suit has been stayed pending the outcome of this arbitration.

**Arguments**

The following is a summary of the parties' contentions as presented during the hearings and in their Main and Reply Post Arbitration Briefs:

AIMCOR'S contentions:

It claims that the Agreement between the parties was breached by Votorantim because neither Clauses 2.2 nor 13 of the Agreement permitted Votorantim to reduce the contractual tonnage or to suspend deliveries respectively while an energy crisis existed in Brazil in the latter part of 2001 and first half of 2002.

8

VOTORANTIM's contentions:

It claims that the energy crisis in Brazil permitted it to reduce contractual tonnage pursuant to Clause 2.2 of the Agreement and to suspend deliveries pursuant to the Force Majeure Clause, No. 13, of the Agreement. Further, Votorantim contends that AIMCOR failed to resume shipments of petcoke, as per contract, once the energy crisis ended.

## DISCUSSION AND MAJORITY DECISION

The Panel has carefully reviewed and evaluated all the evidence presented. In so doing, the Panel agreed unanimously that a Force Majeure event did not occur. In such regard, the Panel noted that the quantity provided for in the Shell Deer Park petcoke contract was accepted in full by Votorantim in 2002, so that there was no suspension in toto of petcoke shipments in 2002. Further, it was agreed unanimously that AIMCOR was at all times acting as a principal, not as an agent or broker, in this transaction.

Thus, the focus turned to Clause 2.2 of the October 24, 2000 Contract between the parties to this arbitration, and the Panel unanimously agreed that if technical or governmental constraints existed in Brazil, Votorantim had the right to reduce the quantity of petcoke it contracted to receive.

The Panel also was of the unanimous opinion that an energy crisis existed in Brazil in the second half of 2001 and first half of 2002.

In the opinion of the Panel, the law of Missouri had no impact on the decision.

At this juncture, the members of the Panel differed on the effect of the energy crisis on Votorantim.

9

The majority finds that Votorantim failed to prove how the energy crisis affected Votorantim per se. Rather, it argued "generally" that the energy crisis prompted a reduction in the use of electricity necessary to grind the petcoke and produce cement, but failed to provide evidence of how, where (among its many plants throughout Brazil) and to what degree it affected them, i.e., what limitations were imposed on them.

Although a Decree was issued by the Brazil Government on June 6, 2002, considerably after the energy crisis began, insofar as Votorantim was concerned, proof of its impact on it was lacking.

Also, fines levied on Votorantim by the Brazilian Government related to the storage of petcoke and not to the use of electricity.

Other, provisional, measures were issued on May 15 and August 24, 2001 by the Government of Brazil, creating a Chamber for the Management of Electrical Power Crisis but it was not shown whether or how and to what extent these provisions had an impact upon Votorantim's use of electricity.

Joao Brenha was asked what stages of penalties would have been imposed if Votorantim had failed to comply with Government regulations. In part, he replied:

> "Well, actually, I am not very, let's say, comfortable in responding like that because I am not absolutely qualified to discuss what happened in terms of energy in Brazil and so forth." (emphasis added) (p. 1186, lines 14/22, hearing of August 30, 2005)

Brenha was also asked "did the amount of electricity available to your plants start to increase at some point in time," to which he replied:

> "Sure, but I would not be able to say where and when."

Further, Brenha sent an email to Scott-Hansen of AIMCOR on January 24, 2002, stating in pertinent part:

> "2 ....There is no way for us to move to a partial reduction, as suggested in your draft letter, without supporting another costs increase. The point is we would consider the partial reduction if the other party were willing to help us bearing some part of the costs which should be achieved restructuring the price ..." (emphasis added) (Ex. 11)

The majority infers from this comment that the energy crisis may not have had an impact on Votorantim, sufficient to warrant a reduction of 150,000 MT during the first half of 2002, but rather that the refusal to accept shipments during that interval was based upon the cost of the PREMCOR petcoke.

Thus, for the foregoing reasons, primarily Votorantim's failure to provide what specific effect the energy crisis had on its ability to receive, store and grind PREMCOR petcoke, the majority finds that Votorantim breached the Contract during the first seven (7) months of 2002 by not scheduling and accepting 150,000 MT of PREMCOR petcoke.

The majority also finds that AIMCOR breached the Contract by not responding to Votorantim's letter of August 16, 2002, in which Votorantim notified AIMCOR that the energy crisis was over and that it was in a position to resume regular shipments in September, October and December 2002 (presumably, each shipment of 50,000 MT or a total of 150,000 MT), or in providing petcoke during those months.

It is to be noted that Nestler of AIMCOR testified that the actions of Votorantim did not amount to an abandonment of the Contract.

## PARTIAL FINAL AWARD

In summary, the Majority of arbitrators (Mr. John F. Ring, Jr. dissenting in part) finds that Votorantim breached the Contract dated October 24, 2000 by not scheduling and accepting (150,000 MT petcoke) during the first half of 2002 and is liable for the damages sustained by AIMCOR as a result.

The Majority also finds that once Votorantim informed AIMCOR on August 16, 2002 that it was prepared to schedule and accept shipments in September, October and December 2002, AIMCOR breached the Contract of October 24, 2000 by not providing petcoke for delivery to Votorantim and is liable for the damages sustained by Votorantim as a result.

Appendix B hereto details arbitrators' fees and costs and is an integral part of this Partial Final Award.  Pursuant thereto, arbitrators' fees are to be shared equally by the parties, but each party is jointly and severally responsible for said fees in toto.

Each party is responsible for its own counsel's legal fees, and Court reporting costs are to be shared equally.

Annexed to this Partial Final Award and also made an integral part hereof is Appendix C, a Partial Dissent by Mr. John F. Ring, Jr.

The Panel remains constituted to hear and determine the damages which flowed from the foregoing breaches.

This Partial Final Award may be reduced to a judgment in any court of competent

jurisdiction.

Dated: New York, New York
       June 28, 2006

_____
Walter R. Muff

_____
John F. Ring, Jr.    (Dissenting in part)

_____
Peter J. Zambito, Chairman

13

```
-----------------------------------------------------X
```
*In the Matter of the Arbitration between*

**APPLIED INDUSTRIAL MATERIALS CORPORATION,**

**CLAIMANT**

**APPENDIX A**

-   **AND –**

**VOTORANTIM CIMENTOS LTDA.,**

**RESPONDENT**

```
-----------------------------------------------------X
```

PERTINENT CLAUSES OF OCTOBER 24, 2000
CONTRACT BETWEEN AIMCOR AND VOTORANTIM

Clause 1 – Term of the Agreement

    1.1. This agreement shall take effect as of January 1, 2001 and shall continue until December 31, 2003, unless terminated prior to such date under other provisions hereof. No suspension of an obligation under this contract by reason of Force Majeure shall extend the term except upon mutual agreement of Buyer and Seller.

Clause 2 – Quantity

    2.1 Seller shall supply and Buyer shall lift the quantity of 300,000 MT +/- 10%. Buyer's Option, in each calendar year. The optional tonnage of +/- 10% is understood as a balance quantity to satisfy shipment conditions.

    2.2 If Buyer is not able for technical or government approval to use petroleum coke in one or more cement plants. Buyer has right to reduce contractual tonnage according to reduced demand of plants affected. Buyer will inform

the Seller in due time in such cases and provide sufficient evidence

accordingly. In such cases Buyer and Seller will formulate a new delivery

schedule in mutual cooperation.

Clause 3 – Quality and Petroleum Coke Source

• • • • • • •

3.2 The petroleum coke to be supplied shall be primarily produced at the

PREMCOR refinery, Port Arthur, Texas, USA. However, it is at the Seller's

option, with Buyer's approval, to use an alternate source of petroleum coke of

the same quality listed on the ANNEX to this agreement for lifting at a

different load port, provided notice is given within 30 (thirty) days prior to the

first day of the vessel's laycan.

Clause 7 – Delivery

7.1 In ratable shipments during the term period per vessel as chartered by Buyer.

A delivery schedule shall be presented by Buyer to Seller thirty (30) days

prior to the beginning of each quarter. A delivery schedule shall be mutually

agreed between Buyer and Seller and be revised and updated for each Quarter.

The delivery schedule for the year 2001 is attached in Annex 2.

7.2 Buyer shall provide seller with regular, good faith estimates in writing of its

inventory level for coke, and Seller shall accept and incorporate Buyer's

reasonable requests regarding modification thereto with a view toward

compliance with Term Supply. At least 30 (thirty) days prior to the beginning

of each quarter, Buyer shall provide Seller with a schedule of coke lifting for

the next three months. If Buyer fails to comply with such schedule for a

reason other than Force Majeure, Buyer shall be responsible for and shall pay any storage fees charged by the Vessel Loading Terminal as a result of noncompliance with such schedule.

## Clause 12 – Title and Risk of Loss

Title and risk of loss of coke that is sold via the Vessel Loading Terminal shall pass from Seller to Buyer as the coke is loaded onto Buyer's vessel at the Vessel Loading Terminal for Transportation to end user.

## Clause 13 – Force Majeure

13.1 Neither Buyer nor Seller shall be liable for loss or damage due to any delay or failure in the performance of its obligations hereunder because of: (1) the compliance with any order or control of any governmental authority or persons purporting to act thereof, or (2) when and so long as the operations contemplated hereunder are interrupted, prevented, or delayed because of acts of God; perils of navigation; war hostilities; public disorders; acts of enemies; strikes; lockouts; labor or employment difficulties; fires; explosions; partial or total failure of the usual means of transportation, unloading, loading, or storage; the failure or delay in delivery to the Refinery of components or feedstocks necessary for the manufacture or production of coke; or any cause beyond is reasonable control, whether or not similar or any of the foreign interfering with the production, supply, transportation, or storage of the coke. If there is any delay or failure in making or accepting deliveries of products hereunder for such cause or causes, Buyer or Seller, as the case may be, shall promptly notify the other of the estimated duration of the delay or failure. In

the event either party finds it necessary to avail itself of the foregoing Force Majeure provisions, this Agreement shall not be extended thereby, but the quantity set forth herein shall be ratably reduced for the period during which said Force Majeure may exist. The affected party shall use all the reasonable good faith diligence and efforts to remove or cure the Force Majeure as quickly as possible.

13.2 Any tonnage lost due to Force Majeure conditions only to be replaced subject to mutual agreement between Buyer and Seller.

Clause 15 – Arbitration

15.1 This contract shall be governed by the laws of the State of Missouri, United States of America.

15.2 Both Buyer and Seller recognize that circumstances may arise which would not have been foreseen at the time this Agreement entered into force. Both parties agree that they will use their best efforts to solve any problems due to any such unforeseeable circumstances in the spirit of mutual understanding.

15.3 In the event of any dispute arising in connection with this contract, the parties hereby agree to submit such dispute to arbitration under the rules of the American Arbitration Association in New York, United States of America.

15.4 Should the dispute not be resolved at the primary arbitration venue as noted on clause 15.3, the parties hereby agree to submit such dispute to arbitration under the rules of the Paris International Chamber of Commerce.

<u>Clause 17 – General Terms</u>

• • • • • • •

17.5  In the event that either party shall fail to perform any of its obligations hereunder and shall fail to remedy such default within 30 (thirty) days after written notice thereof has been given by the nondefaulting party, the nondefaulting party may terminate this Agreement with no further obligation or liability, at its option, by giving written notice to the defaulting party.  Upon such termination, the nondefaulting party shall be entitled, in addition to, and not in lieu of such termination, any and all other legal or equitable remedies which may be available to it in connection with such default.  Each party shall be required to mitigate its damages in the event of the other party's breach.  It is understood and agreed that a failure by Buyer to take and pay for coke that has been agreed upon pursuant to and in accordance to this Agreement shall be a default of Buyer, unless excused hereunder.  Seller's liability to Buyer for damages should not relate to other third parties (beyond Buyer), such as from Buyer's customers.  Seller's liability of nonconforming coke shall not exceed fifty percent (50%) of the F.O.B. vessel price per ton.

```
--------------------------------------------------------X
```
*In the Matter of the Arbitration between*

**APPLIED INDUSTRIAL MATERIALS
CORPORATION,**

**CLAIMANT**

**APPENDIX B**

- **AND –**

**VOTORANTIM CIMENTOS LTDA.,**

**RESPONDENT**

```
--------------------------------------------------------X
```

The Arbitrators' fees in this matter are to be shared equally between the claimant and the Respondent in the total amount of $151,798.00.

The fees are payable as follows:

| | Total to Date | Less previously disbursed | Due Now |
|---|---|---|---|
| Peter J. Zambito, Esq. | $52,458.00 | $13,333.00 | $39,125.00 |
| Walter R. Muff | $47,195.00 | $13,333.00 | $33,862.00 |
| John F. Ring, Jr. | $52,145.00 | $13,333.00 | $38,812.00 |

These fees are payable from the escrow account established, with equal deposits made by Claimant and Respondent, for this purpose with the Society of Maritime Arbitrators, Inc. (SMA).

The Panel's fees are to be paid from this SMA escrow account within ten (10) days of the date of issuance of this Award, with any excess balance returned simultaneously to Claimant and Respondent, as respectively due to them.

Arbitrator Walter R. Muff's travel expenses are the sole responsibility of AIMCOR.

Dated: New York, New York
June 28, 2006

APPENDIX  C

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |
|---|---|
| In the Matter of the Arbitration | \* |
|  | \* |
| between | \* |
|  | \* |
| APPLIED INDUSTRIAL MATERIALS, CORPORATION | \* |
| AS  CLAIMANT  AND  SELLER | \* |
|  | \*   PARTIAL |
| and | \* |
|  | \*   DISSENT |
| VOTORANTIM CIMENTOS LTDA. | \* |
| AS RESPONDENT  AND BUYER | \* |
|  | \* |
| UNDER A PET COKE SALES CONTACT | \* |
| DATED OCTOBER 24, 2000 | \* |
|  | \* |
|  | \* |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

While the Panel agreed unanimously that :

    A) Aimcor was  a principal, not a broker/agent in respect to the Aimcor / Votorantim pet coke sales contract dated October 24, 2000

    B) An energy crisis did in fact exist in Brazil from mid 2001 to mid 2002

    C) That if  technical or governmental constraints existed in Brazil, Votorantim had the right to reduce the quantity of pet coke it contracted to receive

    D) No event of Force Majeure occurred

Nevertheless the majority has ruled that  Votorantim and Aimcor both breeched the above referenced  pet coke sales agreement.

However,  this Arbitrator does not feel that Votorantim breeched the contract in any manner whatsoever. Votorantim acted strictly in accordance with their contractual rights and privileges as stipulated in Clause 2.2 of the Votorantim / Aimcor pet coke sales agreement

Clause 2.2 ( See Appendix A for full wording of this clause ) stipulates that should a technical event occur that caused a reduction Votorantim's  production of  cement, they would be entitled to reduce the imported pet coke from Aimcor which was intended to be used for fuel at the cement plants.

1.

Such an event did in fact occur, which the Majority recognize. A drought throughout Brazil prevented the Brazilian utilities from supplying their normal out put of electricity as some 85 % of Brazilian electricity is produced from hydro-electric sources. Aimcor by their own admission were well aware of this electricity reduction and the adverse effect it would have on cement production.

It is therefore clearly axiomatic that if there is a reduction in production of cement, caused by a reduction of available electricity, there will be a reduced need for fuel to produce the reduced quantity of cement produced. This Arbitrator feels this is clearly a " technical event " allowing Clause 2.2 to be applicable.

Votorantim followed the terms and conditions of the Aimcor / Votorantim pet coke sales contract by requesting a reduction of pet coke shipments during the energy crisis period, and subsequently, when the energy situation abated, in requesting a resumption of shipments as per the contract.

It should be noted that Aimcor , at least in this instance, was a merchant/ trader and not an supplier/originator of the pet coke. In fact Aimcor entered into a supply contract between themselves and Premcor for the physical supply of pet coke from Premcor to Aimcor, which in turn would be provided to Votorantim.

And while such an arrangement is quite common in commercial commodity trading, in this case the terms and conditions of the two separate contracts were not identical or " back to back ". At least not in respect to the buyers rights to reduce the quantity of pet coke shipments. The Premcor / Aimcor supply contract did not have the provisions for the buyer ( i.e. Aimcor ) to reduce quantities, while clearly in Clause 2.2 of the Aimcor / Votorantim contract, the buyer, Votorantim did in fact have this contractual right. Nevertheless, Aimcor did try to get Premcor to reduce the quantities in respect to the Premcor / Aimcor supply contract in order to accommodate Votorantim. However Premcor was unwilling to amend their agreement with Aimcor and demanded that Aimcor perform as per contract.

While the Majority was dissatisfied with the proof submitted by both parties as to exactly how the energy crisis specifically affected Votorantim, and to what degree, it should be noted that these proceedings were bifurcated, and the Panel asked to rule on liability only, in the first instance. This Arbitrator feels that " proof of it's impact " ( i.e. the electricity cut backs effects on the production of cement ) would be more properly addressed in the damages phase of this arbitration, and should have not influenced the Majority's opinion as to liability.

Respectfully,

John F. Ring, Jr.

John F. Ring, Jr.

2.

EXHIBIT "C"

CLOSED, ECF

# U.S. District Court
# United States District Court for the Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:06-cv-07763-LBS

Oxbow Carbon and Minerals LLC. v. Votorantim Cimentos LTDA.

Assigned to: Judge Leonard B. Sand

Similar Case: 1:08-cv-02232-LBS

Cause: 09:1 U.S. Arbitration Act

Date Filed: 09/27/2006

Date Terminated: 01/19/2007

Jury Demand: None

Nature of Suit: 190 Contract: Other

Jurisdiction: Diversity

**Petitioner**

**Oxbow Carbon and Minerals LLC.**
*Successor in interest by Merger to applied Industrial Materials Corporation*

represented by **Anthony James Mavronicolas**
Law Offices of Anthony J. Mavronicolas
75 Washington Place
New York, NY 10011
(212)2536040
Fax: (212)2537171
Email: a.mavronicolas@ajmlaw.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Respondent**

**Votorantim Cimentos LTDA.**

represented by **George Michael Chalos**
Chalos, O'Connor & Duffy, LLP
366 Main Street
Port Washington, NY 11050-3120
(516)767-3600
Fax: (516)767-3605
Email: gmc@chaloslaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/27/2006 | 1 | PETITION TO VACATE ARBITRATION. (Filing Fee $ 350.00, Receipt Number 592134).Document filed by Oxbow Carbon and Minerals LLC..(js, ) Additional attachment(s) added on 10/4/2006 (mbe, ). (Entered: 09/28/2006) |
| 09/27/2006 | | SUMMONS ISSUED as to Votorantim Cimentos LTDA. (js, ) (Entered: 09/28/2006) |

| 09/27/2006 | | Magistrate Judge Henry B. Pitman is so designated. (js, ) (Entered: 09/28/2006) |
|---|---|---|
| 09/27/2006 | | Case Designated ECF. (js, ) (Entered: 09/28/2006) |
| 09/27/2006 | 2 | RULE 7.1 DISCLOSURE STATEMENT. Document filed by Oxbow Carbon and Minerals LLC..(js, ) (Entered: 09/28/2006) |
| 09/29/2006 | 3 | CLERK CERTIFICATE OF MAILING of Petition to Vacate Arbitration Award Pursuant to 9 U.S.C 1 ET SEQ. (2006) mailed to Votorantim Cimentos Ltda. Rua Amauri 255, Andar, 01498-900, Sau Paulo, S.P., Brazil on 9/29/2006 by Registered Mail # rb 632 876 064. (aba, ) (Entered: 09/29/2006) |
| 10/26/2006 | 4 | MOTION to Dismiss. Document filed by Votorantim Cimentos LTDA.. Responses due by 11/6/2006 Return Date set for 11/13/2006 10:30 AM. (Chalos, George) (Entered: 10/26/2006) |
| 10/26/2006 | 5 | MEMORANDUM OF LAW in Support re: 4 MOTION to Dismiss.. Document filed by Votorantim Cimentos LTDA.. (Chalos, George) (Entered: 10/26/2006) |
| 10/26/2006 | 6 | DECLARATION of George M. Chalos in Support re: 4 MOTION to Dismiss.. Document filed by Votorantim Cimentos LTDA.. (Attachments: # 1)(Chalos, George) (Entered: 10/26/2006) |
| 10/31/2006 | | CLERK CERTIFICATE OF MAILING RECEIVED for Petition to Vacate Arbitration Award Pursuant to 9 U.S.C 1 ET SEQ. (2006) mailed to Votorantim Cimentos Ltda. on 9/29/2006 by Registered Mail # rb 632 876 064, RECEIVED ON: 10/11/2006. (aba, ) (Entered: 10/31/2006) |
| 11/13/2006 | 7 | STIPULATION AND ORDER whereas, Oxbow on September 27, 2006 filed a Petition to Vacate and on October 26, 2006 Votorantim filed a Motion to Dismiss in the above captioned matter, the parties have agreed to the following schedule: Oxbow's papers shall be served on November 17, 2006, Votorantim's papers shall be served on December 1, 2006, Oral argument shall be requested for December 7, 2006, subject to the Court's availability. (Signed by Judge Leonard B. Sand on 11/9/2006) (jmi, ) (Entered: 11/13/2006) |
| 11/17/2006 | 8 | AFFIRMATION of Anthony J. Mavronicolas in Support re: 4 MOTION to Dismiss.. Document filed by Oxbow Carbon and Minerals LLC.. (Attachments: # 1 Exhibit 1-8# 2 Exhibit 9-15# 3)(Mavronicolas, Anthony) (Entered: 11/17/2006) |
| 11/17/2006 | 9 | MOTION to Vacate Arbitration. Document filed by Oxbow Carbon and Minerals LLC.. Return Date set for 12/7/2006 02:15 PM. (Mavronicolas, Anthony) (Entered: 11/17/2006) |
| 11/17/2006 | 10 | MEMORANDUM OF LAW in Support re: 9 MOTION to Vacate Arbitration., 4 MOTION to Dismiss.. Document filed by Oxbow Carbon and Minerals LLC.. (Mavronicolas, Anthony) (Entered: 11/17/2006) |
| 11/27/2006 | 11 | AFFIDAVIT of David Nestler in Support re: 9 MOTION to Vacate Arbitration., 4 MOTION to Dismiss.. Document filed by Oxbow Carbon and Minerals LLC.. (Mavronicolas, Anthony) (Entered: 11/27/2006) |
| 11/29/2006 | 12 | AFFIRMATION of George M. Chalos in Support re: 4 MOTION to Dismiss.. |

| | | Document filed by Votorantim Cimentos LTDA.. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C# 4 Exhibit D# 5 Exhibit E# 6 Exhibit F)(Chalos, George) (Entered: 11/29/2006) |
|---|---|---|
| 11/29/2006 | 13 | MEMORANDUM OF LAW in Support re: 4 MOTION to Dismiss. *And in Support of Motion seeking imposition of sanctions and in Opposition to Motion to Vacate*. Document filed by Votorantim Cimentos LTDA.. (Chalos, George) (Entered: 11/29/2006) |
| 12/06/2006 | 14 | REPLY AFFIRMATION of Anthony J. Mavronicolas in Support re: 9 MOTION to Vacate Arbitration.. Document filed by Oxbow Carbon and Minerals LLC.. (Mavronicolas, Anthony) (Entered: 12/06/2006) |
| 12/06/2006 | 15 | REPLY MEMORANDUM OF LAW in Support re: 9 MOTION to Vacate Arbitration.. Document filed by Oxbow Carbon and Minerals LLC.. (Mavronicolas, Anthony) (Entered: 12/06/2006) |
| 12/07/2006 | | Minute Entry for proceedings held before Judge Leonard B. Sand : Oral Argument held on 12/7/2006 re: 9 MOTION to Vacate Arbitration. filed by Oxbow Carbon and Minerals LLC. 4 MOTION to Dismiss. filed by Votorantim Cimentos LTDA. Decision Reserved. (jmi, ) (Entered: 12/21/2006) |
| 12/13/2006 | 16 | TRANSCRIPT of proceedings held on 12/7/06 before Judge Leonard B. Sand. (tro, ) (Entered: 12/13/2006) |
| 01/17/2007 | 17 | NOTICE OF CHANGE OF ADDRESS by Anthony James Mavronicolas on behalf of Oxbow Carbon and Minerals LLC.. New Address: Law Offices of Anthony J. Mavronicolas, 915 Broadway, Suite 1309, New York, New York, USA 10010, (212) 2536040. (Mavronicolas, Anthony) (Entered: 01/17/2007) |
| 01/17/2007 | 18 | ORDER granting 4 Motion to Dismiss; denying 9 Motion to Vacate Arbitration. Because the arbitration panel acted within the scope of its authority in rendering its partial final award, the Oxbow's petitioner to vacate the arbitration award is denied and Votorantim's motion to dismiss is granted. Both motions for sanctions are denied. So Ordered. (Signed by Judge Leonard B. Sand on 1/17/07) (jco) (Entered: 01/18/2007) |
| 01/17/2007 | | Transmission to Judgments and Orders Clerk. Transmitted re: 18 Order on Motion to Dismiss, Order on Motion to Vacate Arbitration, to the Judgments and Orders Clerk. (jco) (Entered: 01/18/2007) |
| 01/19/2007 | 19 | CLERK'S JUDGMENT in favor of Votorantim Cimentos LTDA. against Oxbow Carbon and Minerals LLC. that petitioner's motion to vacate is denied; respondent's motion to dismiss is granted and both motions for sanctions are denied; accordingly, the case is dismissed (Signed by J. Michael McMahon, Clerk, 1/19/07(jf) (Entered: 01/19/2007) |



| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 06/25/2008 10:58:13 | | |

| PACER Login: | fr0689 | Client Code: | Optional for PACER use only |
|---|---|---|---|
| Description: | Docket Report | Search Criteria: | 1:06-cv-07763-LBS |
| Billable Pages: | 2 | Cost: | 0.16 |

EXHIBIT "D"

3 of 12 DOCUMENTS

**OXBOW CARBON AND MINERALS LLC, SUCCESSOR IN INTEREST BY MERGER TO APPLIED INDUSTRIAL MATERIALS CORP., Petitioner, -against- VOTORANTIM CIMENTOS LTDA., Respondent.**

**06 Civ. 7763 (LBS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2007 U.S. Dist. LEXIS 5497*

**January 17, 2007, Decided**

**COUNSEL:** [*1] For Oxbow Carbon and Minerals LLC., Successor in interest by Merger to applied Industrial Materials Corporation, Petitioner: Anthony James Mavronicolas, LEAD ATTORNEY, Law Office of Jeffrey S. Rubin, Huntington, NY.

For Votorantim Cimentos LTDA., Respondent: George Michael Chalos, LEAD ATTORNEY, Chalos, O'Connor & Duffy, LLP, Port Washington, NY.

**JUDGES:** Leonard B. Sand, U.S.D.J.

**OPINION BY:** Leonard B. Sand

**OPINION**

*MEMORANDUM & ORDER*

SAND, J.,

Before the Court is Oxbow Carbon and Minerals LLC's ("Oxbow") petition to vacate an arbitration award pursuant to *9 U.S.C. § 1 et seq. (2000)*, petitioner's motion to vacate the arbitration award, and Votorantim Cimentos LTDA.'s ("Votorantim") motion to dismiss the petition.

*FACTUAL BACKGROUND*

Oxbow is a company organized and existing under the laws of Delaware with its principal place of business in Stamford, Connecticut. (Pet. P 1.) Votorantim is a Brazilian corporation with its principal place of business in Sao Paolo, Brazil. (Pet. P 2.) Oxbow, and its predecessor in interest Applied Industrial Materials Corp. ("AIMCOR") buy and sell petroleum coke in bulk. (Pet. P 1.) Votorantim buys petroleum coke for [*2] fuel in Brazil. (Pet. P 2.) The parties are diverse and the amount in controversy exceeds $ 75,000.

The parties entered into a two year supply contract for petroleum coke on October 24, 2000, with supply beginning on January 1, 2001. (Pet. P 5.) Votorantim temporarily ceased scheduling shipments of the petroleum coke from January 2002 through August 2002, claiming that force majeure protection under the contract permitted it to do so because of a Brazilian energy crisis. (*Id.*) Oxbow objected to the suspension of shipments under the contract's force majeure clause. (*Id.*) After the energy crisis ended, Votorantim attempted to restart the shipments, but was rebuffed. Votorantim counterclaimed against Oxbow for breach of contract.

The contract contains a concise alternative dispute resolution provision under clause 15, entitled "Arbitration." (Pet. Ex. 1.) The arbitration clause provides that "[i]n the event of any dispute arising in connection with this contract, the parties hereby agree to submit such dispute to arbitration under the rules of the American Arbitration Association in New York, United States of America." (*Id.*) Oxbow demanded arbitration of the propriety [*3] of seeking force majeure protection for the cessation of shipments on October 4, 2002. (Pet. P 6.) Five arbitration hearings were held between June 30, 2004, and August 31, 2005. (*Id.*)

During the hearings the parties discussed a bifurcation of the arbitration to first deal with the issue of

liability and later, if needed, with damages. These discussions, some of which took place on the record (which is only partially reproduced for the Court), resulted in high levels of confusion amongst the arbitrators and the parties themselves. What the agreement to bifurcate encompassed is the heart of this motion. The chronology of the agreement to bifurcate is set forth below.

The issue of bifurcation first came up at the first hearing, on June 30, 2004. Counsel for Oxbow requested bifurcation in order to resolve more expeditiously whether the contract was broken by Votorantim. (Mavronicolas Affirmation in Supp. of Pet., Ex. 9 at 119.) ("The bifurcation accomplishes two things, gets us there [to the issue of liability] fast, gives the panel something to focus on immediately, and then we can proceed from there.") Votorantim initially rejected the bifurcation, believing that it "wasn't [*4] the agreement between counsel. Clearly, if we bifurcated liability, then the whole proceeding will have to change, because we have a counterclaim, and our counterclaim is a question of liability as to whether or not the breach which we submit is wrongful by [Oxbow] gave rise to damages." (Id. at 120.)

At a subsequent hearing, on January 19, 2005, the chairman of the arbitration panel informed Oxbow that "[s]ince there is not agreement at this time, the panel will take under advisement your request, Mr. Mavronicolas, and we will give you a decision." (Id. at 440.)

At the July 19, 2005 hearing, the parties revisited the issue of bifurcation of the process. After an off the record discussion, counsel for Oxbow stated that after presenting their cases on the issue of liability, "[w]e are going to brief that issue to the panel and ask for a partial final award on it, reserving the right to then recall witnesses with respect to damages to prove them." (Id. at 1018-19.) Oxbow's counsel added that "if there's additional -- a counterclaim that Votorantim believes that they should be bringing after the question of liability, they'll have an opportunity to do that." (Id. [*5] at 1019.) Votorantim's counsel hesitantly agreed to this plan when asked by the arbitrators if he consented, answering "[y]es. The statement that I think we just agreed to." The parties were directed to give the panel something in writing memorializing the agreement to bifurcate, which they did not do. (Id. at 1017.) ("Give us something in writing jointly agreed by you two guys.")

At the following hearing, on August 30, 2005, the arbitrators expressed confusion as to what, if anything, was agreed to. (Id. at 1149.) One arbitrator stated "I was confused" while the chairman added "I was very confused." (Id.) After reprimanding the parties for not submitting a joint letter as requested, the chairman expressed that "I understand what you are saying. But it was very confusing and it did not come across clearly that you were requesting it [bifurcation]." (Id. at 1151.)

Eventually, counsel for Votorantim sent an email on September 2, 2005, to counsel for Oxbow and the panel of arbitrators, memorializing that "the parties have requested, and the Panel has agreed, to resolve issue(s) of liability first, with the issue(s) of damages to be presented and decided later, [*6] if at all. Of course, should my understanding of the procedure to be followed in this matter is [sic] incorrect, I look forward to a corrective message in return." (Mavronicolas Affirmation in Supp. of Pet., Ex. 12.) The above is the entirety of the agreement; at no point is the issue of when to consider Votorantim's possible counterclaim addressed. Oxbow received the email, and took no corrective measures.

The parties each submitted briefs on the issue of liability to the arbitration panel. In its brief, Votorantim argued not only that it was not liable for breaching the contract, but that Oxbow should be liable for not resuming the sale of petroleum coke for the remainder of the contractual term when the energy crises subsided in Brazil. (Chalos Affirmation in Supp. of Mot. to Dismiss, Ex. C at 27.) Oxbow objected to Votorantim's raising the counterclaim issue in its brief. (Mavronicolas Affirmation in Supp. of Pet., Ex. 17.)

The three person panel of arbitrators returned a partial final award on June 28, 2006 finding that Votorantim breached the contract and was not protected by the force majeure clause and also found that Oxbow breached the contract by not providing petroleum [*7] coke for delivery for the remainder of the contract when Votorantim attempted to restart the shipments. (Pet., Ex. 2 at 12.)

In a July 18, 2006 email Oxbow vehemently objected to the panel's finding of liability on Votorantim's counterclaim, arguing that the panel exceeded the scope of its authority given Oxbow's interpretation of the scope of the bifurcation agreement and requesting modification of the partial award. (Mavronicolas Affirmation in Supp. of Pet., Ex. 18 at 8.) The email raises substantially the

same claims as those presently before the Court. Votorantim objected to any modification and reconsideration of the findings made by the panel. (*Id.*)

On August 15, 2006, the arbitration panel rejected the request for modification, stating in an email that "[t]he Panel has read email exchanges between yourself [Mr. Mavronicolas, attorney for Oxbow] and Mr. Chalos and reviewed the file. On so doing, we see no reason to amend the Partial Final Award on liability." (*Id.*, Ex. 20.)

Oxbow filed the instant petition on September 27, 2006 alleging that the arbitrators exceeded their authority in issuing their partial final award and that the Court should modify the award [*8] or vacate it either in part or in whole. (Pet. P 10.) Votorantim filed its motion to dismiss arguing that the arbitrator's did not exceed their authority. Both parties have brought cross motions for sanctions as well.

*APPLICABLE LAW*



The scope of a district court's review of an arbitral award is very limited. *See Banco de Seguros del Estado v. Mut. Marine Office, Inc.*, 344 F.3d 255, 260 (2d Cir. 2003). An arbitration award should be enforced even if a court disagrees with the award on the merits so long as there is a "barely colorable justification for the outcome reached." *Id.* The Federal Arbitration Act, 9 U.S.C. § 1 et seq., permits vacatur of an arbitral award where the arbitrators have exceeded their power. But the Second Circuit has interpreted that provision narrowly. "We have consistently accorded the narrowest of readings to the Arbitration Act's authorization to vacate awards." *Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 220 (2d Cir. 2002). The inquiry for a district court "focuses on whether the arbitrators had the power based on the parties' submissions or the arbitration agreement, to reach a [*9] certain issue, not whether the arbitrators correctly decided that issue." *Banco de Seguros del Estado*, 344 F.3d at 262. The court "must determine whether the arbitrator[s] acted within the scope of [their] authority, or whether the arbitral award is merely the arbitrator[s'] own brand of justice." *Id.*

*DISCUSSION*

Oxbow's burden in asking the Court to vacate the arbitration panel's award is a heavy one that is not met in this case. From the outset, the Court notes that the parties covenanted to arbitration with a very broad scope,

agreeing to arbitrate any dispute arising under the contract. The parties then agreed to limit the scope of the arbitral proceeding, which they are entitled to do. The precise parameters of this limitation are at issue here, but the Court does not find that the arbitration panel exceeded the scope of its authority in rendering its partial final award.

Based on the record before it, the Court finds that the arbitration panel was within its powers in making its decision. While the panel at one point commented that the bifurcation was confusing, it later stated that it understood what the parties sought and ordered the parties [*10] to memorialize their agreement in writing. When counsel for Votorantim did this in a very short email, he explicitly stated that "the parties have requested, and the Panel has agreed, to resolve issue(s) of liability first, with the issue(s) of damages to be presented and decided later, if at all. Of course, should my understanding of the procedure to be followed in this matter is [sic] incorrect, I look forward to a corrective message in return." (Mavronicolas Affirmation in Supp. of Pet., Ex. 12.) At no point did the arbitration panel, which previously had maintained open dialogue with the parties via email, email Votorantim to correct the scope of the bifurcation. Neither did Oxbow make any attempt to correct the email. [1] Contrary to Oxbow's contention, at no point in this email did Votorantim's counsel limit his client to asserting its counterclaim only after the issue of its initial liability was determined.

> 1  Oxbow's contention that this email was sent over the Labor Day Holiday weekend does not further its case, as this email came months before either party submitted post hearing briefs and were still in the process of deposing certain witnesses on the issue of liability. Further, any hint of bad faith in the timing of the email's transmission is misplaced, as the email came three days after the panel requested (for the second time) a joint writing on behalf of the parties regarding the bifurcation.

[*11] The arbitration panel had made it patently clear to the parties that no matter their level of understanding at the time of the hearing, they wanted the stipulation for bifurcation submitted to them in writing, or else it would not take effect. To wit, at the August 30, 2005 hearing the panel proceeded under the impression that no bifurcation was sought because there had been no

written stipulation. Both parties were aware of the panel's preference, and both parties agreed to the simple stipulation they finally submitted, which on its face bifurcated the hearing into liability and damages. The stipulation did not explicitly address placement of the counterclaim in either half of the bifurcation but the counterclaim is unquestionably an issue of liability. [2] Oxbow was presented with an opportunity to correct whatever discrepancies it felt were embodied in the September 2, 2005 email, and also to provide evidence against Votorantim's counterclaim in its post hearing briefs.

> 2    This calls to mind Votorantim's initial hesitation when bifurcation was first broached on the record, when counsel stated at the initial hearing "Clearly, if we bifurcated liability, then the whole proceeding will have to change, because we have a counterclaim, and our counterclaim is a question of liability as to whether or not the breach which we submit is wrongful by [Oxbow] gave rise to damages." (Mavronicolas Affirmation in Supp. of Pet. Ex. 9 at 120.) It should be noted that the agreement to bifurcate came after the close of the hearings over a year after the topic was first raised, which certainly has led to some of the confusion.

[*12]    Furthermore, after the panel rendered its decision, Oxbow requested and received a second look by the panel. The panel, which was in a better position than the Court to evaluate the intent of the parties' stipulation based on the myriad discussions held, upheld its interpretation of the stipulation. The panel allowed the parties to brief the issue and received numerous lengthy emails from Oxbow arguing almost exactly the same issues that it brings to this Court in its petition. (*See* Mavronicolas Affirmation in Supp. of Pet., Ex. 18.) In these emails Oxbow provided the panel with excerpts of the hearing transcript which it claimed delineated the

scope of the stipulation. Oxbow did not convince the panel. After a review of the record the panel upheld its previous interpretation of the scope of the stipulation which was based on the one written submission by the parties. Mavronicolas Affirmation in Supp. of Pet., Ex. 20.) Oxbow is not seeking a referral to the arbitrators to revisit the issue on which it has already ruled but to have this Court overrule the arbitrators' interpretation of the parties' agreement to bifurcate. (Hr'g Tr. 11-12, Dec. 7, 2006.)

There is far more than [*13] a barely colorable justification for the decision to include the issue of liability on the counterclaim in the partial final liability award. The arbitration panel was well within the scope of its power in considering the counterclaim when it did based upon the language of the parties' stipulation.

*CONCLUSION*

Because the arbitration panel acted within the scope of its authority in rendering its partial final award, the Oxbow's petition to vacate the arbitration award is denied and Votorantim's motion to dismiss is granted. [3] Both motions for sanctions are denied.

> 3    Because the Court decides this case on the scope of arbitrators' authority it does not need to reach the issue of timeliness of the petition to vacate.

SO ORDERED.

Dated: New York, New York

January 17, 2007

Leonard B. Sand

U.S.D.J.

EXHIBIT "E"

-------------------------------------------------X

*In the Matter of the Arbitration between*

APPLIED INDUSTRIAL MATERIALS
CORPORATION,

                 Claimant,               FINAL AWARD

   - and -

VOTORANTIM CIMENTOS LTDA,

                 Respondent.

-------------------------------------------------X

           Before:     Walter R. Muff
                     John F. Ring, Jr.
                     Peter J. Zambito, Chairman

Representations:
For Applied Industrial Materials Corporation
Law office of Anthony J. Mavronicolas
By Anthony J. Mavronicolas, Esq.

For VOTORANTIM Cimentos Ltda.
Chalos O'Connor & Duffy, LLP
By George M. Chalos, Esq.
   LeRoy S. Corsa, Esq.

## INTRODUCTION

     The disputes which are the subject of this arbitration arose out of a Petroleum Coke Sales Agreement (hereinafter the "A/V Term Supply Contract") entered into on October 24, 2000 between Applied Industrial Material Corporation (hereinafter "AIMCOR" or "SELLER") and VOTORANTIM Cimentos Ltda. (hereinafter "VOTORANTIM" or "BUYER").



It should be noted that the A/V Term Supply Contract which is the subject of this arbitration was related, in turn, to a supply Contract between PREMCOR, as suppliers and sellers of petcoke, to AIMCOR, as buyers, AIMCOR having acted as a principal in both of these separate and distinct Contracts.

A PARTIAL FINAL AWARD dealing with liability was issued dated June 28, 2006. A majority of the arbitrators found therein that VOTORANTIM breached the Contract dated October 24, 2000 by not scheduling and accepting 150,000 MT petcoke during the first half of 2002 and was liable for the damages sustained by AIMCOR as a result; and further unanimously found that AIMCOR breached the same Contract by not providing petcoke for delivery to VOTORANTIM for the balance of the A/V Term Supply Contract, after it was informed in writing on August 16, 2002 that VOTORANTIM was in a position to resume regular shipments and was prepared to schedule and accept the remaining shipments as stipulated in the A/V Term Supply Contract.

The Panel incorporates herein the facts and findings of the Partial Final Award dated June 28, 2006. This FINAL AWARD deals with the issue of damages only.

Counsel for AIMCOR filed a Petition to Vacate the PARTIAL FINAL AWARD in the United States District Court for the Southern District of New York, and VOTORANTIM's attorneys cross-moved to dismiss the Petition. The Honorable Leonard B. Sand of the Southern District of New York, on January 17, 2007, issued a Memorandum and Order denying the Petition to Vacate and granting the cross-motion.

A Judgment to the above effect was issued and was entered on or about January 19, 2007.

## PROCEEDINGS

Five (5) hearings on damages were held before the Panel, specifically on April 10, 11 and 12 and July 16 and 17, 2007, during which one (1) witness and one (1) expert testified on behalf of AIMCOR, and one (1) witness testified on behalf of VOTORANTIM. Prior thereto, counsel for AIMCOR submitted a Preliminary Memorandum on Damages. Extensive exhibits relative to the issue of damages were offered on behalf of both parties and were accepted by the Panel and given the weight the Panel deemed each was entitled to be given.

The fifth and last hearing ended at 4:30 p.m. on July 17, 2007. Counsel for AIMCOR submitted and the Panel accepted additional Exhibits.

Thereafter, counsel for the parties submitted Main and Reply Post Hearing Briefs on Damages. Counsel for AIMCOR also submitted a bound volume of CITED LEGAL AUTHORITIES referred to his Main and Reply Briefs.

By email dated November 20, 2007 to both Counsel, the Chairman on behalf of the Panel formally declared the proceedings closed.

## FACTS AND DECISION

AIMCOR, in its MAIN and REPLY BRIEFS, at the end, raised seven (7) points, only two (2) of which we deem necessary to address below.

Point 2 asks for money damages in the amount of $2,164,471, resulting from a breach by VOTORANTIM of the A/V Term Supply Contract, whereas on page 12 of the MAIN BRIEF the contract loss is alleged to be $2,279,450. In its consideration of the discrepancy, the Panel utilized the summary of AIMCOR's claims as set forth in said Point 2.

3

Point 3 of the summary seeks lost commissions of $1,089,380, despite the Panel's earlier ruling in the PARTIAL FINAL AWARD that AIMCOR was a principal in the A/V Term Supply Contract, not a Broker and, therefore, not entitled to commissions. Here, too, AIMCOR's Briefs offered conflicting figures.

Overall, AIMCOR sought damages in Points 2 and 3 of $3,253,851.

Counsel for VOTORANTIM sought $4,247,405.60 in damages for the second half of 2002 and all of 2003 as a result of AIMCOR's breach.

Counsel for both parties also sought interest, costs and attorneys' fees.

In addition, counsel for VOTORANTIM sought $25,838.61 in attorneys' fees incurred in having to oppose AIMCOR's Petition to Vacate the Partial Final Award.

### (a) AIMCOR'S DAMAGES

The Panel determined that for the first half of 2002, AIMCOR was entitled to its "lost profits," the theory of damages being to place the aggrieved party in the same position it would have been had there been no breach, i.e., to make it whole.

AIMCOR's Damages Exhibit 4 (also VOTORANTIM's Exhibit H) reflects that for the 1st Quarter of 2002, 75,000 MT of petcoke was purchased from PREMCOR for $12.39 MT FOB, whereas the contract price to VOTORANTIM was $14.07 MT FOB, the difference being $1.68 MT. Said Damages Exhibit 4 includes a footnote reading, "Note: The commission per MT includes the US$0.41 deduction for the S. African btu discrepancy – Amendment #1."

The Panel notes an arithmetical error of $0.01 in AIMCOR Damages Exhibit 4, in that the difference in price, when $0.41 is added, computes to $2.09 per MT. As the computation for the second quarter of 2002 also gives credit for a differential of $1.41,

4

we accept $2.09 as the proper measure of damages. On such basis, the "lost profit" for the first quarter of 2002 are $156,750.

For the second quarter of 2002, AIMCOR Damages Exhibit 4 and VOTORANTIM Damages Exhibit H reflect that AIMCOR contracted to purchase 75,000 MT from PREMCOR for $11.51 MT FOB, whereas the contract price to VOTORANTIM was $13.03 MT FOB, the difference being $1.52 MT. Adding the $0.41 differential per AIMCOR Damages Exhibit 4, the measure of damages is $1.93 per MT.

Thus, the "lost profits" for the second quarter of 2002 amount to $144,750 (figure in Damages Exhibit 4 was incorrectly calculated).

Overall, for the first two (2) quarters of 2002, the total "lost profits" to AIMCOR amount to $301,500.

It is to be noted that the testimony of Dave Nestler as to the damages sustained, given during the Liability phase of this proceeding, did not account for the $0.41 differential, so that the Panel accepts the testimony of Matthew Scott-Hansen and Damages Exhibit 4, as the correct formula for damages for the first two (2) quarters of 2002, the Panel having corrected an arithmetical error.

Scott-Hansen was an employee of AIMCOR, who reported to Nestler, the senior executive in charge of marketing and sale of petcoke at AIMCOR (Damages T. 28, lines 3/9; T. 160, lines 13/16).

Also of importance is the testimony of Nestler in the liability phase of this proceeding, to wit (T. 839, lines 16/23).

"Q: Okay. Now, just so I am clear, if VOTORANTIM doesn't take the

2002 tonnage, AIMCOR doesn't go out of pocket to PREMCOR, correct?

You don't have to pay for this stuff?

A: Mr. Nestler: No.

Q: That's your interpretation of the contract?

A: Mr. Nestler: Yes."

Scott-Hansen confirmed Nestler's testimony that AIMCOR had not "paid a penny yet" to PREMCOR "for the petcoke under this [VOTORANTIM] contract" (Damages T. 215, lines 22/25).

In furtherance of the above and pursuant to a question by arbitrator Ring, Scott-Hansen testified that AIMCOR never took any of the PREMCOR petcoke destined for VOTORANTIM and sold it elsewhere (Damages T. 229, lines 14/17, 23/25).

Scott-Hansen confirmed his response to arbitrator Ring, on questioning by Chairman Zambito, and added, "PREMCOR took it themselves and found better deals" (Damages T. 234, lines 8/18).

There was also testimony from Scott-Hansen that he recalled hearing that PREMCOR may have oversold petcoke by 200,000 MT (Damages T. 202, lines 23 through T. 204, line 7).

On questioning of Scott-Hansen by VOTORANTIM's counsel, the witness acknowledged that AIMCOR Damage Exhibit 4 (also VOTORANTIM Damage Exhibit H) reflected the net benefit to AIMCOR had the contract not been breached by VOTORANTIM (T. 250, line 22 through 251, line 18).

6

AIMCOR received what purports to be an assignment of PREMCOR's rights against it (AIMCOR Damages Exhibit 17), and the Panel is aware that a suit, presently stayed, was brought on behalf of PREMCOR against AIMCOR in the District Court of Jefferson County, Texas. The Affirmation of James O' Malley, former Director of Power and Energy of PREMCOR (AIMCOR Damages Exhibit 66), was offered, in which it is claimed the difference between the PREMCOR contract price to AIMCOR and PREMCOR's mitigation sales was $1,296,393. AIMCOR Damages Exhibit 17, a letter from PREMCOR's Texas counsel dated April 2, 2007, assigns PREMCOR's "claim" of $1,834,950.20, "For purposes of the arbitration [with VOTORANTIM] only" to AIMCOR. Since PREMCOR's suit has been stayed, and there has been no judgment awarding damages to PREMCOR and chargeable to AIMCOR by the Texas Court, the Panel declines to consider what is, at this juncture, only a "claim" and, therefore speculative.

Based upon the foregoing, the Panel concludes that had VOTORANTIM not breached the Contract during the first two (2) quarters of 2002, AIMCOR would have realized a net profit of $301,500.

### (b) VOTORANTIM'S DAMAGES

VOTORANTIM sought $4,247,405.60 in damages, contending that such sum represented the difference between what it had to pay for replacement cargoes and the price per the Contract entered into with AIMCOR (AIMCOR Damage Exhibit 2).

In support of its claim, counsel for VOTORANTIM offered testimony from Julio Rocha, who testified that he was in North America between 2001 through 2005 and not in Brazil in 2002 (Damages T. 861, lines 20/22).

7

Notwithstanding, the Panel required VOTORANTIM to produce a list of all shipments of petcoke made in the second half of 2002 and in all of 2003. The initial exhibits offered did not reflect all shipments made during these two (2) intervals (VOTORANTIM Damages Exhibit C and AIMCOR Damages Exhibit 26), as a result of which the Panel required a schedule of all such shipments.

In response to the Panel's direction, VOTORANTIM Damages Exhibits Bates 2001 and 2002 (covering the year 2002, including the second half thereof) and 3001 and 3002 (covering the year 2003) were produced by VOTORANTIM. While Rocha was not in Brazil during the intervals in question, the evidence submitted on behalf of VOTORANTIM supported his testimony (VOTORANTIM Damages Exhibits C, Bates 2001, 2002, 3001 and 3002). On review, the Panel accepted the data reflected in VOTORANTIM Damages Exhibit C and AIMCOR Damages Exhibit 26, as reflecting the correct data, and bases its findings (later herein) on said Exhibit.

The Panel next concerned itself with what shipments reflected in 2002 and 2003 were "replacement shipments" or were shipments made pursuant to contracts which VOTORANTIM had with other companies, as only "replacement shipments" would be considered as purchases made in mitigation.

Once the mitigation shipments were determined, the Panel next examined what the quality of the petcoke was in these shipments, as witnesses for both parties testified that PREMCOR quality petcoke could not be used in VOTORANTIM's plants in the north of Brazil (Damages T. 760, lines 16/20); rather, only petcoke of a higher quality then PREMCOR petcoke could be used there (Liability T. 1680, lines 10/20; Liability T. 1309, lines 18/22).

Of the 150,000 MT mitigation purchases made in the second half of 2002 (actually, 149,955.96 MT), the differential in price between those purchases and the AIMCOR/VOTORANTIM Contract price was $1,139,861.61 (AIMCOR Liability Exhibit 26; VOTORANTIM Damages Exhibits C, Bates Nos. 2001 and 2002). The Panel found that while most of the cargoes were discharged in southern Brazilian ports, some petcoke was discharged in northern Brazilian ports, but that such cargo was of a better quality than that discharged in southern Brazilian ports.

In 2003, eight (8) different vessels carried mitigation shipments to Brazil, totaling 294,354.61 MT (VOTORANTIM Damages Exhibit C). These shipments were made between January 7 and July 27, 2003. Counsel for AIMCOR argued that the Contract (AIMCOR Damages Exhibit 2) required "ratable" shipments, whereas the Contract quantity was fulfilled within the first seven (7) months. Having breached the said Contract as of August 2002 and not having scheduled or shipped petcoke thereafter, AIMCOR should not be heard to complain that the mitigation shipments were not spread out over the whole of 2003, but were made on an as needed basis.

Of the eight (8) vessels utilized, only one (1), the MV DENBULK, carried petcoke of a like quality as that stipulated under the A/V Term Supply Contract (AIMCOR Damages Exhibit 2) to a northern Brazilian port. As a result, the Panel declines to accept said shipment of 34,499.11 MT (differential in price $271,439) as a proper mitigation effort. See reference to testimony of both parties, supra.

The Panel also found that the remaining seven (7) vessels carried shipments totaling 258,855.50 MT and were either discharged at ports in the south of Brazil or, if discharged in the north, were of a better quality than PREMCOR petcoke.

9

The differential between the Contract prices (AIMCOR Damages Exhibit 7) and the mitigation shipments, excepting the MV DENBULK shipment, amounts to $2,836,104.99 (VOTORANTIM Damages Exhibits C, Bates Nos. 3001 and 3002).

Counsel for AIMCOR sought to discredit the damages claimed by VOTORANTIM, principally through the testimony of its expert, Mario Sirca, as well as the testimony of VOTORANTIM's witness, Julio Rocha.

Sirca testified that he bought petcoke for his Italian employer, Italcementi, which had no plants in Brazil (Damages T. 1263, lines 12/21) and had no experience in purchasing petcoke for use in Brazil (Damages T. 700, line 25 through 701, lines 2/3; 1383, lines 10/13) and little experience in purchasing petcoke in the United States (Damages T. 1264, lines 4/13).

Yet, Sirca expressed the opinion that, at the relevant times, PREMCOR quality petcoke was available in the market at the same time that VOTORANTIM was buying petcoke of a higher quality and greater price.

Sirca offered a list of sales/purchases made in the U.S. Gulf (AIMCOR Damages Exhibit 18.a). With regard to said list, arbitrator Ring remarked that there is a difference between what is reported and what is actually done (Damages T. 1315, lines 3/5).

Additionally, in response to arbitrator Ring's inquiries, Sirca testified (Damages T. 1317, lines 16/23):

> "MR. RING:  So a lot of these reported deals are just that, reported in the marketplace?
> THE WITNESS: Right.
> MR. RING:  As opposed to substantiated or supported by documents or whatever.
> THE WITNESS: Correct."

On cross-examination, as well as on inquiry by the Panel, Sirca testified that he did not know what was available to VOTORANTIM at the relevant times (Damages T. 1385, line 11 through 1387, line 9):

Further on cross-examination, Sirca testified as follows:

"Q   As of November 26, PREMCOR quality petcoke for the spot purchase you identified, was roughly $19 a ton, right?
A  Correct.
Q  And Votorantim went out and mitigated its damages roughly the same time and paid $22 a ton, right?
A  Correct.
Q  You have no idea whether or not that was the best price that Julio [Rocha] could have gotten at that time, do you?
A  I have no idea, okay." (Damages T. 1400, line 16 through 1401, line 3)

When asked about his knowledge of VOTORANTIM's plants in Brazil, Sirca replied "I haven't been there.  I don't know the details"  (Damages T. 1320, line 23 through 1321, line 3).

Having observed the expert witness and heard his testimony, the Panel was of the unanimous opinion that Sirca's testimony had been discredited and was of no probative value.

The Panel disallows VOTORANTIM's claim for $25,838.61 in attorneys' fees, said to have been incurred in opposing AIMCOR's Petition to Vacate the Partial Final Award.  In such regard, the Panel is guided by Judge Sand's Memorandum and Order dated January 17, 2007, wherein no attorneys' fees were awarded and both parties' motions for sanctions were denied.

## FINAL AWARD

In summary, it is the unanimous finding of the Panel that the damages recoverable by each party are as follows:

11

1.  As a result of VOTORANTIM's breach of the A/V Term Supply Contract during the first six (6) months of 2002, AIMCOR is entitled to recover the following sums:

> a) $156,750.00 for damages sustained during the 1st Quarter of 2002, plus interest at the rate of five (5) percent per annum, calculated from March 31, 2002 to February 29, 2008 (i.e., 5 years, 11 months), $7,837.50 per annum x 5.91 years, equivalent to $46,319.62;

> b)  $144,750.00 for damages sustained during the 2nd Quarter of 2002, plus interest at the rate of  five (5) percent per annum, calculated from June 30, 2002 to February 29, 2008 (i.e., 5 years, 8 months), $7,237.50 per annum x 5.66 years, equivalent to $40,964.25.

The total damages awarded to AIMCOR by the Panel are $301,500.00, plus interest of $87,283.87, totaling $388,783.87.

2.  As a result of AIMCOR's breach of the A/V Term Supply Contract during the last six (6) months of 2002 and for the calendar year 2003, VOTORANTIM is entitled to recover the following sums:

> a) $1,139,861.61 for damages sustained during the second half of 2002, plus interest at the rate of five (5) percent per annum, calculated from December 31, 2002 to February 29, 2008 (i.e., 5 years, 2 months), $56,993.08 per annum x 5.16 years, equivalent to $294,084.29;

> b) $2,836,104.99 for damages sustained during calendar year 2003, plus interest at the rate of five (5) percent per annum, calculated from July 31, 2003 to February 29, 2008 (i.e., 4 years, 7 months), $141,805.24 per annum x 4.58 years, equivalent to $649,467.99.

The total damages awarded to VOTORANTIM by the Panel are $3,975,966.60, plus interest of $943,552.28, totaling $4,919,518.88.

Therefore, the Panel directs AIMCOR to pay the net amount of $4,530,735.01 ($4,919,518.88 – 388,783.87) to VOTORANTIM.

Appendix A hereto details arbitrators' fees and costs and is an integral part of this Final Award. Pursuant thereto, arbitrators' fees and costs are to be shared equally by the parties, but each party is jointly and severally responsible for said fees and costs in toto.

Each party is responsible for its own counsel's legal fees and Court reporting costs.

Annexed to this Final Award, and also made an integral part hereof, is Appendix B, Chairman's Statement.

Arbitrator Walter R. Muff's travel and related expenses are the sole responsibility of AIMCOR.

Dated: New York, New York
       February 29, 2008

Walter R. Muff

John F. Ring

Peter J. Zambito, Chairman

```
-----------------------------------------------X
```
*In the Matter of the Arbitration between*

APPLIED INDUSTRIAL MATERIALS
CORPORATION,

               Claimant,              **APPENDIX A**

    - and -

VOTORANTIM CIMENTOS LTDA,

               Respondent.
```
-----------------------------------------------X
```

The Arbitrator's fees in this matter are to be shared equally between the claimant and the respondent in the total amount of $145,262.50.

The fees are payable as follows:

| | Total during damage phase | Less previously disbursed | Due now |
|---|---|---|---|
| Walter R. Muff | $44,212.50 | $20,000.00 | $24,212.50 |
| John F. Ring, Jr. | $49,750.00 | $20,000.00 | $29,750.00 |
| Peter J. Zambito | $51,300.00 | $20,000.00 | $31,300.00 |

These fees are payable from the escrow account established, with equal deposits made by Claimant and Respondent for this purpose, with the Society of Maritime Arbitrators, Inc. (SMA).

In addition, the Chairman incurred out-of-pocket expenses amounting to $360.66.

The Panel's fees and Chairman's out-of-pocket costs are to be paid from the SMA escrow account within ten (10) days of the date of issuance of this Final Award.

14

```
----------------------------------------------------X
```

*In the Matter of the Arbitration between*

APPLIED INDUSTRIAL MATERIALS
CORPORATION,

               Claimant,                    **APPENDIX B**

  - and -

VOTORANTIM CIMENTOS LTDA,

               Respondent.

```
------------------------------------------------X
```

## CHAIRMAN'S STATEMENT

During the third Damages hearing held on April 12, 2007, I became exasperated with the documentation submitted on behalf of VOTORANTIM as to replacement shipments and asked counsel for AIMCOR to leave the room. During his absence, I chided the witness (Rocha) and made it clear that the Panel wanted data reflecting "all" shipments made during the second half of 2002 and all of 2003, which were pursuant to other contracts, as well as those which were replacement purchases. I was wrong to ask counsel for AIMCOR to leave the room during this interval, but on his return, explained fully what had transpired and reiterated what the witness (Rocha) was directed to produce (Damages T. 870, lines 9 through 25).

> "THE CHAIRMAN: If you produce all of the documentation, you ought to earmark what you were contractually obligated to take aside from the AIMCOR contract and what you specifically went out in the market to get to replace AIMCOR – to replace PREMCOR cargo, okay?
> You see where we are going? We are trying to find the lowest value. I mean, anything that is contractually – they were contractually obligated to take, other contracts, should be outside the scope of this, right?
> But what they went in the spot market to take, is other than contractually. To me, that should be segregated."

At the fifth and last Damages hearing, counsel for AIMCOR referred to my
having asked him to leave the room during the third Damages hearing, as follows
(Damages T. 1463, line 12 through 1465, line 3):

> "MR. MAVRONICOLAS:  Well, it begins with an off-the-record, and
> then the questions start.
>     During that off-the-record period, I was asked – I was out of the room.
> When I returned to the room when those questions started, I found the
> panel – I found the witness and I found opposing counsel.
>     I wasn't present in the room when we were off the record.  I don't know
> what occurred in the room.  But I know there was a series of questions
> that came after it, and so my request is we strike those questions from the
> records.
> MR. CHALOS:  You weren't out of the room.
> THE CHAIRMAN:  Yes, he was out of the room.  I asked him to excuse
> himself and that's when I said to Mr. Rocha, I asked for all of the data
> that wound up in Bates 2001 and 2002, 3001, 3002, because – and I
> mentioned this to you, I know I mentioned this to you subsequently, that I
> was concerned that mitigation efforts had not be exercised and that we
> didn't have the full data to determine whether they went out and sought
> the lowest price cargoes of that ilk.
> MR. MAVRONICOLAS: In fact, you did do that, Mr. Chairman, but you
> do it later.  It's after that point.
>     You make that statement actually on page 870 of the transcript, and you
> begin and talk about production, and ask him to produce.  That happens
> later, Mr. Chairman."

Based upon my explanation, counsel for AIMCOR accepted it, stating (Damages

T. 1467, lines 5 through 24):

> "MR. MAVRONICOLAS:  Mr. Zambito, based on what you said to me
> today, what occurred outside the room, I of course accept what you have
> said as the facts as represented by you.
>     And on that basis, and of course as an advocate for my client, I always
> have to preserve whatever objections we have, and I do that.
>     However, as a matter of response to what you said, I believe that what
> your representation is what occurred in that room, and for everything that
> I know is absolutely accurate, and I will leave it at that, sir, and thank you
> very much for even discussing it with me.
> MR. CHAIRMAN:  Do you drop your motion to excise that portion?
> MR. MAVRONICOLAS:  The necessity for a motion is unnecessary."

Despite having accepted my explanation, counsel for AIMCOR reserved his objection, which I found to be inconsistent (Damages T. 1467, line 25 through 1471, line 13) to wit:

"Again, as I say, I will reserve my objection. I need to do that. I am not going to —
MR. CHALOS: Objection for what?
THE CHAIRMAN: He is objecting to the text. You objecting to what Mr. Ring asked you, whereas I am the one that sent you out of the room. So I am having trouble putting that together.
MR. MAVRONICOLAS: I'm just preserving my client's rights with respect to whatever the process was, the procedure.
THE CHAIRMAN: To the process?
MR. MAVRONICOLAS: The procedure.
THE CHAIRMAN: The procedure.
MR. CHALOS: No, Mr. Chairman, this is unacceptable to me.
THE CHAIRMAN: It doesn't effect you.
MR. CHALOS: Of course it does.
THE CHAIRMAN: No, it doesn't. It effect me. It effects you, yes indirectly. It effects you because if a court — and I want all this down — if a court should determine that I acted improperly sending him out of the room, I get criticized in the judge's opinion.
 However, if the damages turned out to be unanimous, the fact that the judge may knock me out, doesn't amount to a hill of beans.
MR. CHALOS: Well, Mr. Chairman, I think its appropriate at this point in time while there is a contemporaneous issue and not after Mr. Mavronicolas gets to go back to his house and cook up a story, what is it that he thinks he is prejudiced, that he should articulate it, if there was a prejudice.
THE CHAIRMAN: He did articulate it. He said that he was sent out of the room, the reporter was out of the room, he has no idea what was said unilaterally, if you will.
 So I understand that he is suggesting that was inappropriate activity, and that's he is going to reserve his right of objection to me having followed that procedure. Okay.
MR. CHALOS: Well, I am struggling because I don't recall, neither does my partner, Mr. Corsa, recall unilateral ex parte communications.
THE CHAIRMAN: I understand that, but the mere sending him out of the room is what the problem may be. Okay?
 With that in mind, this proceeding is concluded at 4:30 pm..
MR. MAVRONICOLAS: Mr. Chairman, thank you very much."

Despite directing AIMCOR's counsel to set forth his objection in his BRIEFS, I could find no reference to counsel's reservation in either his MAIN or REPLY BRIEF on Damages (Damages T. 1461, lines 16/23).

Notwithstanding, as the Panel's findings were "unanimous," the issue becomes moot in the last analysis.

Peter J. Zambito, Chairman

EXHIBIT "F"

------------------------------------------------X

IN THE MATTER OF ARBITRATION BETWEEN

APPLIED INDUSTRIAL MATERIALS
CORPORATION,

CLAIMANT,

- AND –

VOTORANTIM CIMENTOS LTDA.,

RESPONDENT.

BEFORE:
PETER J. ZAMBITO, ESQ.
CHAIRMAN
WALTER R. MUFF
JACK F. RING

------------------------------------------------X

MAIN BRIEF FOR
APPLIED INDUSTRIAL MATERIALS CORPORATION

LAW OFFICES OF ANTHONY J. MAVRONICOLAS
ATTORNEYS FOR AIMCOR
75 WASHINGTON PLACE, SUITE ONE
NEW YORK, NEW YORK 10011
TEL: (212) 253-6040
FAX: (212) 253-7171

ANTHONY J. MAVRONICOLAS
OF COUNSEL

## INTRODUCTION

This Main Brief is submitted on behalf of Applied Industrial Materials Corporation ("Aimcor"). The evidence now before the Panel will be presented in the "Facts" section of the brief which follows as the law will be primarily presented in the "Law" section. But before proceeding, Aimcor would respectfully request that the Panel keep in mind a few salient facts as it proceeds.

Aimcor and Votorantim had entered into a contract in 2000 for the FOB purchase of petroleum petcoke by Votorantim over three years to be produced at the Premcor refinery in Texas. In 1991 Aimcor and Votorantim had entered into another contract for the FOB purchase of equal quality petroleum coke by Votorantim over three years to be produced at the Shell refinery in Texas as well. By 2002 the price of the Premcor petcoke was $10 a ton higher than the price of the Shell petcoke. In 2002 Votorantim belatedly declared force majeure, and alleged that it was entitled to refuse to accept any Premcor petcoke on the strength of a contract clause allowing for the reduction of the amounts of petcoke purchased based on technical or government prohibitions on the use of petcoke. The factual basis Votorantim relied on for its claims to refuse any purchases of the Premcor petcoke in 2002 were a government program targeting electricity consumption in Brazil in 2002 and the lack of storage space caused by environmental regulations and the energy conservation program. In contrast, in 2002, Votorantim purchased and stored the maximum amount of the cheaper Shell petcoke it could take under the contract with Votorantim       for       the       purchase       of       the       Shell       petcoke.

<u>FACTS</u>

A. <u>The Clark/Premcor/Aimcor/Votorantim Contracts</u>:

Matthew Scott-Hansen, who was the first witness to appear before the Panel in this matter, testified that he and Frank Zweerts negotiated for Aimcor in concluding the October 24, 2000 contract for the sale of petroleum coke ("petcoke") between Applied Industrial Materials Corporation ("Aimcor") and Votorantim Cimentos Ltda. ("Votorantim") ("V/A Contract") which gave rise to these proceedings. AE.1[1], T129,143[2]

Prior to negotiating the V/A Contract, Aimcor had entered into an August 1, 1999 contract with Clark Refining & Marketing ("Clark") for the marketing of Clark's petroleum coke by Aimcor. ("Clark/Premcor Contract") AE.1, p.14-15  Clark was subsequently purchased by Premcor Refining Group Inc. ("Premcor").    T147  On December 1, 2000, after the Votorantim Contract had been executed, Aimcor entered into a Petroleum Coke Supply Agreement ("A/P Contract") with Premcor for supply of the petcoke to Votorantim under the V/A Contract.  AE.2,p.1, PE.H,p.3[3]

Apparently because of provisions in the Clark/Premcor Contract regarding Aimcor's compensation under that contract as being on a commission basis, AE.2,p.18, as well as the active role given to Clark in Aimcor's subsequent marketing of Clark's petcoke under two concurrent contracts, one obtaining petcoke supply from Clark as refinery and selling it for Clark to end users, T151,AE.2,p.14, questions were raised by the Panel as to whether Aimcor acted as an agent or a principal in its subsequent sales of Premcor petcoke to Votoramtim.  T148  Although the determination of whether one acts as agent or principal in any transaction is a matter of law. Mr. Scott-Hansen in

---

[1] References to Aimcor Exhibits 1-39
[2] References to Transcript pages 1-1951
[3] References to Panel Exhibits A-H

responding to one of the Panel member questions explained from his commercial experience that Clark had structured the Clark/Premcor Contract as the refinery that provided the petcoke. T152 As Mr. Scott-Hansen further explained, the refineries which are the only sources of petcoke require transparency as to all aspects of the marketing of their petcoke. T155  David Nestler, who was the second witness to appear before the Panel for Aimcor, expanded on Mr. Scott-Hansen's explanation of the Clark/Premcor Contract's commercial characteristics by testifying that Clark had wanted to be: "very, very involved in the marketing of the petroleum coke." T488

Regardless of whether Aimcor was acting as an agent or a principal on behalf of Premcor, or a blend of both in different aspects of their relationship, the provisions of the V/A Contract which have been put at issue before the Panel, either with merit or as Aimcor will argue as to Votorantim's legal position, without factual or legal foundation, are limited to three clauses. But before addressing them, a fourth contemporaneous contract between Aimcor and Votorantim needs to be considered since it unequivocally evinces the commercial realities that lead Votorantim to breach the V/A Contract and seek defense either in contractual clauses clearly not intended to provide Votorantim with the legal pretext they now seek to avoid their contractual responsibilities to perform in 2002, and even without the factual basis they have now claimed in these proceedings excused Votorantim's failure to perform in 2002.

B. <u>The Shell Contract</u>:

During Mr. Scott-Hansen's direct testimony, both Mr. Muff and Mr. Ring initially raised questions as to the terms of another contract between Aimcor and Votorantim for the sale of Shell petcoke to Votorantim.  T208  In fact, in September of 1999, a year before the V/A Contract, Aimcor and Votorantim had entered into a three year contract for the sale to Votoranitim of 300,000MT, plus or minus at Votorantim's option, of petcoke from the Shell Dear Park Refinery. ("Shell Contract") AE.36, T527  Questioned further by Panel members regarding the Shell Contract, Mr. Scott-Hansen testified that the Votorantim Contract and the Shell Contract in 2001 and 2002, were overlapping in time.  T208  Moreover, the petcoke in both contracts was of the same sulfur percentage, the same HG1, or hardness characteristic, and was sold to Votorantim on an FOB basis. T208-9,527-8, AE.1,p.13, AE.36  As Mr. Scott-Hansen testified, and even Votoranim's witnesses conceded, the quality of the petcoke on the two contracts was the same.  T217, T1909  The only significant difference between the Shell Contract and the Votorantim Contract was the price of the petcoke--**$4.50 a ton under the Shell Contract and $14.50 a ton on the V/A Contract, for a difference of $10 a ton between the two contracts in the fall of 2001**.  T217,527-8, AEB.61[4]

The dramatic price difference between the V/A Contract and the Shell Contract is derived from the pricing mechanisms of the two contracts.   As Mr. Scott-Hansen testified, the Shell Contract with Votorantim was sold on a flat fixed price.   T209.  AE.36,p.2  In contrast, Clause 2 of the V/A Contract for the Premcor petcoke provided for a variable price based on a South African coal index.  T181,T498, AE.1,p.2  The concept that informed the selection of such a clause was to tie the price of the petcoke to

---

[4] References to Aimcor Brenha Exhibits 39-61

an agreed number less than the price of a South African coal index. T181  By doing so the price of the petcoke would always be less than the price of coal, which presumably would have been an alternate fuel source for Votorantim. T181 This in turn would have provided Votorantim with incentive to use Petcoke as a fuel rather than more conventional fuel like coal. T502  However, as the price of coal suddenly exceeded the spot market for petcoke, the petcoke Votorantim was purchasing under the V/A Contract was still cheaper than the coal alternative, but dramatically more expensive than the spot market for that same quality petcoke.  The result: a "price majeure" disguised by Votorantim as a force majeure.

C. The Contractual Provisions of the Votorantim Contract:

As provided for in Clause 4 of the V/A Contract, the purchase was on an FOB basis delivery at Port Arthur Texas on Votorantim's vessel. AE.1, p5, T812  Thus, Votoranim would have ownership of the petcoke as soon as it was loaded on their vessel in Texas. T497  Clause 5.4 of the V/A Contract provided that Votorantim would pay: "...for all petroleum coke **purchased hereunder,** regardless of whether (Votorantim's) cement plants, subsidiaries, or divisions pay (Votorantim)." AE.1,p. In line with those payment provisions, the very first paragraph of the V/A Contract provide that: "(Aimcor) agrees to sell and to deliver, (Votorantim) agrees to **purchase, take delivery and to pay** for petroleum coke described hereunder,..." AE.p.5  It is undisputed that Votorantim's cement plants are subsidiaries owned by Votoranitim as a holding company. T1503  And as Mr. Scott-Hansen testified, Aimcor required the payment provision of Clause 5.4 in the V/A Contract because the plants did not have the necessary credit Votorantim brought to the contract which would assure payment regardless of the inability or unwillingness

of the cement plants to pay. T138 These unambiguous provisions of the V/A Contract clearly delineate Votorantim's contractual duty to "purchase" and "pay", without regard to any impediments Votorantim's cement plants may have encountered in accepting, storing, using or paying for the petcoke the plants were in fact receiving from Votorantim and not under the V/A Contract.

Putting aside for the moment these clear contractual provisions of the V/A Contract that alone mandate a finding that Votorantim breached the contract by failing to both pay for the petcoke it contractually purchased in 2000, and having failed to take delivery of throughout 2002, as the Panel is aware, Votorantim now asserts that Clause 2.2 and Clause 13 excused it from performing at all in 2002. Clause 13 is, of course, a classic force majeure clause that excuses a party from performing during a series of agreed events that directly cause a party not to perform. AE.1,p.9 The clause also requires the party claiming the force majeure to "...**promptly notify...**" its counterpart of the force majeure and to "...**use all the reasonable good faith diligence, and efforts to remove or cure the force majeure...**" AE.1,p.9 First, Votorantim failed to prove the existence of circumstances giving rise to a force majeure, a burden the Chairman of the Panel has already observed is properly upon Votorantim as the party claiming force majeure. But even if Votorantim had carried that burden, its utter failure to either promptly notify of the alleged force majeure, and then its complete failure to take any steps to remove or cure the alleged force majeure itself would preclude application of the clause as a defense to Votorantim's failure to perform in 2002.

Perhaps in recognition of its failure to successfully claim force majeure, as the Panel is also aware, Votorantim has seized on to Clause 2.2 of the V/A Contract as yet

7

another excuse for its failure to perform in 2002.  AE.1,p.5   The clause is surely unequivocal in its language reaching only circumstances in which:  "If (Votorantim) is not able for **technical or governmental approval to use petroleum coke ...**".  AE.1,p5 Nevertheless, Votorantim now attempts to make the clauses clear language ambiguous and would have the Panel disregard both the parties' contractual intentions and commercial reasoning that would have brought such a provision into the contract to begin with.   AE.1,p.5   The circumstances surrounding the inclusion of this clause in the contract is irrefutable. As even Julio Rocha who was the last witness to testify conceded, Clause 2.2 was drafted by both him and Mr. Scott Hansen, although the final language was done by Mr. Scott-Hansen and specifically approved by Mr. Rocha. T1801,3  And as Mr. Scott-Hansen testified, the commercial purpose and intention of Clause 2.2  was to address the fact that Votorantim was relatively new to the use of petcoke as a fuel source, and was intended to cover circumstances when the plants could not burn the petcoke as fuel for obvious "technical" reasons or if the government of Brazil, which had previously banned the importation of petcoke, withdrew its "approval" for the use of petcoke as a permissible fuel during the course of the contract. T131-2 During his testimony Mr. Nestler also explained that Clause 2.2 only concerned the possibility of government actions that might withdraw the approval for the use of petcoke as fuel. T616 Thus, the clause was directed to the possible government withdrawal of permits for the use of petcoke as fuel or technical problems such as excessive emissions which might precipitate the withdrawal of governmental permits allowing the use of petcoke as fuel. T787-8

8

In contrast, Votoranim would have the Panel disregard the unambiguous language of the clause which addresses only the "**use**" of petcoke hindered by government prohibition as to use or due to technological difficulties. Instead of recognizing this reading of Clause 2.2 as the only reasonable commercial basis for including such a clause in a contract, Votorantim has argued in favor of a ridiculously broad reading of the clause which would allow Votorantim to walk away from its obligations to purchase petcoke as a result of events such as the Brazilian government ordering the private sale of cement reduced or even eliminated, as excusing Votorantim from having to purchase any further petcoke under the contract because it no longer needed to "use" petcoke in its plants. Nonsense, unless Votorantim's contractual counterpart were willing to enter into a contract Votorantim could walk away from any time government action inhibited but need not prohibit Votorantim's willingness or ability to use petcoke to produce cement. In fact one of the fundamental cannons of contract construction, the doctrine of plain meaning, which will be discussed in the legal analysis later in this brief, would prohibit such a broad interpretation of Clause 2.2. But in any case, Votorantim's own conduct during the course of performance of the V/A Contract discussed below reveals that even Votorantiim could not have understood such a strained reading of the contract as its lawyers now urge on the Panel.

D. Performance under the Votorantim Contract until October 2001:

The V/A Contract began in January of 2001. AE.1,p.5 The contract was amended in June of 2001 to provide for a new South African Coal Index that would be used to calculate the contract price under that contract. AE.1, p.2 That Amendment was executed by Aimcor, Votorantim and Premcor. AE.1,p2 In adopting the new coal index

Aimcor, Votorantim and Premcor agreed to each absorb ⅓ of the cost caused by adopting the new index. T189

Then in September of 2001 it was discovered that some of the Premcor petcoke that had been shipped in June or July to Votorantim had lower HGI than had been provided for in the contract and was thus harder than had been guaranteed in the V/A Contract. T190,514,537 Aimcor agreed with Votorantim that Aimcor would go to Premcor to address the additional cost Votorantim had incurred in processing and using this harder petcoke. T516 As a result of this problem, Mr. Scott-Hansen testified that he traveled to Brazil to visit the plant to which the hard petcoke had been delivered. T202 In point of fact, John Carter of Premcor negotiated with Votorantim as to the quantum of those costs which Premcor ultimately accepted. T193,5 The amount of those agreed costs totaled approximately $500,000 which amounted to a $10 a ton charge for this harder off-spec petcoke. T194,516 Premcor paid those costs through Aimcor. T703,6 As Mr. Nestler also testified, with the exception of these shipments, the Premcor petcoke was consistently within the 35/41 HGI range of the V/A Contract. T521 The HGI problem was corrected so that Mr. Nestler was able to respond to a question from one of the Panel members that between September and November 30th there were no further problems with the HGI or hardness of the Premcor petcoke that went to Votorantim. T538,540 The Premcor petcoke had, thus, returned to normal levels after those unusually hard summer shipments. T267

E. Votorantim's Failure to Perform the Votorantim Contract after October 2001:

By **October 2001** the price for the Premcor petcoke based on the South African coal index of **the V/A Contract was $10 a ton over the prevailing market price** at the

time. T524,AEB.61 Being committed to purchase a minimum of 300,000MT for 2002, **Votorantim would have spent 3 million dollars over the prevailing market prices** to perform under the V/A Contract. T525. In contrast, the price of the Shell petcoke that Votorantim was purchasing under **the Shell Contract** from Votorantim in October of 2001 was **3 dollars a ton less than prevailing market prices** for petcoke at the time. AEB.61

Without regard to price, for Aimcor establishing a schedule for shipping petcoke from refineries such as Premcor that only produces petcoke as a by-product in the refining of higher value distillate products was critical. T523 Thus on the eve of Mr. Scott-Hansen's trip to Brazil in early October 2001 with Mr. Carter of Premcor to address Votorantim's claim for additional cost incurred in processing the hard, off spec, petcoke received in the late summer of 2001, Votorantim was already proposing a shipping schedule that would reduce the shipments from 6 to 5 in 2002. AE.3 As Mr. Nestler testified, however, between October 2001 and March of 2002 it was uncertain, or in his words, it was "a moving target" as to how much, if any, Premcor petcoke Votorantim would schedule for 2002. T833 What Mr. Nestler did however know in October of 2001 was that Votorantim was still purchasing and scheduling delivery of the significantly less expensive, but equal in quality, Shell petcoke under the Shell Contract. T529-530 In point of fact, examining the correspondence Votorantim was sending to Aimcor between October 2001 and April 2002 regarding Votorantim's continued refusal to schedule delivery of any Premcor petcoke, while scheduling delivery of the Shell coke, is most informative. For that correspondence reveals at least six different positions and rationales Votorantim was attempting to use to disguise its obvious commercial decision

to take the less expensive, and decline the more expensive, petcoke to save itself from the 3 million dollar mistake it had made in agreeing to a pricing formula in the V/A Contract based on an ever changing coal index.

1. Votorantim Position 1, October 3,2001: On October 3, 2001 Jose Brenha, the first witness to testify for Votorantim, sent Mr. Scott-Hansen an e-mail which he marked as of "high" importance and referenced as "Premcor pet coke-year 2002 shipments". AE.3 He begins his e-mail by wishing Mr. Scott-Hansen a fine trip on his way down to Brazil with John Carter of Premcor. AE.3, ¶ 1,4 And as the evidence before the Panel demonstrates, Mr. Scott-Hansen and Mr. Carter were making that trip to Brazil to evaluate the additional costs Votorantim had claimed to have incurred in processing the off-spec hard Petcoke it had received in the late summer of 2001 that was apparently discovered in September of 2001. T190,514 Mr. Brenha then goes on in his second paragraph to thank Mr. Scott-Hansen for sending him correspondences and contract documents on the V/A Contract which helped Mr. Brenha to "complete my overall understanding". AE.3 ¶ 2 It is then in paragraph 4 of his e-mail that Mr. Brenha advises that Votorantim intends to reduce the 2002 Premcor shipments from six to five because of "...**some technical constraints we face in our plants related to the use of PEMCOR petcoke.** " AE.3 ¶ 3 He then goes on in the next paragraph of his e-mail to say that he, Mr. Scott-Hansen and Mr. Carter would certainly further discuss that reduction while in Brazil with Mr. Brenha.

Votorantim, through Mr. Brenha testimony alone, is now attempting to convince the Panel that Votorantim's "technical constraints" were due to the "energy crisis". Putting aside the total lack of legal foundation for such an argument for a later point in

this brief, the undisputed facts do not support the argument.  To begin with, this first e-mail in evidence to discuss the 2002 schedule makes no mention of lack of electricity or storage problems. AE.3  This is despite the fact that it was Mr. Brenha's testimony that the Brazilian government, starting in June of 2001, had issued many "laws" putting discipline on energy production. T1178  Mr. Brenha further testified, first that his discussions with Mr. Scott-Hansen regarding the energy crisis were in June and July, but subsequently changed those dates to "between October and November". [5]  Secondly, the only documented technical problems Votorantim was dealing with in early October were the off-spec harder petcoke Mr. Scott-Hansen and Mr.Carter were traveling to Brazil to discuss with Votorantim as Mr. Brenha's own October 3rd e-mail demonstrates. AE.3, T202

Such an understanding of Votorantim's first position in early October 3rd being a concern solely with the hardness, specification, of the Premcor petcoke is supported by Mr. Scott-Hansen's testimony regarding his trip to Brazil. Thus it was his testimony that while in Brazil Votorantim told him and Mr. Carter that it was Votorantim's concern with the hardness of the Premcor petcoke, and the additional costs it had incurred in processing that off-spec petcoke, that precipitated Votorantim's decision to reduce the

---

[5] Interestingly, as Mr. Brenha was about to respond to Mr. Chalos' question which resulted in this answer, Chairman Zambito asked the witness to identify the dates on which he was having his discussions with Mr. Scott-Hansen. T1198  The Chairman then pointed out that the many exhibits in evidence had dates, so that the witness should be referred to those to help establish the timing of events. T1199  Mr. Chalos then responded: "But I don't care to present my case that way."T1199 Similarly, at an earlier point in his direct testimony when Mr. Brenha was again asked by Mr. Chalos about discussions with Mr. Scott-Hansen regarding delaying the Premcor Contract shipments, Chairman Zambito again asked that the witness put his answer in a time frame.T1192  Mr. Ring then pointed out that "There must be some correspondence on that" . T1193  Counsel for Aimcor then replied: "There is, you will see it on cross examination." and Mr. Chalos replied: "I don't think so. We saw it on AIMCOR's cross examination"  T1193  As shall be demonstrated in the Reply Brief when Mr. Brenha's testimony will certainly be discussed in greater detail, by attempting to avoid the written record and repeatedly claiming that Votorantim no longer retained records on these transactions, Votorantim facilitated the false and misleading testimony Mr. Brenha brought before the Panel.

2002 shipments by one cargo. T202 It was, therefore, Mr. Scott-Hansen's testimony that

he understood Votorantim's "technical constraints" to be due to the off-spec, hard,

petcoke; having nothing to do with electric shortages or storage problems. T203

Mr. Nestler concurred in this understanding of what "technical constraints" Mr. Brenha

was referring to in his October 3rd e-mail. T533   Finally, neither does the October 3 e-

mail mention the alleged inventory problems which Votorantim now claims it was

experiencing as a basis for not taking any Premcor petcoke in 2002. This is despite

having received the citation from the Brazilian authorities in July on 2001 which it put in

evidence as proof of its alleged storage problems at the ports.[6] VE.V[7]

    2.  Votorantim Position 2, October 31,2001: Since as Mr. Nestler testified

scheduling the removal of petcoke from refineries such as Premcor is critical for the

refineries' ability to continue processing crude oil, Mr. Scott-Hansen e-mailed Mr.

Brenha on October 31st after his return from Brazil, requesting Votorantim's schedule for

taking delivery of the Premcor petcoke for the remainder of 2001 and  for 2002. AE.5

Mr. Brenha responded the same day that "…in our understanding on the low HGI

petcoke," Votorantim would only lift the last 2001 Premcor petcoke in December of

2001. AE.5 With respect to the 2003 schedule he wrote: "…due the upcoming restrictions

on exchanging energy among regions we have difficulty in foreseeing consumption of

very hard petcoke." Once again Mr. Brenha says nothing about storage problems, despite

the July 2001 citation they now rely on as the only documentary proof of the alleged

---

[6] And even this citation concerns violations for storing petcoke improperly rather than for storing petcoke in excess of permitted limits. VE.V,p.2  Of course the Panel has documentary evidence before it from a third party vessel agent that as late as April of 2002, revealing room for at least 60,000 MT of cargo at the port of Imbituba to which Votorantim brought over 40,000MT of Shell Petcoke in May of 2001. AE.59, VE.Y, T1575 Imbituba of course was one of the ports to which Votorantim also brought the Premcor petcoke. T1170
[7] References to Votorantim Exhibits A-Z

storage problems Votorantim was experiencing. RE.V As for the alleged "energy crisis", now for the first time at the end of October, despite his testimony that the government began acting on the electricity shortages in June of 2001, he refers not to any reductions of electricity, let alone cut offs of electricity to the cement plants, but instead he refers to "upcoming restrictions on exchanging energy among regions" AE.5

On cross-examination Mr. Chalos questioned Mr. Scott-Hansen about his understanding of what Mr. Brenha was telling Aimcor at the end of October, as demonstrated in Mr. Brenha's October 31st e-mail, regarding the energy situation Votorantim was experiencing at the time and asserted in a classic leading question that Aimcor had been advised that: "...Votorantim was experiencing problems with energy restrictions by the Brazilian government, right" T367 Mr. Scott-Hansen's response was as straight forward as his testimony:

> A. That's not correct
> ....
> A. It has more to do with the fact that
> more electricity is needed to grind harder
> petroleum coke in a fine powder, fine enough
> to be burned, and that their mill at Rio Branco
> plant which we visited are perfectly capable
> of grinding hard petroleum coke but it takes
> more time to grind it when it's so hard and the
> quantity of power coming out of the mill was
> not sufficient to keep the flame lit. T367

But of particular import were Mr. Nestler's concerns in October 2001 that Votorantim was taking the delivery of the cheaper Shell petcoke but not the, by then, much higher priced Premcor petcoke. T529-530, AE.61 And as it turned out his concerns were well founded. As both the testimony and the contemporaneous documents unequivocally demonstrate, Votorantim provided a schedule and took not only the

minimum 300,000MT of Shell petcoke in 2003, but also took the additional ten percent at buyers option that the Shell Contract with Votorantim allowed it to take for a total of 330,000MT that year.  T215,528, AE.36,AEB.58,61

In addition to the spurious legal arguments which Votorantim has concocted by trying to compare Votorantim's contractual obligations under the Shell Contract to those in the V/A Contract which are legally baseless as will be addressed later in this brief, Mr. Brenha attempts to obfuscate the obvious economic interest Votorantim had in taking the Shell petcoke over the Premcor petcoke by claiming that Aimcor agreed to delay the Shell shipments in 2002. T1214 Of course, Mr. Brenha testified that Votorantim had not one correspondence or document to prove that Aimcor and Shell agreed to postpone any of the 2002 shipments under the Shell Contract as he claimed in his testimony.  T1715 Nevertheless, even Mr. Brenha initially testified that Votorantim took delivery of 90,000MT of Shell petcoke between January and May of 2002. T1518-9  In fact, those shipments were in January, March, April and June of 2002.  T1722 And in fact, based on Votorantim's bills of lading produced as evidence by them, as well as Aimcor's contemporaneous shipping records, Votorantim took 200,000MT of Shell petcoke between January and June of 2002.  T1726, AEB.58, VE.Q Thus, not only does the testimony, as well as the documentary evidence, demonstrate that Votorantim took all the cheaper Shell petcoke it could have in 2002, but it took those shipments on a regular basis in the winter and spring of 2002 for a total of 200,000MT—almost two thirds of the 330,000MT it would take in 2002.

3. Votranitim Position 3 November 30, 2001:  A full month after advising Mr. Scott-Hansen that he needed to "work with our plants on the needs to 2002" Mr. Brenha

finally came back on November 30th responding to Aimcor's request for Votorantim's schedule for Premcor coke for 2002. AE.7 He first advises that Votorantim took into consideration "our consumption needs", and now for the first time, "the lack of energy in Brazil" in arriving at its decision not to take any Premcor coke in 2002, but to give Votorantim's proposal for the Shell petcoke the following week. AE.7 As we have seen, the Shell proposal turned out to be taking the full available contract quantity in 2002. T215,528 As for the refusal to schedule any Premcor petcoke in 2002, Mr. Brenha wrote:

> "There is no room in our next year plants
> fuel consumption matrix to hard and unstable
> petcoke as Premcor's used to be. Such a poss-
> ibility has been forseen at our Petcoke sales
> agreement into clause 2, item 2.2 and it fits
> strictly to the situation. For that reason we
> will not schedule Premcor petcoke shipments
> to year 2002." AE.7

In light of this e-mail, Chairman Zambito asked Mr. Scott-Hansen:

> Q ,,,It seems to me there is a conclusion made by
> Votorantim that all subsequent shipments were
> going to be Hargrove. That comes out of the
> blue to me.

> A. In fact, the Premcor petroleum coke had returned
> to normal. T212

Mr. Ring followed up Chairman Zambito's question with his own as to whether the off spec cargos had been an anomaly, and Mr. Scott-Hansen replied that indeed it was an anomaly, and that he had personally explained that to Votorantim. T214 Not only did Mr. Brenha's obvious grope for anything to refuse to schedule the Premcor petcoke as Chairman Zambito's and Mr. Ring's questions illuminate, but even his e-mail describes the past "used to be" condition of the Premcor petcoke. So that even Mr. Brenha understood that the future shipments of the Premcor petcoke would not be hard. AE.7 In

fact ,Votorantim accepted the last 2001 shipment of Premcor petcoke in December. T215 That shipment was on spec and no further HGI off spec claims were made by Votorantim. T215

We also know from Mr. Brenha's testimony that when he sent this November 30th e-mail notifying Aimcor for the first time that Votorantim would not take any Premcor petcoke in 2002 that he had consulted with both his boss and the Votorantim legal department. T1510-1511 Nevertheless, once again Mr. Brenha's notice makes no reference to Votorantim's alleged storage problems at the ports or at its plants. AE.7 Neither does his e-mail notify Aimcor of a force majeure or even allude to Clause 13 of the V/A Contract which contains the force majeure provisions. AE.1,7 Instead, with the advice of his superiors and his legal department, he claims now for the first time that Clause 2.2 allows Votorantim to not even ratably decrease the 2002 Premcor petcoke, but to: "...not schedule Premcor petcoke shipments to year 2002" AE.7

First, even the facts Mr. Brenha claimed to consider in deciding to invoke Clause 2.2 are inapposite: "our consumption needs" and "lack of energy in Brazil" AE.7 The facts needed to invoke Clause 2.2 are specified in the clause itself: "If Buyer is not able **for technical or governmental approval to use petroleum coke** ..." AE.1,p.5 Clearly, Votorantim's plants consumption needs, even if one were prepared to disregard the legal consequence of the party to the Votorantim Contract being the parent company and not the cement plants that consume the petcoke, and the alleged lack of energy in Brazil, are not facts establishing a technical or governmental prohibition on the use of petcoke. This, perhaps, partly explains Votorantim's fourth change of position in December of 2001 and January of 2002

4. <u>Votorantim Position 4 December Video Conference and January 3 Point letter</u>:  A few days after receiving Votorantim's November notice that it intended not to purchase or schedule any Premcor petcoke in 2002, Mr. Scott-Hansen arranged a video conference with Votorantim.  T221  During the conference, in contrast to the November 30th notice, Votorantim advised Aimcor that: "They could envision taking 150 to 200,000 tons during 2002 as opposed to 300,000 tons." T226 And as a concession for accepting Premcor petcoke in 2002, Votorantiim advised Mr. Scott-Hansen that they wanted to change the pricing in the Votorantim Contract to be market related, with a price ceiling and floor. T226

As a result of the conference, Mr. Scott-Hansen drafted a letter Aimcor had prepared to be sent to Premcor and which Votorantim agreed to look over before it was sent to assure that it expressed the positions Votorantim wanted to have presented to Premcor.  T227  This draft, referred to as the three point letter during the hearings, contained in point 2 the proposal for Votorantim to now accept between 150,000 to 200,000MT, if Premcor and Aimcor were prepared to extend the contract term to give the coal index pricing mechanism enough time to return the contract price to favorable market levels.    AE.11,p.2  As Mr. Scott-Hansen described what Votorantim was demanding for now accepting some Premcor petcoke:

> "By extending the term of the contract one more year beyond the three, it would allow the cycle to turn again and would allow the price of the petrol- eum coke derived from the coal index to become a quote/unquote, good price for Votorantim in the future." T229

Mr. Nestler also testified that Votorantim was now proposing that it might be prepared to accept part of the 300,000MT of Premcor petcoke, if the price could be

improved by extending the contract term to allow the coal index to move sufficiently so that the contract price would be better than the spot market price for petcoke. T544,5 If anyone were to doubt that Votorantim's position in December had changed from the refusal to accept any Premcor petcoke at the end of November, to accepting up to 200,000MT on the condition that the Votorantim Contract be amended to assure Votorantim a "good price", one need only consider Mr. Brenha's January 24th e-mail responding to the draft 3 point letter:

> 2. Reduction quantity/Extension contract-The full reduction is related to the energy restrictions and environmental threatens we are facing. There is no way for us to move to a partial reduction, as suggested in your draft letter, without supporting another cost increase. **The point is we would consider the partial reduction if the other party were willing to help us bearing some part of the costs which should be achieved restructuring the price as you suggested ahead in the draft letter. AE.11, ¶ 3**

That Votorantim was now by the end of January demanding changes in the contract pricing as a condition for accepting any Premcor coke in 2002, was unequivocally stated by Mr. Nestler in response to a question from Mr. Chalos regarding Mr. Brenha's January 24th e-mail:

> A. Well, the way I read this, we don't like the contract. We have a problem now. We don't like the contract and we need some help restructuring the price. T735

Asked at yet an earlier point of his cross examination by Mr. Chalos about Mr. Brenha's January 24th e-mail Mr. Nestler responded:

> A...So now all of a sudden we going from we have got an energy problem, we can't take the

coke, but we want a new price…" T720

Finally, Mr. Scott-Hansen testified that he understood that Votorantim was physically capable of receiving some of the 300,000MT of Premcor petcoke for a "price concession" in the V/A Contract. T232  Indeed, Votorantim was physically able to accept additional petcoke in the first half of 2002 since even Mr. Brenha conceded that Votorantim had accepted 200,000 MT of Shell petcoke the first half of 2002 and also conceded that Votorantim was able to store that Shell petcoke. T1550,1726, AEB.58, VE.Q

Given these facts, it should be no surprise that Aimcor did not accept what Votorantim was representing as its circumstances in the 3 point letter. T645 As the party in the middle, Aimcor was, nonetheless, prepared to take Votorantim's position back to Premcor to put a deal together for both parties, Votorantim and Premcor, to modify both agreements, the V/A Contract and the Premcor Contract. T645 Asked why Aimcor had to go back to Premcor, Mr. Nestler explained that it went back to the 1999 Clark Agreement that Premcor had taken on with the purchase of Clark in which the transactions had been done through a broker agreement. T646 As he further explained, the Votorantim transaction in 2000 had thus been done with Aimcor standing in the middle between Votorantim and Premcor. T648 As Mr. Nestler put it in response to a question from Mr. Chalos as to whether Aimcor had some strategic purpose in not bringing all the parties together in one discussion to address Votorantim's January demands:

> A. I don't think there was a strategic purpose.
> We saw our role as trying to hold this deal
> together. T738

From Aimcor's view, and based on what makes commercial sense, they had an interest in keeping their supplier of petcoke, Premcor, happy and their customer for that petcoke, Votorantim, happy as well if they could. T.858

    5. <u>Votorantim Position 5, March 18 Declaration of Force Majeure</u>:  The completed version of the 3 point letter went to Premcor on February 4th and Premcor responded on February 5th inquiring whether Aimcor was going to perform on the Premcor Contract. AE.13  Aimcor responded to Premcor on the same day that the Premcor Contract and V/A Contract were intended to be two concurrently executed contracts and suggested that the parties should work together again as they had on the pricing and quality issues that had arisen in 2001 to arrive at a mutually acceptable solution to the new problem raised by Votorantim's refusal to schedule 2002 deliveries. AE.14  A week later, on February 13[th,] Aimcor wrote Votorantim to advise that neither Premcor or Aimcor were prepared to renegotiate the contracts and that Aimcor expected Votorantim to perform under the V/A Contract. AE.15  In the event Votorantim was not prepared to perform and thus cancel the contract by failing to perform in 2002, Aimcor requested written notification of Votorantim's intention not to perform so that Aimcor could proceed to initiate arbitration under the contract. AE.15

    Votorantim's response came on March 18th and was yet another change in position. AE.16  In this correspondence Votorantim alleged that both the "current energy crisis" and the "political climate" frustrated the "purpose and essence" of the Votorantim Contract. AE.15 ¶ 1  Votorantim then went on for the first time in writing[8] to invoke the force majeure clause of the Votorantim Contract as well as Clause 2.2 as a basis for

---

[8] Mr. Scott-Hansen had been informed on the Friday before the Monday March 18th force majeure declaration that Votorantim was planning to declare force majeure. T242

demanding a ratable reduction in the 2002 shipping schedule, and offering to cooperate in agreeing upon such a reduced schedule. AE. ¶ 2 Aimcor was concerned awaiting Votorantim's declaration of force majeure so that Aimcor could in turn pass it on to Premcor. T341 Of course, Votorantim's March declaration of force majeure, ten months after Mr. Brenha claims the "energy crisis" edicts were being issued by the Brazilian government, nine months after Votorantim had received its citation for having stored petcoke in an unauthorized manner, further troubled Aimcor in light of the fact that Votorantim was still taking Shell petcoke at the same time. T657,804 As a result of an objection from Aimcor's counsel that a question by Mr. Chalos called for a legal conclusion, both Chairman Zambito and Mr. Ring directed that Mr. Chalos instead ask Mr. Nestler for his understanding as a commercial man as to whether the circumstances alleged by Votorantim in its March 18th declaration of force majeure might fall within the terms of Clause 13 of the Votorantim Contract. T803 In response Mr. Nestler testified:

> A. My interpretation, the reason we were skeptical about force majeure is because of their performance on the other contracts in the marketplace, as well as the fact we had another contract of the same quality that they were taking every time.
>
> So if you can't store Precor coke, how can you store Shell coke in the same facilities.
>
> So there was reason to doubt that the force majeure was really a force majeure in my commercial inter-pretation. T804

In point of fact, as the Panel will note later in this brief when the legal issues are addressed, Mr. Nestler's commercial understanding actually reflects the legal position as well. Furthermore, as is undisputable that Votorantim's attempt to declare force majeure at least ten months after it first learned of the alleged force majeure circumstances as Mr.

Brenha testified undoubtedly breached its express duty to "promptly notify the other" found in Clause 13. AE.1,p.9

Finally, having adopted its 5th position with its declaration of force majeure on March 18th, and then again in that same March 18th declaration, after three months of silence on the applicability of Clause 2.2, again invoking the clause, Votorantim was concomitantly bound by the provisions of Clause 2.2 to cooperate with Aimcor to arrive at a schedule for reduced shipments. AE.5,13   However, even if the March 18th declaration had any factual or legal basis, points which the forgoing discussion of the facts clearly refutes; rather than cooperating in arriving at a schedule for reduced shipments Votorantim failed to do so and actually adopted yet a sixth position.

6. <u>Votorantim Position 6, Refusal to Provide Reduced Shipping Schedule</u>:  Faced with being in the middle between the buyer and the supplier, it was obviously in Aimcor's economic interest to have the problem Votorantim's refusal to perform resolved without prejudicing its rights under either contract.   As a result, although Aimcor did not accept Votorantim's invocation of Clause 2.2, or it declaration of force majeure under Clause 13, it made numerous demands on Votorantim that it provide a proposed reduced shipping schedule. T911 Not only did Votorantim fail to satisfy the factual predicate for invoking either Clause 2.2 or 13, but it even failed to come forward with the reduced shipping schedule which Clause 2.2 mandated.   Thus, on April 8th Aimcor sent Votorantim an e-mail requesting that Votorantim provide Aimcor with Votorantim's proposed tonnage reduction and delivery schedule for 2002. AE.21, T245 Aimcor asked Votorantim for a schedule again on April 8th. AE.22, T247 A proposed schedule was not only important for the purposes of complying with the Votorantim

Contract terms, but was also critical for the refinery which needed to move the petcoke from the refinery to facilitate continued operations.  T249   Then again on April 9th Aimcor requested that Votorantim provide a schedule for the first 2002 cargo.  AE.24 As with the prior requests, Votorantim failed to provide a schedule. T250 It was not until April 15th that Votorantim responded in an e-mail in which Mr. Brenha wrote that proposing a shipping schedule would be "senseless", and that only if Aimcor accepted Votorantim's declaration of force majeure and invocation of Clause 2.2 would Votorantim be willing to discuss cooperating to arrive at a solution.  AE.27  Ten days later on April 25th, Mr. Brenha unequivocally stated Votorantim's sixth position that demanded that Aimcor accept Votorantim's defenses, or Votorantim would take no steps to either provide a schedule or even cooperate in resolving the dispute:

> Regarding our telephone conversation of ear-
> lier today , I must remind you, as I explained,
> **there will never be any "Votorantim poss-**
> **ible proposal to settle this problem, or even**
> **Votorantim's acceptance to a possible such**
> **Aimcor proposal, until Aimcor assumes a**
> **formal recognition of the force majeure**
> **noticed in our letters from March**
> **18[th] and April 4[th]** ..."  AE.33

Aimcor certainly understood by this message that Votorantim was prepared to do nothing, provide no proposed schedules or even consider possible resolutions, unless Aimcor accepted Votorantim's declaration of force majeure and invocation of Clauses 13 and 2.2.  T271   In point of fact, only if Aimcor agreed to forego any claim it may have had on the first 150,000MT should have taken in 2003, would Votorantim consider taking the remaining 150,000MT in 2003.  T918-9  Thus, not only does Votorantim fail

to assert facts sufficient to invoke Clause 2.2, but it fails to meet the requirement that it cooperate in arriving at reduced tonnage schedule under that very clause.

F. Votorantim's Numerous Actions Incompatible with a Declaration of Force Majeure:

1. Votorantim's Failure to Allocate Performance: As has been noted, Mr. Nestler was questioned closely during his cross-examination regarding his understanding as a commercial man of the applicability of Votorantim's claim of force majeure to the circumstances Votorantim alleged it was facing. But even putting aside the fact that the evidence now before the Panel demonstrates that the allegations Votorantim was making were not supported by the record, Votorantim failed in a number of areas to satisfy the legal requirements of a force majeure. Although those legal requirements will be discussed in greater detail during the discussion of law that follows, Mr. Nestler's understanding as a commercial man in fact comports with those legal requirements. So as he testified, a party claiming force majeure is duty bound to treat all those it deals with during a true force majeure event equally. T884 Thus, in Mr. Nestler's commercial experience, any reduced performance during a force majeure must be allocated equally to all those entitled to receive performance, not on the basis of which performance best serves the economic interests of the one claiming force majeure. T887 For as Mr. Nestler testified, a party claiming force majeure cannot refuse to perform as Votorantim did on the V/A Contract, but continue full performance on the more favorable Shell Contract. T889 Questioned about this by one of the arbitrators, Mr. Nestler testified that such allocations were in fact part of commercial practice in the petcoke trade industry.

T891  And in fact cases will be cited in the legal discussion to follow which support that same principal of equal allocation during force majeure events.

2. <u>Votorantim's Failure to Prove Lack of Storage and Failure to Cure</u>:  Not only did Votorantim fail to allocate performance during its claimed force majeure, but its claim of storage problems preventing it from performing is both without factual foundation and undermined by its own actions in having totally failed to take any steps to cure the alleged force majeure.

First, we now know from local vessel agents that in April of 2002, at the very time Votorantim was claiming force majeure based on its alleged storage problems, the port of Imbituba to which Premcor petcoke was taken had room in storage for at least 60,000MT of cargo. AEB.59,p.6, T1569  In response to a question from Mr. Ring inquiring as to why the vessel agent should not be qualified to provide such information as Mr. Brenha had just testified, Mr. Brenha claimed that the available storage space may have actually been reserved for a non-petcoke cargo. T1573 Of course Votorantim's own exhibits, which included a list of petcoke vessels it had brought to Brazil in 2002 revealed that Votorantim had in fact discharged  40,000MT of Shell petcoke at Imbituba on May 2nd. RE.Y, T1574  Clearly, either the facts asserted as the basis of the alleged storage problems were misrepresented by Votorantim, or at the very least, Votorantim took no steps to cure those alleged force majeure conditions by taking delivery of Premcor petcoke instead of Shell petcoke, and putting it into that available storage in Imbituba.

Second, Mr. Scott-Hansen witnessed during his trip to Brazil that Votorantim indeed had the ability to transfer petcoke by truck between its plants which could have at least alleviated part of its alleged storage problems.T201 In fact, as Mr. Scott-Hansen

testified, Votorantim had storage facilities at its plants, as well as storage facility ports near and further away from its plants. T199-200  Moreover, as Mr. Brenha testified, the plants Votorantim was taking petcoke to were in the southern and central part of Brazil. T1174 Votorantim did in fact also have at least three plants in the north of Brazil.  T1504 And in fact Votorantim had taken a Kock petcoke it had purchased for 2002 to those northern plans.  T1240, VE.O Obviously, Votorantim could have elected to take some of the Premcor petcoke to those plants in an effort to cure portions of the force majeure caused by the alleged storage problems.

Third, and perhaps most importantly, the V/A Contact was an FOB contract providing for delivery aboard Votorantim's vessel in Texas. AE.1,p.6  Thus, once loaded on the vessel, Votorantim was free to move the petcoke to any port in Brazil or elsewhere were it could have discharged, and stored the petcoke to cure its alleged force majeure conditions. T380,412

Finally, Votorantim has offered no proof beyond Mr. Brenha's incredible testimony that environmental concerns by the government were impacting Votorantim's ability to store additional petcoke.  In point of fact, the July citation that was put in evidence by Votorantim says nothing about exceeding storage capacities for petcoke, but instead is a citation for improperly storing petcoke.  VE.V,p.2

3. Votorantim Purchase of Third Party Petcoke during the alleged Force Majeure: As the Panel is aware, Votorantim has already conceded that it purchased and took delivery of all of the Shell petcoke it could get in 2002. T215,528,1549 But Votorantim's conduct is inconsistent with the existence of a force majeure condition, let alone being conduct demonstrating an attempt to cure force majeure conditions.  Thus in February of

2002 Votorantim commits to an amended contract with Kock Oil Marketing in which Votorantim end up taking 370,000MT in 2002, 60,000MT, of which is shipped in January 2002 to Sepitiba—one of the ports the Premcor petcoke was being shipped to as well. T1553, VE.O,p.1,5 It is thus documented that Votorantim was negotiating contracts for the purchases of significant amounts of petcoke, at prices significantly lower than those it was refusing to take on the V/A Contract, at the very time it was declaring force majeure to Aimcor. Aimcor also learned from the market, and concluded based on public export documents, that in April Kock Industries had sold a spot Premcor cargo to Votorantim which was destined for Brazil—again at much lower prices[9]. T262,294,296,570,827,AE.30,39

4. Evidence of Votorantim Consumption and Brazilian Petcoke Imports for 2002: Aimcor has presented as evidence records of exports of petroleum coke from the United States and the Caribbean to Latin America between 2000 and 2003 as compiled by Jacobs Consultancy. AEB.56  Mr. Brenha was of course aware of Jacobs Consultancy as a petcoke industry information resource. T1576     As those records demonstrate, the average amount of imports over those four years was 1,633,751MT for Brazil. T1579, AEB.56  Comparing that average with the year 2002, the year in which Votorantim claimed it was subject to force majeure circumstances, imports were actually up 100,000MT that year. T1579

Examining Votorantim's own consumption of petcoke for those years is equally revealing. As it turned out the last witness Votorantim presented was Julio Rocha who

---

[9] It should be noted that Mr. Nestler testified that he could not say with certainty that the Kock sale to Votorantim occurred. T869  Nor does that April vessel appear on the list of vessels Votorantim produced for the hearings. VE.Y However, as the Panel will recall Votorantim produced its list after the Panel's request after the third hearing and "corrected" its list during the course of the proceedings. T1721

was done in a deposition format. T1754-1951. In June of 2005 Mr. Rocha did a power point presentation at a Petcoke Conference in Houston Texas on behalf of Votorantim in which he depicted Votorantim's petcoke consumption between 1997 and 2005. AE.62(CD), AE.62A(print copy) As that presentation demonstrated, and Mr. Rocha acknowledged, the height of Votorantim's consumption of petcoke was in 2001, and 2002 ranked second highest. AE.62,p.10 T1921 And as Mr. Rocha, who is in fact an engineer, depicted in his graphs, Votorantim's petcoke consumption difference between its height in 2001 and 2002 was less than 100,000MT. AE62,p10 Thus, as with the records of imports into Brazil in 2002, Votorantim's own consumption records for petcoke, which it never produced in these proceedings, certainly did not reflect the activities of a company that was in any way impeded by the "energy crisis" and the "storage problems" it has now raised as a defense to performing under it contract with Aimcor.

   5. <u>The Brazilian Energy Edicts did not Cut-Off Electricity for Commercial Users:</u>

Even if one were to disregard the fact that Clause 2.2 was limited to prohibitions on the "use" of petcoke, not to the availability of electricity, and that Votorantim as the holding company which was the only party to the V/A Contract was not impacted by the energy edicts, the energy edict itself does not support Votorantim's position that it was subject to energy cut-offs in 2002. First, the edict itself certainly does not limit, let alone prohibit, the use of petcoke in Brazil in 2002. VE.X Further, as the Energy Edict in evidence makes clear in Article 13 ¶ 2, consumer customers are subject to electric power suspension for exceeding consumption targets. VE.X, p.000027 In contrast, commercial customers who exceed consumption targets as provided for in Article 16 ¶ 2 are required

to pay the power company a "MAE practiced price" or offset the excess consumption in one month by accumulated savings previous months.  VE.X,p.000030, T1631  Only if the monetary compensation provided for in Article 16 ¶ 2 is "not viable", will the commercial customer face the possibility of electricity suspension under Article 16 ¶ 3  Moreover, under Article 16 ¶ 5 the governmental authority overseeing the energy edict is authorized to alter the application of Article 16 applicable to commercial customers for "relevant circumstances".   VE.X,p.000030, T1633   Presumably a company like Votorantim, with a legal department able to send lawyers across a hemisphere to observe arbitration hearings, had the ability to have those lawyers make a case at their local authority that Votorantim's unique situation for the use of electricity demonstrated "relevant circumstances" sufficient to avoid energy suspensions under any circumstances.

In fact, in regard to these energy regulations, Mr. Ring asked Mr. Brenha:

> Q. How are these regulations enforced? Did they
> shut off electricity?
>
> A No, actually we had some reduction in pro-
> duction. They, lets say, run less, they preserve,
> running less energy that it could be at full cargo.
> T1181

Nor according to Mr. Brenha, did Votorantim ever incur any penalties for exceeding consumption targets.  T1189  Thus, although Votorantim could have helped cure its alleged "energy crisis" by accepting monetary penalties for over consumption or at least sought partial exemption for "relevant authorities", it obviously chose not to do so.  But in doing so it failed to discharge its duty under Clause 13 to "use all the reasonable good faith diligence, and efforts to remove or cure the force majeure as quickly as possible." AE.1,p.9  But then again, by sitting on its hands as it apparently did, Votorantim could

continue taking the cheaper Shell petcoke and have cover for refusing to take the more

expensive Premcor petcoke.

LAW

## I. THE VOTORANTIM CONTRACT SHOULD BE INTERPRETED BY ITS PLAIN MEANING AND TRADE USAGE

As the Panel is by now no doubt aware, Votorantim is urging on the Panel an interpretation of Clause 2.2 which would have the express language: "...not able for technical or government approval to use petroleum coke..." extended to reach government regulations, directly regulating the conservation and consumption of electricity, which then in turn may have had an impact on the availability of electricity, needed to process petcoke to then be used as fuel in its cement plants. Votorantim further urges on the Panel the view that the language of Clause 2.2, interpreted to mean that government penalties issued for environmental violations in the storage of petcoke at one port, which then allegedly inhibit the further importation and storage of petcoke, and which then somehow curtail the use of petcoke should also be covered under the clause.

As the preceding discussion of the evidence before the Panel reveals, Votorantim has undoubtedly failed to credibly demonstrate that the actions taken by the government with respect to electric consumption and environmental enforcement at the Brazilian ports in 2002 actually even indirectly impacted either its use of petcoke or its storage of petcoke. Just considering Votorantim's purchase, importation, storage and use of all the Shell petcoke, as well as Koch petcoke alone in 2002, and its concession that it was using petcoke as fuel throughout 2002 by itself refutes Votorantim's factual claim. But even putting aside the irrefutable evidence that neither an "energy crisis" nor "storage problems", but rather the significantly cheaper prices of the Shell and the spot market for petcoke in 2002, as opposed to the price of the Premcor petcoke, were what was inhibiting Votorantim's interest in taking the Premcor petcoke in 2002, the applicable

33

contract law on the interpretation of contract provisions does not support Votorantim's

strained reading of Clause 2.2

Professor Corbin, one of the leading authorities on the law of contracts, has

explained the words in a contract are to be given their ordinary meaning:

> "...It is a very commonly reported statement
> that words are to be given 'their plain, ordinary,
> and popular meaning;' but this is always limited
> by adding some such clause as the following: 'in
> the absence of relevant evidence indicating that
> the words were used with a different meaning.'
> If there is in fact a 'plain, ordinary, and popular'
> meaning of words used by the parties, that fact is
> evidential that the parties used then with that mean-
> ing. It is fully overcome, however, as soon as the
> court is convinced that one of the parties used and
> understood the words in a different sense and that
> the other party had reason to know it."
> Corbin on Contracts ¶ 542, p.515

The words employed in Clause 2.2 which are at issue are "to use petroleum coke".

Giving those words their ordinary and plain meaning would surely limit the effect of the

clause to the direct prohibitions on the use of petcoke, certainly not the issuance of

regulations on the availability of electricity or the availability of storage facilities.

Nothing in the record before the Panel suggests that the words at issue in Clause

2.2 were used and understood by Aimcor and Votorantim in the expanded way that

Votorantim urges on the Panel so that "use of petroleum coke" becomes "any

governmental action in non-petcoke matters which ultimately impacts the use of

petroleum coke. In point of fact, the undisputed evidence before the Panel establishes the

application of trade usage to Clause 2.2 would limit the scope of the clause to only

technical problems or governmental action prohibiting the use of petcoke. In fact, even

Julio Rocha who negotiated the V/A Contract for Votorantim testified that his concerns

were with the "use of petcoke", and certainly not with storage problems or the possible

limits on the consumption of electricity.  T1923,1947

The law here on the applicability of trade usage as a basis for interpreting contract

language in a contract for the sale of goods is well settled:

> "The agreement of the parties includes that
> part of their bargain found in course of
> dealing , usage of trade, or course of
> performance. White and Summers,
> Uniform Commercial Code, p.84 (1972)

Trade usage is in fact defined in the Uniform Commercial Code as:

> "¶ 1-205(2)
> A usage of trade is any practice or method of
> dealing having such regularity of observance
> in a place, vocation or trade as to justify an
> expectation that it will be observed with
> respect to the transaction in question. Id.

Moreover, as the principal treatise on the UCC explains, it is not necessary that both

parties be aware of a trade usage, as long as it is used sufficiently in the trade to "justify

and expectation" of its usage. Id.

Here the Panel has before it un-rebutted testimony from Mr. Scott-Hansen, who

worked on this language with Julio Rocha of Votorantim, that these provisions of Clause

2.2 were used in prior transactions in the petcoke trade to accommodate a new user to

petcoke as a fuel source to deal with technical problems in using the petcoke or

governmental prohibitions on the use of petcoke most typically in failing to issue permits

for its use as a fuel source.  T133-4,1801  Applying that trade usage thus makes it clear

that Clause 2.2, understood within the context of trade practice, should be interpreted to

reach only technical or governmental actions prohibiting the use of petcoke and not just

35

any technical problems or governmental actions that might, through a chain of events, inhibit the use of petcoke as Votorantim now urges on the Panel.

## II. CLAUSE 13 DOES NOT PROVIDE VOTORANTIM WITH THE RIGHT TO DECLARE FORCE MAJEURE

First, the contract in which Clause 13 is found is the V/A Contract which is between Votorantim and Aimcor. AE.1  The cement plants that use the petroleum coke, allegedly experiencing  the "energy crisis" were not parties to the contract.  Thus Votorantim which experienced none of this alleged event cannot now invoke Clause 13 for its defense in failing to perform under the V/A Contract. Second, the V/A Contract was an FOB purchase contract under which Votorantim was bound to purchase petcoke as it was loaded aboard its vessel at loading in Texas. AE.1,p.6  None of the events allegedly occurring to the cement plants in Brazil interfered with Votorantim's ability to "purchase, take delivery and to pay" for the petcoke as it was loaded in Texas. As a result, Clause 13 would be inapplicable to excuse Votorantim from its failure to perform in Texas by purchasing, taking delivery and paying for the petcoke as provided for in the contract.

Concomitantly, the law of Missouri which governs this dispute under Clause 15.1 of the V/A Contract, Clause 13 as drafted does not cover an "energy crisis" or a "an environmental problem".  It has been long established under Missouri law that one is bound to perform under a contract subject to explicit contract provisions to the contra:

> "…The general rule is that when one con-
> contracts to perform he is bound to do so,
> even though accidents or forces over which
> he has no control intervene, where no pro-
> vision is made against such contingencies"
> *Gross v. Suburban Motors,* 282 SW 864,5
> (Ct. App, 1955)

Indeed, Clause 13 is such a contract provision, but it simply does not reach the

events Votorantim claims to fall within the clause.  As Professor Calamari, an authority

on contract law has written about the scope of force majeure clauses:

> "...The force majeure clause reads:  *"Neither party*
> *shall be liable for its failure to perform hereunder*
> if  said performance is *made impracticable due to*
> *any occurance* beyond its reasonable control,
> including acts of God, fires, floods, wars, sab-
> otage, accidents, labor disputes or shortages,
> government laws, ordances, rules and regulations."
> Assume that the event on which the claimed
> impossibility is based is an act of the OPEC
> cartel.  The italicized introductory language
> seems broad enough to cover any contingency.
> However, under a rule of interpretation that
> Pasess under the Latin name of *ejusdem*
> *generis*, the broad introductory language is
> cut down by the specific language the follows,
> so that if the particular risk-an act of the cartel-
> is not indicated in the list, it will not serve as an
> excuse unless it is very similar to the specified
> events. There is some authority that the rule of
> *ejusdem generis*  may be avoided by using the
> phrase 'including but not limited to" rather than
> simply 'including' ". Calamari and Perillo,
> The Law of Contracts, 4[th] Ed. p.528-9 (1998)

As with the OPEC illustration, an alleged energy crisis under which a government

entity issues edicts setting targets for the consumption of electricity, and imposing

sanctions for exceeding those targets, is clearly not one of the particular risks listed in

Clause 13.  AE.1, p.9  Nor does Clause 13 contain the inclusive language, "but not

limited to" to which would expand the clause to perhaps cover the alleged "energy

crisis".  AE.1,p.9  As such, Clause 13 could not be invoked by Votorantim here to declare

force majeure.

III. <u>VOTORANTIM FAILED TO PROVIDE TIMELY NOTICE OR TAKE ANY</u>
<u>STEPS TO CURE OR AMELIORATE THE ALLEGED FORCE MAJEURE</u>

Even if Clause 13 were applicable, as the evidence before the Panel establishes, Votorantim failed to advise Aimcor until March of 2001 of the existence of an alleged force majeure despite having itself know of the energy edicts at early as June of 2001, the environmental citation as early as July of 2001 and having only discussed the alleged energy and storage problems in December of 2001 without declaring force majeure. VE.V,X, AE.9,18 Clause 13 under which Votorantim claims force majeure mandates that the party claiming force majeure: "...shall promptly notify the other..." AE.1,p.9 At best four months, and at worst eight months, giving notice after learning of the event of a force majeure is clearly not "prompt".

More importantly, the law governing the declaration and the conduct of the parties during a force majeure is well settled. Clause 13 itself requires that:

> **"The affected party shall use all reasonable**
> **good faith diligence, and efforts to remove**
> **or cure the force majeure as quickly as**
> **possible.** AE.1,p.9

Here Votorantim totally failed to act within the requirements of the law as it applies to events of force majeure.

The law in Missouri recognizes the all of the circumstances giving rise to a claim of force majeure must be beyond the control of the party claiming force majeure. Thus, in *Suburban Newspapers v. Kroger*, 886 F.2nd 1060,1061 ( 8th Cir., 1989) the a panel of the Eighth Circuit applied Missouri law in holding that a party that claiming force majeure could not do so if the facts demonstrate that negative impacts of the force majeure were not beyond its reasonable control. Similarly Votorantim could have taken numerous

actions which would have been reasonable to avoid the impacts of the alleged force majeure the cement plants were experiencing. To mention just a few: 1.Take less Shell petcoke and third party petcoke such as the January 2001 spot sale in order to use and store Premcor petcoke, T1549, VE,O 2.Accept monetary fines for exceeding energy targets and request "relevant circumstances" from the authority regulating energy conservation to obtain more electricity to maintain production and petcoke use, VE.X,p.000030 3.Modify the mixture between components for cement production to keep up petcoke use but lower quality standards which had already been done to some extent to maintain production, T1332-4 4.Find alternative storage locations outside Brazil, use the Premcor petcoke in its North American operations which it had purchased by July 2001 or resell it FOB load port Texas AE.1,p6, T1760 5.Agree to scheduling changes without demanding price concessions or contract waivers. AE.33 and 6.Produce electricity at its cement plants, as it had in other facilities, to use in this case for the processing of petcoke for fuel. T1331. Needless to say, this list of actions should have attempted to diligently remove or cure the force majeure conditions the cement plants were allegedly experiencing is not exhaustive—only illustrative.

Finally, as Mr. Nestler's commercial experiences lead him to conclude, Votorantim had an absolute legal duty to allocate its performance, the purchase of petcoke, equally against all of its existing contractual obligations to purchase petcoke in 2002. The law of Missouri as found in its Uniform Commercial Code encodes this duty to allocate. Thus, when a party's performance is excused by the occurrence of an unforeseen event such as force majeure, the excused party must allocate their remaining

ability to perform equally and reasonably across all its contractual commitments. Thus

UCC400.2-615(b) as adopted in Missouri provides:

> "Where the causes mentioned in paragraph (a)
> affect only a part of the seller's capacity to
> perform, he must allocate production and
> deliveries among his customers but may
> at his option include regular customers not
> then under contract as well as his own req-
> uirements for further manufacture.  He may
> so allocate in any manner which is fair and
> reasonable.

Further, as the commentary on the Missouri code provides this performance must be:

"...prorated evenly among them regardless of price." UCC400.2-615, Comment 11

Votorantim totally failed to make such an allocation, choosing instead to take all

of the cheaper Shell and third party petcoke such as Koch's in 2002 and refusing to take

any of the more expensive Premcor petcoke.

CONCLUSION

W H E R E F O R E, Aimcor, respectfully prays that the Panel find that

Votorantim breached the October 24, 2000 contract of sale between Aimcor and

Votorantim Cimentos Ltda.


Dated: New York, New York
       March 3, 2006


                                  LAW OFFICES OF ANTHONY J. MAVRONICOLAS
                                  ATTORNEYS FOR AIMCOR
                                  75 WASHINGTON PLACE, SUITE ONE
                                  NEW YORK, NEW YORK 10011
                                  TEL: (212) 253-6040
                                  FAX: (212) 253-7171


ANTHONY J. MAVRONICOLAS
OF COUNSEL

EXHIBIT "G"

------------------------------------------X

IN THE MATTER OF ARBITRATION BETWEEN

APPLIED INDUSTRIAL MATERIALS
CORPORATION,

                            CLAIMANT,

    - AND --

VOTORANTIM CIMENTOS LTDA.,

                      RESPONDENT.

------------------------------------------X

BEFORE:
PETER J. ZAMBITO, ESQ.
CHAIRMAN
WALTER R. MUFF
JACK F. RING

REPLY BRIEF FOR
APPLIED INDUSTRIAL MATERIALS CORPORATION

LAW OFFICES OF ANTHONY J. MAVRONICOLAS
ATTORNEYS FOR AIMCOR
75 WASHINGTON PLACE, SUITE ONE
NEW YORK, NEW YORK 10011
TEL: (212) 253-6040
FAX: (212) 253-7171

ANTHONY J. MAVRONICOLAS
OF COUNSEL

## INTRODUCTION

This Reply Brief is submitted on behalf of Applied Industrial Materials Corporation ("Aimcor") in reply to "Votorantim Cimentos LTDA's Post Arbitration Brief " ("V.Brief") that has been filed on behalf of Votorantim Cimentos LTDA ("Votorantim"). Aimcor has previously submitted its "Main Brief for Applied Industrial Materials Corporation" ("A.Brief"). As was done in its Main Brief, Aimcor will address the evidence before the Panel which Votorantim has relied on in its Main Brief in the "Facts" section that follows, as Votorantim's legal arguments will be primarily presented in the "Law" section. But before proceeding, Aimcor would respectfully request that the Panel keep in mind a few salient facts as it proceeds.

Aimcor and Votorantim had entered into the now disputed contract in 2000 for the FOB purchase of Premcor petcoke by Votorantim. Around that same time Aimcor and Votorantim had entered into another contract for the FOB purchase of equal quality Shell petroleum coke by Votorantim. By 2002 the price of the Premcor petcoke was $10 a ton higher than the price of the Shell petcoke. In 2002, Votorantim purchased and stored the maximum amount of the cheaper Shell petcoke and purchased none of the Premcor petcoke.

## FACTS

A. The Clark/Premcor/Aimcor/Votorantim Contracts:

Votorantim offers the Panel nothing on the series of contracts that led up to the October 24, 2000 contract for the sale of petroleum coke ("petcoke") between Aimcor and Votorantim ("V/A Contract") which gave rise to these proceedings. AE.1[1], T129,143[2]

Although Votorantim chooses to ignore the point, as Mr. Scott-Hansen testified that refineries such as Premcor and its predecessor Clark are the only sources of petcoke require transparency as to all aspects of the marketing of their petcoke. T155 And as David Nestler, testified, that refinery in this case wanted to be: "very, very involved in the marketing of the petroleum coke." T488 This explains Premcor's active participation in the negotiation of the V/A Contract and in negotiating the problems that arose during the course of performance of that contract. AE.1,3, T.190,514 Nevertheless, Votorantim repeatedly stresses Premcor's position rejecting Votorantim's various rationales for refusing to purchase and schedule deliveries of Premcor petcoke in 2002. V.Brief,p.13 Obvious incredulous as to Votorantim being prevented from taking Premcor petcoke because of an "energy crisis" or "storage problems", while purchasing all of the significantly less expensive Shell petcoke, Premcor was understandably not prepared to participate in the price re-negotiations of the contracts that Votorantim was seeking as a condition of taking any Premcor petcoke in 2002. Thus, since Premcor was prepared to not only participate, but actually sign the amendment to the V/A Contract as "accepted and authorized by Premcor", and actively participated and ultimately paid for

---

[1] References to Aimcor Exhibits 1-39
[2] References to Transcript pages 1-1951

3

Votorantim's additional cost incurred in processing the off-spec material that had been shipped in the summer of 2001, if Votorantim's claims in 2002 had been credible and believable rather than a ruse to avoid an expensive contract, both Premcor and Aimcor would, based on past dealings, undoubtedly have been willing to address any legitimate problems Votorantim was confronting.

B. The Shell Contract:

Votorantim of course makes no mention in its brief of the contemporaneous contract Votorantim had with Aimcor for the purchase of Shell petcoke in 2002. (Shell Contract) ,V.Brief, p1-20  Having taken the maximum 300,000 MT in 2002, in addition to the optional 10% at buyers option, of identical petcoke in specification, but significantly less in price, Votorantim obviously had no interest in addressing this bete noir.

It is anticipated that in its Reply Brief that Votorantim will attempt to argue, as it did at the hearings, that the Shell Contract contained different language in the force majeure clause than the V/A Contract and did not contain Clause 2.2 pertaining to technical or governmental approval being denied for the use of petcoke.  Leaving aside the total lack of factual basis for Votorantim to build a defense for failing to perform in 2002 under either of those clauses, Votorantims argument is logically flawed.  If indeed Votorantim had confronted a true force majeure situation in 2002, the subtle differences in language between the two force majeure clauses would have been irrelevant.  AE.1,p9, 36,p.14  As both Mr. Scott-Hansen and Mr. Nestler testified, as commercial men, that although the language may have varied, the intentions behind both clauses were identical

to relieve parties from performance upon the occurrence or unforeseeable events that could not be overcome with reasonable diligence. T347,805

Similarly, the presence of Clause 2.2 in the V/A Contract and its absence in the Shell Contract would not have permitted Votorantim to keep taking the Shell petcoke, but not the Premcor petcoke. AE.1p.6    First, the clause specifically refers only to Votorantim not being able to "use" petcoke because of a lack or withdrawal of "technical or governmental approval to use". AE.1,p.5  Not one fact Votorantim has suggested, let alone proven, that Votorantim could not use the Premcor petcoke in 2002 because of "technical or governmental approval" having been denied or withdrawn.   But even if unforeseen governmental actions withdrawing approval for the use of Premcor had occurred as Votorantim now claims, force majeure would have been declarable under both the V/A Contract and the Shell Contract making Clause 2.2 legally redundant.  The only real difference between the two contracts was the price of the petcoke--**$4.50 a ton under the Shell Contract and $14.50 a ton on the V/A Contract, for a difference of $10 a ton between the two contracts in the fall of 2001.**  T217,527-8, AEB.61[3]

C. The Contractual Provisions of the Votorantim Contract:

Votorantim docs dutifully quote Clause 2.2 and Clause 13 for the Panel in its Main Brief. V.Brief, p.3 But it totally neglects to examine the actual terms of the clauses to determine their applicability to even the circumstances it claims to have been experiencing in Brazil in 2002.

With respect to Clause 2.2, as noted above, none of the facts alleged by Votorantim demonstrates that "**technical or governmental approval to use petroleum coke in one or more cement plants**" impacted Votorantim let alone prevented it from

---

[3] References to Aimcor Brenha Exhibits 39-61

5

performing under the V/A Contract by purchasing and then scheduling delivery of the Premcor petcoke in 2002.  There simply is no evidence that either **technical or governmental approval to use** petcoke was denied or withdrawn from Votorantim in 2002.  To the contrary, not only did Votorantim continue to purchase and store the Shell petcoke in 2002, but even as Mr. Brenha testified, Votorantim was using petcoke as fuel in its cement plants throughout the time it claims it was subject to force majeure conditions excusing it from performing under the V/A Contract in 2002. T1651

As with Clause 2.2, Votorantim also conveniently fails to examine the actual provisions of the Force Majeure Clause in its Main Brief and their applicability to the circumstances Votorantim claims to have been facing in 2002.  V.Brief,p.3  First, putting aside for the moment the lack of credible proof Votorantim offered for the "unprecedented…energy crisis" it now claims prevented it from performing, Votorantim ignores both the specific terms of the clause and the procedure required under the clause for successfully raising the force majeure clause as a defense to its total failure to perform in 2002.  As the Clause provides, the force majeure circumstances giving rise to the defense  must be because of compliance with a governmental order which prevents performance of "its obligations hereunder" or when the "operations contemplated hereunder are interrupted".  AE.1,p.9  None of the circumstances Votorantim claims to have confronted in 2002 satisfy those provisions.  A simple reading of the V/A Contract identifies the obligations and operations contemplated under the contract:

> Seller agrees to sell and to deliver, Buyer agrees to
> purchase, take delivery and to pay for petroleum
> coke described hereunder, under the conditions set
> forth herein. AE, p.5

6

As an FOB sales contract providing for delivery aboard the buyers vessel in Texas, the V/A Contract with Votorantim was a contract for the sale of goods in the United States. The parties' obligations and operations are uncomplicated: seller delivers FOB, buyer has a ship available to take delivery and pays for the goods. End of transaction. That a non-party to the contract, various cement plants in Brazil, may have been having problems with storage and electric consumption, facts Aimcor disputes, simply do not fall within the obligations and operations contemplated in an FOB sales contract. For the Panel to find otherwise would require the arbitrators to re-write the contract to a delivery contract in Brazil and to make the cement plants parties to the contract after the fact.

Not only does Votorantim ignore the fundamental provisions of Clause 13, but they also ignore the equally important procedural requirements of the clause pertaining to notice and good faith efforts to cure the effects of force majeure circumstances. Thus, Clause 13 requires that the party claiming force majeure "promptly notify the other". AE.1,p.9   Here, although the circumstances giving rise to the alleged force majeure began, according to Mr. Brenha, in May or June of 2001, Votorantim did not declare force majeure until March 2002—ten months later. T.1218, VE.V[4] Similarly, as pointed out in Aimcor's Main Brief, Votorantim took no action to cure the alleged force majeure, let alone act in good faith to diligently do so as Clause 13 mandates. A.Brief, pp38-40 Nor did Votorantim make the required allocation among its supply contracts as the law mandates in such circumstances giving rise to force majeure declarations, choosing instead to take all of the cheaper Shell petcoke and to refuse to take any of the more expensive Premcor petcoke in 2002. A. Brief,p.38

---

[4] Reference to Votorantim Exhibits A-Z

D. Performance under the Votorantim Contract until October 2001:

As has been noted, Votorantim has nothing to say in its Main Brief about the active role Aimcor, Premcor and Votorantim took in initially negotiating the V/A Contract and then in resolving problems that arose during the course of performance. AE.1,3, T190,514   Nonetheless, if Votorantim's claims of force majeure had been credible, or if Votorantim had not demanded that the parties accept its claim of force majeure before Votorantim would cooperate in resolving the problem, then both Aimcor and Premcor would have, based on their past course of dealing, attempted to resolve Votorantim's alleged problems.

E. Votorantim's Failure to Perform the Votorantim Contract after October 2001 :

As Aimcor pointed out in its Main Brief, Votorantim's failure to perform under the V/A Contract in 2002 had to do with the higher price of the Premcor petcoke in comparison to the less expensive Shell petcoke.  A.Brief, pp10-12   Thus, despite the alleged force majeure in 2002, Votorantim was able to purchase and store 330,000MT of Shell Petcoke, but was using petcoke as fuel throughout 2002. T215,528,1651   And Votorantim was using the Shell Petcoke in 2002 during which Brazil imported 100,000MT more of petoke from the United States than it had in either 2001 and 2002. AEB.56, T1579   Similarly, even Votorantim's own consumption records reveal that 2002 was the second highest year for consumption of petcoke for Votorantim. And 2002 had consumption of 100,000MT less than its largest consumption year of 2001. AE.62,p.10,62A,T1921   Of course, not only does Votorantim avoid any discussion of Votorantim's consumption of petcoke in 2002, but as will be discussed below, failed to produce critical documents that would have revealed both Votorantim's consumption and

storage of petcoke in 2002. Instead, Votorantim offers the Panel generalizations from the record upon which it urges the Panel to excuse Votorantim from having to perform in 2002. But an examination of those generalizations, placed in the context of the documentary record before Panel exposes that sham. But before addressing those generalizations in the context of Votorantim's repeated changes of position in 2001 and 2002 which expose an unhappy contract partner shifting about for any reason not to perform, the Panel should recall significant questions from the Panel and from Aimcor during the hearings regarding Votorantim's failure to produce important documents which would have revealed what was occurring in Votorantim's cement plants in 2002.

1. Votorantim Repeated Failure to Produce Documentary Proof of Force Majeure Effects: As counsel for Aimcor emphasized for the Panel in his opening statement at the first hearing in this matter:

> "...I pointed out to the panel at the very
> beginning-our discovery request were
> very focused. We believe-they made
> statements about what was happening in
> Brazil and what they were doing, what
> they couldn't do, the force majeure. We
> have asked to see what they were actually
> doing." T104

Then during Mr. Brenha's direct testimony, Mr. Ring observed that the information the Panel was presented with regarding Votorantim's imports into ports in 2002 was confusing so he requested documents clarifying the point. T1251. Mr. Ring followed up with a request that Votorantim produce their actual records of their annual petcoke imports based on Mr. Brenha's testimony Mr. Ring noted had confirmed such records were obtainable. T1255 Mr. Chalos then replied to Mr. Ring: "Okay, but that is inconsistent with my understanding of the documents they maintain." T1255 And as the

•

Panel will note, not only did Votorantim claim that such contemporaneous import records no longer existed, but not one e-mail reflecting any discussions regarding the "energy crisis" or its "storage problems" between Votorantim's employees, or with any third party, has been put into evidence by Votorantim. VE.A-Z   Amazingly, this is despite Mr. Brenha's testimony that he consulted with both his boss and Votorantim's legal department before sending his November 30, 2001 e-mail declaring for the first time that Votorantim would not be taking any Premcor petcoke in 2002. But based on a series of subsequent questions raised by the Panel, Votorantim claimed that it had failed to retain any e-mails pertaining to this matter despite the fact that litigation had been threatened by Aimcor as early as February of 2002. T13381344   And then again, despite acknowledging in March of 2002 that it had consulted counsel regarding this dispute, Votorantim did not preserve any inventory records which would have revealed what their documented inventory was in 2002. The Panel of course ordered the production of any such documents, whether kept in digital form or written, but none were ever produced or put into evidence as proof of the effects of the "energy crisis" and the "storage problems" on Votorantim. T1353,1356

Votorantim's claim of no inventory records prompted Mr. Ring to ask: "What about the cost of inventory if you don't know what your inventory quantity is?" T1275 Mr. Brenha again claimed not to have any contemporaneous records on inventory, which prompted Mr. Ring to ask: "I would think that if you are getting towards a position where you are going to be fined by the port because of excess inventory, you damn well want to know what your inventory was" Mr. Brenha's response: Votorantim did not keep regular data for those inventories. T1277 Chairman Zambito then asked that there must be

10

invoices for Votorantim's storage costs, and Mr. Brenha incredibly replied that Votorantim pays such invoices but does not keep them. T1278  The Panel then ordered the production of such inventory records for Votorantim's plants and discharge ports, but none were ever produced or put into evidence. T1348,50

With respect to any documents and correspondence regarding other suppliers who were providing Votorantim with petcoke in 2003, Mr. Chalos advised the Panel that "...they're no longer maintained by Votorantim" . T1317-8  Nor did Votorantim allegedly maintain any of the proposed shipping schedules that may have been exchanged with other petoke supplier like TCP or Koch to Votorantim in 2003.  T1352 The Panel in fact ordered an additional search for such documents, but none were ever produced let alone introduced into evidence as contemporaneous evidence of what was really occurring in Votorantim's cement plants and their purchase and use of petcoke throughout 2002. T1320-1,2

With respect to contemporaneous records demonstrating Votorantim's consumption of electricity, Votorantim's electric bills for 2001 and 2002 were requested by counsel for Aimcor. T1327 Mr. Chalos replied: "He ('Mr. Brenha) doesn't know" T1327 This then prompted Mr. Ring to ask: "There must be electric bills from the power company?", to which the witness finally replied: "Of course". T1327 The Panel then ordered the production of those electric bills. T1334 None were ever produced, let alone put into evidence to establish Votorantim's consumption of electricity during the time it claims to have been experiencing force majeure conditions excusing it from performing under the V/A Contract.

11

All of these response from Votorantim claiming that it no longer maintained these records, prompted Mr. Ring to ask:

> "One thing I would like to see tomorrow
> morning, and you certainly should be able
> to do it, is a clear definition of your retention
> policy. T1363

The response from one of Votorantim's in-house lawyers who attended the hearing to defend the 30 day retention policy Votorantim was claiming as preventing it from producing these undoubtedly relevant documents was:

> "There are no laws regarding that, because its
> your own correspondence, you are free if you
> receive a letter, you can toss it in the trash"
> T1363

Mr. Ring's response: "You must agree 30 days is crazy" T1364 To which Mr. Chalos replied: "Mr. Ring, most U.S. companies are 30 days, as a matter of fact..." T1364 Prompting Mr. Ring to say: "That's not true" T1364  Mr. Ring then went on to explain the basis for his incredulity:

> "It's my company and I am giving authority to
> some clerk or even a trader to give away infor-
> mation that may impact the company and manage-
> ment later on?
>
> In other words, you have middle level manage-
> ment making corporate decisions. **I find that
> strange.**
>           ...
> A trader involved in a negotiation like these
> guys were, and something goes wrong or goes
> right and he deletes all the e-mails after 30 days
> and then litigation comes up? **I find that
> extraordinary.** T1365
>           ...
> We all grew up in the business and we all kept
> records for three to five years in the shipping
> business; but **I am staggered to think it's 30**

**days**." T1367

Votorantim's failure to present as evidence even one contemporaneous document or correspondence, beyond what it was sending to Aimcor, tending to prove that the alleged energy crisis did in fact significantly halt the use of petcoke in the cement plants or that storage was indeed unavailable would be a sound basis for the Panel to draw the negative inference that indeed the energy crisis had no substantial effect on Votorantim's use of petcoke in 2002. Or at the very least, the Panel should find that Votorantim failed to carry its burden of proof establishing the impact of the alleged force majeure on its plants, its ability to store petcoke and the existence of facts sufficient to invoke tonnage reductions under Clause 2.2.

Without documentary evidence to prove its case, Votorantim primarily depends on the testimony of Mr. Brenha to carry its burden of proof. Mr. Brenha of course testified that he "threw away" the notes he made during these events. T1417 Much of his testimony, however, was either false or misleading as even the Panel's questions to him and his responses regarding Votorantim's unavailable documents and correspondence makes clear. But even when testifying as to matters of substance Mr. Brenha's testimony was inaccurate at best and purposely misleading at its worst. This is best seen in considering the Brenha testimony put in the context of the numerous change of positions Votorantim adopted in trying to justify Votorantim's refusal to perform in 2002.

2. <u>Votorantim Position 1, October 3,2001</u>: Interestingly, Votorantim's Main Brief avoids any mention of Mr. Brenha's e-mail of October 3rd in which Votorantim announced that it would reduced the 2002 Premcor shipments from five to six because "technical constraints". AE.3 Mr. Brenha however makes no mention of either energy

issues or storage problems in this October e-mail despite the fact that he conceded on cross examination that he had allegedly been concerned with the energy situation since the previous June. T1583-4

3. <u>Votorantim Position 2, October 31, 2001</u>:  Votorantim's Main Brief does address Mr. Brenha's October 31st e-mail in which he now raises Votorantim's alleged "difficulty in foreseeing consumption of very hard petcoke." V.Brief, p.5, AE.5  But although Votorantim's brief now characterizes that "difficulty" as " 'difficulties' in its use, storage and consumption of petcoke", the e-mail never suggests use and storage as its difficulty, only "consumption of very hard petcoke". V.Brief,p.5 AE.5

4. <u>Votorantim Position 3, November 30, 2001</u>:  Although Votorantim in its brief does consider Mr. Brenha's November 30th e-mail in which he now advises that Votorantim will not schedule Premcor purchases in 2002, they argue that Mr. Brenha "again, confirmed" in that November 30th e-mail Votorantim's position. V.Brief,p.5 Nonsense. The October 31st e-mail claimed difficulty in consuming Premcor petcoke and claimed difficulty in foreseeing consumption, while in the November 30th e-mail the changed position was that Votorantim would purchase no Premcor petcoke in 2002. AE.5,7  Votorantim's brief then goes on to assert factual statements, without one citation to the record before the Panel beyond the 3 point letter Aimcor prepared to present the circumstances Votorantim was claiming to Premcor, regarding Votorantim's inability to "fully consume" petcoke, allegedly growing petcoke stockpiles and that the "Brazilian government directed Votorantim to cease any further deliveries of pet coke." V.Brief,p.5n5 The reason these assertions are given no citations by Votorantim is because they are not true other than the concession that Votorantim was indeed consuming

14

petcoke in 2002. But even that assertion is inaccurate, since the documentary evidence before the Panel reveals that Votorantim's consumption of petcoke in 2002 was the second highest ever, while total Brazilian importation of petcoke was at a three year high in 2002  AEB.56,62

Rather than referring to the record to establish time references as to what Aimcor may have known at that time, Votorantim uses an unacceptably broad brush in asserting in its brief that: "At all relevant times, Aimcor was fully apprised of the severity and the wide-reaching impacts of the dire situation in Brazil. A.Brief, p.6 More unsupported factual assertions without citations to the record.  Instead, they point to Mr. Scott-Hansen's testimony to support Votorantim's further uncited assertion that Aimcor was aware at some again unspecified time of a litany of problems Votorantim claims to have been experiencing in Brazil. A.Brief,p.6  But even in that testimony Mr. Scott-Hansen makes it clear that he answered the question put to him by Mr. Chalos as to Votorantim's expressed need for more energy, not as a general proposition on the need for energy, but as Mr. Scott-Hansen's recognition of Votorantim's need for more energy to process "hard petroleum coke".  T368    And as Mr. Scott-Hansen made clear in his next answer to another question from Mr. Chalos, the additional energy was needed to process the off-spec and hard Premcor petcoke Votorantim had received, not as acceptance of a general energy problem which Votorantim now attempts to twist that testimony into being.  T368  Mr. Scott-Hansen did testify honestly about learning in 2002 about energy problems in the Aluminum industry which required "huge amounts of electricity" to produce Aluminum. T383  But nothing in that testimony supports Votorantim's argument that Aimcor was aware, let alone accepted as true, Votorantim's claims as to the problems it

15

was confronting in Brazil regarding the availability of energy and storage problems. V.Brief,p.8

Votorantim then turned to the testimony of Mr. Nestler to try and support its argument that Aimcor had "knowledge of the troubles Votorantim were experiencing." V,Brief,p.8 Again, what Mr. Nestler testified to was: "...,I mean there was market knowledge there were some issues in Brazil." T612  Such knowledge does not translate into specific knowledge of the" troubles Votorantim was experiencing" beyond what Votorantim was telling Aimcor at various stages during Votorantim's shifting positions.

The final proofs Votorantim offers on the problems it was allegedly confronting in 2002 are extracts from Mr. Brenha's testimony.    V.Brief,p.9 These include the statement that Votorantim had in 2002 to reduce the amounts of petcoke it had been purchasing, which is refuted by the fact it took all the Shell petcoke it could get in 2002. T215,1190,1529  It also includes Mr. Brenha's assertion that Votorantim could not keep taking petcoke to its plants or the ports because of storage problems, which is refuted by the vessel agent's report that 60,000MT of storage was available in at least one of Votorantim's discharge ports in April of 2002 and that Votorantim discharged Shell petcoke into that very storage the following month. T1191,1573-4  And it also included Mr. Brenha's testimony that Votorantim was fined because inventories at some ports had been exceeded, which is refuted by the fact that only one port fine is in evidence and that was a fine for storage of petcoke in an improper manner not for exceeding capacity limits[5]. T1228, VE.V

---

[5] Interestingly, in its Main Brief Votorantim first acknowledges in footnote 5 that the fines were for improper storage causing dust problems and then in footnote 6 claims the fines were for exceeding storage capacity at the port.

5. Votorantim Position 4, December Video Conference and the January 3 Point Letter:    Only at the time of the video conference in December of 2001 did Votorantim finally bring up alleged storage problems and then the alleged effects of the energy crisis as excuses for failing to perform in 2002 and as the representations Votorantim wanted Aimcor to make to Premcor. Votorantim quotes the letter in which Aimcor repeated those claims by Votorantim as proof that Aimcor "expressly acknowledged the severe effects of energy crisis on Votorantim". V.Brief,p.12 More nonsense. As the last sentence in the very first paragraph makes clear, the representations made in the letter were Votorantim's not Aimcor's: "...**At Votorantim's request** Aimcor prepared a few drafts which we have now fine tuned into a summary for Premcor's review of those **points which Votorantim would like us to present** as 'starting points for discussion' ' AE.12

6. Votorantim Position 5, March 18 Declaration of Force Majeure:  Votorantim devotes a number of pages of its brief to quotations of Votorantim's belated declaration of force majeure on March 18th and the subsequent response from Aimcor. V.Brief,pp.14-18 It in fact says nothing about those exchanges, so that Aimcor would refer the Panel to Aimcor's Main Brief in which Aimcor pointed out the relevant facts surrounding those exchanges, and Aimcor's serious doubts as to the veracity of Votorantim's claims. A.Brief, pp.22-4

7. Votorantim Position 6, Refusal to Provide Reduced Shipping Schedule: Although Votorantim asserts in its Main Brief that it was Votorantim's view that it was entitled under Clauses 2 and 13 of the V/A Contract to reduce the quantities of petcoke it would accept in 2002, it offers the Panel no evidence of ever having proposed such a reduced tonnage schedule. V.Brief,p.18 It does not do so because it never offered such a

17

reduced schedule despite Aimcor's repeated requests that Votorantim do so.  A.Brief, pp.24-6

F.Votorantim's Numerous Actions Incompatible with a Declaration of Force Majeure:

1.Votoranitm's Failure to Allocate Performance:  Votorantim of course fails to discuss any allocations it made among its contract suppliers during the  alleged force majeure in an effort to minimize damages for all of its suppliers, because it failed to make any allocation.  V.Brief, p.26  Votorantim chose instead to take the less expensive Shell and market petcoke. T527,1553

2.Votorantim's Failure to Prove Lack of Storage and Failure to Cure: As proof of its alleged storage problems, Votorantim offers the Panel only the testimony of Mr. Brenha and the July 2001 citation Votorantim received at one of the ports for improperly storing petcoke. V.Brief,p.10-11,n5,6  As has been demonstrated here, based on the available documentary record, none of which was provided by Votorantim since it allegedly failed to retain any documents or correspondence in this matter, not only was storage available, but Votorantim used it for Shell petcoke and third party petcoke like the 350,000 MT Kock petcoke it took delivery of in 2002. T1553

3.Votorantim's Purchase of Third Party Petcoke during the alleged Force Majeure: Here again, Votorantim's Main Brief is silent, so Aimcor will only refer the Panel to Aimcor's Main Brief where the evidence before the Panel on these third party purchases in 2002 during the alleged force majerue is discussed.  A.Brief,p.28

4. Evidence of Votorantim Consumption and Brazilian Petcoke Imports for 2002: Despite Votorantim's failure to present any evidence on its alleged reduced use of petcoke in 2002 and reduced availability of electricity in 2002, even in the face of the

Panel's order that Votorantim's electric bills be produced, Aimcor's Main Brief discusses the documentation proving the high and what appears to be normal level of Votorantim's petcoke production in 2002. A.Brief, p.29

   5.The Brazilian Energy Edicts did not Cut-Off Electricity for Commercial Users: Although Votorantim initially refers to the Brazilian energy edict in its Main Brief, it interesting neglects to examine the substance of the edict. V.Brief,p.4 But Aimcor does discuss the actual substance of the edict in its Main Brief and it is indisputable that the edict never banned the use of petcoke as fuel and did not provide for the cut off of electricity to commercial customers such as Votorantim. A.Brief, p.30   Instead, customers such as Votorantim were incentivized by monetary penalties to stay within consumption targets and were even provided with a procedure for seeking exemptions from those consumption penalties. A.Brief,p.30 But as Mr. Brenha testified in response to a question from Mr. Zambito,   Votorantim never was penalized for exceeding its consumption targets. T1187, 1187 And as Mr. Brenha again testified in response to Mr. Ring's first question to him on electricity being cut off as enforcement of these regulations:

> Q. How were these regulations enforced?
>    Did they shut off electricity?
> A.(In English) **No, actually had some**
>    **reduction in production. They, lets**
>    **say, run less, they preserve, running**
>    **less energy than it could be at full**
>    **cargo.** T1181[6]

Clearly, Votorantim was never barred from using petcoke and never had its electricity cut off. But even more importantly, neither did it choose to pay any penalty to consume the

---

[6] Mr. Chalos repeatedly attempted to have Mr. Brenha change this initial obviously unfavorable answer, which prompted Chairman Zambito to cut off the questioning by observing that "we are getting very repetitious" and to point out that Mr. Ring's question had been answered to everyone's satisfaction. T1190

electricity it now claims it needed to "fully consume the quantity of pet coke it was contractually obliged to purchase" V.Brief, p.5

G. <u>Votorantim's Alleged Counterclaim prematurely Before the Panel</u> :   Surprisingly, Votorantim has incorrectly presented the Panel with arguments in support of its alleged counterclaim in this set of briefs. V.Brief, p.12 But the issues as to Votorantim's alleged counterclaim were specifically reserved for any subsequent proceedings after the issuance of a partial final award on Aimcor's case-in-chief on Votorantim's liability under the V/A Contract alone. T438-439

<u>LAW</u>

## I. <u>THE VOTORANTIM CONTRACT SHOULD BE INTERPRETED BY ITS PLAIN MEANING AND TRADE USAGE</u>

Votorantim concedes in its Main Brief that the language in both Clause 2.2 and Clause 13 are unambiguous. V.Brief,p.21 As such, as has been noted above, Clause 13 by its very terms only covers force majeure events which directly impact and excuse performance under the V/A Contract. The alleged energy crisis and storage problems in Brazil, which Votorantim now claims were affecting the end user cement plants, are clearly not events which could directly impact Votorantim's sole duties under the V/A Contract to perform by paying and taking delivery in Texas. AE.1,p.9 Similarly the unambiguous language of Clause 2.2 only allowed for reductions in tonnage for "…technical or governmental approval to use petroleum coke…" AE.1,p.6 None of the circumstances Votorantim has alleged as triggering its right to invoke Clause 2.2 fall within the requirements of the clause.

As Votorantim has also conceded, it is the intent of the parties that governs the interpretation of contract language. V.Brief,p.21 Here Mr. Scott-Hansen, Mr. Nestler and Mr. Zweerts have explained that Clause 2.2 was intended to only reach circumstances when Votorantim, as a new user of petcoke as a fuel was prohibited from using petcoke because of technical difficulties or governmental order. T131-2, 616, Z.Aff. ¶ 3[7] Even Mr. Rocha who negotiated the V/A Contract for Votorantim testified that he was concerned because the use of petcoke as a fuel source was a "new process" for Votorantim. T1923 And as such, as Mr. Rocha's testimony on direct examination

---

[7] Reference to Affirmation of Frank Zweerts dated January 15, 2006.

revealed, it was the prohibitions on the "use" of petcoke he was concerned about, certainly not storage problems or alleged electricity scarcity:

> Q. Were there other concerns that you had
>    on behalf of Votorantim Cimentos?
> A. Yes.
> Q. What were they?
> A. **That we would be able to use this
>    petcoke.** T1767

Clearly, the parties' intention here was to protect Votorantim from technical obstacles or governmental regulations directly preventing the use of petcoke by Votorantim as a fuel source. As a result the attenuated interpretation Votorantim is urging on the Panel, any action by the government which might impact the rate at which Votorantim was using petcoke, is simply untenable.

Faced with these difficulties, Votorantim urges the Panel to apply the doctrine of *contra preferentum* to construe Clause 2.2 in the overly expansive manner Votorantim seeks. V.Brief,p.22

First the facts do not support the argument. Thus, during his direct testimony, Mr. Rocha testified in response to one of Mr. Chalo's questions:

> Q. Who draft the contents of Clause 2?
> A. Well, we did together. T1801

Second, even if one were to argue that Mr. Scott-Hansen, having sent the last wording to Mr. Rocha, made Aimcor the drafter, still would not allow for the application of the doctrine the way Votorantim suggests.

The law here is well settled, as the reporter's notes on the more recent draft of the Restatement of Contracts, 2nd, makes clear that the doctrine of *contra preferentum*: "...has less force when the other party has taken an active role in the drafting process, or

is particularly knowledgeable..." and "...the rule does not apply if the non-drafting party's interpretation is unreasonable." Restatement of Contracts. Second, § 206, p.106 Further as Professor Corbin has pointed out in his treatise on the law of contracts, there are numerous cases illustrating the inapplicability of the doctrine when the parties mutually participated in the drafting of the contested clauses. Corbin of Contracts, § 24.27 (Rev Ed, 1998) Further, he also noted: "The 'contra preferentum' device is intended to aid a party whose bargaining power was less than that of the draftsperson". Id. Here not only is Votorantim's proposed interpretation of Clause 2.2 unreasonable, but Votorantim also took an active role in the drafting of the clause as a party of equal, if not greater, bargaining power. The doctrine would therefore be inapplicable in this case.

Even the reported Missouri case Votorantim cites on this point does not support the position Votorantim is urging on the Panel. V.Brief,p.22 Thus, in *Village of Cairo v. Bodine*, 685 SW2d. 253,265 (Mo.Ap, 1989), although the court recognized that an ambiguous contract term can be construed against a drafter, the court held that its role was still to determine the intentions of the parties:

> " 'the entire contract, subsidiary agreements, the
> relationship of the parties, the subject matter of
> the contract, the facts and circumstances surrounding
> the execution of the contract, the practical construction
> the parties themselves have placed on the contract by
> their acts and deeds, and other external circumstances
> which cast light on the intent of the parties' "

And has been noted already, the parties' intentions for Clause 2.2 could not have been as Votorantim now must claim if the clause is going to be read the unreasonably broad way Votorantim has urged it on the Panel. Simply put: "use" means use in the unambiguous way it was utilized in the clause.

23

II. <u>CLAUSE 13 DOES NOT PROVIDE VOTORANTIM WITH THE RIGHT TO DECLARE FORCE MAJEURE</u>

Perhaps no argument is more misplaced than Votorantim's repeated assertion that Mr. Scott-Hansen's drafting of the 3 Point letter for Votorantim was an acknowledgement of Votorantim's allegations as to the circumstances giving rise to their ultimate declaration of force majeure. V.Brief, p.28  As the very letter itself states, the 3 Point letter was: "...a summary for Premcor's review of these points which Votorantim would like us to present as 'starting points for discussion' " AE.12  And as Mr. Scott-Hansen who prepared the letter testified, the letter was prepared at Votorantim's request to present Votorantim's alleged circumstances regarding storage problems and the energy crisis to Premcor. T227

III. <u>VOTORANTIM FAILED TO PROVIDE TIMELY NOTICE OR TAKE ANY STEPS TO CURE OR AMELIORATE THE ALLEGED FORCE MAJEURE</u>

Since Votorantim in its Main Brief fails to assert that it either complied with the procedural requirements of Clause 13 by providing Aimcor with timely notice of the alleged force majeure or to take any steps to cure or ameliorate the alleged force majeure by allocating its reduced performance among its various contract partners, Aimcor will simply refer the Panel back to Aimcor's Main Brief on this issue. A. Brief, pp.38-40

24

<u>CONCLUSION</u>

W H E R E F O R E, Aimcor, respectfully prays that the Panel find that

Votorantim breached the October 24, 2000 contract of sale between Aimcor and

Votorantim Cimentos Ltda.


Dated: New York, New York
       March 13, 2006


LAW OFFICES OF ANTHONY J. MAVRONICOLAS
ATTORNEYS FOR AIMCOR
75 WASHINGTON PLACE, SUITE ONE
NEW YORK, NEW YORK 10011
TEL: (212) 253-6040
FAX: (212) 253-7171


ANTHONY J. MAVRONICOLAS
OF COUNSEL

EXHIBIT "H"

6C78OXBC

1

```
    6C78OXBC
 1  UNITED STATES DISTRICT COURT
 1  SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x
 2
 3  OXBOW CARBON AND MINERALS LLC,
 3
 4                  Petitioner,
 4
 5            v.                        06 Cv. 7763 (LBS)
 5
 6  VOTORANTIM CIMENTOS LTDA,
 6
 7                  Respondent.
 7
 8  ------------------------------x
 8
 9                                  December 7, 2006
 9                                  5:10 p.m.
10
10  Before:
11
11                  HON. LEONARD B. SAND
12
12                                  District Judge
13
13                  APPEARANCES
14
14  LAW OFFICES OF ANTHONY J. MAVRONICOLAS
15      Attorneys for Petitioner
15  BY:  ANTHONY J. MAVRONICOLAS
16
16  CHALOS O'CONNOR & DUFFY
17      Attorneys for Defendant
17  BY:  GEORGE M. CHALOS
18
18
19
19
20
20
21
21
22
22
23
23
24
25
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2

```
    6C78OXBC
 1            (In open court)
 2            THE COURT:  This is a motion to vacate an arbitration
 3  award.
 4            Who represents the movant?
 5            MR. MAVRONICOLAS:  I do, your Honor.  Anthony
 6  Mavronicolas.
 7            THE COURT:  You are?
 8            MR. CHALOS:  George Chalos, and I represent Votorantim
```

Page 1

6C78OXBC

```
 9   Cimentos.
10             THE COURT:  I got some reply papers which came to
11   chambers in the afternoon.  It's been a very hectic day.
12             Let me ask the petitioner's attorney, what is the
13   relief that you are seeking?
14             MR. MAVRONICOLAS:  I think there are two possibilities
15   of relief, your Honor.  I think one of them would be a partial
16   vacation of just that portion of the arbitration award, or, as
17   Judge Sweet indicated in the case that was before him more
18   recently, Blue Bell, that a distinct possibility would be that
19   the court could remand the arbitration award back to the
20   arbitrators and say, Gentlemen, please consider not just the
21   plaintiff's claim, but also consider the respondent's
22   counterclaim, and give the petitioner an opportunity to put in
23   a defense.  That's really the issue.  That's really the
24   substance of what is going on here.
25             THE COURT:  Reading your reply brief, I understand
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

6C78OXBC

```
 1   your position to be that regardless of the breadth of the
 2   agreement to arbitrate, there was a stipulation submitted to
 3   the arbitrator, is that correct?
 4             MR. MAVRONICOLAS:  Yes, your Honor, regarding the
 5   procedure of the arbitration.
 6             THE COURT:  And that the award, insofar as it went
 7   beyond the stipulation, is contrary to that stipulation.
 8             MR. MAVRONICOLAS:  That's correct, your Honor.
 9             THE COURT:  And the stipulation provided that the
10   other matter, the matter of the counterclaim, would be dealt
11   with by the arbitrator, but subsequent to a determination of
12   the plaintiff's claim.
13             MR. MAVRONICOLAS:  Yes, your Honor.  If you would want
14   me to explain the underlying transaction, I can explain it.
15             THE COURT:  I don't know that that's really relevant,
16   but let me see.
17             One of these alternatives is that I vacate the portion
18   of the arbitration award which went beyond the stipulation and
19   remand it to the arbitrator now to deal, pursuant to the
20   stipulation, with the counterclaim.
21             MR. MAVRONICOLAS:  Yes, your Honor.  But I would add
22   that I would think that it might not even be necessary to
23   vacate any part of the award.  This is a partial final
24   arbitration award.  The arbitrators still have to decide a
25   number of issues, at the very least, questions of damages.  By
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

6C78OXBC

```
 1   remanding it to the arbitrators, which you can do according to
 2   Judge Sweet's decision, what would basically happen, you can
 3   remand it the arbitrators, ask them to address not just the
 4   claim, as they have already done, but also to address the
 5   counterclaim and address any other issues the parties need to
 6   bring forward.
 7             THE COURT:  Why would they address the claim which was
 8   clearly within the stipulation and which, as I read these
 9   papers, is not challenged?
10             MR. MAVRONICOLAS:  Exactly.  They wouldn't.  Really,
11   again, all they would have to do is open up the hearings, that
12   they are going to do anyway on the damages, on the question of
13   the counterclaim.  The respondent would come forward with their
```

Page 2

6C78OXBC

14    counterclaim.  Then we would be given an opportunity to put our
15    defense in to that counterclaim.  Then the arbitrators could do
16    one of two things.  They could either then rule on the
17    counterclaim, which is the final issue on liability, or say,
18    Look, we want to hear damages as well, and then go on with
19    damages.  That's just a question of what they would want to do.
20         I would think that both for the arbitral process, in
21    terms of efficaciousness, and in terms of what you are entitled
22    to do under the Federal Arbitration Act and under the New York
23    statute, you're remanding it to the arbitrators and saying,
24    Look, gentlemen, we want you to address all the issues the
25    parties want to bring before you, including their counterclaim
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                                    5

6C78OXBC

1     and our defense to that counterclaim.  All we want is an
2     opportunity to put in a defense to a counterclaim that they
3     have improperly ruled on.  That's what it comes down to.
4          THE COURT:  Let me hear from the respondent.
5          MR. CHALOS:  Thank you, your Honor.  Good evening.
6     George Chalos on behalf of Votorantim Cimentos.
7          Your Honor, we take the position that, first off, this
8     application is improperly before the court.  It's time-barred.
9     There is 90 days from delivery of the award.  This matter was
10    filed 91 days after the date of the award and under the case
11    law cited in our papers that time-bar date is a strict date,
12    not one that is subject to deference or discretion.
13         So our first point is the matter is improperly before
14    the court and needs to be dismissed as a matter of law.
15         Secondly, your Honor, if we go beyond that, and this
16    is only in the case if we go beyond our first argument, our
17    position is that it was clear from the very, very beginning
18    what the scope of the bifurcation agreement was.  All issues of
19    liability were bifurcated from issues of damages.  It made no
20    sense for us to proceed in a piecemeal fashion.  All my
21    witnesses from my corporate defendant are in Brazil.  We would
22    never have agreed to do it in a piecemeal fashion.
23         What the intention always was was to do liability
24    first, because we viewed this case, as a worst-case scenario,
25    as being a setoff, where we may not have performed for a
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                                    6

6C78OXBC

1     certain period of time, but we were sure that they didn't
2     perform for a larger period of time.  The amount of damages in
3     the setoff would be for sure in our favor, and at that point in
4     time it would be a business decision by the Brazilians whether
5     or not they wanted to proceed with the proceeding up in New
6     York, because frankly it had to be cost-effective for them to
7     do so.
8          THE COURT:  Was there, as the petitioner alleges, a
9     stipulation presented to the -- is it one arbitrator or a
10    panel?
11         MR. CHALOS:  A panel of three.
12         THE COURT:  -- to the panel setting forth the scope of
13    the arbitration?
14         MR. CHALOS:  There was.
15         THE COURT:  Didn't that stipulation call for the
16    counterclaim issue to be dealt with after the liability on the
17    first claim was resolved?
18         MR. CHALOS:  Absolutely not, your Honor.  Let me
                              Page 3

6C78OXBC

19  expand, if I may.
20          There was initially no agreement between the parties
21  as to the scope of whether or not there was going to be a
22  bifurcation at all.  In fact, when we had worked out initially
23  between counsel the preliminary agreement to bifurcate the
24  claims, we went to the panel jointly and the panel said, No, we
25  are not going to do this in a piecemeal fashion, we are going
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                    7
6C78OXBC

1   to do it together.  It wasn't until two hearings later that the
2   panel said, Wait a minute, let's revisit that issue of
3   bifurcation because it seems to make sense, once they got a
4   better flavor of what the case was.  So the panel said
5   expressly, There is a lot of confusion here.  We want a joint
6   written submission detailing the scope of this bifurcation
7   agreement.  I did that.  September 2, 2005, Exhibit B.
8           THE COURT:  Exhibit B.
9           MR. CHALOS:  To our reply.
10          THE COURT:  Exhibit B to your reply.
11          MR. CHALOS:  If it pleases the court, I will hand it
12  up.  May I?
13          THE COURT:  Yes.
14          MR. CHALOS:  Now, your Honor, I am a bit handicapped
15  not having it in front of me, but I can tell you from memory
16  exactly what it says.  We also cite it in our papers.
17          What it says is, to the panel, I am taking the
18  laboring oar on behalf of myself and Mr. Mavronicolas and all
19  the parties to memorialize the scope of our agreement, and our
20  agreement is that we are bifurcating liability from damages.
21  That was never responded to.  That was never objected to.
22  That's the basis on which the rest of the arbitration
23  proceeded.
24          Now, your Honor, I would like to point out to the
25  court that following the issuance of the partial final award,
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                    8
6C78OXBC

1   there was a long series of exchanges, which is Exhibit 19 to
2   Mr. Mavronicolas's -- I say Mr. Mavronicolas.  I should say
3   Oxbow's -- let me correct myself.  Mr. Mavronicolas's
4   affirmation in support of petition to vacate.  Exhibit 19.
5           THE COURT:  Exhibit 19 to that?
6           MR. CHALOS:  Yes.  There was a long series of
7   exchanges after the initial request came from Oxbow and AIMCOR
8   to the panel to reconsider and vacate its award.  After that
9   long series of e-mail exchanges, the panel said, Look, we have
10  reviewed all the exchanges, we have reviewed our files, we have
11  reviewed the record, and we think that what we did was
12  perfectly correct.  To this court I suggest --
13          THE COURT:  This has already been brought to the
14  arbitrators --
15          MR. CHALOS:  Correct, your Honor.
16          THE COURT:  -- with a claim that it was beyond the
17  stipulation.  And they had already determined that they did not
18  exceed the stipulation.
19          MR. CHALOS:  Absolutely correct.  I don't believe
20  there is any dispute about that.
21          What I submit to the court is that the controlling
22  case law is clear that the decision of the arbitrators needs to
23  receive great deference because they are indeed the people best
                        Page 4

6C78OXBC
24    suited to decide the scope of that arbitration agreement and
25    bifurcation agreement which that proceeding proceeded under.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
                                                                    9
        6C78OXBC
 1              Unless the court has any questions of me, I think I am
 2    prepared to rest.
 3              THE COURT:  Let me ask petitioner, what is your answer
 4    to the objection that you're out of time?
 5              MR. MAVRONICOLAS:  Well, there is a very distinct
 6    answer.  We proceeded under the Federal Arbitration Act.  The
 7    Federal Arbitration Act provides for proceeding within three
 8    months of the award.  As the moving papers demonstrate, our
 9    petition was filed within those three months.
10              In addition to that, your Honor, we in fact did move
11    under the New York statute to give the arbitrators an
12    opportunity to correct their error.  What the New York statute
13    provides for, your Honor, is that from the time that the
14    arbitrators make their decision, which in this case was August
15    18, the time under the New York statute runs.  So that our
16    filing on September the 27th was both timely under the Federal
17    Arbitration Act and timely under the New York statute.
18              Your Honor, more importantly, I would like to speak to
19    the arbitration agreement a moment and the agreement on how to
20    handle these proceedings.  We have put in our moving papers
21    repeated citations to the record and what occurred here.  In
22    those citations to the record, it is clear that it was always
23    our intention and understanding and the parties' understanding
24    that we would address AIMCOR's claim first and then address the
25    counterclaim.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
                                                                   10
        6C78OXBC
 1              In fact, Mr. Chalos refers to his September 5th
 2    e-mail.  What he doesn't refer to, your Honor, is a later one
 3    in which the arbitrators come to him and say, Mr. Chalos, are
 4    you done presenting your witnesses?  And Mr. Chalos, in exhibit
 5    number -- let me now refer to our exhibits, and I will just
 6    read it because it's simple enough just to say.  November the
 7    30th.  This is a month and a half after he does his e-mail in
 8    which he talks about addressing issue, not all issues, of
 9    liability and damages later.  And in parentheses he puts
10    issues.  He doesn't say all.  That's really where the
11    arbitrators got thrown off.  But what he did say, and which is
12    clear, in an e-mail from him on November 30, the chairman
13    asked, Are you going to go forward with any more witnesses
14    before we get to a briefing schedule?  And he says, At present,
15    we, on behalf of Votorantim, do not anticipate any further
16    witnesses with respect to the pending proceedings regarding
17    AIMCOR's claim.
18              Your Honor, we proceeded on the basis of AIMCOR's
19    claim, and if you give me a moment just to give you the facts
20    of the case why it made sense.  The whole dispute has to do
21    with our client selling to his client a series of petroleum
22    coke, and in the course of that, they came back and said, We
23    have got an energy crisis in Brazil, and under that energy
24    crisis we can't perform under the contract.  That situation
25    existed for nine months.  Then in August of that same year,
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
                                                                   11

6C78OXBC

6C78OXBC
1  they came back and said the energy crisis is over, we want to
2  proceed with the contract.
3        We said from the outset, and it's in the record,
4  anything I say here right now is going to be documented here in
5  the transcript, because if you compare our papers to theirs, I
6  was very careful to refer both to either the transcripts, the
7  briefs that were submitted, and what essentially happened was,
8  we said to the arbitrators, Look, if there truly was a force
9  majeure, if truly there is a defense to their performance under
10 the contract, then that resolves the principal issues in this
11 case and then maybe we can get to something else.  And what I
12 was thinking was, once we decide the question whether they have
13 got a defense under the contract, then we can proceed to maybe
14 settle the case.  That is really what was going on in my mind.
15       What the arbitrators did in prematurely deciding their
16 counterclaim, without giving us any opportunity at any point to
17 say, we have a defense to starting the contract up again, I
18 wrote in my brief, your Honor, in my reply brief, when we first
19 saw the counterclaim, and I can quote that verbatim, This is
20 premature.  We never agreed to address the counterclaim at this
21 point.  We want to have an opportunity to do that.
22       THE COURT:  What is troubling me is the respondent's
23 counsel says this dispute as to whether the counterclaim issue
24 was or was not fully before the arbitrators was submitted to
25 the arbitrators and so it would be pointless to refer it back
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              12
6C78OXBC
1  to them.  You're not asking for a referral to the arbitrators.
2  You're asking me, in essence, to overrule the arbitrators'
3  determination that on the record before it the counterclaim was
4  within the scope of the submission.
5        MR. MAVRONICOLAS:  Absolutely, your Honor.
6        THE COURT:  That's a much heavier burden.
7        MR. MAVRONICOLAS:  Let me take it further.  Under the
8  New York arbitration statute, you're given an opportunity,
9  before proceeding in the courts, and there is reason for it, to
10 at least give them an opportunity to look at an error that they
11 have made, to correct a mistake in their award.  They looked at
12 it.  They were wrong to begin with for making their decision.
13 I then, under the state statute, hey, look, let's at least give
14 them an opportunity to address that, go forward to them and say
15 do that.  Mr. Chalos comes back and says, No, no, you shouldn't
16 be here, this belongs in the court.  What the arbitrators did
17 was essentially say, No, we have decided it as we can.  Then
18 Mr. Chalos tried to proceed before the arbitrators on the
19 damages and the arbitrators said, No, what we want to do is we
20 want the court to basically decide this issue before we go any
21 further.
22       THE COURT:  The arbitrators want the court to decide
23 the issue.
24       MR. MAVRONICOLAS:  What they have done is they have
25 made a determination as to what they thought they should have
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              13
6C78OXBC
1  before them.  They have decided that.  Then what we did was we
2  proceeded in the courts.  The other side wanted to then proceed
3  on damages and the arbitrators said no.
4        THE COURT:  Do I have all of that before me?
                        Page 6

6C78OXBC

5        MR. MAVRONICOLAS:  Yes, you do, including the
6   application that I made to the arbitrators and the rationale
7   under which we made that application.
8        THE COURT:  What you're saying is if I determined
9   that, I would not be usurping any authority of the arbitrators,
10  but I would be responding to the request of the arbitrators
11  that I resolve it?
12       MR. MAVRONICOLAS:  What I am suggesting, your Honor,
13  is that what you're given the authority to do under both the
14  New York statute and the federal statute is in circumstances in
15  which they have either exceeded their authority, and they are
16  not the ones to determine that, or in which they have acted
17  improperly by not allowing someone to make their defenses,
18  you're then entitled to look at that and say, Gentlemen, that's
19  right, that is in fact --
20       THE COURT:  I thought I understood you to say the
21  arbitrators said, No, let the court tell us.
22       MR. MAVRONICOLAS:  Mr. Chalos went forward to say
23  let's do damages.  What the arbitrators said was, No, we are
24  not going to do damages, we are going to wait and see what the
25  court decides.  There is a decision by the arbitrators in this
                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                              14

6C78OXBC

1   record in which they say, No, we think we decided properly.
2   That is correct.  But then Mr. Chalos tried to go forward on
3   damages and the arbitrators said, No, we are going to wait and
4   see what the court has to say.
5        THE COURT:  Obviously, the decision here requires the
6   court to have a complete familiarity with what happened, and
7   obviously because of many, many other matters which have
8   occupied the court, the court has not yet done that, and so I
9   will reserve decision.
10       MR. MAVRONICOLAS:  Thank you, your Honor.
11       MR. CHALOS:  If I may, we believe that, as Mr.
12  Mavronicolas has suggested, all of the relevant correspondence
13  and documentation is in the record, in different spots but it's
14  all there.  We have made a request for costs having to come
15  here and defend this matter.  We believe there really is no
16  good-faith basis for a dispute.
17       THE COURT:  I am aware of that, and obviously I can't
18  deal with that until I have determined the merits.  If I
19  determine that the petitioner's case is totally without merit,
20  then I will consider your application for costs.
21       MR. MAVRONICOLAS:  We have responded to that in our
22  reply brief.  The question here is, what did the parties agree
23  to in terms of this procedural stipulation?  If in fact, your
24  Honor, the court determines that what was agreed to was that we
25  would do the claim first and the counterclaim second, we have
                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                              15

6C78OXBC

1   made an application to say, Look, there would be appropriate
2   sanctions, but it wouldn't be against us, it would be against
3   the other side, because it's pretty clear factually.
4        THE COURT:  What you are both telling me is that
5   before one addresses the question of sanctions, one has to
6   address the question of merits.  I think that's a little
7   obvious, but thank you for calling that to my attention.
8            Decision reserved.
9            (Adjourned)
                      Page 7

6C78OXBC

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

G

EXHIBIT "I"

7/19/05 - Applied Industrial Materials and Votorantim Cimentos Arbitration
Hearing #3

Page 833

1     Nestler - Continued Cross - (Chalos)
2   partial volume somewhere in the neighborhood of
3   150 to 200,000 tons.  So from October of 2001
4   until here, like I mentioned earlier, it was a
5   moving target, it was uncertain on what volume
6   they wanted.
7           Until we got to the March 18th
8   letter, that's the first time they initially, in
9   writing, declared we do not want any of the
10  volume.
11      Q     But we looked earlier today at
12  Exhibit 11, that's a January 24 letter.  They were
13  pretty clear they could not accept anything in
14  2002, no matter what the circumstances?
15      A     But the three points letter, one of
16  the provisions in there, they're willing to
17  consider a reduced volume and take some tonnage in
18  the second half.
19      Q     Okay.  Now, we will keep that one
20  and make a mental note they're willing to take
21  tonnage in the second half in the back of our
22  minds and I will come back to that very shortly.
23          MR. MAVRONICOLAS:  What is the
24  question, Mr. Chairman?
25          MR. CHALOS:  That is a note.

Page 834

1     Nestler - Continued Cross - (Chalos)
2           THE CHAIRMAN:  It's a footnote.
3      Q     Now, at the time that you wrote
4   this letter of April 2, and you write that
5   Votorantim requested a reduction of contractual
6   tonnages, in your mind's eye, Votorantim had not
7   cancelled the contract with AIMCOR, did they?
8      A     They did not cancel the contracts.
9      Q     Now, read down, if you will, to the
10  third paragraph.  It says, "As Votorantim is
11  aware, PREMCOR is unwilling to participate in
12  renegotiation of the existing sales contracts,"
13  and contracts is in the plural.
14          What were you talking about
15  contracts?
16      A     The contract between us and
17  Votorantim; that Votorantim wanted to change
18  several of the components or several of the
19  conditions of.
20      Q     The next sentence says, "As such,
21  Votorantim must perform under the existing
22  contract."
23          When you wrote that, you were aware
24  that the only contract Votorantim was a party to
25  was the Votorantim-AIMCOR contract, correct?

Page 835

1     Nestler - Continued Cross - (Chalos)
2      A     Yes.
3      Q     Now --
4           MR. MAVRONICOLAS:  Mr. Chairman,
5   again it's a legal conclusion as to who is
6   the party to the contracts --
7           THE CHAIRMAN:  Oh, please, please,
8   please.
9      Q     Now, take a look at the last
10  paragraph, if you will.  "In the event that
11  Votorantim fails to perform, it's AIMCOR's
12  intention to commence arbitration as provided for
13  in Clause 15 of the sales contract."
14          Now, that's the second time it
15  threatened arbitration, is it not?  You have done
16  that once before.
17      A     Okay.
18      Q     Yes, you agree?
19      A     I agree that we talked about it.  I
20  don't know if it's the second or third or fourth;
21  but, yes, we talked about if we can't come to some
22  resolution, we have no other choice but to
23  arbitrate.
24      Q     Back on the same question that I
25  have, if AIMCOR is solely the party in the middle,

Page 836

1     Nestler - Continued Cross - (Chalos)
2   why isn't there a copy to PREMCOR of this letter?
3      A     Well, I don't recall specifically
4   if there was one, but assuming that there isn't, I
5   am sure that through the discussion and dialogue
6   that we had with PREMCOR, we told them this is
7   what we are going to do.
8      Q     But why the discrete messages if
9   it's an issue that everybody needs to get out in
10  the open all together, why not do it that way?
11          MR. MAVRONICOLAS:  Mr. chairman, he
12  just testified that he is telling him why
13  the discrete messages.  Come on.
14          THE CHAIRMAN:  I don't see a
15  problem with it.  Okay?  I have questions
16  myself in the same area, okay?  So I think
17  the question is proper.
18      A     Again, I think every step of the
19  way we were talking with PREMCOR, we were talking
20  with Votorantim.
21      Q     But my question is very simple.
22  Why not just have one communication, put the issue
23  on the table and resolve it in one form?
24      A     I don't have a good answer for
25  that.  I think we felt like, and I still feel

40 (Pages 833 to 836)

EXHIBIT "J"

7/17/07 - Applied Industrial Materials Corp. and Votorantim Cimentos Ltda. Arbitration
Hearing #5

Page 1443

1    Sirca - Redirect (Mavronicolas)
2        MR. CHALOS:  Objection.
3    A    Yes, I did.
4    Q    With respect to that, were those
5    available cargos, were they available to everybody
6    in the market?
7    A    In principal, the answer is yes.
8    If you want me to expand --
9        THE CHAIRMAN:  No, I understood.
10    A    -- I can expand.
11        THE CHAIRMAN:  You used principle
12    correctly.
13    Q    Mr. Sirca, when you say principle,
14    what did you mean?
15    A    It is clear in principle.
16        THE CHAIRMAN:  As a rule.
17    A    As a rule.
18    But I should not say that, you're
19    lawyers, but let me take an example.  If I have a
20    dispute with, let's say, a supplier, take SSM, and
21    we are having trouble, you know, they may say,
22    hey, look, I don't want sell to him, but we should
23    not.
24    But as a rule, it is available to
25    everybody.

Page 1444

1    Sirca - Redirect (Mavronicolas)
2    Q    That's what the market is about,
3    isn't it?
4    A    Availability in the market to every
5    buyer.
6    Q    That's what you understood by
7    opportunity to mean?
8    A    That's it.
9    Q    And that opportunity was available
10    to Votorantim, as far as you know?
11        MR. CHALOS:  Objection.
12    A    In principle, I answered yes.
13        MR. MAVRONICOLAS:  Okay.  Thank
14    you.
15        THE CHAIRMAN:  You asked that three
16    times.
17        MR. MAVRONICOLAS:  I wanted a clear
18    record.
19        THE CHAIRMAN:  Do you need any
20    recross?
21        MR. CHALOS:  Yes.
22    RECROSS EXAMINATION
23    BY MR. CHALOS:
24    Q    Mr. Sirca, let's be clear.
25    Mr. Rocha testified that he was in the market in

Page 1445

1    Sirca - Recross (Chalos)
2    the second half of 2002 and all of 2003 trying to
3    replace the cargos that AIMCOR failed to provide,
4    and this was the best that he could do.
5    You have no evidence to contradict
6    that here today, do you?
7    A    I don't have any evidence.  What I
8    know is there were other cargos available in the
9    market.  It doesn't mean that, you know, I don't
10    know -- we know that Oxbow had some petroleum coke
11    available, and they sold to China.  That's a fact.
12    That's all I know.
13    Whether there were other cargos
14    available, I had to assume he didn't find other
15    cargos, but I don't know.
16    Q    You don't know if Oxbow made that
17    cargo available to Votorantim, do you?
18    A    I don't know.
19        MR. CHALOS:  Nothing further.
20    A    You have to call and talk.  The
21    guys ought to know, if they talked to each other.
22        THE CHAIRMAN:  Okay.  The testimony
23    is concluded?
24        MR. MAVRONICOLAS:  Yes, but for --
25    yes, the testimony is concluded.  There

Page 1446

1    Proceedings
2    is a point we want to raise, a couple of
3    administrative points.
4        THE CHAIRMAN:  Such as?
5        MR. MAVRONICOLAS:  Well, you have
6    asked for us to see if we could find if
7    there was a draft report that he has
8    available in Italy.  You have asked for
9    that.  So I am going to try -- I am
10    going --
11        MR. CHALOS:  Well, we will waive
12    the request.
13        MR. MAVRONICOLAS:  So -- okay.
14        THE CHAIRMAN:  You don't need it.
15    You don't have to look.
16        MR. MAVRONICOLAS:  The only other
17    two points are, I guess there is a
18    question about we have seen no SSM
19    documents in here, no SSM contracts.  We
20    are endeavoring to obtain those.  We
21    believe that they may exist.  So we will
22    need a little time to do that.
23        THE CHAIRMAN:  You know, this has
24    gone on the --
25        MR. MAVRONICOLAS:  No, no, no.

49 (Pages 1443 to 1446)

7/17/07 - Applied Industrial Materials Corp. and Votorantim Cimentos Ltda. Arbitration
Hearing #5

Page 1447

1            Proceedings
2 Mr. Chairman, all I am saying is, they
3 have put no contracts in for SSM. They
4 have made some statements about the fact,
5 you know, what they do with those
6 transactions. We want an opportunity to
7 obtain those documents.
8      THE CHAIRMAN: I thought, my
9 recollection is the testimony yesterday
10 was that they were no longer available,
11 they couldn't find them.
12      MR. MAVRONICOLAS: I know that, but
13 that's what I am telling you. What I am
14 saying is --
15      THE CHAIRMAN: If they can't find
16 them, how are they going to materialize?
17      MR. MAVRONICOLAS: Because Oxbow
18 bought SSM. The closing is now in
19 process. By mid-August or early
20 September, the transaction will be
21 completed and Oxbow will have access to
22 SSM contracts.
23      At that point, we are going to --
24      THE CHAIRMAN: This has gone on too
25 long. It really has. It's gone on too

Page 1448

1            Proceedings
2 long.
3      MR. MAVRONICOLAS: Mr. Chairman,
4 it's going to take time to get the
5 transcript, to begin with.
6      But hold it --
7      THE CHAIRMAN: I will tell you
8 what, I will tie it to the receipt of the
9 transcript. If you don't have it by
10 then, forget it. I am not going to leave
11 it open ended.
12      MR. MAVRONICOLAS: Mr. Chairman, I
13 am not suggesting open-ended. What I am
14 suggesting to you, like I just
15 represented to this panel, as an
16 attorney, okay, as a representative to
17 this panel, and as public knowledge and
18 as Matthew testified here, Oxbow has
19 bought SSM. They have now said that they
20 don't have SSM contracts. They couldn't
21 find them.
22      I am telling the panel that we may
23 be able to get access to those documents
24 by September as soon as the closing is
25 completed.

Page 1449

1            Proceedings
2      THE CHAIRMAN: Why if Oxbow was
3 buying SSM, why hasn't Oxbow asked for
4 them already?
5      MR. MAVRONICOLAS: Because until
6 the closing -- until it's approved by the
7 -- in order for Oxbow to buy SSM, you
8 need two antitrust approvals. You need
9 an antitrust approval from the United
10 States government and an
11 antitrust approval and from the European
12 government. Both from the EEU.
13      They have already gotten the
14 approval from the U.S. government.
15 They're waiting for the approval of the
16 UK Union to do it.
17      I have been told that should be
18 concluded by next month or the beginning
19 of September. That's not an unusual
20 process.
21      THE CHAIRMAN: Where is SSM
22 located?
23      THE WITNESS: In Rotterdam,
24 Holland.
25      THE CHAIRMAN: Has Oxbow made any

Page 1450

1            Proceedings
2 request for this data.
3      MR. MAVRONICOLAS: What I have been
4 told, until that closing occurred -- I
5 have asked for that.
6      What I have been told is that until
7 the closing occurs, you can't go into the
8 corporation, because if you do that, you
9 jumped the antitrust situation.
10      You're a lawyer, you can understand
11 that. Until the antitrust clearance is
12 clear, they're not able to do that.
13      All I am saying is, I want an
14 opportunity to do that.
15      THE CHAIRMAN: We are not going to
16 wait until September, I will tell you
17 right now, because we don't even know as
18 a fact that it will end in September.
19      MR. MAVRONICOLAS: Well, if it
20 doesn't end in September, I will report
21 that to the panel.
22      THE CHAIRMAN: We are going to give
23 you until the time the transcripts are
24 received, which I am told is -- you said
25 about mid-August.

50 (Pages 1447 to 1450)

7/17/07 - Applied Industrial Materials Corp. and Votorantim Cimentos Ltda. Arbitration
Hearing #5

Page 1451

1    Proceedings
2        MR. MAVRONICOLAS: Can we go off
3    the record here for 30 seconds?
4        THE CHAIRMAN: No, I want all this
5    on the record.
6        MR. MAVRONICOLAS: Okay. I will
7    put it on the record.
8        My son is getting married at the
9    end of August. I am going to be -- the
10    last week in August, I am going to be
11    attending his wedding and helping him
12    prepare for it, which is the last week of
13    August.
14        THE CHAIRMAN: And we are talking
15    the middle of August.
16        MR. MAVRONICOLAS: Hold on a
17    second.
18        As I told you a moment ago, I have
19    been told by the attorneys, if you want
20    some affidavit on this, who are doing
21    this closing, that they won't be able to
22    access anything until the close -- until
23    the closing is approved by the antitrust.
24        Now this proceeding has gone on for
25    a long time.

Page 1452

1    Proceedings
2        THE CHAIRMAN: Too long.
3        MR. MAVRONICOLAS: Yes, and we
4    started as the claimants and we would
5    like to see it closed as well.
6        So I would submit to the panel,
7    perhaps they want to take it under
8    consideration, we want an opportunity,
9    not to delay it an inordinate period of
10    time, but to be able to obtain the
11    documents which may be available, and if
12    they're not available by that time, then
13    I want to be in a position to advise the
14    panel and we can proceed on that basis.
15        THE CHAIRMAN: Where is the
16    wedding?
17        MR. MAVRONICOLAS: In Madison,
18    Wisconsin.
19        THE CHAIRMAN: When is it?
20        MR. MAVRONICOLAS: My son is
21    getting married Labor Day weekend, first
22    week in September.
23        MR. CORSA: Father of the groom.
24        MR. RING: You're lucky, you don't
25    have to pay for anything.

Page 1453

1    Proceedings
2        MR. MAVRONICOLAS: Can we go off
3    the record?
4        THE CHAIRMAN: Off the record.
5        (Discussion off the record)
6        THE CHAIRMAN: First order of
7    business, do you have any questions, Mr.
8    Muff?
9        MR. MUFF: No.
10        THE CHAIRMAN: Mr. Ring?
11        MR. RING: No, sir.
12        THE CHAIRMAN: You said no?
13        MR. RING: No.
14        THE CHAIRMAN: I have none either.
15    Okay.
16        We have given consideration to your
17    request and we have actually altered some
18    of the dates we had initially were going
19    to propose.
20        We would like main briefs by
21    October 1, which is a Monday.
22        MR. MUFF: Want to mention
23    transcripts first?
24        THE CHAIRMAN: He said about the
25    17th of August.

Page 1454

1    Proceedings
2        October 1, a Monday, main briefs.
3    Reply briefs, October 15, also a Monday.
4        In addition, ~~we have a common~~
5    ~~fee that~~ ~~~~ ~~~~
6    high already. There is $75,000 in
7    escrow. We ask you to consider letting
8    us each take a draw. We all have over
9    $20,000 accrued already.
10        MR. CHALOS: No objection.
11        THE CHAIRMAN: Mr. Mavronicolas?
12        MR. MAVRONICOLAS: I will take it
13    up with the client. I am certain there
14    won't be a problem.
15        THE CHAIRMAN: With that in mind,
16    also, the fact that we now have a ton of
17    paper to review, to convene, to write an
18    award, we need each of you to pursue
19    $15,000 additionally.
20        This is the fifth hearing in the
21    damages. All have been long. All of the
22    hearings that preceded in the liability
23    phase were long. And all of the colloquy
24    and all that's gone on and the objections
25    just prolonged this thing. It's

51 (Pages 1451 to 1454)

7/17/07 - Applied Industrial Materials Corp. and Votorantim Cimentos Ltda. Arbitration
Hearing #5

Page 1455

1      Proceedings
2  prolonged it. Okay.
3          And with the additional deposit,
4  the same procedure, let us know and then
5  to be transmitted to the SMA coffers.
6          MR. CHALOS:  Main briefs, and reply
7  briefs, full stop, right?  No surreply?
8          THE CHAIRMAN:  Main briefs are both
9  the same day.  Main briefs --
10         MR. CORSA:  There should be a
11  response to whatever we put in from
12  Mr. Mavronicolas.
13         THE CHAIRMAN:  You're going to put
14  it in simultaneously, then all are going
15  to have an opportunity to reply.  That's
16  what we are saying.
17         So everything is simultaneous, it's
18  not one to the other --
19         MR. MAVRONICOLAS:  Then Mr.
20  Chairman, I have a request.
21         My request is that these
22  proceedings have gone a long time.
23  There's a lot of paper that's been
24  submitted.
25         What I would like to do, which has

Page 1456

1      Proceedings
2  been done in other arbitrations, we would
3  like to have an opportunity to submit the
4  briefs, do our exchanges and upon the
5  conclusion of that, once the arbitrators
6  have had an opportunity to read the
7  briefs, we would like to have an
8  opportunity to have oral argument to
9  present our cases.
10         MR. CHALOS:  No.
11         THE CHAIRMAN:  Let me just say
12  this.  I have heard complaints primarily
13  from you, Mr. Mavronicolas, about your
14  client being up in arms about costs.  You
15  just now compounded that problem.
16         MR. MAVRONICOLAS:  Well, again --
17         THE CHAIRMAN:  What are you going
18  to say orally that you can't put in a
19  brief?
20         MR. MAVRONICOLAS:  Well, I think
21  it's about the same thing that would
22  happen in a courtroom.  It seems to me
23  that there are significant sums that are
24  involved in this arbitration.  It seems
25  to be it's gone on a long time.  It seems

Page 1457

1      Proceedings
2  to me, like in a courtroom, you should --
3  no, sometimes you don't get oral
4  argument, and it's up to the panel to
5  determine this.
6          But if it's important enough to put
7  aside an hour or two hours, you can set
8  the time for oral arguments.  Say, look,
9  a half for each one of you and rebuttal
10  of 15 minutes, would be more than
11  appropriate to allow.
12         There's been a lot of evidence
13  that's been thrown around and there has
14  been a lot of paper, and once they have a
15  chance the read the briefs, once the
16  panel has had a chance to read the
17  briefs, whether we do it with a
18  conference call or whether we do it all
19  sitting in the same room, I don't think
20  that matters that much.
21         All that matters is an additional
22  hour or two hours to make an oral
23  presentation or oral argument would seem
24  to be appropriate.
25         THE CHAIRMAN:  I disagree with you

Page 1458

1      Proceedings
2  in our system about high profile cases.
3  I have been involved in cases involving
4  much more money than this, the DG
5  HARMONY, for example, and there was no
6  oral argument that I recall in that case.
7  It was briefed.
8          What you are basically saying is
9  you want a brief, you want a reply brief
10  and then you want to argue on top of that
11  which is now a surreply brief.
12         MR. MAVRONICOLAS:  Mr. Corsa just
13  asked for the surreply brief.
14         THE CHAIRMAN:  No, you
15  misunderstand --
16         MR. MAVRONICOLAS:  I am sorry.  But
17  the fact of the matter is, no, I am not
18  looking for a surreply.
19         What I am saying to you is that
20  given how long this has gone on, given
21  the issues that you pointed out in the
22  transcripts, it seems to me to have an
23  opportunity to make an oral presentation
24  to the panel after they have had a chance
25  to read the briefs, after they have had a

52 (Pages 1455 to 1458)

7/17/07 - Applied Industrial Materials Corp. and Votorantim Cimentos Ltda. Arbitration
Hearing #5

Page 1459

1    Proceedings
2    chance to look at the exhibits, before
3    they actually deliberate would be an
4    appropriate thing to do.  That's our
5    request.
6        THE CHAIRMAN:  Oral argument is in
7    the discretion of the judge.  In this
8    case, the panel.  Okay?
9        My inkling is that we are not going
10   to grant it, but I will confer with my
11   fellow arbitrators and give you a prompt
12   response.
13       I wanted to tell you right off the
14   bat, I am not in favor of it.
15       MR. RING:  Let's do it now.
16       THE CHAIRMAN:  Wait to do it now?
17   Off.
18       (Recess taken)
19       THE CHAIRMAN:  Back on the record.
20       The panel has considered your
21   request, Mr. Mavronicolas, and it is
22   denied.
23       With that, anything else?
24       MR. MAVRONICOLAS:  Can I have
25   one -- can I have five minutes to look

Page 1461

1    Proceedings
2    I am going to make a motion before the
3    str                    me record, and it's
4    pag                         pages         in the
5    transcript.
6
7                              is a series of
8    que                              for a break
9    du
10   hearing                              going to
11   ask
12   str                          the record
13   that
14   has
15
16       THE CHAIRMAN:  Let me say for the
17   umteenth time, we will accept everything
18   and give it the weight it's entitled to.
19       You want to make your argument,
20   make it in the brief.  Don't make a
21   motion.  You're just going to, again,
22   increase costs that are really not
23   necessary.
24       MR. CHALOS:  These are Mr. Ring's
25   questions.

Page 1460

1    Proceedings
2    over something before we close totally?
3        THE CHAIRMAN:  Okay.
4        MR. MAVRONICOLAS:  Five minutes,
5    what time is it?
6        THE CHAIRMAN:  I am going to tell
7    you, we want to be flexible and want to
8    give you an opportunity, this is not a
9    court of equity.
10       MR. MAVRONICOLAS:  Well, off the
11   record.  Can we go off the record?
12       THE CHAIRMAN:  I said what I am
13   going to say.  I am giving you the
14   opportunity for five minutes.
15       MR. MAVRONICOLAS:  Thank you.
16       (Recess taken)
17       THE CHAIRMAN:  Back on the record.
18       MR. MAVRONICOLAS:  Thank you for
19   your indulgence, Mr. Chairman.
20       During the break when we were
21   looking at the                      back
22   and looked at the transcript from the
23   last hearing we developed the issues
24   that had arisen, and when I went through
25   those transcript I found something that

Page 1462

1    Proceedings
2        THE CHAIRMAN:  You want to excise
3    Mr. Rings questions?
4        MR. MAVRONICOLAS:  Yes, sir.
5        MR. MUFF:  What questions?
6        MR. MAVRONICOLAS:  The series of
7    questions that started at page 863, line
8    2.
9        MR. MUFF:  That's on the damages?
10       MR. MAVRONICOLAS:  Yes.
11       MR. MUFF:  863?
12       MR. MAVRONICOLAS:  863, line 3
13   through page 867, line 7.
14       MR. CHALOS:  Mr. Chairman, if I
15   could be heard, we don't believe it's
16   appropriate.  The panel has accepted
17   everything and has advised the parties.
18       THE CHAIRMAN:  Let's research this,
19   just to enlighten us.
20       MR. CHALOS:  Okay.
21       THE CHAIRMAN:  This is very unusual
22   to excise what an arbitrator said.
23   That's another first.
24       863, line what?
25       MR. MAVRONICOLAS:  It starts off

53 (Pages 1459 to 1462)

7/17/07 - Applied Industrial Materials Corp. and Votorantim Cimentos Ltda. Arbitration
Hearing #5

Page 1463

```
 1              Proceedings
 2   with discussion off the record.
 3        THE CHAIRMAN: I see it.  Okay.
 4   Until what page?
 5        MR. MAVRONICOLAS:  867.
 6        MR. CHALOS:  Line 8?
 7        MR. MAVRONICOLAS:  Yes, line 8.
 8        MR. CHALOS:  That's what I had
 9   highlighted.
10        MR. RING:  What is the objection,
11   if I might ask?
12        MR. MAVRONICOLAS:  Well, it begins
13   with an off-the-record, and then the
14   questions start.
15        During that off-the-record period,
16   I was asked -- I was out of the room.
17   When I returned to the room when those
18   questions started, I found the panel -- I
19   found the witness and I found opposing
20   counsel.
21        I wasn't present in the room when
22   we were off the record.  I don't know
23   what occurred in the room.  But I know
24   there was a series of questions that came
25   after it, and so my request is we strike
```

Page 1464

```
 1              Proceedings
 2   those questions from the record.
 3        MR. CHALOS:  You weren't out of the
 4   room.
 5        THE CHAIRMAN:  Yes, he was out of
 6   the room.  I asked him to excuse himself
 7   and that's when I said to Mr. Rocha, I
 8   asked for all of the data that wound up
 9   in Bates 2001 and 2002, 3001, 3002,
10   because -- and I mentioned this to you, I
11   know I mentioned this to you
12   subsequently, that I was concerned that
13   mitigation efforts had not be exercised
14   and that we didn't have the full data to
15   determine whether they went out and
16   sought the lowest price cargos of that
17   ilk.
18        MR. MAVRONICOLAS:  In fact, you did
19   do that, Mr. Chairman, but you do it
20   later.  It's after that point.
21        You make that statement actually on
22   page 870 of the transcript, and you begin
23   and talk about production, and ask him to
24   produce.  That happens later,
25   Mr. Chairman.
```

Page 1465

```
 1              Proceedings
 2        Again, I wasn't present in the
 3   room.
 4        MR. RING:  Are you inferring that
 5   was inappropriate conversation while you
 6   were out of the room?
 7        MR. MAVRONICOLAS:  I don't know.  I
 8   wasn't in the room.
 9        THE CHAIRMAN:  I told you what it
10   was, didn't I?  Didn't I tell you what
11   happened?  And that's exactly what it
12   was.
13        At that time, I was not convinced
14   that we had all the data to determine
15   whether there had been proper mitigation
16   efforts.
17        That's -- and I represent to you as
18   arbitrators, as an attorney, that's what
19   was said.  There was nothing said that in
20   any way prejudiced your case.
21        MR. MAVRONICOLAS:  Okay, sir.
22        MR. CHALOS:  Mr. Chairman --
23        MR. RING:  The purpose of my
24   questions was to find out exactly how
25   they went out to get the replacement
```

Page 1466

```
 1              Proceedings
 2   cargo to ascertain the facts.
 3        I don't think they were
 4   inappropriate.
 5        MR. CHALOS:  Mr. Chairman, this is
 6   an inappropriate attempt to influence the
 7   panel with a fear of potential challenge
 8   for --
 9        THE CHAIRMAN:  Please.  Again,
10   you're treating us that we are idiots,
11   and we don't know what we are doing.
12   Please.
13        MR. MAVRONICOLAS:  Thank you,
14   Mr. Chairman.
15        THE CHAIRMAN:  And you should know
16   me better than to even suggest that
17   something inappropriate took place.
18   Okay?  I am not angry about that.
19        MR. MAVRONICOLAS:  Can we off the
20   record?
21        THE CHAIRMAN:  I am not angry about
22   that, but I want to let you know that is
23   not my style and never has been and never
24   will be.
25        MR. MAVRONICOLAS:  Can we go off
```

54 (Pages 1463 to 1466)

7/17/07 - Applied Industrial Materials Corp. and Votorantim Cimentos Ltda. Arbitration
Hearing #5

Page 1467

Proceedings
1    Proceedings
2    the record a second?
3        THE CHAIRMAN: Oh, yes.
4        (Discussion off the record)
5        MR. MAVRONICOLAS: Mr. Zambito,
6    based on what you said to me today, what
7    occurred outside the room, I of course
8    accept what you have said as the facts as
9    represented by you.
10       And on that basis, and of course as
11   an advocate for my client, I always have
12   to preserve whatever objections we have,
13   and I do that.
14       However, as a matter of response to
15   what you said, I believe that what your
16   representation is what occurred in that
17   room, and for everything that I know is
18   absolutely accurate, and I will leave it
19   at that, sir, and thank you very much for
20   even discussing it with me.
21       THE CHAIRMAN: Do you drop your
22   motion to excise that portion?
23       MR. MAVRONICOLAS: The necessity
24   for a motion is unnecessary.
25       Again, as I say, I will reserve my

Page 1468

1    Proceedings
2    objection. I need to do that. I am not
3    going to --
4        MR. CHALOS: Objection for what?
5        THE CHAIRMAN: He is objecting to
6    the text. You objecting to what Mr. Ring
7    asked you, whereas I am the one that sent
8    you out of the room. So I am having
9    trouble putting that together.
10       MR. MAVRONICOLAS: I'm just
11   preserving my client's rights with
12   respect to whatever the process was, the
13   procedure.
14       THE CHAIRMAN: To the process?
15       MR. MAVRONICOLAS: The procedure.
16       THE CHAIRMAN: The procedure.
17       MR. CHALOS: No, Mr. Chairman, this
18   is unacceptable to me.
19       THE CHAIRMAN: It doesn't effect
20   you.
21       MR. CHALOS: Of course it does.
22       THE CHAIRMAN: No, it doesn't. It
23   effect me. It effects you, yes,
24   indirectly. It effects you because if a
25   court -- and I want all this down -- if a

Page 1469

1    Proceedings
2    court should determine that I acted
3    improperly sending him out of the room, I
4    get criticized in the judge's opinion.
5        However if the damages turned out
6    to be unanimous, the fact that the judge
7    may knock me out, doesn't amount to a
8    hill of beans.
9        MR. CHALOS: Well, Mr. Chairman, I
10   think it's appropriate at this point in
11   time while there is a contemporaneous
12   issue and not after Mr. Mavronicolas gets
13   to go back to his house and cook up a
14   story, what is it that he thinks he is
15   prejudiced, that he should articulate it,
16   if there was prejudice.
17       THE CHAIRMAN: He did articulate
18   it. He said that he was sent out of the
19   room, the reporter was out of the room,
20   he has no idea what was said
21   unilaterally, if you will.
22       So I understand that he is
23   suggesting that was inappropriate
24   activity, and that's he is going to
25   reserve his right of objection to me

Page 1470

1    Proceedings
2    having followed that procedure. Okay.
3        MR. CHALOS: Well, I am struggling
4    because I don't recall, neither does my
5    partner, Mr. Corsa, recall unilateral ex
6    parte communications.
7        THE CHAIRMAN: I understand that,
8    but the mere sending him out of the room
9    is what the problem may be. Okay?
10       With that in mind, this proceeding
11   is concluded at 4:30 p.m.
12       MR. MAVRONICOLAS: Mr. Chairman,
13   thank you very much.
14       (Time Noted: 4:30 p.m.)

55 (Pages 1467 to 1470)