UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

VOTORANTIM CIMENTOS LTDA.,

                              Petitioner,          08 CV 02232 (LBS)

-    against -


OXBOW CARBON AND MINERALS LLC,
SUCCESSOR IN INTEREST BY MERGER
TO APPLIED INDUSTRIAL MATERIALS
CORPORATION

                              Respondents.
-------------------------------------------------------X


**VOTORANTIM'S MEMORANDUM OF LAW IN OPPOSITION TO OXBOW'S
MOTION TO PARTIALLY VACATE FINAL ARBITRATION AWARD**


                              CHALOS & CO, P.C.
                              Attorneys for Petitioner
                              Votorantim Cimentos Ltda.
                              123 South Street
                              Oyster Bay, NY 11771
                              Ph:    516-714 4300
                              Fax:   866-702-4577
                              Email: gmc@chaloslaw.com

## TABLE OF CONTENTS

RELEVANT FACTS & PROCEDURAL HISTORY ……………………….......  1.

THE LAW CONCERNING THE STANDARD TO
VACATE AN ARBITRATION AWARD ON THE
BASIS OF A CLAIM OF "MANIFEST DISREGARD
OF THE LAW" BY THE ARBITRATORS ……………………………………...  9.

OXBOW'S MOTION TO PARTIALLY VACATE
THE PANEL'S FINAL AWARD ON THE BASIS
OF MANIFEST DISREGARD OF THE LAW
IS WITHOUT MERIT ………………………………………………………..…  11.

    *a.  Oxbow's challenge to the Panel's liability determination
       is time barred.* ………………………………………… …………...  11.

    *b.  The Panel properly rejected Oxbow's U.C.C.
       arguments raised during the damages  phase,
       as Oxbow failed to present these arguments
       during the liability phase*………………………………………….…  14.

    *c.  There is significantly more than a "barely
        colorable justification for the outcome reached"
       by the Panel.* ………………………………………………………  16.

CHAIRMAN ZAMBITO'S EX PARTE COMMUNICATION
WITH MR. ROCHA WAS, AT WORST, HARMLESS ERROR,
AS IT (1) DID NOT DEPRIVE OXBOW OF A FAIR HEARING
AND INFLUENCE THE OUTCOME OF THE ARBITRATION,
AND (2) DID NOT GO TO THE HEART OF THE MERITS
OF THE DISPUTE…………………………………………………………………  18.

IT IS JUST AND PROPER TO AWARD VOTORANTIM
THE ATTORNEY'S FEES AND COSTS IT INCURRED
IN DEFENDING AIMCOR'S BASELESS PETITION TO
VACATE THE ARBITRATION AWARD AND NOT THE
PANEL'S FINAL AWARD…………………………………..……………………  21.

CONCLUSION…………………………………………………………………  22.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

VOTORANTIM CIMENTOS LTDA.,

                         Petitioner,              08 CV 02232 (LBS)

- against -                                       **VOTORANTIM'S
                                                  MEMORANDUM OF LAW IN
                                                  OPPOSITION TO OXBOW'S
                                                  MOTION TO PARTIALLY
                                                  VACATE FINAL
                                                  ARBITRATION AWARD**

OXBOW CARBON AND MINERALS LLC,
SUCCESSOR IN INTEREST BY MERGER
TO APPLIED INDUSTRIAL MATERIALS
CORPORATION

                         Respondents.
-------------------------------------------------------X

      **COME NOW**, Petitioner, VOTORANTIM CIMENTOS LTDA., (hereinafter

"VOTORANTIM"), by and through the undersigned counsel, who submits this

Memorandum of Law in Opposition to Oxbow's Motion to Partially Vacate Final

Arbitration Award.

<u>**RELEVANT FACTS & PROCEDURAL HISTORY**</u>

      In the interest of brevity, undersigned counsel respectfully incorporates by

reference the relevant facts and procedural history as more fully set forth in the

accompanying Declaration of George M. Chalos., Esq., (and Exhibits attached thereto).

Notwithstanding, for the Court's convenience, Votorantim takes this opportunity to

highlight the following salient facts and procedural history.

      The Parties entered into a Petroleum Coke Sales Agreement on or about June 21,

2001. See Exhibit "A" to the Chalos Declaration. Section 15 of the Sales Agreement

contained an Arbitration Clause requiring that the "contract shall be governed by the laws

of the State of Missouri, United States of America, and; [i]n the event of any dispute

arising in connection with this contract, the parties hereby agree to submit such dispute to

arbitration under the rules of the American Arbitration Association in New York, United

States of America. (See Exhibit "A," sections 15.1 and 15.3).

Additionally, the contract specifically provided the following with respect to the

quantity to be bought/sold:

> ### Clause 2 – Quantity
>
> 2.1 Seller shall supply and Buyer shall lift the quantity of
> 300,00MT +/- 10% Buyers option, in each calendar year.
> The optional tonnage of +/- 10% is understood as a balance
> quantity to satisfy shipment conditions.
>
> 2.2 If Buyer is not able for technical or government
> approval to use petroleum coke in one or more cement
> plants. Buyer has right to reduce contractual tonnage
> according to reduced demand of plants affected. Buyer will
> inform Seller in due time in such cases and provide
> sufficient evidence accordingly. In such case Buyer and
> Seller will formulate a new delivery schedule in mutual
> cooperation.

See Exhibit "A," sections 2.1 and 2.2.

The parties also agreed an express procedure to be followed should one of the

parties default and the other wish to seek to terminate the agreement. Specifically,

Clause 17.5 provides, in relevant part, the following:

> ### Clause 17 – General Terms
>
> *  *  *
>
> 17.5 In the event that either party shall fail to perform any
> of its obligations hereunder and shall fail to remedy such
> default within 30 (thirty) days after written notice thereof

> has been given by the non defaulting party, the non
> defaulting party **_may_** terminate this Agreement with no
> further obligation or liability, at its option, by giving
> written notice to the defaulting party. . . (emphasis added)

See Exhibit "A," section 17.5.

Following a dispute between the parties, an arbitration panel was convened. During the period of June 30, 2004 to November 10, 2005 six (6) arbitration hearings were conducted to determine **all** issues of liability. See Chalos Declaration, at para. 6 and the Panel's Partial Final Award attached to the Chalos Declaration at Exhibit "B." Extensive exhibits and briefing were offered by both parties and were accepted by the Panel. *Id.* On June 28, 2006, the Panel issued its Partial Final Award, which conclusively determined **all** contested liability issues. Specifically, the Panel wrote:

> \* \* \*
> . . . *During the proceedings, counsel and the Panel
> agreed to proceed solely on the issue of liability, with
> subsequent hearings on the issue of damages to be held, if
> necessary, after an Award as to liability was issued.* . .
>
> \* \* \*

See Chalos Declaration, at para. 7 and the Panel's Partial Final Award attached to the Chalos Declaration as Exhibit "B" at p.3.

In summary, the Panel found that, despite the problems experienced by Votorantim, the Brazilian energy crisis did not rise to the level of a force majeure situation and found Votorantim had failed to schedule and accept 150,000 MT of petcoke during the first seven (7) months of 2002 (i.e. – The first half of the second year of a three year contract). See Chalos Declaration, at para. 8; Chalos' Exhibit "B," at p.3. The Panel further held that Oxbow (then referred to as Aimcor) had breached the contract by

not responding to Votorantim's letter of August 16, 2002. In its August 16, 2002 letter, Votorantim notified Aimcor that the Brazilian energy crisis was over and that it was in a position to resume regular shipments. See Chalos Declaration at para. 9; Exhibit "B" at p.3. In rendering its decision, the Panel made the following specific findings:

> *According to David Nestler, a witness for AIMCOR, VOTORANTIM's January 24th message does not state that VOTORANTIM wanted to cancel the contract. In a letter dated August 16, 2002, VOTORANTIM notified AIMCOR that the energy crisis in Brazil "no longer exists," and that it was in a position to resume regular shipments in September, October and December 2002 (presumably a total of 150,000 MT, as each prior shipment was 50,000MT). Nothing was produced on the record that AIMCOR responded to that letter.*

See Chalos Declaration, at para. 10; Exhibit "B" at p.7-8.

> \*   \*   \*

> *The majority also finds that AIMCOR breached the Contract by not responding to Votorantim's letter of August 16, 2002, in which Votorantim notified AIMCOR that the energy crisis was over and that it was in a position to resume regular shipments in September, October and December 2002 (presumably, each shipment of 50,000 MT or a total of 150,000 MT),or in providing petcoke during those months.*

> *It is to be noted that Nestler of AIMCOR testified that the actions of Votorantim did not amount to an abandonment of the Contract.*

See Chalos Declaration at para. 10; Exhibit "B" at p.11.

Following the issuance of the Panel's Partial Final Award[1], Oxbow filed Petition to Vacate the Award primarily arguing that the Panel had exceeded its authority in conclusively deciding all issues of liability at that time. A copy of the docket report for

---

[1] Again, the Partial Final Award, which was issued on June 28, 2006, was the final determination on all issues of liability.

the prior challenge by Oxbow (case no 1:06-cv-07763-LBS) is submitted as Exhibit "C" to the Chalos Declaration. Specifically, on or about September 27, 2006, Oxbow submitted a Petition to Vacate the Partial Final Award on liability, which was assigned to this Honorable Court. See Chalos Exhibit "C" at Docket Entry #1. Thereafter, Votorantim opposed Oxbow's application by moving to dismiss Plaintiff's action. See Chalos Declaration, Exhibit "C" at Docket Entries #4, 5 and 6. Following the submission of the parties complete briefing,[2] oral argument was held before this Honorable Court on December 7, 2006.[3] On January 17, 2007, a Memorandum and Order was issued granting Votorantim's motion to dismiss; denying Oxbow's motion to vacate; and finding that the arbitration Panel acted within the scope of its authority in deciding all issues concerning liability. (See Chalos Exhibit "C," at Docket Entry #18). A Clerk's Judgment in favor of Votorantim was entered on January 19, 2007. (See Chalos Exhibit "C" at Docket Entry #19). The Court's decision has been published on Lexis. Attached to the Chalos Declaration as Exhibit "D" is a copy of this Honorable's decision available in Lexis as: Oxbow Carbon and Minerals LLC, Successor in Interest By Merger to Applied Industrial Materials Corp. v. Votorantim Cimentos Ltda., 2007 U.S. Dist LEXIS 5467)(January 17, 2007).

Thereafter, five (5) additional hearings relating solely to *damages*[4] were held by the Panel, during which one (1) witness and one (1) expert testified on behalf of Oxbow and one (1) witness testified on behalf of Votorantim. See Chalos Declaration at para. 18 and the Panel's Final Award attached to the Chalos Declaration at Exhibit "E" at p.3.

---

[2] See Chalos Declaration, Exhibit "C" at Docket Entries #8-#15.
[3] See Chalos Declaration, Exhibit "C," at Docket Entry #16.

[4] Specifically, the Panel held hearings to determine damages on April 10, 11, 12 and July 16 and 17, 2007.

Prior to the commencement of the damages hearings, counsel for Aimcor submitted a

Preliminary Memorandum on Damages to the Panel.  During the course of the damages

proceedings, extensive exhibits and briefing[5] relative to the issues of damages were

offered and accepted and given the weight the Panel deemed each was entitled to be

given.  See Chalos Declaration at para. 20.  At the conclusion of the damages hearings,

counsel for Aimcor requested an opportunity, and the Panel agreed, to allow Aimcor to

submit additional documentary evidence, (which the Panel accepted). See Chalos

Declaration at para. 21; Exhibit "E" at p.3.

In rendering its Final Award on damages, the Panel reiterated that all issues

relating to liability had been *previously* decided on June 28, 2006, (as per the Panel's

Partial Final Award), and that the Final Award addressed *"the issue of damages only."*

Specifically, the Panel wrote:

> ***A PARTIAL FINAL AWARD dealing with liability was***
> ***issued dated June 28, 2006.*** *A majority of the arbitrators*
> *found therein that VOTORANTIM had breached the*
> *Contract dated October 24, 2000 by not scheduling and*
> *accepting 150,000 MT petcoke during the first half of 2002*
> *and was liable for the damages sustained by AIMCOR as a*
> *result; and further unanimously found that AIMCOR*
> *breached the same Contract by not providing petcoke for*
> *delivery to VOTORANTIM for the balance of the A/V Term*
> *Supply Contract, after it was informed in writing on August*
> *16, 2002 that VOTORANTIM was in a position to resume*
> *regular shipments and was prepared to schedule and*
> *accept the remaining shipments as stipulated in the A/V*
> *Term Supply Contract.*
>
> *The Panel incorporates hearing the facts and findings of*
> *the Partial Final Award dated June 28, 2006.* ***This FINAL***

---

[5] Oxbow submitted to the Panel a "Preliminary Brief in Support of Damages;" a "Main Brief In Support of Damages;" and a "Reply Brief in Support of Damages." See Goldman Declaration at paras. 9,10 & 11, as well as Goldman Exhibits "G," "H," and "I."

> ***AWARD deals with the issue of damages only.*** *(emphasis added).*

See Chalos Declaration, para: 22; Exhibit "E" at p.2.

As for its findings concerning the damages claimed to be due and owing to Oxbow as a result of the Panel's prior liability finding against Votorantim, the Panel stated that it sought to put Oxbow in the same position it would have been had Votoratim fully performed during the first seven (7) months of 2002, and determined that Oxbow would have earned a net profit of USD301,500. See Chalos Declaration, para. 23; Exhibit "E" at p.3-7, 12. Accordingly, the Panel awarded Oxbow USD388,783.87 (i.e. – USD 301,500, plus interest in the amount of USD87,283.87).

As for its calculation of damages claimed to be due and owing to Votorantim, the Panel sought to put Votorantim in the same position it would have been had it not been forced to go out to the marketplace and purchase substitute shipments during the second half of 2002, as well as during calendar year 2003 (i.e. – the last eighteen (18) months of the contract) as a result of Oxbow's breach of the contract. Specifically, the Panel found that, as a result of Oxbow's breach of the Contract during the second half of 2002 and for the calendar year 2003, Votorantim is entitled to damages in the aggregate amount of USD 4,919,518.88.[6]   See Chalos Declaration, paras. 24; Exhibit "E" at pps. 11-12.

During the course of the damages hearing, Oxbow vigorously challenged the quantum claimed by Votorantim by presenting expert evidence and through grueling cross-examination of Votorantim's witness, Julio Rocha. In this regard, the Panel noted:

> *Counsel for AIMCOR sought to discredit the damages claimed by VOTORANTIM, principally through the*

---

[6] The Panel expressly held that Votorantim is entitled to USD 1,1139,861.61 for damages sustained in the second half of 2002; USD 2,836,104.99 for damages sustained during calendar year 2003; and interest in the amount of USD 943,552.28 – totaling an aggregage damage award of USD 4,919,518.88 to Votorantim.

> *testimony of its expert, Mario Sirca, as well as the*
> *testimony of VOTORANTIM's witness, Julio Rocha.*

See Chalos Declaration, para. 25; Exhibit "E" at p. 10.

However, after having an opportunity to observe the witnesses and hear their

testimony, the Panel found the testimony of Oxbow's expert to have been "discredited"

and "of no probative value." Specifically, the Panel wrote:

> *Having observed the expert witness and heard his*
> *testimony, the Panel was of the <u>unanimous opinion</u> that*
> *Sirca's testimony had been discredited and was of no*
> *probative value.* (emphasis added).

See Chalos Declaration at para. 26 and the Panel's Final Award attached to the Chalos

Declaration at Exhibit "E," at p. 11.

In contrast, the Panel found Votorantim's witness credible, holding that "the

[contemporaneous documentary] evidence submitted on behalf of VOTORANTIM"

supported the testimony presented by Mr. Rocha. See Chalos Declaration at para 27 and

the Panel's Final Award attached to the Chalos Declaration at Exhibit "E," at p. 8.

Following the issuance of the Panel's Final Award, Votorantim filed a Petition to

Confirm the Panel's findings as to damages on March 6, 2008. See Docket Entry #1. On

March 14, 2008, this Honorable Court accepted the matter as a related case to the prior

proceedings had in 1:06-cv-07763 (LBS). See Docket Entry #4. Thereafter, on or about

May 23, 2008, Oxbow filed the within motion seeking to "partially vacate" the Panel's

Final Award on the grounds that: (1) the Panel manifestly disregarded the law, and (2)

arbitrator misconduct. See Docket Entries #5-8.

For the reasons more fully set forth herein and the accompanying Declaration of

George M. Chalos, Oxbow's motion is without merit. Accordingly, Votorantim

respectfully requests this Honorable Court to issue an Order: (1) denying Oxbow's

motion in all respects; (2) confirming the Panel's Final Award as a judgment of this

Court; (3) awarding Votorantim the costs and expenses it has had to incur in opposing

this application; and (4) granting such further and additional relief as the Court deems

just and proper under the circumstances.

### THE LAW CONCERNING THE STANDARD TO VACATE AN ARBITRATION AWARD ON THE BASIS OF A CLAIM OF "MANIFEST DISREGARD OF THE LAW" BY THE ARBITRATORS.

The Second Circuit recognizes "manifest disregard of the law" as an additional

ground to warrant a court's decision to vacate an arbitral award beyond those prescribed

by FAA § 10(a). Wallace v. Buttar, 378 F.3d 182, 189 (2d Cir. 2004); *See also* Goldman

v. Architectural Iron Co., 306 F.3d 1214, 1216 (2d Cir. 2002). In recognition of the

strong federal policy favoring arbitration as a means of resolving disputes, the application

of this doctrine is severely limited[7],"highly deferential and such relief is appropriately

rare." Porzig v. Dresdner, Kleinwort, Benson, North America LLC, 497 F.3d 133, 139

(2d Cir. 2007), citing Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S, 333 F.3d

383, 389 (2d Cir. 2003).   Manifest disregard "clearly means more than error or

misunderstanding with respect to the law," Merrill Lynch, Pierce, Fenner & Smith, Inc. v.

Bobker, 808 F.2d 930, 933 (2d Cir. 1986), and "we are not at liberty to set aside an

arbitrat[or's] . . . award because of an arguable difference regarding the meaning or

applicability of laws urged upon [him]." *Id.* at 934

Accordingly, the Second Circuit narrowly circumscribes the grounds that justify

vacating an award for manifest disregard of the law, placing the burden on the movant to

---

[7] *See,* GMS Group, LLC v. Benderson, 326 F.3d 75, 81 (2d Cir. 2003).

demonstrate "**both** that (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, **and** (2) the law ignored by the arbitrators was well-defined, explicit, and clearly applicable to the case." Wallace, *supra* at 189 (internal quotation marks omitted).  Further elaborating on this standard, the court has stressed that to vacate an arbitral award it requires "an overt disregard of the law and not merely ... an erroneous interpretation." Dunhill Franchisees Trust v. Dunhill Staffing Systems, Inc. 513 F. Supp. 2d 23; U.S. Dist. LEXIS 80317 (S.D.N.Y. 2007); See also Pike v. Freeman, 266 F.2d 78, 76 (2d Cir. 2001) (*quoting* Folkways Music Publishers, Inc. v. Weiss, 989 F.2d 108, 111-12 (2d Cir. 1993)).  "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision.'" *Id.* (Quoting United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc., 484 U.S. 29, 38, 108 S. Ct. 364, 98 L. Ed. 2d 286 (1987)).  Even if a party proves that the arbitrators' decision is based on a manifest error of fact or law, a court must nevertheless confirm the award if legitimate grounds for the decision can be inferred from the facts of the case. Ian Schaad v. Susquehanna Capital Group, et al., 2004 U.S. Dist, LEXIS 5772, at 11 (S.D.N.Y. 2004)(emphasis added); *See also* Willemijn Houdstermaatschappij B.V. v. Standard Microsystems Corp., 103 F.3d 9, 13 (2d Cir. 1997).  Moreover, an arbitration award must be enforced even if a court disagrees with the award on the merits so long as there is a "barely colorable justification for the outcome reached." Oxbow Carbon and Minerals LLC v. Votorantim Cimentos Ltda., 2007 U.S. Dist. LEXIS 5497, at 8, citing Banco de Seguros del Estado v. Mut. Marine Office, Inc., 344 F.3d 255, 260 (2d Cir. 2003).

## OXBOW'S MOTION TO PARTIALLY VACATE
## THE PANEL'S FINAL AWARD ON THE BASIS OF
## MANIFEST DISREGARD OF THE LAW IS WITHOUT MERIT

For the reasons more fully set forth above and below, Oxbow's motion to partially vacate the Panel's Final Award on the basis that the Panel manifestly disregarded the law is without merit.

### a. Oxbow's challenge to the Panel's liability determination is time barred.

It is common ground that the Federal Arbitration Act provides that a "notice of a motion to vacate, modify, or correct an award must be served upon the adverse party or his attorney within three (3) months after the award is filed or delivered." *See* 9 USCS 12. It was incumbent on Oxbow to move to vacate the Panel's June 28, 2006 award on liability issues on or before September 26, 2006, (i.e. - ninety (90) days from the issuance of the Partial Final award on June 28, 2006). Having failed to raise its manifest disregard of the law arguments at the time it raised its prior challenge to the Panel's partial final award (i.e.- on or before September 26, 2006), it is respectfully submitted that Oxbow is now time-barred from challenging the Panel's previous liability determination on the basis that the arbitrator's manifestly disregarded the law. Here, Oxbow's motion fails to raise any challenge or objection to the Panel's findings and determinations as to the damages awarded in this matter. Rather, Oxbow seeks to re-argue that the Panel manifestly disregarded the law two (2) years ago when it rendered its award on liability issues, which enabled both parties to collect damages in a quantum to be determined by the Panel in accordance with the evidence presented during the damages phase of the proceeding.

There can be no dispute that Panel's Partial Final Award finally and definitively disposed of all liability issues. It has long been held that an interim arbitration ruling is sufficiently final if it finally and definitively disposes of a claim, despite not disposing of all claims that were submitted to arbitration. In the Matter of the Arbitration between Northeast Securities, Inc. v. Quest Capital Strategies, et. al., 2003 U.S. Dist LEXIS 20025, (S.D.N.Y. 2003); See also Metallgesellschaft A.G. v. M/V Captain Constante, 790 F.2d 280, 283 (2d. Cir 1986).

Additionally, it is common ground that under the Missouri Arbitration Act, "[a]n application to vacate an award shall be made within ninety (90) days after delivery of a copy of the award to the applicant, except that if predicated upon corruption, fraud or other undue means, it shall be made within ninety days after such grounds are known or should have been known." R.S.Mo. Section 435.405(2). Here, Oxbow does not allege that the Panel engaged in any corruption or fraud, and similarly does not allege that the award was procured by other undue means. There can be no dispute that the Panel issued its final award concerning all issues of liability on June 28, 2006. As such, Oxbow had until September 26, 2006 (i.e. - ninety (90) days from the issuance of the Partial Final award on June 28, 2006) in order to challenge the Panel's liability determinations.

In *Local 2, International Brotherhood of Electrical Workers, AFL-CIO v. Anderson Underground Construction, Inc.*, the United States District Court for the Western District of Missouri was confronted with a similar situation as to that here. On April 29, 1988, the plaintiff in *Local 2*, filed a motion for judgment on the pleadings or alternatively for summary judgment asserting that the defendant did not make a motion to vacate said arbitration award within ninety (90) days, as required by the statute of

limitations. Local 2, International Brotherhood of Electrical Workers, AFL-CIO v. Anderson Underground Construction, Inc., 1988 U.S. Dist. LEXIS 12739 (November 7, 1988). Plaintiff asserted that, pursuant to *R.S.Mo. § 435.405(a)* ( a portion of the Uniform Arbitration Act), an application to vacate an arbitration award "shall be made within ninety (90) days after delivery of a copy of the award to the applicant." R.S.Mo. § 435.405(a).

In its decision, the court noted that it was undisputed that (1) the arbitration award was originally entered on February 14, 1986; (2) defendants first received notice of the award about February 20, 1986; (3) the February 14, 1986, award was revised and was signed on July 2, 1986; (4) defendants had never made application to vacate or modify the award; (5) plaintiff filed its complaint to enforce the award on July 18, 1986.

Among other issues, the court had to determine: (1) how long did defendants have following receipt of the arbitration award to apply to set aside the award, and; (2) did defendants apply to set aside the award within this time period? *Id.*, citing Auto Workers v. Hoosier Cardinal Corp., 383 U.S. 696, 704-05 (1966); International Brotherhood of Electrical Workers, Local 969 v. Babcock & Wilcox, 826 F.2d 962, 964 (10th Cir. 1987). The court noted that the timeliness of an action to vacate an arbitration award is "determined, as a matter of federal law, by reference to the appropriate state statute of limitations. The statute of limitations to be applied in *Local 2* was the Uniform Arbitration Act, as adopted in Missouri. I.B.E.W. Local 969, supra, at 964-65 (in LMRA arbitration award confirmation proceeding court borrowed 90 day statute of limitations contained in Colorado's version of the Uniform Arbitration Act). The court concluded

that it was clear from the record that the defendants did not apply to vacate the award within ninety (90) days and, consequently, the award was upheld.

Here, there can be no dispute that well more than ninety (90) days have elapsed since the panel issued is award on liability issues, and as such, it is respectfully submitted that Oxbow's challenge to the Panel's liability determination is now time barred as a matter of law. Accordingly, it is respectfully requested that this Honorable Court enter an Order denying in all respects Oxbow's motion to partially vacate the Panel's Final Award on damages.

### b.  The Panel properly rejected Oxbow's U.C.C. arguments raised during the damages  phase, as Oxbow failed to present these arguments during the liability phase.

It is shocking that nearly two (2) years after the Panel's issuance of its partial final award on liability, Oxbow seeks to have this Honorable Court review the Panel's June 28, 2006 liability determinations.   Nevertheless, Oxbow argues that the Panel either ignored or misapplied the Uniform Commercial Code. However, this argument is without merit, as Oxbow failed to timely raise such arguments during the liability phase of the arbitration.

Despite presenting this court with a comprehensive record of its submissions to the Panel during the damages phase of the arbitration, Oxbow has neglected to provide the Court with the briefing presented during the liability phase.  This omission was clearly intentional.  For the Court's ready reference, copies of the "main brief" and "reply brief" submitted to the Panel on behalf of Oxbow during the liability phase are attached as Exhibits "F" and "G" to the accompanying Chalos Declaration.  As the Court will readily note, Oxbow failed to raise the U.C.C. arguments currently presented to this

14

Court when the issue of liability was before the Panel[8]. As such, it is respectfully submitted that Oxbow effectively waived such arguments, and that such argument was clearly inapplicable to the damages phase of this arbitration.

Again, during the damages phase of the arbitration, issues of liability were no longer before the Panel, as they had already been conclusively decided and were properly to be considered the "law of the case" as the Panel addressed damages. Specifically, the Panel's finding in the liability portion of this case enabled both parties to collect damages in an amount to be proven during subsequent damages proceedings. Following the Panel's Partial Final Award, the Panel's sole duty was limited to deciding the quantum of each party's damages based upon the evidence presented. The appropriate time for Oxbow to have raised its U.C.C. arguments was during the liability phase and/or during its prior challenge to the Panel's June 28, 2006 liability award. There can be no dispute that, in the instant motion to vacate the Panel's Final Award (concerning damages), Oxbow presents no challenge to the substantive evidence presented during the damages phase, which clearly and properly formed the basis of the Panel's damages awards to both parties in accordance with its June 28, 2006 liability determination.

Accordingly, it is respectfully requested that this Honorable Court enter an Order denying in all respects Oxbow's motion to partially vacate the Panel's Final Award on damages.

---

[8] In fact, in its letter to the Panel dated July 18, 2006, requesting an amendment to the Partial Final Award, counsel for Oxbow makes no mention of the U.C.C. whatsoever. (See Letter of Anthony Mavronicolas, Esq., to the Panel, dated July 18, 2006, a copy of which is annexed to the Goldman Declaration (submitted by Oxbow), as Exhibit "C." As previously stated, Oxbow similarly failed to present its U.C.C. argument during the course of its prior challenge to Panel's Partial Final Award on liability in either its briefing to this Honorable Court or during oral argument on December 7, 2006. See Chalos Declaration at Exhibits "F, G." Additionally, for the Court's ready reference, a copy of the oral argument is attached to the accompanying Chalos Declaration as Exhibit "H").

c. ***There is significantly more than a "barely colorable justification for the outcome reached" by the Panel.***

The U.S. Supreme Court has made clear that arbitration is a preferred method of dispute resolution, and that the federal courts are to defer to the decisions of the arbitrators. United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 4 L. Ed. 2d 1424, 80 S. Ct. 1358 (1960); United Steelworkers v. American Manufacturing Co., 363 U.S. 564, 80 S. Ct. 1343, 4 L. Ed. 2d 1403 (1960); United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 4 L. Ed. 2d 1409, 80 S. Ct. 1347 (1960). As the Second Circuit has long held, "When arbitrators explain their conclusions . . . in terms that offer even a barely colorable justification for the outcome reached, confirmation of the award cannot be prevented by litigants who merely argue, however persuasively, for a different result." Andros Compania Maritima v. Marc Rich & Co., A.G., 579 F.2d 691, 704 (2d Cir. 1978).

Moreover, the UCC was enacted to create a set of guidelines upon which to make uniform decisions within the courts, and was not created as a defined or explicit law. Specifically, while it is common ground that the Uniform Commercial Code was enacted, in part, "to make uniform the law among the varying jurisdictions," its' commentary clearly and unambiguously provides:

> *"At the same time, the drafters of the UCC recognized that broad rules governing commercial transactions were unlikely to meet the needs of all parties. Thus, 'freedom or contract is a principle of the Code.'"*

See N.Y.U.C.C. §1-102, Official Comment 2.

It is, of course, axiomatic to state that, "the agreement of the parties will trump the provisions of the UCC." N.Y.U.C.C. §4-A-501(1). As noted above, the parties

contractually agreed an express procedure to be followed should one of the parties default

and the other wish to seek to terminate the agreement.  Specifically, Clause 17.5

provides, in relevant part, the following:

> ### Clause 17 – General Terms
>
> \*   \*   \*
>
> 17.5 In the event that either party shall fail to perform any
> of its obligations hereunder and shall fail to remedy such
> default within 30 (thirty) days after written notice thereof
> has been given by the non defaulting party, the non
> defaulting party *may* terminate this Agreement with no
> further obligation or liability, at its option, by giving
> written notice to the defaulting party. . .

See Exhibit "A," section 17.5 (emphasis added).

After receiving and considering extensive exhibits and briefing by both parties,

28, 2006, the Panel found that the contract had **not** been terminated and the required

written notice was **not** presented by Oxbow.  Specifically, the Panel made the following

specific findings:

> *According to David Nestler, a witness for AIMCOR,*
> *VOTORANTIM's January 24th message does not state that*
> *VOTORANTIM wanted to cancel the contract.  In a letter*
> *dated August 16, 2002, VOTORANTIM notified AIMCOR*
> *that the energy crisis in Brazil "no longer exists," and that*
> *it was in a position to resume regular shipments in*
> *September, October and December 2002 (presumably a*
> *total of 150,000 MT, as each prior shipment was*
> *50,000MT). Nothing was produced on the record that*
> *AIMCOR responded to that letter.*

See Chalos Declaration, para.10; Exhibit "B" at p.7-8.

> \*   \*   \*
>
> *The majority also finds that AIMCOR breached the*
> *Contract by not responding to Votorantim's letter of August*
> *16, 2002, in which Votorantim notified AIMCOR that the*

> *energy crisis was over and that it was in a position to*
> *resume regular shipments in September, October and*
> *December 2002 (presumably, each shipment of 50,000 MT*
> *or a total of 150,000 MT), or in providing petcoke during*
> *those months.*
>
> *It is to be noted that Nestler of AIMCOR testified that the*
> *actions of Votorantim did not amount to an abandonment*
> *of the Contract.*

See Chalos Declaration, para.10; Exhibit "B" at p.11.

Specifically, David Nestler, the senior corporate representative to appear during the arbitration on behalf Oxbow, testified that Votorantim ***never*** cancelled the contract.

> *Q.  Now, at the time you wrote this letter of April 2, and you write*
> *that Votorantim requested a reduction of contractual tonnages,*
> *in your mind's eye, Votorantim had not cancelled the contract*
> *with Aimcor, did they?*
>
> *A.  They did not cancel the contract.*

See Chalos Declaration, Relevant portions of the transcript, a copy of which is annexed to the Chalos Declaration as Exhibit "I".

Accordingly, it is respectfully submitted that there was more than a colorable basis for the Panel to find that Oxbow failed to honor its contractual obligations by providing the contractual tonnage during the second half of 2002 and all of 2003, which Votorantim was forced to "cover" on the spot market at a significant extra cost.

## CHAIRMAN ZAMBITO'S EX PARTE COMMUNICATION WITH MR. ROCHA WAS, AT WORST, HARMLESS ERROR, AS IT (1) DID NOT DEPRIVE OXBOW OF A FAIR HEARING <u>AND</u> INFLUENCE THE OUTCOME OF THE ARBITRATION, AND <u>(2) DID NOT GO TO THE HEART OF THE MERITS OF THE DISPUTE</u>

It is common ground between the parties that "in order to vacate an award based on an *ex parte* conversation, a party must show that this conversation deprived him of a

fair hearing and influenced the outcome of the arbitration." Spector v. Torenberg, 852

F.Supp 201, 209-210 (SDNY 1994), citing M&A Elec Power Coop, v. Local Union No,

702, International Brotherhood of Electrical Workers, AFL-CIO, 977 F.2d 1235, 1237-

1238 (8th Cir. 1992).

Furthermore, "the subject matter of the conversation must have gone to the heart

of the dispute's merits, and an award will therefore not be vacated of the conversation

concerned a merely peripheral matter. Spector v. Torenberg, 852 F.Supp 201, 210

(SDNY 1994), citing M&A Elec Power Coop, v. Local Union No, 702, International

Brotherhood of Electrical Workers, AFL-CIO, 977 F.2d 1235, 1238 (8th Cir. 1992). See

also, Metropolitan Property & Cas. Ins. Co. v. J.C. Penney Cas. Ins. Co., 780 F. Supp.

885, 893 (D.Conn 1991).

In the instant matter, it is undisputed that the *ex parte* communication between the

Panel and Mr. Rocha merely involved the Chairman inquiring as to the availability of

additional documentation identified by the witness during cross-examination. This brief

inquiry came after two (2) grueling days of cross examination by Oxbow. Specifically,

Mr. Rocha appeared in New York and testified during the second damages hearing on

April 11, 2007, and again the following day during the third damages hearing on April

12, 2007.[9] Thereafter, as per Oxbow's request, Mr. Rocha appeared in New York for a

third day of cross examination on July 16, 2007.

In support of its motion, Oxbow cites Totem Marine Tug & Barge, Inc., v. North

American Towing, Inc. In that matter, the Fifth Circuit Court of Appeals reversed the

USDC-EDLa's confirmation of an arbitration award on the basis that an *ex parte*

communication between the panel and one of the parties, after the hearings had been

---

[9] It was during the course of the hearing on April 12, 2007 that the *ex parte* communication took place.

19

concluded, ultimately determined the outcome of such panel's decision.  Totem Marine Tug & Barge, Inc., v. North American Towing, Inc., 607 F.2d 649 (1979).  The facts of that case are easily distinguishable from this matter.

Specifically, the *ex parte* communication in the Totem Marine case took place after the proceedings had been closed.  Totem was never notified of the communication; and never given any opportunity to contest the information presented to the arbitrator. *Id.* at page 652.  Here, Oxbow had a full and uninhibited opportunity to continue cross examination of Mr. Rocha.  In fact, Oxbow continued to examine Mr. Rocha for another two (2) days following the *ex parte* communication.  Moreover, Oxbow further presented Mr. Sirca, a purported "expert" witness, to rebut the testimony presented by Mr. Rocha.

Finally, it is undisputed that the *ex parte* communication related to the availability of documents identified during the course of the hearing and bore solely upon Votorantim's damage calculations and mitigation efforts.  See Exhibit "J", a copy of the relevant portion of the transcript at page 1464; See also Chairman Zambito's statement appended to the Panel's Final Award and submitted herein as Chalos Declaration Exhibit "E."  Oxbow's Motion to Vacate pending before the court does not concern the Panel's calculation of damages.  Rather, the instant motion impermissibly seeks to challenge the Panel's determination of liability.  Oxbow has failed to identify or articulate any prejudice occurring from the *ex parte* communication apart from its argument that it was "inherently prejudicial."

Accordingly, it is respectfully submitted that Oxbow was not deprived of a fair hearing; that the *ex parte* discussion did not influence the outcome of the arbitration; and that the discussion went to the heart of the merits challenged in this motion.

**IT IS JUST AND PROPER TO AWARD VOTORANTIM
THE ATTORNEY'S FEES AND COSTS IT INCURRED IN
DEFENDING AIMCOR'S BASELESS PETITION TO VACATE
THE ARBITRATION AWARD AND NOT THE PANEL'S FINAL AWARD**

Imposition of sanctions and/or attorneys fees is warranted when there is a groundless petition to vacate an arbitration award. Cuna Mutual Ins. V. Office & Prof. Employees Int'l Union, Local 39, 443 F.3d 556 (7th Cir. 2006). Such awards are warranted and serve a valuable purpose as they pose "[a] realistic threat [that] may discourage baseless litigation over arbitration awards and help fulfill the purposes of the pro-arbitration policy contained in the Federal Arbitration Act." B.L. Harbert Int'l, LLC v. Hercules Steele, Co., 441 F.3d 905 (11th Cir. 2006).

In B.L. Harbert Int'l, LLC v. Hercules Steele, the Court opined that "[t]his Court is exasperated by those who attempt to salvage arbitration losses through litigation that has no sound basis in the law applicable to arbitration awards. The warning this opinion provides is that in order to further the purposes of the FAA and to protect arbitration as a remedy we are ready, willing, and able to consider imposing sanctions in appropriate cases. While Harbert and its counsel did not have the benefit of this notice and warning, those who pursue similar litigation positions in the future will." Id. at 914.

The case before this Honorable Panel is exactly what the Harbert Court was referring to. Here, Oxbow lost the arbitration as respects liability issues and, thereafter, unsuccessfully sought to salvage that loss before this very Court. Then, Oxbow lost the arbitration as respects damages issues and astonishingly, now attempts to salvage that loss, too, before this very same Court.

Accordingly, it would be proper for this court to award Votorantim attorney's fees and all costs incurred in opposing Oxbow's baseless and unnecessary Motion to Vacate the arbitration decision, as the motion has no sound basis in the law.

## **CONCLUSION**

In conclusion, and based upon the foregoing, it is clear that Oxbow's Motion to partially Vacate the Final Arbitration Award should be denied in all respects. More specifically, Oxbow has not, and cannot show that the Panel acted in "manifest disregard of the law" in rendering its final decision. In fact, the theories of law which Oxbow cite as being disregarded by the Panel were not properly before them during the relevant (damages) portion of this arbitration. Rather, Oxbow is now attempting to raise substantive issues of liability, long past its deadline to do so.

Notwithstanding the foregoing, the Panel did have reason to award damages to both parties based upon the flexible contractual relationship set forth in the contract between the parties. Again, the ability to collect damages arose from the liability decision, and not the Final Award, which is currently being disputed. The Final Award was only dispositive as to the amount of damages awarded to each party.

As for the *ex parte* communication between Chairman Zambito and Mr. Rocha or Votorantim, Oxbow has not, and cannot show that such communication caused any prejudice against its case. Moreover, it is undisputed that the communication involved a discussion of document production regarding the damages portion of the case. However, Oxbow does not dispute any of the Panel's decisions regarding its calculation of damages.

Finally, Votorantim respectfully requests an award of attorney's fees and costs for its opposition to this unnecessary and unwarranted motion, as is within the court discretion.

Dated: Oyster Bay, New York
      June 27, 2008

Respectfully submitted,

s/George M. Chalos
CHALOS & CO, P.C.
123 South Street
Oyster Bay, NY 11771
Ph:    516-714 4300
Fax:   866-702-4577
Email: gmc@chaloslaw.com

To:    PAUL, HASTINGS, JANOFSKY & WALKER, LLP
      75 East 55th Street
      New York, New York 10022-3205
      Attn:  Daniel B. Goldman, Esq.
           Lawrence J. Conlan, Esq
      *Via Email & ECF*

      LAW OFFICES OF ANTHONY J. MARVONICOLAS
      75 Washington Place, Suite One
      New York, New York 10011
      Attn:  Anthony J. Mavronicolas, Esq
      *Via Email*