IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| VOTORANTIM CIMENTOS LTDA,<br><br>                  Petitioner,<br><br>    - against -<br><br>OXBOW CARBON AND MINERALS LLC,<br>SUCCESSOR IN INTEREST BY MERGER TO<br>APPLIED INDUSTRIAL MATERIALS<br>CORPORATION,<br><br>                  Respondent. | 08 CV 02232 (LBS)<br><br>SUPPLEMENTAL DECLARATION OF<br>DANIEL B. GOLDMAN IN SUPPORT<br>OF REPLY BRIEF IN SUPPORT OF<br>MOTION TO VACATE PARTIALLY<br>AND CONFIRM PARTIALLY FINAL<br>ARBITRATION AWARD |

        DANIEL B. GOLDMAN, an attorney duly admitted to practice law in the Courts of the State of New York and the United States District Court for the Southern District of New York, under penalty of perjury, hereby declares:

        1.    I am a Partner at the law firm of Paul, Hastings, Janofsky & Walker LLP, counsel to Oxbow Carbon and Minerals LLC, Successor in Interest by Merger to Applied Industrial Materials Corporation ("Oxbow"), respondent in this action.

        2.    I submit this declaration in support of Oxbow's Reply Brief in Support of Motion to Vacate Partially and Confirm Partially the Final Arbitration Award.

        3.    Annexed as Exhibit A is a true and correct copy of excerpts from the Transcript of hearing dated April 16, 2007.

Dated: New York, New York
       July 18, 2008

                                                          _____
                                                           Daniel B. Goldman (DG-4503)

## CERTIFICATE OF SERVICE

I hereby certify that on July 18, 2008, the foregoing Supplemental Declaration of Daniel B. Goldman in Support of the Reply Brief in Support of Motion to Vacate Partially and Confirm Partially the Final Arbitration Award was filed electronically and served upon the following counsel of record by UPS overnight mail in accordance with the Federal Rules of Civil Procedure and the Southern District of New York Local Civil Rules. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

George M. Chalos, Esq.
Chalos & Co., P.C.
123 South Street
Oyster Bay, New York 11771
*Attorneys for Petitioner*

PAUL, HASTINGS, JANOFSKY
& WALKER LLP

/s/ Lawrence J. Conlan
Lawrence J. Conlan (LC 2170)
75 East 55th Street
New York, New York 10022
(212) 318-6000

# EXHIBIT A

7/16/07 - Applied Industrial and Votorantim Cimentos Arbitration - HEARING #4

Mel Winter & Associates, Inc.

Page 887 to Page 1253

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY: MEL WINTER & ASSOCIATES, INC.

*MEL WINTER & ASSOCIATES, INC.*
*317 Madison Avenue, 21st Floor*
*New York, NY    10017*
*Phone:   212-925-1222*
*FAX:   212-687-8435*

7/16/07 - Applied Industrial Materials Corp. and Votorantim Cimentos Ltda. Arbitration
Hearing #4

Page 1220

Scott-Hansen - Cross (Chalos)

1 answer.
2
3  THE CHAIRMAN: That's your
4  interpretation of the contract. I
5  disagree with you what that says.
6  MR. MAVRONICOLAS: What is his
7  question?
8  THE CHAIRMAN: You can make your
9  argument in your brief.
10  Now the question is -- you asked
11  him, did you say something --
12  MR. MAVRONICOLAS: Can I read the
13  whole thing in? There is another part he
14  quoted. The question goes on and it --
15  he says -- "PREMCOR has a different
16  interpretation, do they not?
17  "I don't believe so. I think the
18  understanding was that if Votorantim
19  doesn't take this volume, then we will go
20  out and help PREMCOR try to find an
21  alternate buyer for that coke.
22  "The difference between what it was
23  sold for and what the contract called
24  for, is what we summarized on the damages
25  for nonperformance."

Page 1221

Scott-Hansen - Cross (Chalos)

1
2  That's what the full thing says.
3  THE CHAIRMAN: So it's all in the
4  record. Interpretation is another story.
5  Now, you want to know if Matthew
6  made a similar statement?
7  MR. CHALOS: Correct.
8  THE CHAIRMAN: In testimony?
9  MR. CHALOS: He knows that's the
10  situation, he testified to it.
11  THE WITNESS: Based upon reading
12  this transcript right now, it's difficult
13  for me to understand what Mr. Nestler's
14  position was.
15  THE CHAIRMAN: He is not asking you
16  that.
17  THE WITNESS: I can't answer
18  whether I testified to the same effect as
19  is being written here.
20  THE CHAIRMAN: What did you tell
21  panel?
22  MR. MAVRONICOLAS: He wants to ask
23  him from the transcript.
24  THE CHAIRMAN: Off the record.
25  (Discussion off the record)

Page 1222

Scott-Hansen - Cross (Chalos)

1
2  THE CHAIRMAN: Back on the record.
3  Q  Now, you told this panel that your
4  understanding of this contract, the AIMCOR-PREMCOR
5  contract, was that if AIMCOR didn't take any tons,
6  AIMCOR wasn't obligated to pay PREMCOR anything,
7  right?
8  A  I believe I testified to this panel
9  that we would have to pay to them the damages
10  which they suffered by selling the coke elsewhere.
11  THE CHAIRMAN: You're not answering
12  the question.
13  Read the question back. Listen
14  carefully and answer the question.
15  MR. MAVRONICOLAS: The question and
16  answer.
17  THE CHAIRMAN: I don't want the
18  answer back. I want the question read
19  back and I want a response to the
20  question.
21  (Record read)
22  THE CHAIRMAN: Yes or no?
23  MR. MAVRONICOLAS: If he can answer
24  yes or no.
25  THE WITNESS: I do not believe that

Page 1223

Scott-Hansen - Cross (Chalos)

1
2  is correct.
3  MR. RING: Can I ask a simple
4  question?
5  Your understanding, what damages,
6  if any, how would they be calculated if
7  AIMCOR did not lift PREMCOR petcoke?
8  MR. MAVRONICOLAS: Mr. Ring, I will
9  not allow the witness to answer. It was
10  a legal question.
11  THE CHAIRMAN: He is entitled to
12  ask him a question.
13  THE WITNESS: It's my understanding
14  that we would be held liable for the
15  damages resulting from PREMCOR --
16  resulting from that petcoke, which had
17  been destined for Votorantim, being sold
18  elsewhere and our company and PREMCOR
19  together endeavored to find the best
20  alternatives for those tons.
21  In the end, the sales which were
22  concluded for those tons, were not
23  concluded by AIMCOR, but were concluded
24  by PREMCOR because we worked in parallel
25  to find alternative outlets and that the

85 (Pages 1220 to 1223)